IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| KENT H. PAYNE, Individually and as the Administrator of the Estate of JORDAN KENT PAYNE, and LESLIE KING-PAYNE, Individually,<br><br>Plaintiffs,<br><br>vs.<br><br>JOHN WEAKLAND, JASON BARNES, and MADISON COUNTY, IOWA,<br><br>Defendants and Crossclaimants,<br><br>EYERLY-BALL COMMUNITY MENTAL HEALTH SERVICES, and SCOTT THOMAS,<br><br>Defendants and Crossclaim Defendants. | Case No. 4:21-cv-00349<br><br>DEFENDANTS and CROSSCLAIMANTS JOHN WEAKLAND, JASON BARNES, AND MADISON COUNTY, IOWA'S STATEMENT OF MATERIAL FACTS SUPPORTING THEIR MOTION FOR SUMMARY JUDGMENT |

COME NOW Defendants John Weakland, Jason Barnes, and Madison County, Iowa (the "Municipal Defendants"), and for their Statement of Material Facts Supporting their Motion for Summary Judgment, state to the Court as follows:

1.      On June 9, 2020, Jordan Kent Payne ("Payne") was arrested on a warrant issued for contempt of Court.  [DCI Report p. 2, MADISON APP 0069; Complaint, Municipal Defendants' Answer, ¶21.; Payne Contempt Order (Depo. Ex. 1), MADISON APP 0073]

2.      The contempt charge was related to Payne's conduct at a hearing on June 8, 2020, on an extension of a no-contact order entered previously against Payne on February 25, 2015, for the protection of Payne's ex-wife, Hayle (Crow) Elizabeth Payne.  [DCI Report p. 2, MADISON APP 0069; Payne Contempt Order (Depo. Ex. 1), MADISON APP 0073].

3.       The court found Payne in contempt of court during the hearing and sentenced him to 30 days in jail.  [DCI Report p. 2, MADISON APP 0069; Payne Contempt Order (Depo. Ex. 1), MADISON APP 0073].

4.        The court issued a mittimus warrant for Payne's arrest, ordering that he be held until the sentence is served.  *Id.*

5.       On June 9, Payne was arrested at his residence and transported to the Madison County Jail (the "Jail").   [DCI Report p. 2, MADISON APP 0069; Payne Arrest Report, MADISON APP 0074; Payne Booking Report (Depo. Ex. 4), MADISON APP 0078-81].

6.       While being booked into the Jail, Jail Administrator Steve Niblo asked Payne a series of intake questions, which are recorded in a booking report.  [DCI Report p. 2, MADISON APP 0069; Payne Booking Report (Depo. Ex. 4), MADISON APP 0078-81; Niblo Depo. Tr. 29:9–29:25, MADISON APP 0008; Booking Video, MADISON APP 0001].

7.       These Questions, and their responses, included the following:

| 12 | Mental illness | Y |
|----|----------------|---|
| 13 | Been hospitalized in the last 12 m | Y |
|    | . . . . | |
| 20 | Anxious/afraid/angry | N |
| 21 | Embarrassed/ashamed | N |
| 22 | Talking in a strange manner | N |
| 23 | Under the infl of alcohol | N |
| 24 | Under the infl of drugs | N |
| 25 | Scars/marks att suicide | N |
| 26 | Ever tried to hurt yourself | Y |
| 27 | Ever tried to kill yourself | Y |
| 28 | Thinking of hurting self now | N |
| 29 | Family mbr/friend attempt suici | Y |
| 30 | Any reason why not be jailed | Y |

[Payne Booking Report (Depo. Ex. 4), MADISON APP 0078-81; Booking Video, MADISON APP 0001].

8.     Payne was on medication at the time of his arrest and detention at the Jail.  [DCI Report p. 2, MADISON APP 0069; Payne Med. Prescriptions (Depo. Ex. 5), MADISON APP 0082-85; Leslie Payne Depo. Tr. 100:13–20, MADISON APP 0013].

9.     Payne was taking Buspirone and Vraylar while he was in jail.  [Payne Med Prescriptions (Depo. Ex. 5), MADISON APP 0082-85; Leslie Payne Depo. Tr. 100:13–20, MADISON APP 0013].

10.    Jail medication records show Payne was given his medication while detained at the jail. [DCI Report p. 2, MADISON APP 0069; Payne Medication Record, MADISON APP 0086] On June 9, 2020, at 4:02 p.m. and 9:16 p.m., Payne was given his Buspirone medication.  *Id*.  On June 10, 2020, Payne was given his Buspirone medication at 8:10 a.m., 12:50 p.m., and 6:10 p.m.  *Id*.  And then on June 12, Payne was given his Buspirone medication at 8:09 a.m., and again at 12:12 p.m.  Id.  On June 10th and 11th, 2020, at 6:10 and 6:18 pm, Payne was given his Vraylar medication at supper.  *Id*.

11.    An amenity that inmates are afforded at the Jail is a messaging system called "Chirp," which is a texting device—essentially a cell phone—that can be issued to the inmate which allows them to text people from the jail facility.  [DCI Report p. 3, MADISON APP 0070; Barnes Depo. Tr. 111:10–112:3, MADISON APP 0030; Chirping Device Agreement MADISON APP 0088-92].

12.     Each message costs $0.10 to send.  [DCI p. 3, MADISON APP 0070; Barnes Depo. Tr. 111:10–112:3, MADISON APP 0030; Chirping Device Agreement, MADISON APP 0088-92].

13.     Payne elected to have a Chirp device, which he used to text with his girlfriend, Christina McKinley ("McKinley") while he was at the jail.  [McKinley Depo. Tr. 36:19–37:13, App. MADISON APP 0035].

14.     During the three days Payne was at the Jail, Payne had a total of 430 messages to and from his Chirp device.  [DCI Report p. 3, MADISON APP 0070; Chirp Record (Depo. Ex. 2), MADISON APP 0093-130].

15.     Some of the messages indicate that Payne was struggling with his mental health, but he did not want to be forthcoming about that to the Jail staff; for example, on June 11, some of the messages read as follows:

Payne:          Somethings not rought[1] in my head and chest im hearing voices that wont stop wtf is wrong wyh me.  I love you.

McKinley:      Like what kind of voices and what are they saying have you had any meds since you've been there?  I love you baby.

Payne:          I need to talk to eve this am emergency I need to be back on serequel u don't want to know what I'm hearing, swallow that apple whole smash head off table.  Mom wont return my texts

McKinley:      Did you tell the jailer

              . . . .

Payne:          I aint sayn shit so they can strip me naked and chain me to a bed like last time.

[Chirp Record p. 25–26[2]; MADISON APP 0116-117].

16.     In another series of texts about 45 minutes later, Payne stated the following:

Payne:          Im going back to crying and smashing head off wall.  Ilove you.

McKinley:      Stop with the smashing your head… I need you as much as you need me don't forget that please

---

[1]Texts are reproduced as written and contain grammatical and spelling errors.
[2]Citations to the Chirp Record correspond to the pagination of the document not the viewer.

| | |
|---|---|
| Payne: | I cant help it it wont stop |

    . . . .

| | |
|---|---|
| Payne: | Smashing my head off the wall stops voices. |
| McKinley: | Stop it jordan please.  I need you. |

    . . . .

| | |
|---|---|
| Payne: | Somethings dead wrong with me m I canr explain it I just want to stop. |
| McKinley: | I'll talk to your mom in the morning about talking to eve about Seroquel |
| Payne: | Never have felt this before. |
| McKinley: | I text her earlier about it.  Its because you need your fucking meds. |
| Payne: | I'm on them.  But aint working at all |

[Chirp Record pp. 18–19, 22, MADISON APP 0109-110].

17.    Thereafter, the texts for the remainder of the evening are fairly lucid.  [Chirp Record pp. 11–18, MADISON APP 0102-110].

18.    Even the following morning, Payne's texts with McKinley begin normally and affectionately.  [Chirp Record p. 10, MADISON APP 0101].

19.    But then at 11:08:31 a.m., Pyane states, "So youre gonna be mad at me probably sad but I always loved u but im going to listen to the voices."  [Chirp Record p. 10, MADISON APP 0101].

20.    McKinley seemed alarmed and inquired as to what he meant.  [Chirp Record pp. 8–9, MADISON APP 0099-100].

21.    Payne replied, "I found a way out of my head."  [Chirp Record p. 8, MADISON APP 0099].

22.     McKinley asked if she needed to call the jail, to which Payne replied, "Please don't." [Chirp Record pp. 8–9, MADISON APP 0099-100].

23.     In some additional back and forth, Payne seemed to indicate that he was feeling better and that he just needed some sun.  [Chirp Record p. 8, MADISON APP 0099].

24.     But at 11:17:38, Payne stated, "Truth here my head is telling me to rip out my veins with my teeth."  [Chirp Record p. 7, MADISON APP 0098].

25.     Following this, McKinley asked Payne if he wanted her to tell Payne's mother or the cops "cause I'm not just gonna do nothing."  [Chirp Record p. 7, MADISON APP 0098].

26.     Payne stated, "Not cops," but also said, "Baby help me please," and "all these thoughts won't stop."  [Chirp Record pp. 6–7, App. MADISON APP 0097-98].

27.     McKinley replied, "I told you mom just now only other thing I can do is tell the cops which if this doesn't stop Jordan I have no choice your freaking me the hell out," and "I told your mom you seriously need a doctor she said ok."  [Chirp Record p. 6, MADISON APP 0097].

28.     Payne told McKinley, "I'll be better after busbar at noon," but then a few minutes later, stated, "Baby I'm scaring myself."  [Chirp Record p. 6, MADISON APP 0097].

29.     In the final text of the morning of June 12, 2020, at 11:34:54, McKinley stated, "If it doesnt get better I'm calling the cops up there I mean it."  [Chirp Record p. 6, MADISON APP 0097].

30.     At about 11:40 a.m., in response to McKinley's concern, Leslie Payne, Jordan Payne's mother, called the Jail and spoke with Linda Barker.  [Linda Barker Statement, MADISON APP 00131; Leslie Phone Call Audio, MADISON APP 0007].

31.     Leslie told Barker that McKinley had contacted her and said that Payne made comments about wanting to tear out or bite out his veins.  [Linda Barker Statement, MADISON APP 00131].

32.     Following this, Barker immediately went to the master control dispatch room and told

Angie Henry, the dispatch coordinator at the jail, what Leslie had said about Payne.  [Henry Depo.

Tr. 4:11–14, MADISON APP 0037; 42:23–43:20, MADISON APP 0044; Linda Barker Statement,

MADISON APP 0131; DCI Report p. 2, MADISON APP 0069].

33.     Jailer John Weakland entered the room shortly after this, and Barker informed him as

well.  [Linda Barker Statement, MADISON APP 0131; Angela Henry Statement, MADISON

APP 0132; Linda Jail Video 11:56:01 et seq., MADISON APP 0001].

34.     Although difficult to hear, pieces of this conversation can be heard in the jail video;

Barker can be see entering the dispatch area at 11:43:39, and then saying,

> Barker:     He's texting his girlfriend or whatever . . . however they're
> communicating, and said he's getting ready to chew out his veins. .
> . tear out his veins . . . So I'm reporting that to you.  He wants to
> tear them out or whatever, so whoever's monitoring his shit . .
> .[inaudible] . . . –ever the hell it is. . . .  [followed by something
> inaudible].
>
> Henry:     Well, I agree, but I don't want anything to happen to him on our
> watch.  Fuck that.  You know.

[Linda Jail Video, MADISON APP 0001].

35.     The audio after this part is difficult to hear, but certain phrases can be picked out, such

as ". . . exactly, exactly, so I'm just reporting it. . ." and then some references to ". . . the girlfriend. .

.," ". . . I assume he's chirping. . .," ". . . can monitor all that . . .," ". . . make sure he's not [inaudible],"

and "Right."  [Linda Jail Video 11:44:55, MADISON APP 0001].

36.     Following this, there is some only-partially-audible discussion about someone named

Nathan and some apparently unrelated incidents.  *Id*.  Then at 11:45:52 am, Barker said, "Alright,

well, I did my part.  Tell John-boy to watch him.  I don't know who monitors Chirpers."  [Linda Jail

Video, MADISON APP 0001].  Then more unrelated discussion ensued.  *Id*.

37.    Shortly thereafter, at 11:56:01, Weakland, who was returning with lunches, entered the dispatch area, and Barker asked, "John, can you monitor the Chirps?"  [Linda Jail Video 11:56:01 et seq., MADISON APP 0001; Linda Barker Statement (Depo. Ex. 3), MADISON APP 0131].

38.    Then the following exchange occurs:

Weakland:    "Can I monitor the Chirps?"

Barker:    "Yeah."

Mixed:    "Chirping . . .", ". . .the texts . . ."

Weakland:    "Um . . . I think so. . ."

Barker:    "You might want to check . . . Payne . .  Jordan . . . Jordan's girlfriend [inaudible] eating out or tearing out all his veins or something."

Henry:    "He's not happy about [inaudible]."

Barker:    "So just check on him to make sure.  I don't want anything to happen on our watch."

Weakland:    "He's saying . . . saying what, now?"

Barker:    "That he's going to tear out his veins, or something.  It looks like he's sleeping now, but I'm just saying.  You know . . .

Henry:    [Inaudible]

Barker:    "Yes, so. . ."

Weakland:    "He wanted to speak, uh, um, I set up, hopefully, Scott is stopping out today. [inaudible] talk to Scott.  He was talking about these, uh, having some weird visions and shit."

39.    Because Leslie wanted an update on Payne's status, Barker responded to Leslie by text, advising her that Payne was sleeping on the bunk and lunch had just arrived.  [Linda Barker Statement, MADISON APP 0131; DCI Report p. 2, MADISON APP 0069].

40.    As can be heard in the video, Barker was able to see Payne from where she was in the dispatch room while relaying the information to Henry and Weakland, commenting, "It looks like he's sleeping now . . . ." [Linda Jail Video 11:56:01, MADISON APP 0001].

41.     Video from Payne's cell confirms that he was indeed laying in bed during the time Barker, Henry, and Weakland were speaking in the dispatch control room.  [Max Cell Video 11:43:00–12:00:00, MADISON APP 0003].

42.     At deposition, Henry explained that from the dispatcher's location in the dispatch control room, a person could see into the max cell where Payne was located from a standing position. [Henry Depo. Tr. 9:16–12:3, MADISON APP 0038-39].

43.     However, the dispatcher would not be able to see into the max cell while seated, because the view would be blocked by 6 monitors at the dispatcher's work station.  [Henry Depo. Tr. 9:16–11:18, MADISON APP 0038-39].

44.     Thereafter, at 12:21:34, Weakland arrived at Payne's cell and give Payne some medication.  [Max Cell Video, MADISON APP 0003].  Weakland asked him if he's OK, and Payne said he needs to "talk to that doctor pretty bad." *Id*.  After Weakland said something inaudible, Payne replied, I just need my Seroquel."   *Id*.  Payne said, "I'm just losing it in here a little bit" and then Payne and Weakland conversed a bit about his medications, after which Payne stated, "I'm doing alright, I just, my head, its not right," and then "this'll make it better," and then he took a pill.  *Id*. Payne then asked something inaudible, and then Weakland said, "Yeah, I'll call him," presumably in reference to Thomas at Eyerly Ball.[3]  *Id*.

45.     Consistent with the video, Barnes testified it was his understanding that after Payne's mother called into the jail, Weakland checked on Payne, asked if he was OK, asked if he needed help

---

[3]This appears to be *in addition to* an already planned visit from Thomas at the jail.  In Payne's cell video, at 10:23:00 Weakland stopped at Payne's cell, and Payne got out of bed and asked about a call "to Eyerly Ball—mental health?"  Weakland replied, "Yeah, he should be in here today," to which Payne politely replied, "thank you" while appearing to retrieve the Chirp device through the cell door.

or anything, and then it was at this point that Eyerly Ball was contacted to come meet with Payne. [Barnes Depo. Tr. 102:2–20 MADISON APP 0029].

46.     From approximately 1:31 to 1:53 pm on June 12, 2020, Payne met with Scott Thomas ("Thomas") from Eyerly Ball, just a little over an hour after Weakland's last interaction with Payne at his cell.  [DCI Report p. 2, 4, MADISON APP 0069, 71; Thomas Incident Report, MADISON APP 0133-135; Thomas Progress Note, MADISON APP 0136-137; Thomas Interview Video, MADISON APP 0004].

47.     Scott Thomas was the Jail Division Case Manager with Unity Point Health Eyerly Ball OMHS.  [DCI Report p. 2, MADISON APP 0069].

48.     Thomas described his job responsibilities in this role as screening individuals for possible mental health concerns and discussing options for services and referring individuals to such services.  [Thomas Depo. Tr. 28:1–23, MADISON APP 0049; Unity Point Job Description (Depo. Ex. 6), MADISON APP 00138-143].[4]

49.     Thomas testified that he would pay attention and look out for self-harm or suicide concerns in individuals.  [Thomas Depo. Tr. 10–13, MADISON APP 0048].

50.     But Thomas also testified that he does not conduct mental health assessments and evaluations, and he is not qualified to provide or administer a suicide risk assessment.  [Thomas Depo. Tr. 53:5–18, MADISON APP 0052].

51.     On June 11, 2020, Thomas recalled receiving an email stating that Payne wanted to meet with him the next time he was at the jail.  [Thomas Depo. Tr. 59:18–25, MADISON APP 0053].

---

[4]Thomas denied certain job duties on his job description were accurate: he testified his job did not include conducing precommitment screenings, responding to calls from law enforcement personnel related to mental health issues, and assisting in the development of client crisis plans. [Thomas Depo. Tr. 32:5–34:11, MADISON APP 0050-51; Unity Point Job Description, MADISON APP 00138-143].

52.     Thomas remembered being called by one of the jailers from the Madison County Sheriff's Department in regard to Payne also, but he didn't specify precisely when.  [Thomas Depo. Tr. 34:1–11, MADISON APP 0051].

53.     Thomas recalled that Weakland told him Payne wanted to talk to him about his medications.  [Thomas Depo. Tr. 58:1–10, MADISON APP 0053].

54.     Thomas came to the jail on June 12 and met with Payne in the jail's "Multipurpose Room."  [Thomas Depo. Tr. 60:1–13, MADISON APP 0053].

55.     Broadly, the meeting consisted of discussion related to Payne's medications, his current mental health symptoms, his history of services, and his current life and legal circumstances. [Thomas Incident Report, MADISON APP 00133-135; Thomas Progress Note, MADISON APP 00136-137].

56.     The Chirp records show that immediately prior to the Thomas interview beginning, at 1:29:49, McKinley sent the following text to Payne:

McKinley:   To be honest the papers down stairs on the table your mom I was going to take it until I found out for a fact that you cheated on me 4 freaking weeks ago.  Ive known since I got home yesterday I just haven't said anything cause you've been freaking out.  I don't know why you did this to me Ive been nothing but good to you for the last 6 months. you say I'm the best thing that's ever happened to you yet you still cheated on me with some ugly ass tatted dude.

[Chirp Record pp. 5–6, MADISON APP 0096-97].

57.     Payne apparently saw this message just before leaving for his appointment with Thomas, because at 1:30:28, he replied "What r u talkn bout."  [Chirp Record p. 5, MADISON APP 0096].

58.     Video from his cell shows Payne reacting to McKinley's message; while laying on his bed, he is looking down at his Chirping device, which is laying face up on the floor, and at 1:30:10,

11

he suddenly grabs the device, springs up in bed, and exclaims, "What!"  [Max Cell Video, starting 1:29:49, MADISON APP 0003].

59.     Appearing agitated by the message, the video shows him stand up and start typing on the device, and he audibly says, "What are you talking about?"  [Max Cell Video, starting 1:30:10, MADISON APP 0003].

60.     He then sat down on his bed and said something inaudible.  [Max Cell Video, starting 1:30:34, MADISON APP 0003].

61.     Just then, at 1:30:40, Jailer Weakland entered Payne's cell and informed him that Scott with Eyerly Ball was there to see him.  [Max Cell Video, starting 1:30:40, MADISON APP 0003].

62.     At 1:31:21, Weakland escorted Payne from his cell to meet with Thomas in the Jail's "multipurpose" room.  [Weakland Depo. Tr. 26:22–27:3, MADISON APP 0062; Thomas Interview Video, 1:31:21, MADISON APP 0004].

63.     Weakland understood Thomas's role to be evaluating Payne for his mental health and determine what needs he may have.  [Weakland Depo. Tr. 27:15–20, MADISON APP 0062].

64.     Payne seemed agitated to begin with, but he calmed down during the course of the meeting.  [Thomas Incident Report, MADISON APP 0133-135; Thomas Progress Note, MADISON APP 0136-137; Thomas Interview Video, MADISON APP 0004].

65.     Payne indicated that he was taking a new medication and did not believe it was effective in helping manage his mental health symptoms.  [Thomas Incident Report, MADISON APP 0133-135; Thomas Progress Note, MADISON APP 0136-137].

66.     Payne expressed the desire to go back on Seroquel, which he felt was more effective. [Thomas Incident Report, MADISON APP 0133-135; Thomas Progress Note, MADISON APP 0136-137].

67.     Payne denied previous psychosis, but he indicated that he had a thought of "eating his vein." [Thomas Incident Report, MADISON APP 0133-135; Thomas Progress Note, MADISON APP 0136-137].

68.     During the meeting, Payne told Thomas that he attempted suicide seven times in past last year and that he lost his kids and he lost everything; he immediately followed this by stating, "I'm not going to kill myself here," but "I can't guarantee I won't kill myself when I leave here." [Video, Thomas Interview 1:40:26, MADISON APP 0004].

69.     He went on to say that he didn't want to go on suicide watch, and he reiterated he wasn't going to kill himself. [Video, Thomas Interview 1:40:55, MADISON APP 0004].

70.     And a bit later, he reiterated again, "I don't want to kill myself in general!" [Video, Thomas Interview 1:40:05, MADISON APP 0004].

71.     A few minutes later, Payne explained, "I can calm myself down, I just can't keep it down." [Video, Thomas Interview 1:43:55, MADISON APP 0004].

72.     In his report, Thomas noted that Payne was not optimistic about life after his release, but that he stated directly that he would not hurt himself while in custody. [Thomas Incident Report, MADISON APP 0133-135; Thomas Progress Note, MADISON APP 0136-137].

73.     During the course of the interview, Payne made a number of statements about his mental health or how he was feeling. He said he's "not doing so well" and that he had lost everything. [Thomas Interview Video 1:32:40, MADISON APP 0004].

74.     He mentioned giving himself a black eye, "hearing these fucking things in my head, all sorts of stupid shit I'm not trying to listen to," and he said he's not in good shape right now, mentioning that his girlfriend thought he was cheating on her. [Thomas Interview Video 1:33:25, MADISON APP 0004].

75.     He talked about getting thoughts in his head, and the only person he had to talk to was his girlfriend, but he expressed concern that she would call the jail and have them put him on suicide watch.  [Thomas Interview Video 1:36:30, MADISON APP 0004]

76.     He then referenced the thoughts in his head, saying "chew my veins out, shit like that . . . I don't want these thoughts in my head."  [Thomas Interview Video 1:36:44, MADISON APP 0004].

77.     At about 1:40:08, Payne asks if everything he was saying was confidential, and then asked Thomas to promise that he wouldn't say anything, to which Thomas agreed, but explaining that if he was subpoenaed he may have to say something, and the two exchanged a fist-bump.  *Id.*

78.     It is at this point that Payne stated that he'd had 7 suicide attempts in the past year, but then, as noted above, assured he wouldn't kill himself while in custody.  *Id.*

79.     He also said he couldn't sleep, that he had got nothing left, and that he was "not like this normally," but he also indicated that he didn't want to go on suicide watch.  [Thomas Interview Video, 1:40:40, MADISON APP 0004].

80.     He also stated, "After I slit my wrists they brought me here, instead of take me to the hospital.  They chained me to the bed.  I had bloody wrists."  [Thomas Interview Video 1:42:22, MADISON APP 0004].

81.     In his report, Thomas indicated that he and Payne discussed having time to sort things out and for Payne to see a psychiatrist to review his medications.  [Thomas Incident Report, MADISON APP 0133-135; Thomas Progress Note, MADISON APP 0136-137].  Payne agreed to his.  *Id.*  Thomas then indicated that he would schedule the first available appointment, which could even be yet that day.  *Id.*  Thomas asked if there was anything else he could do for Payne, and Payne indicated there was not."  *Id.*

82.     Thomas promptly scheduled a telemedicine appointment with a psychiatrist at Eyerly Ball which was to take place a mere 1.5 hours later at 3:30 p.m.  [DCI Report, p. 3, MADISON APP 0070; Thomas Email (Depo. Ex. 31), MADISON APP 0144].

83.     After the interview, Thomas informed the Jail about the conversation he had with Payne concerning his medications, specifically that he was looking to have him set up for an Integrated Telehealth Partners ("ITP") appointment to see a psychiatrist, and he checked with Weekland concerning his availability to coordinate this appointment.[5]  [Thomas Depo. Tr. 72:7–73:1, MADISON APP 0055; Weekland Depo. Tr. 27:21–28:6, MADISON APP 0062].

84.     Thomas also specifically informed Weekland that Payne told him on more than one occasion that he was not going to hurt himself in custody, but that he was not sure what would happen when he left.  [Thomas Depo. Tr. 73:2–5, MADISON APP 0055].

85.     Thomas emailed the Jail at 2:19 informing them he had scheduled the ITP for Payne at 3:30 that day.  [Thomas Email (Depo. Ex. 31), MADISON APP 0144].

86.     Thomas also called the Jail and left a message that he had scheduled the appointment with the psychiatrist at 3:30 pm.  [Thomas, Scott Call Audio, MADISON APP 0007].

87.     Weekland recalled from that conversation that "there was no concern that Jordan was going to hurt himself."  [Weekland Depo. Tr. 27:21–28:6, MADISON APP 0062].  Weekland explained:

> Q.     You don't recall at all Scott Thomas ever suggesting that a closer eye be kept on Jordan Payne?

---

[5]Thomas explained in deposition that Integrated Telehealth Partners is a company that provides the psychiatric appointments.  [Thomas Depo. Tr. 78:24–79:1, MADISON APP 0057]. He further testified the appointment was scheduled with a Dr. Kovilparambil Xavier Antony who was rumored to be from Florida.  [Thomas Depo. Tr. 79:2–22, MADISON APP 0057].

A.    No, I do not remember.  No.  I'm sorry.  I take that back.  I do not remember the specifics of the conversation, but I do remember that after we spoke that there was not any concern.  I did not feel any extra concern for Jordan Payne.

[Weakland Depo. Tr. 34:16–23, MADISON APP 0064].

88.    Weakland did not recall Thomas ever telling him that during the interview Payne said he had nothing left in life, that Payne reported difficulty sleeping, that Payne was hearing voices, that Payne reported wanting to chew his veins out, or that Payne had a history of suicide.  [Weakland Depo. Tr. 32:12–33:3, MADISON APP 0063].

89.    And Thomas never suggested to Weakland to increase the level of supervision of Payne.  [Weakland Depo. Tr. 27:21–28:6, MADISON APP 0062].

90.    Likewise, nobody ever asked Henry for assistance in providing additional supervision of Payne.  [Henry Depo. Tr. 48:24–49:2, MADISON APP 0045].

91.    Thomas admitted he did not relay to Weakland the concerning statements Payne had made during the interview:

A.  I'm just relaying information that Jordan gave to me, which was specifically that he wasn't going to harm himself.

Q.  (By Mr. Rehkemper) Did you relay that he told you that he had attempted suicide seven times prior that year?  Did you tell jail staff that?

A.  I did not.

Q.  Did you tell jail staff that he had a history of depression?

A.  I did not.

Q.  Did you tell jail staff that he had a history of severe mental illness?

A.  I did not.

Q.  Did you tell jail staff that he had a current injury that was causing him pain?

A.  No.

Q  Did you tell jail staff that Jordan Payne communicated hearing voices?

A.  No.

Q.  Did you tell jail staff that Jordan Payne specifically told you he thought about eating his veins?

A.  I don't recall whether I did or not.

Q.  Do you recall telling jail staff that Jordan reported having difficulties sleeping?

A.  I did not.

Q.  Did you recall telling jail staff that Jordan Payne had a history of substance abuse?

A.  No.

Q  Or that he communicated a sense of hopelessness or concern that he had nothing left when he left?

A.  No.

Q.  Did you make jail staff aware that Jordan Payne told you that he was having relationship problems or had a difficult relationship with his girlfriend?

A.  No.

[Thomas Depo. Tr. 77:7–78:19, MADISON APP 0056-57].

92.     In addition to his promise to Payne during the interview to keep these statements secret, Thomas stated in deposition that he believed it to be protected health information.  [Thomas Depo. 68:9–13, MADISON APP 0054].

93.     He stated disclosing the information would require a release, but agreed there are exceptions to the disclosure protections, and he could disclose it if he felt Payne was a danger to himself or others.  [Thomas Depo. 68:14–23, MADISON APP 0054].

94.     Thomas also did obtain a signed release from Payne that permitted disclosures to law enforcement agencies.  [Thomas Depo. Tr. 69:4–70:20, MADISON APP 0054-55; Payne Release, App. __].  He nevertheless did not disclose the information to the jail.  *Id.*

95.     Following the interview, Jailer John Weakland escorted Payne back to his cell.  [Max Cell Video 1:54:14, MADISON APP 0003; Weakland Depo. Tr. 28:7–9, MADISON APP 0062.

96.     Henry saw Payne with Weakland in the booking area on his way back to his cell.  [Henry Depo. Tr. 47:15–48:23, MADISON APP 0045; Angela Henry Statement, MADISON APP 0132].

97.     She described Payne as having a casual conversation with Weakland while in transit.  [Henry Depo. Tr. 47:15–48:23, MADISON APP 0045; Angela Henry Statement, MADISON APP 0132].

98.     At 1:54:14, Payne began to enter his cell.  [Max Cell Video, MADISON APP 0003].  Payne and Weakland were talking, and upon entry into the cell, Payne pointed at the wall phone and said, "Can I use this phone?  This phone doesn't work."  *Id.*  Weakland asks, "It doesn't work?"  *Id.*  And Payne explained it did not and that he can't use his phone cards.  *Id.*  He followed this up by saying, "And now my girlfriend thinks I'm cheating on her."  *Id.*  Apparently unaware that Payne may have been talking about the text he received just before the Thomas Interview, Weakland replied, "While you're in jail?"  *Id.*  Payne sighed, turned, and took a couple steps into the cell.  *Id.*  Weakland then said, "Um, yeah, let me, uh, let me get things finished, and I'll come check out that phone."  *Id.*  Payne replied with a thumbs up, and then walked into his cell and picked up his Chirping device.  *Id.*  Weakland then left Payne's cell at 1:54:34.  *Id.*

99.     It was at this point that Payne discovered a string of 20 texts from McKinley, continuing from the initial accusation he saw before the Thomas interview, further shaming him for

the alleged infidelity.   [Chirp Record pp. 2–6, MADISON 0093-97; Max Cell Video 1:54:38,

MADISON APP 0003].

100.    In the cell video, Payne can be observed reacting to these text messages.  After picking

up the device at 1:54:38 and reviewing the messages, Payne started becoming visibly and audibly

upset. [Max Cell Video 1:55:02, MADISON APP 0003].  These are the messages Payne was looking

at:

- So no when you were acting so funny about the ecstasy meth I know why cause you cheated on me

- I'm taking about may 2nd

- The sherades up jordan stop lieing

- I didn't deserve this

- I made myself physically sick since I found out

- I didn't even work today… I couldnt

- I played in bed crying all morning

- Layed

- Why…. I didn't deserve this.  And now I do think you cheated the other day. You did a month ago why wouldn't you do it last time…. You acted weird that day too. My instincts never stray me idk why I believed you I'm a fool . I love you so much.  You did this to a woman that loved you more then anyone ever could.

- Why Jordan.  I deserve that much.

- We wernt even fighting I went back and looked at our pics from then and fb…. We had a great day you cheated on me when I had my fucking kids.  That was so low.

- A fucking year together and I dont even get why… or an apology.  That's because your not sorry.  You've been doing it to me this whole fucking time I'm a fucking fool…. fuck me man

- But I'm the best thing that's ever happened to you… wow you do that to the best thing that's ever happened to you.  I'm heartbroken Jordan you can't begin to imagine

- I'm glad I found out before we moved in together wtf. Why. Why would you lead me the fuck on like you actually loved me.  You don't fucking do that to someone you love.  That's not love.  I introduced you to my fucking kids like a fool wtf was I thinking omg.  I hope he was worth it jordan I hope all of them were worth it.

- You don't love me you were fucking using me[6]

[Chirp Messages pp. 3–5, MADISON APP 0094-96].

101.    Given McKinley awareness of Payne's mental health problem and expressed fear about what he might do to himself in the jail, the timing of this could not have been worse; especially in view of the conversation that had just happened the day before: on June 11, at 15:08:16, McKinley told him, "I love you too.  I'm here for you.  I'm on your side don't ever forget that."  [Chirp Record p. 24, MADISON APP 0115].  And Payne replied, "Thats whats leeping me alive."  [Chirp Record p. 23–24, App. MADISON APP 0114-115].

102.    While observing the 20 messages, Payne went from sitting on his bed, to pacing a bit in his cell, and then said out loud, "I'm not fucking lying.  I'm not lying to you," and then said something inaudible.  [Jail Check Video 1:56:14, MADISON APP 0005].  He can be seen typing on the device, and then he sat back down on his bed.  *Id.*

103.    During this timeframe, the first outgoing message Payne sent was at 1:55:41 and read, "baby please believe me im begging you."  [Chirp Record p. 3, MADISON APP 0094].  And then this exchange followed:

Payne:          I love you this is all false info (1:56:04 pm)

---

[6]Some of texts were split into more than one message, and these have been combined as reproduced.  But the substance of all 20 messages is included here.

| McKinley: | STOP FUCKING LYING (1:56:07 pm) |
|---|---|
| Payne: | Baby im not (1:57:17) |
| McKinley: | Man up STOP FUCKING LIEIN (1:57:23) |

*Id.*

Then at 1:57:58, McKinley said, "I saw the mf video you lien ass….. god you cant even own up and apologize fuck you fuck you man fuck you." *Id*.

104.     At 1:58:05, Payne quickly stood up from his bed, paced the floor, and then plopped back down on his bed, letting out a gasp and saying something inaudible.  [Jail Check Video, MADISON APP 0005].

105.     The Chrip record showed that at 1:58:32, Payne replied, "Ok," and then "Fine" a few seconds later.  [Chirp Record p. 3, MADISON APP 0094].

The final string of messages back and forth between Payne and McKinley were these:

| McKinley: | Its time stamped. . . . I'm far from stupid jordan stop playing me mf (1:58:40) |
|---|---|
| McKinley: | Fuck I hate you you broke my fucking heart it made.me physically sick jordan I didn't deserve this wtf (1:59:16) |
| Payne: | I didn't use u (1:59:17) |
| Payne: | I love you (1:59:29) |
| McKinley: | That's not fucking love why jordan fuck did I not do enough not love you enough why… I dont get why I'm not enough ever wtf (2:00:16) |

[Chirp Record p. 2, MADISON APP 0093].

106.     This message from McKinley was the final message to be delivered; Payne attempted to send another outgoing message at 2:00:16, but the chirp records show he was out of funds, and his message was unable to be delivered.  [Chirp Record p. 2, MADISON APP 0093].

107.    While this final exchange was happening, the cell video shows that at 1:59:36, Payne abruptly got out of his bed, walked across the cell, and audibly exclaimed, "Shit!" [Jail Check Video, MADISON APP 0005]. He then went back, sat on his bed, muttered something inaudible, and looked at his Chirping device. *Id.* Then at 2:00:34, he tossed the device on the ground and collapsed onto his bed in a fetal position. *Id.*

108.    After barely one minute, at 2:01:37, Payne sat up in his bed and began tying a white sheet into a noose. *Id.* At 2:02:04, Payne stood up, walked over to the interior door of his room, and attempted to fix the noose in the door frame by closing the door on the opposite end of the sheet.[7] *Id.* At 2:02:20, Payne began attempting to lift himself up to put his head in the noose, but ultimately his attempts failed. *Id.* He then took the noose down and returned to his bed for a few second. *Id.*

109.    At 2:03:09, Payne stood up from his bed, put on his slippers, and went into the shower with the noose. *Id.* The view of what transpired from here is blocked by the shower door. *Id.* The bottom foot or so of the door has a translucent curtain or flap, but not a lot can be observed. *Id.*

110.    At 2:03:57, Payne opened the shower door, and after a few seconds, closed it somewhat abruptly. *Id.* Some movement can be seen at the bottom of the shower door, and at 2:04:36, there was a thump, and the bottom flap of the shower door moved a bit. *Id.*

111.    At 2:04:42, Payne began gagging and gasping, and this lasted for about 5 seconds. *Id.*

112.    After this, nothing can be observed or heard until 2:05:21. *Id.* At this point, some more movement can be seen at the bottom of the shower, and this is followed by another thump at

---

[7]As can be seen in the video, the cell is divided into two compartment, separated by a door and partial wall. The door dividing the two compartments of the cell is not the cell door that leads to the hallway of the jail.

2:05:25, and then more gasping and choking sounds, which end at about 2:05:32. *Id.* The cell remains quiet after this. *Id.*

113.    At 2:14:41, Weakland entered the area where the cell adjacent to Payne's was, and he spoke to the inmates in that cell, but he did not go past Payne's cell. [Jail Check Video, MADISON APP 0005].

114.    At 2:26:50, the inmates in the cell adjacent to Payne's came out of their cell and walked through the door that leads them past Payne's cell, but they apparently did not see or say anything regarding Payne. *Id.*

115.    At 2:27:41, Weakland entered the cell adjacent to Payne's cell, did some cleaning while the inmates were out, and then exited the cell and left the area through the door leading away from Payne's cell at 2:29:06. *Id.*

116.    According to jail records, at 2:46:18, approximately 52 minutes after last speaking to Payne, Weakland conducted a cell check at Payne's cell. [Cell Check Record, MADISON APP 0146]. At this point, Weakland observed that Payne was in the shower. [Weakland Witness Statement, MADISON APP 0153-154; Weakland Depo. Tr. 54:14–23, MADISON APP 0067].

117.    Weakland explained that when he observed inmates in the shower or on the toilet while doing cell checks, he would afford them their privacy. [Weakland Depo. Tr. 29:25–30:9, MADISON APP 0062].

118.    The jail video shows Weakland coming through the door into the adjacent area after checking Payne's cell at 2:46:30. [Jail Check Video, MADISON APP 0005].

119.    In the moments leading up to Weakland discovering Payne's suicide, Weakland explained in his statement that he was doing a commissary request for the dorm cell, and when he

walked past the max cell where Payne was, he saw him still in the shower.  [Weakland Witness Statement, MADISON APP 0153-154; Weakland Depo. Tr. 54:14–23 MADISON APP 0067].

120.    Knowing that he saw Payne in the shower when he did his previous cell check, Weakland went back to Payne's cell to check on him.  *Id.*

121.    At 3:16:36, Weakland went to Payne's cell and called in there, asking, "Jordan, you ok? Jordan." [Jail Check Video, MADISON APP 0005; Max Cell Video, MADISON APP 0003].

122.    Not hearing any response, Weakland left the area briefly, and promptly returned. *Id.*

123.    At 3:17:24, he entered Payne's cell and said his name a couple times on his way toward the shower.  *Id.*  At 3:17:31, he opened the shower door, and Weakland's tone changed as he exclaimed, "Jordan!"  *Id.*

124.    Weakland went in the shower and tried to lift Payne, but he was unable to, so he hurried out of the cell and went to the dispatch area where he retrieved a pair of scissors and told Henry to call for help.  [Weakland Witness Statement, MADISON APP 0153-154].

125.    At deposition, Weakland described what he observed and his reaction.  Weakland recalled Payne had a sheet around his neck, and Weakland attempted to cut the sheet off. [Weakland Depo. Tr. 39:21–40:2, MADISON APP 0065].

126.    Upon first discovering Payne hanging in the shower, Weakland explained that he left Payne's cell and went to dispatch to get scissors, and told Angela at Dispatch to call for help. [Weakland Depo. Tr. 40:6–12, MADISON APP 0065].  Weakland did not have a radio on his person in the jail.  [Weakland Depo. Tr. 40:13–25, MADISON APP 0065].  He also did not carry sharp objects on him in jail, so he had to return to dispatch in order to get scissors to cut the sheet. [Weakland Depo. Tr. 41:1–14, MADISON APP 0065].

127.    Henry was in the master control, dispatch room when Weakland entered, asked for help, and grabbed some scissors.  [Henry Depo. Tr. 49:3–51:8, MADISON APP 0045-46].

128.    She described Weakland's demeanor as being alerted.  *Id.*  Henry explained that Weakland asked for the scissors and requested that she summon help, but he did not explain specifically why.  *Id.*

129.    Henry dispatched the deputies who were working, and they entered the cell and assisted.  *Id.*  After this, Henry dispatched an ambulance.  [Henry Depo. Tr. 51:9–17, MADISON APP 0046].

130.    Weakland reentered Payne's cell at 3:18:11 and was able to cut the sheet and get Payne down.  [Jail Check Video, MADISON APP 0005; Max Cell Video, MADISON APP 0003; Weakland Depo. Tr. 41:10–19, MADISON APP 0065].

131.    Several Deputies and Winterset Police arrive at Payne's cell very quickly, entering the cell at 3:18:45.  *Id.*; [Weakland Depo. Tr. 41:10–19, MADISON APP 0065; Deputy Don Kinney Incident Report (Depo. Ex. 24), MADISON APP 0155-157; Deputy Little Statement (Depo. Ex. 25), MADISON APP 0158].

132.    The call for service for the emergency personnel was received at 3:19:51.  [Call for Service Record, MADISON APP 0158-159].  They got him out of the shower, laid him on the floor, and began attempting life-saving measures at 3:19:06.  *Id.*

133.    While the officers are continuing to administer CPR to Payne, at 3:21:40, Weakland said, "I thought he was in the shower."  *Id.*  The resuscitation attempts continued even as the officers, deputies, and EMTs start wheeling Payne away at 3:28:28.  *Id.*

134.    At about 3:30, the ambulance transported Payne to the Madison County Hospital. [Deputy Don Kinney Incident Report (Depo. Ex. 24), MADISON APP 0155-157]. Unfortunately,

attempts to revive Payne never succeeded.  Payne's cause of death was determined to be suicide by hanging.  [Autopsy Report, MADISON APP 0161-171].

135.    Sheriff Barnes was notified of Payne's suicide by a call from dispatcher Angela Henry.  [Barnes Depo. Tr. 115:7–23,  MADISON APP 0031].  Barnes had been home for the day and was not at the jail when the suicide happened.  *Id.*

136.    Barnes responded immediately, and when he arrived, he observed officers doing CPR on Payne.  *Id.*

137.    Barnes quickly contacted the Division of Criminal Investigation to conduct an independent investigation of the incident.  [Barnes Depo. Tr. 116:2–19, MADISON APP 0031].

138.    Disability Rights Iowa was also conducted an investigation. [Barnes Depo. Tr. 116:22–117:13, MADISON APP 0031].

139.    Barnes believed Weakland did the best he could have done with what he knew at the time.  [Barnes Depo. Tr. 117:18–21, MADISON APP 0031].

140.    Upon concluding its investigation, DCI issued a report.  [DCI Report, MADISON APP 0068-72].  The DCI Report does not assign any blame to Barnes or Weakland for Payne's suicide.  *Id.*

141.    Payne had some history with attempted suicide, including an involuntary commitment.  Only two occasions, however, would have involved Jail staff in any way.  First, on April 20, 2015, Payne was arrested for violating a no-contact order and booked into the Madison County Jail.  [2015 Arrest Report, MADISON APP 0172].  While at the Jail, Payne wrapped a phone cord around his neck and leaned back in an apparent suicide attempt; however, Niblo, who recalled the incident, believed this was an attempt for attention.  [Niblo Depo. Tr. 55:14–56:8, MADISON APP 0010; Leslie Payne Depo. Tr. 70:18–72:20, MADISON APP 0012; Med. Record

– 2015 Suicide Attempt p. 1, MADISON APP 0173; 2015 Physician Documentation, MADISON APP 0182-185].  Payne did this in the presence and view of a jailor, who told him to stop.  [Med. Record – 2015 Suicide Attempt p. 1, MADISON APP 0173].  Payne then unwrapped the cord from around his neck.  [Med. Record – 2015 Suicide Attempt p. 1, MADISON APP 0173].

142.   A deputy then took Payne to the hospital for evaluation after the phone cord incident.  [Niblo Depo. Tr. 55:14–56:8, MADISON APP 0010; Leslie Payne Depo. Tr. 70:18–72:20, MADISON APP 0012].  Payne had some abrasions on his neck, and after about a day, the hospital transferred him back to the jail.  [Leslie Payne Depo. Tr. 70:18–72:20, MADISON APP 0012].

143.   In 2016, after a domestic assault on his mother Leslie, Payne made her watch him write a suicide note, and then he slit his wrists with a paring knife.  [2016 Incident Report p. 3, MADISON APP 0188; Leslie Payne Depo. Tr. 72:21–73:25, MADISON APP 0012].  However, the resulting injury produced only superficial bleeding.  *Id.*

144.   Payne was arrested for the assault, and while being transported to the Madison County Jail, Payne told the officers he wanted to go to the hospital to get stitches in his wrist and to be evaluated.  [2016 Incident Report p. 4, MADISON APP 0189].  After arrival at the jail, his request was granted, after which he was taken to the hospital and then later returned to the jail.  *Id.*

145.   Barnes was not aware of mental health issues Payne had at the jail prior to June 12, 2020, or of any prior involuntary commitments of Payne.  [Barnes Depo. Tr. 110:4–111:2, MADISON APP 0030].

146.   Prior to June 12, 2020, Weakland was not familiar with Payne.  [Weakland Depo. Tr. 24:13–15, MADISON APP 0061].  The morning of June 12, 2020 was the first time Weakland

recalled meeting Payne.   [Weakland Depo. Tr. 24:16–21 MADISON APP 0061, corrected testimony 52:7–53:13, MADISON APP 0066].

147.     During Payne's time in the Jail, Weakland never had any behavioral problems with Payne.   [Weakland Depo. Tr. 28:13–15, MADISON APP 0062].   Weakland recalled no documented concerns regarding Payne's interactions with other inmates.  [Weakland Depo. Tr. 28:16–19, MADISON APP 0062].

148.     Henry recalled Payne being an inmate in the jail and referred to him as a "frequent flyer."  [Henry Depo. Tr. 40:21–25, MADISON APP 0043].   However, she could not recall the last time he was in jail prior to the suicide incident in 2020.  [Henry Depo. Tr. 41:1–4, MADISON APP 0043].

149.     Henry was not familiar with, and did not recall, the incident in which Payne wrapped the phone cord around his neck  [Henry Depo. Tr. 41:5–13, MADISON APP 0043].

150.     Henry also explained that despite being a frequent flyer at the Jail, prior to June 12, 2020, Payne had never been any trouble for her.  [Henry Depo. Tr. 52:25–53:3, MADISON APP 0046].  She stated Payne has never demonstrated any type of violent propensities or anything of the sort.  [Henry Depo. Tr. 53:4–6, MADISON APP 0046].

151.     Madison County Jail's suicide prevention policy is contained in the Madison County Sheriff's Office's Standard Operating Procedures contain policies related to suicide prevention.  [Madison Co .SOP (Depo. Ex. 14) p. 11, MADISON APP 0202].

152.     The SOP directs that all staff involved in the booking and supervision of prisoners be trained in suicide prevention.  *Id.*  At the time of an inmate's admission, attempts are required to be made to determine whether the inmate is suicidal.  *Id.*  It provides a list of questions the jailer

or dispatcher is to ask during the admission process, with appropriate documentation, to aid in

suicide prevention:

- Does the prisoner show signs of depression?
- Does the prisoner appear overly anxious, afraid, or angry?
- Does the prisoner appear unusually embarrassed or ashamed?
- Is the prisoner acting or talking in a strange manner?
- Does the prisoner appear to be under the influence of alcohol or drugs?
- Does the prisoner have any scars or marks which indicate a previous suicide attempt?

*Id.* It then notes, "In all cases, the following questions will be asked of the prisoner:"

- Have you ever tried to hurt yourself?
- Have you ever attempted to kill yourself?
- Are you thinking of hurting yourself now?
- Housing for prisoners with disabilities shall be designated for their use, or reasonable accommodations shall be provided for the prisoner's safety and security.

*Id.* at 12.

153.    The policy requires documentation of these items and further provides that [i]f an

inmate is violent or suicidal, he/she may be denied any or all of his/her linen, mattresses, and or

all personal items until it has been determined that there is no longer a threat." *Id.* The policy

continues:

The Jailer/Dispatcher will determine what type of monitoring is necessary for the inmate's protection from him/herself. The inmate will be kept on a special watch, with the Jailer/Dispatcher logging all cell checks in 15 minute intervals, or as determined by the Sheriff or Jail Administrator.

The special watch will remain in effect until the Sheriff or Jail Administrator feels that it may be removed, or the length of the checks can be changed. This will be decided by either questioning the inmate, or by observation that there is no longer a threat. Once the Sheriff of Jail Administrator has deemed it safe to lift the special watch, all property removed from the inmate will be returned.

In the event that the inmate requests to speak to a chaplain or representative from a bona-fide religion, or member from a social service department, the Jail Administrator will need to be notified and approve the visit.

*Id.* The Standard Operating Procedures also address processes that need to be followed in the event of an attempted suicide. *Id.*

154.    Upon hire, jailers attend a 40-hour jail school, and then they are required to take 20 hours of annual training thereafter, all through the Iowa Law Enforcement Academy. [Barnes Depo. Tr. 27:2–11, MADISON APP 0020].

155.    Within the department, they have CPR and first aid, as well as Police Legal Sciences, which is 2 hours of online training everyone is required to do every month. [Barnes Depo. Tr. 27:12–22 MADISON APP 0020; 39:25–40:18, MADISON APP 0023].

156.    Madison County's job descriptions describes the training required for the positions of Jail/Dispatcher and Dispatcher/Jailer. [Job Descriptions (Depo. Ex. 16), MADISON APP 0220-223].

157.    A Dispatcher/Jailer's primary job is dispatching, but they are trained to serve in a jailer role in case they need to cover for a jailer while they're retrieving meals or a similar temporary absence. [Barnes Depo. Tr. 35:18–36:11, MADISON APP 0022].

158.    Dispatcher/Jailers do dispatch related training in addition to attending jail school. [Barnes Depo. Tr. 36:12–38:6, MADISON APP 0022].

159.    Jailer/Dispatcher's attend the initial 40-hour jail school and then must maintain their jailer certification through 20-hours of annual training. [Barnes Depo. Tr. 24:2–11 MADISON APP 0019; 36:13–39:15, MADISON APP 0022-23].

160.    Both roles also require eight hours per year of continuing education. [Barnes Depo. Tr. 36:16–24, App. MADISON APP 0022].

161.    Barnes recalled the topics covered during the 20-hour annual jailer certification course included medication review management, implicit bias training, gambling, inmate suicide

prevention, and sexual harassment.  [Barnes Depo. Tr. 40:19–41:6, MADISON APP 0023]. However, the Iowa Law Enforcement Academy determined the contents of the annual certification.  [Barnes Depo. Tr. 41:11–17, MADISON APP 0023].

162.    Henry described the training in similar terms, and explained the dispatch school through the Iowa Law Enforcement Academy—the Basic Iowa System Training ("BIST"), which certifies them to have access to the NCIC system—was a 40-hour school.  [Henry Depo. Tr. 19:7–27:12, MADISON APP 0040-42].

163.    Henry also acknowledged that police science tests are administered monthly for the dispatch and the jail.  [Henry Depo. Tr. 19:23–20:3, MADISON APP 0040].

164.    She recalled that some of the police science testing within the past couple years had covered suicide intervention or prevention, but Henry could not recall specific dates.  [Henry Depo. Tr. 21:9–22:16, MADISON APP 0040-41].

165.    The monthly police science testing included training on suicide prevention or intervention within the past six months.  [Henry Depo. Tr. 24:11–15, MADISON APP 0041].

166.    Henry could not recall the extent to which the police science training had been used prior to June of 2020, but it had been in place for the past couple of years.  [Henry Depo. Tr. 24:16–21, MADISON APP 0041].

167.    Henry recalled receiving suicide prevention or intervention training at the ILEA jail school, which was included as a training topic every so often, depending on the discretion of the presenter from the ILEA.  [Henry Depo. Tr. 24:25–26:13, MADISON APP 0041-42].

168.    Every two years dispatchers recertify through NCIC, requiring another test.  [Henry Depo. Tr. 20:15–20, MADISON APP 0040].

169.     Upon being hired at the Jail, Weakland went through a jail-school training at the Iowa law enforcement academy.  [Weakland Depo. Tr. 13:4–13, MADISON APP 0059].

170.     Following the jail school, Weakland recalled receiving annual training of 20 hours on his job, but could not recall the extent to which it covered suicide prevention.  [Weakland Depo. Tr. 15:16–16:25, MADISON APP 0060].

171.     Although unable to recall specific trainings now that he was no longer working as a jailer, Weakland remembered he was trained in the policies of the Madison County Jail, including the Jail's standard operating procedures.  [Weakland Depo. Tr. 16:10–16, MADISON APP 0060].

172.     Weakland's employment file contains certifications and enrollment confirmations. [Weakland's Employment File pp. 18–29, MADISON APP 0241-252].

173.     As the Sheriff, Barnes supervises the entire Sheriff's Department.  [Barnes Depo. Tr. 9:7–12:23, MADISON APP 0015-16].

174.     Barnes expects and relies on his Chief Deputy, Chief Deputy Allen, to ensure the policies and procedures are implemented in the jail.  *Id.*  Chief Deputy Allen is in charge of many of the administrative responsibilities for the jail.  *Id.*

175.     Below Chief Deputy Allen is the Jail Administrator, Steve Niblo, who supervises the Jailers.  *Id.*  The jail administrator oversees the day-to-day, shift-to shift responsibilities in the Jail, where he works on site.  *Id.*  Barnes appointed Niblo as the jail administrator in 2015 after he took office.  [Barnes Depo. Tr. 13:11–16, MADISON APP 0016].

176.     During his time as Sheriff at Madison County, two other inmates besides Payne had died.  [Barnes Depo. Tr. 58:25–60:14, MADISON APP 0024].  One was due to a blood clot the inmate had, and he was transported to the hospital where he later died.  The second was in 2016

when an inmate attempted suicide in order to be transferred to the hospital where he could then escape (as he had previously done in tehpast), but he accidentally killed himself in the process.  *Id.*

177.    When Barnes became Sheriff, he restructured the department to improve the division of labor.  [Barnes Depo. Tr. 15:7–22, MADISON APP 0017].

178.    Barnes created the Jail Administrator position so one person could attend solely to the responsibilities at the jail—previously, the Chief Deputy was responsible for the jail in addition to his other responsibilities.  *Id.*

179.    Barnes created the Jail Administrator position and hired Niblo for the position to "make it better back there."  *Id.*

180.    Barnes also created a dispatch supervisor position.  *Id.*

181.    A substantive change in procedure was finalized in about 2015 at jail when they obtained funding to have 24/7 jailer coverage.  [Barnes Depo. Tr. 21:7–19, MADISON APP 0018].

182.    A jail inspector from the state also came in every year to evaluate their policies and practices for compliance with existing jail standard.  [Barnes Depo. Tr. 22:5–11, MADISON APP 0019].

183.    The inspection included many items too numerous to list, but it included staff training and review of suicide prevention.  [Jail Inspection Report (Depo. Ex. 15) p. 3, 15, 27 MADISON APP 0260, 272, 284; Barnes Depo. Tr. 30:6–34:23, MADISON APP 0021].

184.    The Jail had not received any negative remarks on their suicide prevention procedures in the inspection reports, and the inspector generally commented, "Madison County Jail is a clean, well-maintained and well-managed facility."  [Jail Inspection Report (Depo. Ex. 15), pp. 8, 20, 32 MADISON APP 0265, 277, 289; Barnes Depo. Tr. 30:6–34:23, MADISON APP 0021].

185.     Barnes stated the standard operating procedures served as the default manual for the employees to fulfill their employment obligations.  [Barnes Depo. Tr. 23:25–24:4, MADISON APP 0019].

186.     Barnes also reviewed the standards yearly and review state standards for any required supplementation.  [Barnes Depo. Tr. 25:4–24, App. MADISON APP 0019].

187.     In 2017, Barnes worked with the-Chief Deputy Jim Ascione to revise the standard operating procedures.  [Barnes Depo. Tr. 19:18–23, MADISON APP 0018].  These procedures were still in place in 2020.  *Id.*

188.     In revising them, they worked through the procedures, chapter by chapter, to determine what was still working and what needed tweaked.  [Barnes Depo. Tr. 19:24–20:5, MADISON APP 0018].  The SOP included standards such as the state requirements under Iowa Code chapter 50.  [Barnes Depo. Tr. 20:13–21:6, MADISON APP 0018].

189.     Barnes communicated to the jail administrator how important it is to keep an eye on everyone in the jail the best they can and to do their best job possible.  This was communicated to staff during training, orientation, day-to-day operations, and in meetings.  [Barnes Depo. Tr. 58:3–15, MADISON APP 0024].

190.     The guidelines Barnes expected from Jail staff were that they follow the suicide prevention policy, that they conduct jail checks, keep documentation, and to communicate.  [Barnes Depo. Tr. 58:18–24, MADISON APP 0024].

191.     Barnes stated that prior to the date of Payne's suicide, he impressed upon all Jail employees that suicide was a real risk, that they needed to pay careful attention, and report to the Jail Administrator of Chief Deputy if any action needed to be taken.  [Barnes Depo. Tr. 64:21–67:10 MADISON APP 0025-26].

192.    The suicide prevention plan contained in the standard operating procedures revised in 2017 was in effect at the time Payne was housed in the Jail in 2020.  [Barnes Depo. Tr. 65:11–66:11, MADISON APP 0025-26].

193.    Barnes stated that they remind jail staff constantly they need to pay attention and take suicide prevention seriously.  [Barnes Depo. Tr. 68:21–70:24, MADISON APP 0026-27].

194.    The jail also utilized the mental health resources of Eyerly Ball for its inmates.  [Barnes Depo. Tr. 94:3–18, MADISON APP 0028].

195.    The contract with Eyerly Ball was called a "jail diversion" program, which sought to assist inmates with their medications, and if an inmate was having a mental health crisis at the jail, Scott Thomas from Eyerly Ball would come in and assist.  [Barnes Depo. Tr. 94:3–18 MADISON APP 0025; 132:10–133:15, MADISON APP 0033].

196.    Under the Jail Diversion program, Eyerly Ball connects inmates to telehealth mental health providers.  [Barnes Depo. Tr. 129:4–18, MADISON APP 0032].

/s/ Michael C. Richards
Michael C. Richards, AT0010828
DENTONS DAVIS BROWN PC
215 10th Street, Suite 1300
Des Moines, Iowa 50309-3993
Telephone:   (515) 288-2500
Facsimile:   (515) 243-0654
E-mail: mike.richards@dentons.com

ATTORNEYS FOR MUNICIPAL
DEFENDANTS AND CROSSCLAIMANTS
JOHN WEAKLAND, JASON BARNES,
AND MADISON COUNTY, IOWA

Copies To:

Robert G. Rehkemper
Cory F. Gourley
GOURLEY, REHKEMPER,
& LINDHOLM, PLC
440 Fairway Drive, Suite 210
West Des Moines, IA 50266
Email: rgrehkemper@grllaw.com
Email: cfgourley@grllaw.com

ATTORNEYS FOR PLAINTIFF
KENT H. PAYNE, INDIVIDUALLY, AND
AS ADMINISTRATOR OF THE ESTATE
OF JORDAN KENT PAYNE

Paul J. Statler
STATLER LAW, P.L.L.C.
301 East Walnut Street, Suite 7
Des Moines, Iowa 50309
Email: paul@statlerlaw.net

Glen S. Downey
THE LAW OFFICES OF
GLEN S. DOWNEY, LLC
5214 Ingersoll Avenue
Des Moines, IA, 50312
Email: glen@downey-law.net

ATTORNEYS FOR PLAINTIFF
LESLIE KING-PAYNE, INDIVIDUALLY

Jack Hilmes
Joseph F. Moser
FINLEY LAW FIRM, P.C.
699 Walnut Street, Suite 1700
Des Moines, IA 50309
Email: jhilmes@finleylaw.com
Email: jmoser@finleylaw.com

ATTORNEYS FOR DEFENDANTS AND
CROSSCLAIM DEFENDANTS
EYERLY-BALL COMMUNITY MENTAL
HEALTH SERVICES, AND
SCOTT THOMAS

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on February 13, 2023, by:

☐ U.S. Mail                          FAX ☐
☐ Hand Delivered          Overnight Courier ☐
☐ Email                             CM/ECF ☒

Signature:   /s/ Michael C. Richards