IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| KENT H. PAYNE, Individually and as the Administrator of the Estate of JORDAN KENT PAYNE, and LESLIE KING-PAYNE, Individually,<br><br>Plaintiffs,<br><br>vs.<br><br>JOHN WEAKLAND, JASON BARNES, and MADISON COUNTY, IOWA,<br><br>Defendants and Crossclaimants,<br><br>EYERLY-BALL COMMUNITY MENTAL HEALTH SERVICES, and SCOTT THOMAS,<br><br>Defendants and Crossclaim Defendants. | Case No. 4:21-cv-00349<br><br><br>DEFENDANTS and CROSSCLAIMANTS JOHN WEAKLAND, JASON BARNES, AND MADISON COUNTY, IOWA'S BRIEF SUPPORTING THEIR MOTION FOR SUMMARY JUDGMENT |

COME NOW Defendants John Weakland, Jason Barnes, and Madison County, Iowa (the "Municipal Defendants"), and for their Brief Supporting their Motion for Summary Judgment, state to the Court as follows:

## TABLE OF CONTENTS

Page

I.   FACTS ...................................................................................................................3

     A.   Arrest, Booking, and Intake Questions ...................................................3

     B.   Medications.............................................................................................4

     C.   "Chirp" Messaging...................................................................................4

     D.   Leslie Payne's Call to the Jail ................................................................6

     E.   Meeting with Scott Thomas from Eyerly Ball ........................................9

F.      Thomas's Conversation with Weakland about Payne ...........................................13

G.      Payne's Return to his Cell, McKinley's Chirp Messages, and Payne's Suicide ...15

H.      Discovery of Suicide.................................................................................20

I.       Prior Suicide Attempts.............................................................................22

J.       History with Payne.................................................................................23

II.       ARGUMENT.................................................................................................24

A.      Summary Judgment Standard ..................................................................24

B.      The Municipal Defendants are entitled to Qualified Immunity...........................25

i.       The Municipal Defendants were not deliberately indifferent to a known risk that Payne would commit suicide .............................................................27

1.      The deliberate indifference standard, and its application to prison officials .............................................................................................27

a.      Jailer Weakland was not deliberately indifferent to a known risk that Payne would commit suicide ...........................................32

i.       Subjective knowledge. ..................................................32

ii.      Reasonable preventive measures .................................36

2.      Supervisor and county liability ....................................................43

a.      Madison County's suicide prevention policy .........................45

b.      Training and supervision.........................................................47

III.      CONCLUSION..............................................................................................52

# I. FACTS

## A. Arrest, Booking, and Intake Questions.

On June 9, 2020, Jordan Kent Payne ("Payne") was arrested on a warrant issued for contempt of Court. [Statement of Material Facts ("SOMF") 1]. The contempt charge was related to Payne's conduct at a hearing on June 8, 2020, on an extension of a no-contact order entered previously against Payne on February 25, 2015, for the protection of Payne's ex-wife, Hayle (Crow) Elizabeth Payne. [SOMF 2]. The court found Payne in contempt of court during the hearing and sentenced him to 30 days in jail. [SOMF 3]. The court issued a mittimus warrant for Payne's arrest, ordering that he be held until the sentence is served. [SOMF 4]. On June 9, Payne was arrested at his residence and transported to the Madison County Jail (the "Jail"). [SOMF 5].

While being booked into the Jail, Jail Administrator Steve Niblo ("Niblo") asked Payne a series of intake questions, which are recorded in a booking report. [SOMF 6]. These Questions, and their responses, included the following:

| 12 | Mental illness | Y |
| 13 | Been hospitalized in the last 12 m | Y |
| | . . . . | |
| 20 | Anxious/afraid/angry | N |
| 21 | Embarrassed/ashamed | N |
| 22 | Talking in a strange manner | N |
| 23 | Under the infl of alcohol | N |
| 24 | Under the infl of drugs | N |
| 25 | Scars/marks att suicide | N |
| 26 | Ever tried to hurt yourself | Y |
| 27 | Ever tried to kill yourself | Y |
| 28 | Thinking of hurting self now | N |
| 29 | Family mbr/friend attempt suici | Y |
| 30 | Any reason why not be jailed | Y |

[SOMF 7].

**B. Medications.**

Payne was on medication at the time of his arrest and detention at the Jail. [SOMF 8]. Payne was taking Buspirone and Vraylar while he was in jail. [SOMF 9]. Jail medication records show Payne was given his medication while detained at the jail. [SOMF 10]. On June 9, 2020, at 4:02 p.m. and 9:16 p.m., Payne was given his Buspirone medication. [SOMF 10]. On June 10, 2020, Payne was given his Buspirone medication at 8:10 a.m., 12:50 p.m., and 6:10 p.m. [SOMF 10]. And then on June 12, Payne was given his Buspirone medication at 8:09 a.m., and again at 12:12 p.m. [SOMF 10]. On June 10th and 11th, 2020, at 6:10 and 6:18 pm, Payne was given his Vraylar medication at supper. [SOMF 10].

**C. "Chirp" Messaging.**

An amenity that inmates are afforded at the Jail is a messaging system called "Chirp," which is a texting device—essentially a cell phone—that can be issued to the inmate which allows them to text people from the jail facility. [SOMF 11]. Each message costs $0.10 to send. [SOMF 12]. Payne elected to have a Chirp device, which he used to text with his girlfriend, Christina McKinley ("McKinley") while he was at the jail. [SOMF 13].

During the three days Payne was at the Jail, Payne had a total of 430 messages to and from his Chirp device. [SOMF 14]. Some of the messages indicate that Payne was struggling with his mental health, but he did not want to be forthcoming about that to the Jail staff; for example, on June 11, some of the messages read as follows:

Payne:      Somethings not rought[1] in my head and chest im hearing voices that wont stop wtf is wrong wyh me. I love you.

McKinley:   Like what kind of voices and what are they saying have you had any meds since you've been there? I love you baby.

---

[1]Texts are reproduced as written and contain grammatical and spelling errors.

| | |
|---|---|
| Payne: | I need to talk to eve this am emergency I need to be back on serequel u don't want to know what I'm hearing, swallow that apple whole smash head off table. Mom wont return my texts |
| McKinley: | Did you tell the jailer |

. . . .

| | |
|---|---|
| Payne: | I aint sayn shit so they can strip me naked and chain me to a bed like last time. |

[SOMF 15].

In another series of texts about 45 minutes later, Payne stated the following:

| | |
|---|---|
| Payne: | Im going back to crying and smashing head off wall. Ilove you. |
| McKinley: | Stop with the smashing your head… I need you as much as you need me don't forget that please |
| Payne: | I cant help it wont stop |

. . . .

| | |
|---|---|
| Payne: | Smashing my head off the wall stops voices. |
| McKinley: | Stop it jordan please. I need you. |

. . . .

| | |
|---|---|
| Payne: | Somethings dead wrong with me m I canr explain it I just want to stop. |
| McKinley: | I'll talk to your mom in the morning about talking to eve about Seroquel |
| Payne: | Never have felt this before. |
| McKinley: | I text her earlier about it. Its because you need your fucking meds. |
| Payne: | I'm on them. But aint working at all |

[SOMF 16].

Thereafter, the texts for the remainder of the evening are fairly lucid. [SOMF 17]. Even the following morning, Payne's texts with McKinley begin normally and affectionately. [SOMF 18].

But then at 11:08:31 a.m., Payne states, "So youre gonna be mad at me probably sad but I always loved u but im going to listen to the voices." [SOMF 19]. McKinley seemed alarmed and inquired as to what he meant. [SOMF 20]. Payne replied, "I found a way out of my head." [SOMF 21]. McKinley asked if she needed to call the jail, to which Payne replied, "Please don't." [SOMF 22]. In some additional back and forth, Payne seemed to indicate that he was feeling better and that he just needed some sun. [SOMF 23]. But at 11:17:38, Payne stated, "Truth here my head is telling me to rip out my veins with my teeth." [SOMF 24].

Following this, McKinley asked Payne if he wanted her to tell Payne's mother or the cops "cause I'm not just gonna do nothing." [SOMF 25]. Payne stated, "Not cops," but also said, "Baby help me please," and "all these thoughts won't stop." [SOMF 26]. McKinley replied, "I told you mom just now only other thing I can do is tell the cops which if this doesn't stop Jordan I have no choice your freaking me the hell out," and "I told your mom you seriously need a doctor she said ok." [SOMF 27]. Payne told McKinley, "I'll be better after busbar at noon," but then a few minutes later, stated, "Baby I'm scaring myself." [SOMF 28]. In the final text of the morning of June 12, 2020, at 11:34:54, McKinley stated, "If it doesnt get better I'm calling the cops up there I mean it." [SOMF 29].

### D. Leslie Payne's Call to the Jail.

At about 11:40 a.m., in response to McKinley's concern, Leslie Payne ("Leslie"), Jordan Payne's mother, called the Jail and spoke with Linda Barker ("Barker"). [SOMF 30]. Leslie told Barker that McKinley had contacted her and said that Payne made comments about wanting to tear out or bite out his veins. [SOMF 31]. Following this, Barker immediately went to the master control dispatch room and told Angela Henry ("Henry"), the dispatch coordinator at the jail, what

Leslie had said about Payne. [SOMF 32]. Jailer John Weakland entered the room shortly after this, and Barker informed him as well. [SOMF 33].

Although difficult to hear, pieces of this conversation can be heard from video picked up in the nearby booking area; Barker can be see entering the dispatch area at 11:43:39, and then saying,

> Barker: He's texting his girlfriend or whatever . . . however they're communicating, and said he's getting ready to chew out his veins. . . tear out his veins . . . So I'm reporting that to you. He wants to tear them out or whatever, so whoever's monitoring his shit . . .[inaudible] . . . –ever the hell it is. . . . [followed by something inaudible].
>
> Henry: Well, I agree, but I don't want anything to happen to him on our watch. Fuck that. You know.

[SOMF 34]. The audio after this part is difficult to hear, but certain phrases can be picked out, such as ". . . exactly, exactly, so I'm just reporting it. . ." and then some references to ". . . the girlfriend. . .," ". . . I assume he's chirping. . . ," ". . . can monitor all that . . .," ". . . make sure he's not [inaudible]," and "Right." [SOMF 35]. Following this, some only-partially-audible discussion occurs about someone named Nathan and some apparently unrelated incidents. [SOMF 35]. Then at 11:45:52 am, Barker said, "Alright, well, I did my part. Tell John-boy to watch him. I don't know who monitors Chirpers." [SOMF 36]. Then more unrelated discussion ensued. [SOMF 36].

Shortly thereafter, at 11:56:01, Weakland, who was returning with lunches, entered the dispatch area, and Barker asked, "John, can you monitor the Chirps?" [SOMF 37]. Then the following exchange occurs:

> Weakland: "Can I monitor the Chirps?"
>
> Barker: "Yeah."

Mixed:          "Chirping . . .", ". . .the texts . . ."

Weakland:       "Um . . . I think so. . ."

Barker:         "You might want to check . . . Payne . .  Jordan . . . Jordan's girlfriend [inaudible] eating out or tearing out all his veins or something."

Henry:          "He's not happy about [inaudible]."

Barker:         "So just check on him to make sure.  I don't want anything to happen on our watch."

Weakland:       "He's saying . . . saying what, now?"

Barker:         "That he's going to tear out his veins, or something.  It looks like he's sleeping now, but I'm just saying.  You know . . ."

Henry:          [Inaudible]

Barker:         "Yes, so. . ."

Weakland:       "He wanted to speak, uh, um, I set up, hopefully, Scott is stopping out today. [inaudible] talk to Scott.  He was talking about these, uh, having some weird visions and shit." [SOMF 38].

Because Leslie wanted an update on Payne's status, Barker responded to Leslie by text, advising her that Payne was sleeping on the bunk and lunch had just arrived.  [SOMF 39].  As can be heard in the video, Barker was able to see Payne from where she was in the dispatch room while relaying the information to Henry and Weakland, commenting, "It looks like he's sleeping now . . . ." [SOMF 40].  Video from Payne's cell confirms that he was indeed laying in bed during the time Barker, Henry, and Weakland were speaking in the dispatch control room.  [SOMF 41].  At deposition, Henry explained that from the dispatcher's location in the dispatch control room, a person could see into the max cell where Payne was located from a standing position.  [SOMF 42].

However, the dispatcher would not be able to see into the max cell while seated at their workstation, because the view would be blocked by 6 monitors.  [SOMF 43].

Thereafter, at 12:21:34, Weakland arrived at Payne's cell and give Payne some medication.  [SOMF 44].  Weakland asked him if he's OK, and Payne said he needs to "talk to that doctor pretty bad."  [SOMF 44].  After Weakland said something inaudible, Payne replied, I just need my Seroquel."  [SOMF 44].  Payne said, "I'm just losing it in here a little bit" and then Payne and Weakland conversed a bit about his medications, after which Payne stated, "I'm doing alright, I just, my head, its not right," and then "this'll make it better," and then he took a pill.  [SOMF 44].  Payne then asked something inaudible, and then Weakland said, "Yeah, I'll call him," presumably in reference to Scott Thomas at Eyerly Ball.[2]  [SOMF 44].  Consistent with the video, Barnes testified it was his understanding that after Payne's mother called into the jail, Weakland checked on Payne, asked if he was OK, asked if he needed help or anything, and then it was at this point that Eyerly Ball was contacted to come meet with Payne.  [SOMF 45].

**E.  Meeting with Scott Thomas from Eyerly Ball.**

From approximately 1:31 to 1:53 pm on June 12, 2020, Payne met with Scott Thomas ("Thomas") from Eyerly Ball, just a little over an hour after Weakland's last interaction with Payne at his cell.  [SOMF 46].  Scott Thomas was the Jail Division Case Manager with UnityPoint Health Eyerly Ball OMHS.  [SOMF 47].  Thomas described his job responsibilities in this role as screening individuals for possible mental health concerns and discussing options for services and

---

[2]This appears to be *in addition to* an already planned visit from Thomas at the jail.  In Payne's cell video, at 10:23:00 Weakland stopped at Payne's cell, and Payne got out of bed and asked about a call "to Eyerly Ball—mental health?"  Weakland replied, "Yeah, he should be in here today," to which Payne politely replied, "thank you" while appearing to retrieve the Chirp device through the cell door.

referring individuals to such services. [SOMF 48].[3] Thomas testified that he would pay attention and look out for self-harm or suicide concerns in individuals. [SOMF 49]. But Thomas also testified that he does not conduct mental health assessments and evaluations, and he is not qualified to provide or administer a suicide risk assessment. [SOMF 50].

On June 11, 2020, Thomas recalled receiving an email stating that Payne wanted to meet with him the next time he was at the jail. [SOMF 51]. Thomas remembered being called by one of the jailers from the Madison County Sheriff's Department regarding Payne also, but he didn't specify precisely when. [SOMF 52]. Thomas recalled that Weakland told him Payne wanted to talk to him about his medications. [SOMF 53]. Thomas came to the jail on June 12 and met with Payne in the jail's "Multipurpose Room." [SOMF 54]. Broadly, the meeting consisted of discussion related to Payne's medications, his current mental health symptoms, his history of services, and his current life and legal circumstances. [SOMF 55].

The Chirp records show that immediately prior to the Thomas interview beginning, at 1:29:49, McKinley sent the following text to Payne:

McKinley: To be honest the papers down stairs on the table for your mom I was going to take it until I found out for a fact you cheated on me 4 freaking weeks ago. Ive known since I got home yesterday I just haven't said anything cause you've been freaking out. I don't know why you did this to me Ive been nothing but good to you for the last 6.months. you say I'm the best thing that's ever happened to you yet you still cheated on me with some ugly ass tatted dude.

[SOMF 56]. Payne apparently saw this message just before leaving for his appointment with Thomas, because at 1:30:28, he replied "What r u talkn bout." [SOMF 57]. Video from his cell

---

[3]Thomas denied certain job duties on his job description were accurate: he testified his job did not include conducing precommitment screenings, responding to calls from law enforcement personnel related to mental health issues, and assisting in the development of client crisis plans. [SOMF 48].

shows Payne reacting to McKinley's message; while laying on his bed, he is looking down at his Chirping device, which is laying face up on the floor, and at 1:30:10, he suddenly grabs the device, springs up in bed, and exclaims, "What!" [SOMF 58]. Appearing agitated by the message, the video shows him stand up and start typing on the device, and he audibly says, "What are you talking about?" [SOMF 59]. He then sat down on his bed and said something inaudible. [SOMF 60]. Just then, at 1:30:40, Jailer Weakland entered Payne's cell and informed him that Scott with Eyerly Ball was there to see him. [SOMF 61].

At 1:31:21, Weakland escorted Payne from his cell to meet with Thomas in the Jail's "multipurpose" room. [SOMF 62]. Weakland understood Thomas's role to be evaluating Payne for his mental health and determine what needs he may have. [SOMF 63]. Payne seemed agitated to begin with, but he calmed down during the course of the meeting with Thomas. [SOMF 64]. Payne indicated to Thomas that he was taking a new medication and did not believe it was effective in helping manage his mental health symptoms. [SOMF 65]. Payne expressed the desire to go back on Seroquel, which he felt was more effective. [SOMF 66]. Payne denied previous psychosis, but he indicated that he had a thought of "eating his vein." [SOMF 67].

During the meeting, Payne told Thomas that he attempted suicide seven times in past last year and that he lost his kids and he lost everything; he immediately followed this by stating, "I'm not going to kill myself here," but "I can't guarantee I won't kill myself when I leave here." [SOMF 68]. He went on to say that he didn't want to go on suicide watch, and he reiterated he wasn't going to kill himself. [SOMF 69]. And a bit later, he reiterated again, "I don't want to kill myself in general!" [SOMF 70]. A few minutes later, Payne explained, "I can calm myself down, I just can't keep it down." [SOMF 71]. In his report, Thomas noted that Payne was not optimistic

about life after his release, but that he stated directly that he would not hurt himself while in custody. [SOMF 72].

During the course of the interview, Payne made a number of statements about his mental health or how he was feeling. He said he's "not doing so well" and that he had lost everything. [SOMF 73]. He mentioned giving himself a black eye, "hearing these fucking things in my head, all sorts of stupid shit I'm not trying to listen to," and he said he's not in good shape right now, mentioning that his girlfriend thought he was cheating on her. [SOMF 74]. He talked about getting thoughts in his head, and the only person he had to talk to was his girlfriend, but he expressed concern that she would call the jail and have them put him on suicide watch. [SOMF 75] He then referenced the thoughts in his head, saying "chew my veins out, shit like that . . . I don't want these thoughts in my head." [SOMF 76].

At about 1:40:08, Payne asks if everything he was saying was confidential, and then asked Thomas to promise that he wouldn't say anything, to which Thomas agreed, but explaining that if he was subpoenaed he may have to say something, and the two exchanged a fist-bump. [SOMF 77]. It is at this point that Payne stated that he'd had 7 suicide attempts in the past year, but then, as noted above, assured he wouldn't kill himself while in custody. [SOMF 78]. He also said he couldn't sleep, that he had got nothing left, and that he was "not like this normally," but he also indicated that he didn't want to go on suicide watch. [SOMF 79]. He also stated, "After I slit my wrists they brought me here, instead of take me to the hospital. They chained me to the bed. I had bloody wrists." [SOMF 80].

In his report, Thomas indicated that he and Payne discussed having time to sort things out and for Payne to see a psychiatrist to review his medications. [SOMF 81]. Payne agreed to his. [SOMF 81]. Thomas then indicated that he would schedule the first available appointment, which

could even be yet that day.  [SOMF 81].  Thomas asked if there was anything else he could do for Payne, and Payne indicated there was not."  [SOMF 81].  Thomas promptly scheduled a telemedicine appointment with a psychiatrist at Eyerly Ball which was to take place a mere 1.5 hours later at 3:30 p.m.  [SOMF 82].

### F.  Thomas's Conversation with Weakland about Payne.

After the interview, Thomas informed the Jail about the conversation he had with Payne concerning his medications, specifically that he was looking to have him set up for an Integrated Telehealth Partners ("ITP") appointment to see a psychiatrist, and he checked with Weakland concerning his availability to coordinate this appointment.[4]  [SOMF 83].  Thomas also specifically informed Weakland that Payne told him on more than one occasion that he was not going to hurt himself in custody, but that he was not sure what would happen when he left.  [SOMF 84].  Thomas emailed the Jail at 2:19 informing them he had scheduled the ITP for Payne at 3:30 that day.  [SOMF 85].  Thomas also called the Jail, reporting that he had scheduled the appointment with the psychiatrist at 3:30 pm.  [SOMF 86].

Weakland recalled from that conversation that "there was no concern that Jordan was going to hurt himself."  [SOMF 87].  Weakland explained:

> Q.     You don't recall at all Scott Thomas ever suggesting that a closer eye be kept on Jordan Payne?
>
> A.     No, I do not remember.  No.  I'm sorry.  I take that back.  I do not remember the specifics of the conversation, but I do remember that after we spoke that there was not any concern.  I did not feel any extra concern for Jordan Payne.

[SOMF 87].

---

[4]Thomas explained in deposition that Integrated Telehealth Partners is a company that provides the psychiatric appointments.  [Thomas Depo. Tr. 78:24–79:1, App. __].  He further testified the appointment was scheduled with a Dr. Kovilparambil Xavier Antony who was rumored to be from Florida.  [SOMF 83].

Weakland did not recall Thomas ever telling him that during the interview Payne said he had nothing left in life, that Payne reported difficulty sleeping, that Payne was hearing voices, that Payne reported wanting to chew his veins out, or that Payne had a history of suicide. [SOMF 88]. And Thomas never suggested to Weakland to increase the level of supervision of Payne. [SOMF 89]. Likewise, nobody ever asked Henry for assistance in providing additional supervision of Payne. [SOMF 90].

Thomas testified that he did not relay to Weakland the concerning statements Payne had made during the interview:

A. I'm just relaying information that Jordan gave to me, which was specifically that he wasn't going to harm himself.

Q. (By Mr. Rehkemper) Did you relay that he told you that he had attempted suicide seven times prior that year? Did you tell jail staff that?

A. I did not.

Q. Did you tell jail staff that he had a history of depression?

A. I did not.

Q. Did you tell jail staff that he had a history of severe mental illness?

A. I did not.

Q. Did you tell jail staff that he had a current injury that was causing him pain?

A. No.

Q Did you tell jail staff that Jordan Payne communicated hearing voices?

A. No.

Q. Did you tell jail staff that Jordan Payne specifically told you he thought about eating his veins?

A. I don't recall whether I did or not.

Q. Do you recall telling jail staff that Jordan reported having difficulties sleeping?

A. I did not.

Q. Did you recall telling jail staff that Jordan Payne had a history of substance abuse?

A. No.

Q Or that he communicated a sense of hopelessness or concern that he had nothing left when he left?

A. No.

Q. Did you make jail staff aware that Jordan Payne told you that he was having relationship problems or had a difficult relationship with his girlfriend?

A. No.

[SOMF 91].

In addition to his promise to Payne during the interview to keep these statements secret, Thomas stated in deposition that he believed it to be protected health information. [SOMF 92]. He stated disclosing the information would require a release, but agreed there are exceptions to the disclosure protections, and he could disclose it if he felt Payne was a danger to himself or others. [SOMF 93]. Thomas also did obtain a signed release from Payne that permitted disclosures to law enforcement agencies. [SOMF 94]. He nevertheless did not disclose the information to the jail. *Id*.

### G. Payne's Return to his Cell, McKinley's Chirp Messages, and Payne's Suicide

Following the interview, Jailer John Weakland escorted Payne back to his cell. [SOMF 95]. Henry saw Payne with Weakland in the booking area on his way back to his cell. [SOMF 96]. She described Payne as having a casual conversation with Weakland while in transit. [SOMF 97].

At 1:54:14, Payne began to enter his cell. [SOMF 98]. Payne and Weakland were talking, and upon entry into the cell, Payne pointed at the wall phone and said, "Can I use this phone? This phone doesn't work." [SOMF 98]. Weakland asks, "It doesn't work?" [SOMF 98]. And Payne explained it did not and that he can't use his phone cards. [SOMF 98]. He followed this up by saying, "And now my girlfriend thinks I'm cheating on her." [SOMF 98]. Apparently unaware that Payne may have been talking about the text he received just before the Thomas Interview, Weakland replied, "While you're in jail?" [SOMF 98]. Payne sighed, turned, and took a couple steps into the cell. [SOMF 98]. Weakland then said, "Um, yeah, let me, uh, let me get things finished, and I'll come check out that phone." [SOMF 98]. Payne replied with a thumbs up, and then walked into his cell and picked up his Chirping device. [SOMF 98]. Weakland then left Payne's cell at 1:54:34. [SOMF 98].

It was at this point that Payne discovered a string of 20 texts from McKinley, continuing from the initial accusation he saw before the Thomas interview, further shaming him for the alleged infidelity. [SOMF 99]. In the cell video, Payne can be observed reacting to these text messages. After picking up the device at 1:54:38 and reviewing the messages, Payne started becoming visibly and audibly upset. [SOMF 100]. These are the messages Payne was looking at according to the Chirp timestamps:

- So no when you were acting so funny about the ecstasy meth I know why cause you cheated on me

- I'm taking about may 2nd

- The sherades up jordan stop lieing

- I didn't deserve this

- I made myself physically sick since I found out

- I didn't even work today… I couldnt

16

- I played in bed crying all morning

- Layed

- Why…. I didn't deserve this.  And now I do think you cheated the other day.
  You did a month ago why wouldn't you do it last time…. You acted weird that
  day too. My instincts never stray me idk why I believed you I'm a fool . I love
  you so much.  You did this to a woman that loved you more then anyone ever
  could.

- Why Jordan.  I deserve that much.

- We wernt even fighting I went back and looked at our pics from then and fb….
  We had a great day you cheated on me when I had my fucking kids.  That was
  so low.

- A fucking year together and I dont even get why… or an apology.  That's
  because your not sorry.  You've been doing it to me this whole fucking time
  I'm a fucking fool…. fuck me man

- But I'm the best thing that's ever happened to you… wow you do that to the
  best thing that's ever happened to you.  I'm heartbroken Jordan you can't begin
  to imagine

- I'm glad I found out before we moved in together wtf. Why. Why would you
  lead me the fuck on like you actually loved me.  You don't fucking do that to
  someone you love.  That's not love.  I introduced you to my fucking kids like
  a fool wtf was I thinking omg.  I hope he was worth it jordan I hope all of them
  were worth it.

- You don't love me you were fucking using me[5]

[SOMF 100].  Given McKinley awareness of Payne's mental health problem and expressed

fear about what he might do to himself in the jail, the timing of this could not have been worse;

especially in view of the conversation that had just happened the day before: on June 11, at

15:08:16, McKinley told him, "I love you too.  I'm here for you.  I'm on your side don't ever forget

that."  [SOMF 101].  And Payne replied, "Thats whats leeping me alive."  [SOMF 101].

---

[5]Some of texts were split into more than one message, and these have been combined as
reproduced.  But the substance of all 20 messages is included here.

While observing the 20 messages, Payne went from sitting on his bed, to pacing a bit in his cell, and then said out loud, "I'm not fucking lying.  I'm not lying to you," and then said something inaudible.  [SOMF 102].  He can be seen typing on the device, and then he sat back down on his bed.  [SOMF 102].  During this timeframe, the first outgoing message Payne sent was at 1:55:41 and read, "baby please believe me im begging you."  [SOMF 103].  And then this exchange followed:

Payne:   I love you this is all false info (1:56:04 pm)

McKinley:  STOP FUCKING LYING (1:56:07 pm)

Payne:   Baby im not (1:57:17)

McKinley:  Man up STOP FUCKING LIEIN (1:57:23)

[SOMF 103].  Then at 1:57:58, McKinley said, "I saw the mf video you lien ass….. god you cant even own up and apologize fuck you fuck you man fuck you."  [SOMF 103].  At 1:58:05, Payne quickly stood up from his bed, paced the floor, and then plopped back down on his bed, letting out a gasp and saying something inaudible.  [SOMF 104].  The Chrip record showed that at 1:58:32, Payne replied, "Ok," and then "Fine" a few seconds later.  [SOMF 105].

The final string of messages back and forth between Payne and McKinley were these:

McKinley:  Its time stamped. . . . I'm far from stupid jordan stop playing me mf (1:58:40)

McKinley:  Fuck I hate you you broke my fucking heart it made.me physically sick jordan I didn't deserve this wtf (1:59:16)

Payne:   I didn't use u (1:59:17)

Payne:   I love you (1:59:29)

McKinley:  That's not fucking love why jordan fuck did I not do enough not love you enough why… I dont get why I'm not enough ever wtf (2:00:16)

[SOMF 105]. This message from McKinley was the final message to be delivered; Payne attempted to send another outgoing message at 2:00:16, but the chirp records show he was out of funds, and his message was unable to be delivered. [SOMF 106].

While this final exchange was happening, the cell video shows that at 1:59:36, Payne abruptly got out of his bed, walked across the cell, and audibly exclaimed, "Shit!" [SOMF 107]. He then went back, sat on his bed, muttered something inaudible, and looked at his Chirping device. [SOMF 107]. Then at 2:00:34, he tossed the device on the ground and collapsed onto his bed in a fetal position. [SOMF 107].

After barely one minute, at 2:01:37, Payne sat up in his bed and began tying a white sheet into a noose. [SOMF 108]. At 2:02:04, Payne stood up, walked over to the interior door of his room, and attempted to fix the noose in the door frame by closing the door on the opposite end of the sheet.[6] [SOMF 108]. At 2:02:20, Payne began attempting to lift himself up to put his head in the noose, but ultimately his attempts failed. [SOMF 108]. He then took the noose down and returned to his bed for a few second. [SOMF 108].

At 2:03:09, Payne stood up from his bed, put on his slippers, and went into the shower with the noose. [SOMF 109]. The view of what transpired from here is blocked by the shower door. [SOMF 109]. The bottom foot or so of the door has a translucent curtain or flap, but not a lot can be observed. [SOMF 109]. At 2:03:57, Payne opened the shower door, and after a few seconds, closed it somewhat abruptly. [SOMF 110]. Some movement can be seen at the bottom of the shower door, and at 2:04:36, there was a thump, and the bottom flap of the shower door moved a bit. [SOMF 110].

---

[6]As can be seen in the video, the cell is divided into two compartment, separated by a door and partial wall. The door dividing the two compartments of the cell is not the cell door that leads to the hallway of the jail.

At 2:04:42, Payne began gagging and gasping, and this lasted for about 5 seconds. [SOMF 111]. After this, nothing can be observed or heard until 2:05:21. [SOMF 112]. At this point, some more movement can be seen at the bottom of the shower, and this is followed by another thump at 2:05:25, and then more gasping and choking sounds, which end at about 2:05:32. [SOMF 112]. The cell remains quiet after this. [SOMF 112] .

**H. Discovery of Suicide.**

As noted above, Weakland last saw Payne at 1:54:34 after dropping Payne off at his cell. At 2:14:41, Weakland entered the area where the cell adjacent to Payne's was, and he spoke to the inmates in that cell, but he did not go past Payne's cell. [SOMF 113]. At 2:26:50, the inmates in the cell adjacent to Payne's came out of their cell and walked through the door that leads them past Payne's cell, but they apparently did not see or say anything regarding Payne. [SOMF 114]. At 2:27:41, Weakland entered the cell adjacent to Payne's cell, did some cleaning while the inmates were out, and then exited the cell and left the area through the door leading away from Payne's cell at 2:29:06. [SOMF 115].

According to jail records, at 2:46:18, approximately 52 minutes after last speaking to Payne, Weakland conducted a cell check at Payne's cell. [SOMF 116]. At this point, Weakland observed that Payne was in the shower. [SOMF 116]. Weakland explained that when he observed inmates in the shower or on the toilet while doing cell checks, he would afford them their privacy. [SOMF 117]. The jail video shows Weakland coming through the door into the adjacent area after checking Payne's cell at 2:46:30. [SOMF 118].

In the moments leading up to Weakland discovering Payne's suicide, Weakland explained in his statement that he was doing a commissary request for the dorm cell, and when he walked past the max cell where Payne was, he saw him still in the shower. [SOMF 119]. Knowing that

he saw Payne in the shower when he did his previous cell check, Weakland went back to Payne's cell to check on him. [SOMF 120]. At 3:16:36, Weakland went to Payne's cell and called in there, asking, "Jordan, you ok? Jordan." [SOMF 121]. Not hearing any response, Weakland left the area briefly, and promptly returned. [SOMF 122]. At 3:17:24, he entered Payne's cell and said his name a couple times on his way toward the shower. [SOMF 123]. At 3:17:31, he opened the shower door, and Weakland's tone changed as he exclaimed, "Jordan!" [SOMF 123]. Weakland went in the shower and tried to lift Payne, but he was unable to, so he hurried out of the cell and went to the dispatch area where he retrieved a pair of scissors and told Henry to call for help. [SOMF 124].

At deposition, Weakland described what he observed and his reaction. Weakland recalled Payne had a sheet around his neck, and Weakland attempted to cut the sheet off. [SOMF 125]. Upon first discovering Payne hanging in the shower, Weakland explained that he left Payne's cell and went to dispatch to get scissors and told Henry at Dispatch to call for help. [SOMF 126]. Weakland did not have a radio on his person in the jail. [SOMF 126]. He also did not carry sharp objects on him in jail, so he had to return to dispatch in order to get scissors to cut the sheet. [SOMF 126].

Henry was in the master control, dispatch room when Weakland entered, asked for help, and grabbed some scissors. [SOMF 127]. She described Weakland's demeanor as being alerted. [SOMF 128]. Henry explained that Weakland asked for the scissors and requested that she summon help, but he did not explain specifically why. [SOMF 128]. She dispatched the deputies who were working, and they entered the cell and assisted. [SOMF 129]. After this, Henry dispatched an ambulance. [SOMF 129].

Weakland reentered Payne's cell at 3:18:11 and was able to cut the sheet and get Payne down. [SOMF 130]. Several Deputies and Winterset Police arrive at Payne's cell very quickly, entering the cell at 3:18:45. *Id.*; [SOMF 131]. The call for service for the emergency personnel was received at 3:19:51. [SOMF 132]. They got him out of the shower, laid him on the floor, and began attempting life-saving measures at 3:19:06. [SOMF 132]. While the officers are continuing to administer CPR to Payne, at 3:21:40, Weakland said, "I thought he was in the shower." [SOMF 133]. The resuscitation attempts continued even as the officers, deputies, and EMTs start wheeling Payne away at 3:28:28. [SOMF 133]. At about 3:30, the ambulance transported Payne to the Madison County Hospital. [SOMF 134]. Unfortunately, attempts to revive Payne never succeeded. Payne's cause of death was determined to be suicide by hanging. [SOMF 134].

Sheriff Barnes was notified of Payne's suicide by a call from dispatcher Angela Henry. [SOMF 135]. Barnes had been home for the day and was not at the jail when the suicide happened. [SOMF 135]. Barnes responded immediately, and when he arrived, he observed officers doing CPR on Payne. [SOMF 136]. He quickly contacted the Division of Criminal Investigation to conduct an independent investigation of the incident. [SOMF 137]. Disability Rights Iowa was also conducted an investigation. [SOMF 138]. Barnes believed Weakland did the best he could have done with what he knew at the time. [SOMF 139]. Upon concluding its investigation, DCI issued a report. [SOMF 140]. The DCI Report does not assign any blame to Barnes or Weakland for Payne's suicide. [SOMF 140].

### I. Prior Suicide Attempts.

Payne had some history with attempted suicide, including an involuntary commitment. Only two occasions, however, would have involved Jail staff in any way. [SOMF 141]. First, on April 20, 2015, Payne was arrested for violating a no-contact order and was booked into the

Madison County Jail. [SOMF 141]. While at the Jail, Payne wrapped a phone cord around his neck and leaned back in an apparent suicide attempt; however, Niblo, who recalled the incident, believed this was an attempt for attention. [SOMF 141]. Payne did this in the presence and view of a jailor, who told him to stop. [SOMF 141]. Payne then unwrapped the cord from around his neck. [SOMF 141]. A deputy then took Payne to the hospital for evaluation. [SOMF 142]. Payne had some abrasions on his neck, and after about a day, the hospital transferred him back to the jail. [SOMF 142].

In 2016, after a domestic assault on his mother Leslie, Payne made her watch him write a suicide note, and then he slit his wrists with a paring knife. [SOMF 143]. However, the resulting injury produced only superficial bleeding. [SOMF 143]. Payne was arrested for the assault, and while being transported to the Madison County Jail, Payne told the officers he wanted to go to the hospital to get stitches in his wrist and to be evaluated. [SOMF 144]. After arrival at the jail, his request was granted, after which he was taken to the hospital and then later returned to the jail. [SOMF 144].

**J. History with Payne.**

Barnes was not aware of mental health issues Payne had at the jail prior to June 12, 2020, or of any prior involuntary commitments of Payne. [SOMF 145]. Prior to June 12, 2020, Weakland was not familiar with Payne. [SOMF 146]. The morning of June 12, 2020 was the first time Weakland recalled meeting Payne. [SOMF 146]. During Payne's time in the Jail, Weakland never had any behavioral problems with Payne. [SOMF 147]. Weakland recalled no documented concerns regarding Payne's interactions with other inmates. [SOMF 147].

Henry recalled Payne being an inmate in the jail and referred to him as a "frequent flyer." [SOMF 148]. However, she could not recall the last time he was in jail prior to the suicide incident

in 2020. [SOMF 148]. Henry was not familiar with, and did not recall, the incident in which Payne wrapped the phone cord around his neck [SOMF 149]. Henry also explained that despite being a frequent flyer at the Jail, prior to June 12, 2020, Payne had never been any trouble for her. [SOMF 150]. She stated Payne has never demonstrated any type of violent propensities or anything of the sort. [SOMF 150].

Additional facts will be developed and cited in connection with the legal analysis below.

## II. ARGUMENT

### A. Summary Judgment Standard.

A court is required to grant summary judgment when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When reviewing motions for summary judgment, the district court views the evidence in the light most favorable to the nonmoving party. *A.H. v. St. Louis, County, Missouri*, 891 F.3d 721, 727 (8th Cir.2018). Courts also draw all inferences in favor the non-moving party. *Laganiere v. County of Olmsted*, 772 F.3d 1114, 1116 (8th Cir. 2014).

"There is no genuine issue of material fact if the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 510 (8th Cir. 1995). The court "determines whether there is a genuine issue of material fact based upon the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits," *id.,* as well as documents, electronically stored information, declarations, stipulations, admissions, or other materials. Fed. R. Civ. P. 56. "Reliance on 'mere pleadings' will not suffice to discharge the non-movant's burden." *McLaughlin*, 50 F.3d at 510. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

Summary judgment is further required when a nonmoving party cannot produce facts to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "Summary judgment is not a dress rehearsal or practice run; it 'is the put up or shut up moment in a lawsuit, when [the nonmoving] party must show what evidence it has that would convince a trier of fact to accept its version of the events.' " *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999), *overruled on other grounds as stated in Higgins v. Mississippi*, 217 F.3d 951, 954 (7th Cir. 2000)).

### B. The Municipal Defendants are Entitled to Qualified Immunity.

Broadly, 42 U.S.C. section 1983 creates a civil cause of action for deprivations of constitutional rights caused by persons acting under color of any statute or ordinance of any state or territory in the United States. Plaintiffs here allege Federal Constitutional Claims against the Municipal Defendants under the 8th and 14th Amendments to the United States Constitution—specifically, failing to protect Payne from suicide. But, qualified immunity "shield[s] government officials in the exercise of their discretionary functions." *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000). The purpose of qualified immunity is to "protect officials from the expense of frivolous suits that would unduly inhibit them in discharging their duties." *Id.* An "official is protected by qualified immunity so long as 'their actions could reasonably have been thought consistent with the rights they are alleged to have violated.' " *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635 at 638 (1987)); *Olson v. Bloomberg*, 339 F.3d 730, 735 (8th Cir. 2003) ("A government official is shielded by qualified immunity from suit for damages if a reasonable

official could have believed his or her conduct to be lawful, in light of clearly established law and the information possessed by the official.")

"Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law. But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." *Olson*, 339 F.3d at 735. (quoting *Greiner v. City of Champlin*, 27 F.3d 1346, 1352 (8th Cir. 1994)). To overcome qualified immunity, the Plaintiff must

> assert a violation of a constitutional or statutory right; that right must have been clearly established at the time of the violation; and, given the facts most favorable to the plaintiff, there must be no genuine issues of material fact as to whether a reasonable official would have known that the alleged action indeed violated the right.

*Gregoire*, 236 F.3d at 417. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Luckert v. Dodge County*, 648 F.3d 808, 817 (8th Cir. 2012). "Qualified immunity 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.' " *Id.* (quoting *Malley v. Briggs*, 475 U.W. 335 (1986)).

Here, under the 8th and 14th amendments, protection from the known risk of suicide is considered a clearly established constitutional right within the context of this case. *See Weaver v. Lincoln County, Nebraska*, 388 F.3d 601, 605, 606 n.6 (8th Cir. 2004); *Gregoire*, 236 F.3d at 417. But, as a matter of law, the Municipal Defendants didn't violate it. Plaintiffs must show that the Municipal Defendants were "deliberately indifferent" to a known risk that Payne would commit suicide. *Gregoire*, 236 F.3d at 417; *Yellow Horse v. Pennington County*, 225 F.3d 923, 927 (8th Cir. 2000). This is an exacting standard, and for reasons that follow, Plaintiffs cannot meet it.

### i. The Municipal Defendants were not deliberately indifferent to a known risk that Payne would commit suicide.

The United States Court of Appeals for the Eighth Circuit recognizes that "the Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs," and this includes the risk of suicide. *Gregoire*, 236 F.3d at 417. "Section 1983 claims arising out of inmate suicide cases have been analyzed in terms of prison officials' failure to provide appropriate medical care, so ' "deliberate indifference has become the barometer" by which these claims are tested.' " *Olson v. Bloomberg*, 339 F.3d 730, 735 (8th Cir. 2003) (quoting *Bell v. Stigers,* 937 F.2d 1340, 1343 (8th Cir.1991)).[7] Plaintiffs' claims fail as a matter of law under this standard, and the Municipal Defendants are shielded from liability by qualified immunity.

### 1. The deliberate indifference standard, and its application to prison officials.

Courts observe deliberate indifference claims against prison officials in inmate suicide cases arise under two factual circumstances. *Id.* (citing *Rellergert v. Cape Girardeau County,* 924 F.2d 794, 796 (8th Cir.1991)).

> First, there have been deliberate indifference claims in which the jailers allegedly failed to discover the inmate's suicidal tendencies. *See, e.g., Hott v. Hennepin County,* 260 F.3d 901, 905–06 (8th Cir.2001). Second, there have been deliberate indifference claims where jailers knew about suicidal tendencies but allegedly failed to take reasonable preventive measures. *See, e.g., Yellow Horse v. Pennington County,* 225 F.3d 923, 927 (8th Cir.2000).

---

[7]Deliberate indifference claims by *pretrial detainees* are analyzed under the Fourteenth Amendment rather than the Eighth Amendment, but the analysis is essentially the same. *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012). "Under the Fourteenth Amendment, pretrial detainees are entitled to at least as great protection as that afforded convicted prisoners under the Eighth Amendment." *Id.* (quoting *Vaughn v. Green Cnty., Ark.*, 438 F.3d 845, 850 (8th Cir. 2006)).

*Id.* As to the second category, the question is "whether the measures taken were so inadequate as to be deliberately indifferent to the risk" of suicide. *Luckert*, 684 F.3d at 818 (quoting *Rellergert,* 924 F.2d at 796)).

Courts hold that the suicide *itself* is not probative on this question, "because 'tying the suicide to proof of deliberate indifference is tantamount to requiring jailers to provide suicide-proof institutions,' and to ensure against suicide ever happening. [Rellergert, 924 F.2d at 796]. This is not the constitutional test." *Luckert*, 684 F.3d at 818. Rather, the 8th Circuit holds,

> [W]e must objectively "consider[ ] the measures taken in light of the practical limitations on jailers to prevent inmate suicides." [Rellergert, 924 F.2d at 796] "Simply laying blame or fault and pointing out what might have been done is insufficient. The question is not whether the jailers did all they could have, but whether they did all the Constitution requires." *Id.* at 797. "In evaluating an official's response to a known suicide risk, we should be cognizant of how serious the official knows the risk to be." *Gregoire,* 236 F.3d at 418.

*Id.* at 818.

The 8th Circuit holds an official may be liable under the Eight Amendment for deliberate indifference only when "he or she (1) knows that the inmate faces 'a substantial risk of serious harm' and (2) 'fail[s] to take reasonable measures to abate that risk." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)). "Deliberate indifference is 'akin to criminal recklessness,' something more than mere negligence; a plaintiff must show that a prison official 'actually knew that the inmate faced a substantial risk of serious harm' and did not respond reasonably to that risk." *A.H.*, 891 F.3d at 726 (quoting *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)). When Prison officials take "affirmative, deliberative steps" to prevent suicide, then poor judgment, negligence, and even gross negligence do not constitute deliberate indifference. *Luckert*, 684 F.3d at 818; *see also Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006) ("Deliberate

indifference is greater than gross negligence.") Deliberate indifference is a demanding standard; although in a different context, one court explained:

> Precisely what constitutes deliberate indifference on the part of prison officials has been the subject of some debate. It is at least clear that mere negligence or inadvertence is insufficient to satisfy this standard. *Wilson,* 501 U.S. at ——, 111 S.Ct. at 2328; *see Estelle,* 429 U.S. at 105, 97 S.Ct. at 291. Indeed, deliberate indifference requires the "unnecessary and wanton infliction of pain." *Givens v. Jones,* 900 F.2d 1229, 1232 (8th Cir.1990). . . . **[W]hatever its exact contours, deliberate indifference requires a highly culpable state of mind approaching actual intent**.

*Choate v. Lockhart*, 7 F.3d 1370, 1374 (8th Cir. 1993) (emphasis added) (footnote omitted).

It is important to highlight the mental state associated with the deliberate indifference standard—it is not a should-have-known objective reasonableness analysis; rather, the standard is subjective, conscious awareness of a substantial risk. *Gregoire*, 236 F.3d 417. In the inmate-suicide context, the 8th Circuit has followed the United States Supreme Court discussion of the deliberate indifference standard in *Farmer v. Brennan*, 511 U.S. 825 (1994). *Gregoire*, 236 F.3d at 417.

In *Farmer*, the U.S. Supreme Court confronted this standard. 511 U.S. at 829. The context there was a prisoner's safety from abuse by other inmates. *Id.* at 830–31. Like the present matter, this context concerns *prevention* of harm. *See id.* The U.S. Supreme Court rejected the Petitioner's invitation there to adopt an objective, civil-law recklessness standard, instead opting to follow a standard more akin to criminal recklessness. *Id.* at 837. The court explained,

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something

society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. See Prosser and Keeton §§ 2, 34, pp. 6, 213–214; see also Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680; *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837–38. This requires a court to inquire "into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment," *id.* at 837 (quoting *Wilson v. Seiter*, 501 U.S. 294 at 299–302 (1991)), thereby imposing a subjectivity requirement in Eighth Amendment suits against prison officials. *Id.* To act recklessly under the subjective, criminal recklessness standard, "a person must 'consciously disregard' a substantial risk of serious harm.' " *Id.* at 839 (quoting Model Penal Code § 2.02(2)(c)). Although the test is a subjective one, the mental state of the offending official may be proved by circumstantial evidence, thus giving no safe harbor to defendants from objectively obvious risks. *Id.* at 842–43. The United States Supreme Court described this tension as follows:

We are no more persuaded by petitioner's argument that, without an objective test for deliberate indifference, prison officials will be free to ignore obvious dangers to inmates. Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. Cf. 1 C. Torcia, Wharton's Criminal Law § 27, p. 141 (14th ed. 1978); Hall 115. We doubt that a subjective approach will present prison officials with any serious motivation "to take refuge in the zone between 'ignorance of obvious risks' and 'actual knowledge of risks.' " Brief for Petitioner 27. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, cf. Hall 118 (cautioning against "confusing a mental state with the proof of its existence"), and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. Cf. LaFave & Scott § 3.7, p. 335 ("[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of"). For example, if an Eighth Amendment plaintiff presents evidence showing

that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." Brief for Respondents 22.

*Id.*

The Court commented as follows on overcoming the standard:

Because, however, prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety. That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so. Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.

In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure " 'reasonable safety,' " *Helling, supra,* at 33, 113 S.Ct., at 2481; see also *Washington v. Harper,* 494 U.S., at 225, 110 S.Ct., at 1038–1039; *Hudson v. Palmer,* 468 U.S., at 526–527, 104 S.Ct., at 3200–3201, a standard that incorporates due regard for prison officials' "unenviable task of keeping dangerous men in safe custody under humane conditions," *Spain v. Procunier,* 600 F.2d 189, 193 (CA9 1979) (Kennedy, J.); see also *Bell v. Wolfish,* 441 U.S. 520, 547–548, 562, 99 S.Ct. 1861, 1878–1879, 1886, 60 L.Ed.2d 447 (1979). Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Id.* at 844–45.

Following *Farmer*, The Eighth Circuit summarized the standard for deliberate indifference as follows:

Under this standard, an official is deliberately indifferent (reckless) if he disregards a known risk to a prisoner's health. *Id.* at 837, 114 S.Ct. 1970. To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk. *Id.* However, this knowledge is subject to proof by all the usual

ways, including inferences based on the obviousness of the risk. *Id.* at 842, 114 S.Ct. 1970. Lastly, even if an official knows of a risk, he is not liable for a subsequent injury if he responded reasonably to the known risk. *Id.* at 844, 114 S.Ct. 1970.

*Gregoire*, 236 F.3d at 417.

### a. Jailer Weakland was not deliberately indifferent to a known risk that Payne would commit suicide.

Plaintiff's deliberate indifference claim against Weakland fails as a matter of law. Weakland was not aware of a substantial risk that Payne would commit suicide or otherwise harm himself. But even in view of the low risk he was aware of, he took reasonable, appropriate steps in response—he promptly arranged for Payne to meet with Thomas to address Payne's mental health needs and medication. Payne's abrupt suicide after his meeting with Thomas was tragic and surprising. Qualified immunity shields Weakland from any liability, and the court should grant summary judgment in the Municipal Defendants' favor on Plaintiff's claim against Weakland.

### i. Subjective knowledge.

Plaintiffs cannot show that Weakland was actually and subjectively aware that Payne would kill or even harm himself. *See Lambert v. City of Dumas*, 187 F.3d 931 937–38 (8th Cir. 1999). As noted, the deliberate indifference analysis does not apply a should-have-known standard; rather Plaintiffs must show Weakland had actual knowledge of a substantial risk of harm to Payne, and then disregard that knowledge. *Id.* at 937. In other words, Plaintiffs have to show that Weakland was "actually and subjectively aware" of the substantial risk. *Id.* They cannot do this, and their claims fail.

For example, in *Hott v. Hennepin County Minnesota*, 260 F.3d 901, 905–906 (8th Cir. 2001), the 8th Circuit held jail officials did not violate an inmate's 8th Amendment rights when

they failed to identify him as having an increased risk of suicide. Plaintiff there argued the jail denied access to necessary medical care by not obtaining medical records classifying the inmate as a suicide risk, and they further failed to meet an obligation to investigate his mental condition in view of the inmate's habit of making strangling gestures. *Id.* at 905. Plaintiff further contended additional charges brought against the inmate just before his suicide, a request for a late-night phone call to his girlfriend, and his glum demeanor should have put the jail on notice the inmate was an increased risk for suicide. *Id.* 905–06.

The 8th Circuit rejected these contentions. *Id.* at 906. The court held the jail had no constitutional duty to obtain personal medical records from outside the prison or from a county hospital where the prisoner had previously received treatment. *Id.* The evidence didn't show that any of the staff subjectively understood and interpreted the strangling gestures as a suicide threat. *Id.* The late-night phone call was reasonably explained by the inmate's desire to check on his infant son. *Id.* And a gloomy affect doesn't trigger a constitutional duty to inquire whether an inmate is feeling suicidal. *Id.* The court held, "In short, there is no evidence to indicate that the ADC or its employees had actual knowledge that Hott posed a serious threat of harm to himself. In the absence of such evidence, the plaintiff cannot show that ADC personnel were subjectively indifferent to his needs for medical care." *Id.* The court explained,

> [T]he burden is on the plaintiff to show that (1) he suffered from a serious medical need and (2) the prison officials actually knew of his need, but deliberately failed to meet it. The inadequate medical care analysis focuses on the particular risk of suicide posed by the specific prisoner, rather than on the generalized threat of suicide among the population of prisoners as a whole.

*Id.* at 905.

Accordingly, the absence of actual, subjective awareness to the risk of harm is fatal to a deliberate indifference claim, and what a party *post hoc* believes a jail official should have known

is irrelevant. *Lambert v. City of Dumas*, further makes the point—there, the inmate hanged himself from his cell door a few hours after being jailed. 187 F.3d 934. The record showed that three years prior, the decedent had swallowed a crack pipe while in custody, which may have been an attempt to commit suicide. *Id.* at 934 n.5. Based on the prior incident, the district court denied qualified immunity on the grounds that there was some evidence to suggest the officers should have known about the inmate's suicidal tendencies. *Id.* at 934. But the 8th Circuit reversed, because the *should-have-known* analysis was improper—what mattered was what was *actually in the minds* of the officers involved in the arrest and detention. *Id.* at 937.

In *Lambert*, no evidence showed the officers were "actually and subjectively aware" that the inmate would harm himself. *Id.* The evidence did not show that any of the involved officers were aware of the prior incident in which the inmate attempted to swallow the crack pipe. *Id.* But the court went further and held that even if they had actual knowledge of that incident, it still failed to show the inmate had suicidal intentions three years later or that there was a strong likelihood of self-inflicted harm. *Id.*

Here, Plaintiffs cannot show Weakland *actually knew* Payne was at risk of killing or even harming himself. Focusing on the mind of Weakland at the moment he returned Payne to his cell, the record is clear that Weakland did not understand Payne to be at risk of suicide or self-harm. Moments before, Weakland had just conferenced with Thomas about Payne, and as a consequence of that, Weakland believed "there was no concern that Jordan was going to hurt himself." [SOMF 87]. Weakland testified, I do not remember the specifics of the conversation, but I do remember that after we spoke that there was not any concern. I did not feel any extra concern for Jordan Payne." [SOMF 87]. That was the state of Weakland's mind when he returned Payne to his cell, and it is not actual, subjective awareness of any suicide or self-harm risk.

While informing Weakland about the ITP appointment, Thomas relayed that Payne had said he didn't know what would happen when he got *out* of jail, but he said more than once that he was not going to harm himself in custody. [SOMF 84]. Plaintiffs cannot show that Weakland understood this to mean anything other than what Weakland testified to—*i.e.*, that there was not any concern about Payne. [SOMF 87]. Thomas never suggested increasing Payne's level of supervision. [SOMF 89]. He never told Weakland about Payne's alleged seven suicide attempts. [SOMF 91]. He never told Weakland about Payne's history of depression. [SOMF 91]. He never told Weakland that Payne had a history of severe mental illness. [SOMF 91]. He never told Weakland that Payne had an injury that was causing him pain. [SOMF 91]. He never told Weakland that Payne said he was hearing voices. [SOMF 91]. He never told Weakland that Payne had a history of substance abuse. [SOMF 91]. He never told Weakland that Payne felt hopeless and like he had nothing left. [SOMF 91]. And he never told Weakland that Payne was having relationship problems with his girlfriend. [SOMF 91]. The court has to focus on what Weakland actually knew and not impute information that was never communicated to him.

Weakland was entitled to rely on Thomas's assessment of Payne after the phone call from Leslie reporting Payne's comments about tearing out his veins. In a very recent opinion addressing analogous issues in the prison context, the 8th Circuit has again reiterated that "Prison officials lacking medical expertise are entitled to rely on the opinions of medical staff regarding inmate diagnosis and the decision of whether to refer the inmate to outside doctors or dentists" *Reece v. Hale*, --- F.4th ---, 2023 WL 1179760 at *4 (8th Cir. 2023). The court further explained that even in cases where more could have been done, the court will not review deliberate indifference claims "through the lens of 'hindsight's perfect vision,' " because plaintiffs "must demonstrate more than

mere negligence or 'ordinary lack of due care for the prisoner's safety' to succeed" on the claim. *Id.* at *5.

At best, Plaintiffs can argue that based on the little information Weakland had, he should have known Payne was at risk of killing or harming himself. But even granting *arguendo* that exceptionally generous inference, that is *not* the standard courts apply in evaluating deliberate indifference. *See Lambert*, 187 F.3d at 937–38 (holding the *should-have-known* inquiry improper to the deliberate indifference analysis, and holding the accused official must be actually and subjectively aware of a substantial risk of harm and then disregard that knowledge). Even if a credible argument could be made that Weakland could have interpreted the information available to him differently, that also does not establish actual, subjective awareness of substantial risk. The jailers in *Hott* failed to interpret the inmate's strangling gestures as a suicide threat, but the mistake did not amount to actual, subjective awareness of a substantial risk. 260 F.3d at 906. Likewise, here, there is no evidence in the record that Weakland was actually aware of any substantial risk Payne posed to himself. And this makes sense, because Payne was deliberately concealing the severity of his condition from jail staff in order to avoid being placed on suicide watch. [SOMF 15, 22, 26]

### ii.  Reasonable preventive measures.

Weakland's risk awareness was altered by Thomas's report that Payne would not harm himself in custody, and any prior concerns, potentially raised by Payne's desire to meet with Thomas or Leslie's phone call to the jail, were extinguished. After speaking with Thomas, Weakland actually believed there were no concerns with Payne harming himself. Because Weakland lacked actual, subjective knowledge of a substantial risk that Payne would kill himself, the analysis ends there, and Plaintiff's claims fail.

Nevertheless, even considering Weakland's risk awareness *before* meeting with Thomas, Weakland took reasonable steps to address Payne's needs relating to his mental health and medications. Weakland's awareness of the risk that Payne posed to himself at this time was low, but he still was prompt in arranging a meeting with Thomas and giving Payne access to the Jail's mental health resources. The 8th Circuit holds that "where suicidal tendencies are discovered and preventive measures taken, the question is only whether the measures taken were *so inadequate as to be deliberately indifferent to the risk*," and a completed suicide itself is not probative on that question. *Rellergert*, 924 F.2d at 796. Responding to an inmate's needs by taking them to a mental health professional is not deliberate indifference. Plaintiffs' claims fail.

When evaluating a prison official's response to a suicide risk, courts consider both the level of risk the official understood and also the affirmative steps they take to abate the risk thereafter. As to the level of risk, courts again focus on what the jail official *actually knew* vis-à-vis the risk. In *Gregoire v. Class*, 236 F.3d 413, 415–17 (8th Cir. 2000), the court looked to the jail official's state of mind and what he actually knew of the inmate's risk of suicide when evaluating a deliberate-indifference claim. There, the allegation was that the case manager of the inmate's cell block was deliberately indifferent to the inmate's risk of suicide by failing to check on the inmate for about 40 minutes after receiving a phone call from the inmate's ex-wife indicating that the inmate intended kill himself. *Id.* at 416. During the phone call, the ex-wife also asked the case manager to reassure the inmate that she was not going to prevent him from seeing his daughters. *Id.*

The ex-wife did not inform the case manager that the inmate had made previous suicide threats, was being treated for depression, and had attempted suicide in the past year. *Id.* There, an initial health screening revealed the inmate's treatment and hospitalization for depression and

recent contemplation of suicide. *Id.* The inmate had even been on suicide watch after being transferred to the penitentiary, and a psychology intake interview revealed suicidal ideation, but it also indicated he wasn't a present risk of suicide. *Id.* None of this information was in the inmate's case file, and the case manager knew only what the ex-wife told him when she called the jail. *Id.* at 418. The case manager also believed the ex-wife seemed more concerned that the inmate understand he could continue to see his daughters than about the threat of suicide. *Id.* at 416.

The case manager's low level of awareness of the risk of suicide was a significant factor in the court's analysis. *Id.* The court focused on what the case manager actually knew, *i.e.*, the contents of the phone call, and how he responded to that. *Id.* at 417–18. The court held,

> In evaluating an official's response to a known suicide risk, we should be cognizant of how serious the official knows the risk to be. Our cases indicate that a single phone call to an official who has no other reason to think an inmate is a suicide risk, most likely does not create a strong likelihood that infliction of self-harm will result. *Cf. Bell v. Stigers,* 937 F.2d 1340, 1344 (8th Cir.1991) (stating "[a] single off-hand comment about shooting oneself when no gun is available cannot reasonably constitute a serious suicide threat"); *Lambert,* 187 F.3d at 938 (stating that knowledge of a single incident of attempting to swallow a crack pipe three years previous did not give rise to knowledge of a present serious risk of suicide).

*Id.* at 418. Although *completely disregarding* a phone call alerting of a suicide risk *could* amount to deliberate indifference, the court observed that the case manager took some action in response to the risk in attempting to meet with the inmate 40 minutes after the call. *Id.* The court noted there was no indication in the record that he knew of the inmate's history with depression, suicidal ideations or threats, his previous suicide attempt, or his classification as a suicide risk. *Id.* at 417.

The court held, "Even if an official knows of a risk of suicide, and suicide does occur, the official is entitled to qualified immunity if he could reasonably believe that his response to the risk was not deliberately indifferent (or reckless) to that risk." *Id.* The court also explained,

> In hindsight it may have been preferable if Joffer [the case manager] had immediately sent someone to check [inmate] Bouska. **However, we must evaluate his actions in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position.** *Cf. Rellergert,* 924 F.2d at 796. "The question is not whether the jailers did all they could have, but whether they did all the Constitution requires." *Id.* at 797. While we expect that jailers will learn from their failures in preventing suicide, they are not constitutionally liable for every failure, only those where they are deliberately indifferent to the risk of suicide.

*Id.* at 418–419.

Weakland's prompt responsiveness in arranging a mental health appointment went well beyond the constitutional minimum for 8th and 14th Amendment deliberate indifference claims. *Rellergert by Rellergert v. Cape Girardeau Co., Mo.*, 924 F.2d 794, 796 (8th Cir. 1991), addressed the question of the adequacy of preventive measures to prevent suicide in the prison context. There, inmate Mark England indicated on a medical history form that he had attempted suicide in the past. *Id.* at 794–95. A social worker who interviewed him the following day concluded he suffered from mild depression but did not have suicidal symptoms or need for mental health treatment. *Id.* at 795. Pursuant to procedure to prevent inmate suicides, however, England nevertheless was housed in a common area of the jail where he could be observed by a duty officer from a centrally located booth. *Id.* Policy also required the jailer to never leave the booth, and in the event of an emergency, to call dispatch for help. *Id.* The procedure was designed both for safety and to prevent escape or injury in the event a jailer leave the booth and be overpowered by inmates. *Id.*

During the shift of Jailer Bedell, England went into the bathroom area adjacent to the booth but not otherwise visible to the jailer. *Id.* Bedell was in the booth and was occupied processing the charge of a new prisoner when he observed England walk to the bathroom. *Id.* After England did not return quickly, Bedell sent another inmate and a trustee into the bathroom to check on

England, who discovered England had hung himself with a bedsheet. *Id.* Bedell alerted dispatch, and outside personnel arrived within 10–15 minutes and confirmed the tragedy. *Id.* Bedell remained in the booth the entire time as per policy. *Id.* Bedell testified that when he saw England go to the bathroom, he could not see whether he carried a sheet or other bedding with him. *Id.*

In analyzing the deliberate indifference question, the court noted that "where suicidal tendencies are discovered and preventive measures taken, the question is only whether the measures taken were *so inadequate as to be deliberately indifferent to the risk*," and the suicide itself is not probative on that question. *Id.* at 796 (emphasis added). The court also elaborated,

> Whether or not the measures taken by jailers are sufficient to preclude a finding of deliberate indifference, thereby providing qualified immunity to the jailers, must be determined by considering the measures taken in light of the practical limitations on jailers to prevent inmate suicides. Evaluation of the measures cannot be made from an *ex post facto* perspective. Once a suicide has been accomplished in spite of preventive measures, it is all to easy to point out the flaws of failure. The proper consideration of the measures implemented by the jailers can only be from an objective point of view. While the jailers should learn from their failure to aid in the prevention of later suicides, we cannot fairly judge them by that failure.
>
> . . . .
>
> Simply laying blame or fault and pointing out what might have been done is insufficient. The question is not whether the jailers did all they could have, but whether they did all the Constitution requires. The requirement for defeat of a claim of qualified immunity is that the evidence demonstrate deliberate indifference by the jailers in the face of a known suicide risk at the time preventive measures were effected.
>
> . . . .
>
> While we conclude that the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk, we cannot say that the law is established with any clarity as to what those measures must be.

*Id.*

Although the law is not clear on precisely what measure must be taken, in no event can the measures taken here be considered constitutionally deficient. Here, it is important to emphasize

again the low level of awareness Weakland had concerning any risk of harm Payne presented to himself. Weakland did not know Payne, had no history with Payne at the jail, had only just met Payne, and was not aware of his previous suicide attempts. [SOMF 146, 147]. The record does not show that Weakland was aware of Payne's responses to the Booking Report, which indicated Payne had previously tried to hurt and kill himself. But even if he was familiar with the booking report, it indicated Payne was not presently anxious, afraid, angry, embarrassed, or ashamed, he was not under the influence of alcohol or drugs, he had no scars or marks of attempted suicide, and he was not thinking about hurting himself now. [SOMF 6].

Similar to *Gregoire*, what Weakland knew of the level of risk to Payne primarily came from the phone call to the jail. But the risk of suicide was even more cryptic here—the call did not clearly indicate Payne presently intended to commit suicide, but rather that he had thoughts about tearing out his veins. [SOMF 30, 31, 34, 38]. The information was relayed to Weakland because he didn't take the call personally, and at the time this was discussed, Payne was observed sleeping on his bed. [SOMF 38, 39, 40, 41].

Weakland also knew Payne wanted to see Thomas about his medications and something about "visions." *Id.*; [SOMF 44] But in response to this and the call from Leslie, Weakland promptly arranged Payne's meeting with Thomas, which was to occur soon after Leslie called the jail, and the meeting with Thomas resulted in a follow up appointment for Payne with a psychiatrist a mere one-and-a-half hours later. [SOMF 44, 45, 82]. Weakland facilitated Payne's access to mental health services offered at the jail. Under the standard articulated in *Rellergert*, these measures are not "so inadequate as to be deliberately indifferent to the risk." 924 F.2d at 796.

In sum, the jail provided inmates with access to mental health resources, which Weakland utilized promptly in response to Payne's needs and the phone call from Payne's mother. Weakland

was trying to help Payne.  Weakland was in no way indifferent to any risk that he understood at the time.

Further, the timeline is also important here.  Although Thomas's report to Weakland that Payne wouldn't harm himself in custody extinguished any of Weakland's concerns from that point in time moving forward, there is not much Weakland could have done in any event.  The suicide happened very quickly after—and in apparent response to—the final chirp messages between Payne and McKinley when McKinley accuses him of lying and breaks off their relationship.  From Weakland's vantage point, he could not have known when he returned Payne to his cell that Payne was about to read a series of text messages from McKinley that would precipitate Payne's very rapid descent into taking his own life barely 10 minutes later.

The chain of events following Payne's meeting with Thomas show the suicide happened so quickly and unpredictably, there is nothing Weakland could have done.  After being informed that Payne was not a suicide threat, Weakland had a casual conversation with Payne on the way back to his cell, and he left Payne's cell at 1:54:34, with Payne displaying no indication he was going to kill himself.  [SOMF 98].  Payne then reviewed the infidelity messages from McKinley and texted back and forth with her a few times before running out of funds.  [SOMF 99, 100, 101, 102, 103, 104, 105, 106].  At 2:00:34, Payne collapsed onto his bed in a fetal position.  [SOMF 107].  At 2:01:37, Payne sat up and began tying a white sheet into a noose.  [SOMF 108].  At 2:02:20, Payne made his first attempt to hang himself by his interior door, which failed.  [SOMF 108].  At 2:03:09, Payne went into the shower with the noose.  [SOMF 109].  At 2:04:36, there is a thump inside of the shower.  [SOMF 110].  Soon thereafter, at 2:04:42, Payne began gagging and gasping.  [SOMF 111].  At 2:05:25 there is a final thump, and at 2:05:32, the last choking sound can be heard, after which the cell goes silent.  [SOMF 112].

Accordingly, from the time Weakland was assured Payne was not a suicide risk, and then Weakland's final contact with Payne at 1:54:34, only 7 minutes and 3 second elapsed before Payne sat on his bed and began forming a noose. Only 7 minutes and 46 seconds elapsed before Payne first attempted to hang himself. Only 10 minutes and 2 seconds elapsed before Payne likely hung himself in the shower. And only 10 minutes and 58 seconds elapsed before the last audible sounds of life can be heard from Payne's cell.

The facts here are clearly distinguishable from cases where there was a triable issue on deliberate indifference. The facts of *Olson v. Bloomberg*, 339 F.3d 730, 734 (8th Cir. 2003), illustrate the exemplary behavior that amounts to deliberate indifference in prison suicide cases. Fact issues in *Olson* precluded summary judgment, which, if resolved in the plaintiff's favor, would have amounted to deliberate indifference. *Id.* There, the inmate directly told the jailer he was going to commit suicide. *Id.* In response to the credible threat, the jailer allegedly replied, "You do what you got to do and I'll do what I got to do." *Id.* at 733, 735. The Jailer then allegedly walked away for 25 minutes and then was not responsive to numerous inmates' emergency calls after the suicidal inmate became unresponsive. *Id.* That is deliberate indifference.

This is not a 'do-what-you-got-to-do' case. Payne's suicide was both tragic and surprising. It was also traumatic for Weakland, and it caused him to leave his career in law enforcement. Weakland was not deliberately indifferent to Payne's medical needs or any known risk of self-harm or suicide. Weakland is entitled to qualified immunity as a matter of law.

### 2. Supervisor and County Liability.

Likewise, Sheriff Barnes and Madison County are entitled to qualified immunity. There is no question that Sheriff Barnes was not personally involved in Payne's arrest or detention at the Jail. [SOMF 135]. But Plaintiffs cannot show that his training and supervision of jail staff were so inadequate as to make the constitutional violation here likely. And the county's custom and

policies were designed to prevent suicide, and they cannot be found deliberately indifferent to inmate suicide as a matter of law. The Municipal Defendants here are entitled to qualified immunity, and this court should grant summary judgment in their favor.

In a 42 U.S.C. section-1983 claim, a jail supervisor cannot be liable on a theory of respondeat superior for alleged constitutional violations committed by subordinate officers. *Weaver*, 833 F.3d at 606. However, the 8th Circuit holds,

> [A supervisor] may be held individually liable under § 1983 . . . if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights. The plaintiff must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts. This requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation.

*Id.* (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996)).

Likewise, concerning the County's liability, the United States Supreme Court held in *Monell v. Department of Social Services of City of New York*,

> [A] local government may not be used under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

436 U.W.658 694 (1978). In the present context, a municipality can be liable when the municipal policy itself is unconstitutional, or where "the municipality's deliberate indifference to the need to train and supervise its employees causes an employee to violate a third party's constitutional rights." *A.H.*, 891 F.3d at 728. The policy or custom must be the "moving force of the constitutional violation." *Monell*, 436 U.W. at 694.

On the question of whether a policy *itself* violates constitutional rights, the 8th Circuit holds,

> Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving . . . issues of fault and causation is straightforward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation.

*Id.* (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404–05 (1997)). In this context, plaintiffs "must show that the Policy itself reflects deliberate indifference of the County and [Director] to the risk of inmate or detainee suicide that was the 'moving force' behind the violation of . . . rights." *Id.* The 8th Circuit specifically holds municipal policies that aim to prevent inmate suicides likely survive under the deliberate indifference standard—the court in *A.H.* noted, "A municipal policy 'cannot be both an effort to prevent suicides and, at the same time, deliberately indifferent to suicides.' " *Id.* (quoting *Liebe*, 157 F.3d at 579)).

### a. Madison County's suicide prevention policy.

Madison County's suicide prevention policy is not deliberately indifferent to inmate suicide. The policy is contained in the Madison County Sheriff's Office's Standard Operating Procedures contain policies related to suicide prevention. [SOMF 151]. It directs that all staff involved in the booking and supervision of prisoners be trained in suicide prevention. [SOMF 152]. At the time of an inmate's admission, attempts are required to be made to determine whether the inmate is suicidal. [SOMF 152]. It provides a list of questions the jailer or dispatcher is to ask during the admission process, with appropriate documentation, to aid in suicide prevention:

- Does the prisoner show signs of depression?
- Does the prisoner appear overly anxious, afraid, or angry?
- Does the prisoner appear unusually embarrassed or ashamed?
- Is the prisoner acting or talking in a strange manner?
- Does the prisoner appear to be under the influence of alcohol or drugs?
- Does the prisoner have any scars or marks which indicate a previous suicide attempt?

*Id.* It then notes, "In all cases, the following questions will be asked of the prisoner:"

- Have you ever tried to hurt yourself?
- Have you ever attempted to kill yourself?
- Are you thinking of hurting yourself now?
- Housing for prisoners with disabilities shall be designated for their use, or reasonable accommodations shall be provided for the prisoner's safety and security.

[SOMF 152]. The policy requires documentation of these items and further provides that [i]f an inmate is violent or suicidal, he/she may be denied any or all of his/her linen, mattresses, and or all personal items until it has been determined that there is no longer a threat." [SOMF 153]. The policy continues:

> The Jailer/Dispatcher will determine what type of monitoring is necessary for the inmate's protection from him/herself. The inmate will be kept on a special watch, with the Jailer/Dispatcher logging all cell checks in 15 minute intervals, or as determined by the Sheriff or Jail Administrator.
>
> The special watch will remain in effect until the Sheriff or Jail Administrator feels that it may be removed, or the length of the checks can be changed. This will be decided by either questioning the inmate, or by observation that there is no longer a threat. Once the Sheriff of Jail Administrator has deemed it safe to lift the special watch, all property removed from the inmate will be returned.
>
> In the event that the inmate requests to speak to a chaplain or representative from a bona-fide religion, or member from a social service department, the Jail Administrator will need to be notified and approve the visit.

[SOMF 153]. The Standard Operating Procedures also address processes that need to be followed in the event of an attempted suicide. [SOMF 153].

These procedures are designed to prevent suicides; they're not deliberately indifferent towards them. "A municipal policy 'cannot be both an effort to prevent suicides and, at the same time, deliberately indifferent to suicides.' " *Id.* (quoting *Liebe*, 157 F.3d at 579)). As shown by the booking report, the intake screening questions are followed. [SOMF 6, 7]. And as discussed below, Jail staff are trained and expected to follow the procedures in addition to other training they receive on suicide prevention to secure and maintain a jailer certification.

### b. Training and supervision.

Sheriff Barnes's training and supervision of jail staff was not deficient here as a matter of law. Barnes did not tacitly authorize a constitutional violation, and the training procedures and supervision were not so inadequate that they were likely to result in a constitutional violation. The municipal defendants are entitled to qualified immunity, and Plaintiffs' claims fail as a matter of law. *Weaver*, 833 F.3d at 606.

Jail staff undergo substantial training through the Iowa Law Enforcement Academy, and Sheriff Barnes requires additional monthly training in police science in addition to all employees being trained on the department's standard operating procedures, which include suicide prevention. Upon hire, jailers attend a 40-hour jail school, and then they are required to take 20 hours of annual training thereafter, all through the Iowa Law Enforcement Academy. [SOMF 154]. Within the department, they have CPR and first aid, as well as Police Legal Sciences, which is 2 hours of online training everyone is required to do every month. [SOMF 155].

Madison County's job descriptions describes the training required for the positions of Jail/Dispatcher and Dispatcher/Jailer. [SOMF 156]. A Dispatcher/Jailer's primary job is dispatching, but they are trained to serve in a jailer role in case they need to cover for a jailer while they're retrieving meals or a similar temporary absence. [SOMF 157]. Dispatcher/Jailers do dispatch related training in addition to attending jail school. [SOMF 158]. Jailer/Dispatcher's attend the initial 40-hour jail school and then must maintain their jailer certification through 20-hours of annual training. [SOMF 159]. Both roles also require eight hours per year of continuing education. [SOMF 160]. Barnes recalled the topics covered during the 20-hour annual jailer certification course included medication review management, implicit bias training, gambling,

inmate suicide prevention, and sexual harassment. [SOMF 161]. However, the Iowa Law Enforcement Academy determined the contents of the annual certification. [SOMF 161].

Henry described the training in similar terms, and explained the dispatch school through the Iowa Law Enforcement Academy—the Basic Iowa System Training ("BIST"), which certifies them to have access to the NCIC system—was a 40-hour school. [SOMF 162]. She also acknowledged that police science tests are administered monthly for the dispatch and the jail. [SOMF 163]. Some of the police science testing within the past couple years had covered suicide intervention or prevention, but Henry could not recall specific dates. [SOMF 164]. And the monthly police science testing included training on suicide prevention or intervention within the past six months. [SOMF 165]. She could not recall the extent to which the police science training had been used prior to June of 2020, but it had been in place for the past couple of years. [SOMF 166]. She recalled receiving suicide prevention or intervention training at the ILEA jail school, which was included as a training topic every so often, depending on the discretion of the presenter from the ILEA. [SOMF 167]. And every two years dispatchers recertify through NCIC, requiring another test. [SOMF 168].

Upon being hired at the Jail, Weakland went through a jail-school training at the Iowa law enforcement academy. [SOMF 169]. Following the jail school, Weakland recalled receiving annual training of 20 hours on his job, but could not recall the extent to which it covered suicide prevention. [SOMF 170]. Although unable to recall specific trainings now that he is no longer employed in that capacity, Weakland remembered he was trained in the policies of the Madison County Jail, including the Jail's standard operating procedures. [SOMF 171]. Weakland's employment file contains certifications and enrollment confirmations. [SOMF 172].

As the Sheriff, Barnes supervises the entire Sheriff's Department. [SOMF 173]. Barnes expects and relies on his Chief Deputy, Chief Deputy Allen, to ensure the policies and procedures are implemented in the jail. [SOMF 174]. Chief Deputy Allen is in charge of many of the administrative responsibilities for the jail. [SOMF 174]. Below Chief Deputy Allen is the Jail Administrator, Steve Niblo, who supervises the Jailers. [SOMF 175]. The jail administrator oversees the day-to-day, shift-to shift responsibilities in the Jail, where he works on site. [SOMF 175]. Barnes appointed Niblo as the jail administrator in 2015 after he took office. [SOMF 175].

During his time as Sheriff at Madison County, two other inmates besides Payne had died. [SOMF 176]. One was due to a blood clot the inmate had, and he was transported to the hospital where he later died. The second was in 2016 when an inmate attempted suicide in order to be transferred to the hospital where he could then escape (as he had previously done in the past), but he accidentally killed himself in the process. [SOMF 176].

When Barnes became Sheriff, he restructured the department to improve the division of labor. [SOMF 177]. He created the Jail Administrator position so one person could attend solely to the responsibilities at the jail—previously, the Chief Deputy was responsible for the jail in addition to his other responsibilities. [SOMF 178]. Barnes created the Jail Administrator position and hired Niblo for the position to "make it better back there." [SOMF 179]. He also created a dispatch supervisor position. [SOMF 180]. A substantive change in procedure was finalized in about 2015 at jail when they obtained funding to have 24/7 jailer coverage. [SOMF 181].

A jail inspector from the state also came in every year to evaluate their policies and practices for compliance with existing jail standard. [SOMF 182]. The inspection included many items too numerous to list, but it included staff training and review of suicide prevention. [SOMF 183]. The Jail had not received any negative remarks on their suicide prevention procedures in

the inspection reports, and the inspector generally commented, "Madison County Jail is a clean, well-maintained and well-managed facility." [SOMF 184].

Barnes stated the standard operating procedures served as the default manual for the employees to fulfill their employment obligations. [SOMF 185, 186]. In 2017, Barnes worked with the-Chief Deputy Jim Ascione to revise the standard operating procedures. [SOMF 187]. These procedures were still in place in 2020. [SOMF 187]. They worked through the procedures, chapter by chapter, to determine what was still working and what needed tweaked. [SOMF 188]. The SOP included standards such as state requirements under Iowa Code chapter 50. [SOMF 188].

Barnes communicated to the jail administrator how important it is to keep an eye on everyone in the jail the best they can and to do their best job possible. This was communicated to staff during training, orientation, day-to-day operations, and in meetings. [SOMF 189]. The guidelines he expected from Jail staff were that they follow the suicide prevention policy, that they conduct jail checks, keep documentation, and to communicate. [SOMF 190].

Barnes stated that prior to the date of Payne's suicide, he impressed upon all Jail employees that suicide was a real risk, that they needed to pay careful attention, and report to the Jail Administrator of Chief Deputy if any action needed to be taken. [SOMF 191]. The suicide prevention plan contained in the standard operating procedures revised in 2017 was in effect at the time Payne was housed in the Jail in 2020. [SOMF 192]. Barnes stated that they remind jail staff constantly they need to pay attention and take suicide prevention seriously. [SOMF 193].

The jail also utilized the mental health resources of Eyerly Ball for its inmates. [SOMF 194]. The contract with Eyerly Ball was called a "jail diversion" program, which sought to assist inmates with their medications, and if an inmate was having a mental health crisis at the jail, Scott

Thomas from Eyerly Ball would come in and assist. [SOMF 195]. Under the Jail Diversion program, Eyerly Ball connects inmates to telehealth mental health providers. [SOMF 196].

The problem here did not involve county policies policy that were deliberately indifferent to inmate suicides. And the problem here was not a result of any failure in Sheriff Barnes's training and supervision of Weakland or any other jail staff. The problem here was that Payne was suffering a mental health crisis that he kept hidden from jail staff because he did not want to be placed on suicide watch—a suicide prevention measure of the Jail that he was personally familiar with, and one which he knew staff would impose. He explicitly admitted he didn't tell the jailer what he was experiencing because he wanted to avoid this:

McKinley:       Did you tell the jailer

                . . . .

Payne:          I aint sayn shit so they can strip me naked and chain me to a bed like last time.

[SOMF 15].

And further, Jail staff were assured by Thomas from Eyerly Ball that Payne was not at risk of committing suicide. As mentioned in the analysis above, they were entitled to rely on this assessment. *Reece v. Hale*, --- F.4th ---, 2023 WL 1179760 at *4 (8th Cir. 2023) (*quoting Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011) ("Prison officials lacking medical expertise are entitled to rely on the opinions of medical staff regarding inmate diagnosis and the decision of whether to refer the inmate to outside doctors or dentists.")))

Payne's own concealment of his mental status and the failure of Thomas to relay potentially concerning statements Payne had made, coupled with his affirmative assurance Payne was not a suicide threat, left the Jail in the dark as to the true nature and extent of the risk of Payne posed to harming himself. Per jail policy, Payne was given access to mental health services in response to

Payne's needs and requests. Nobody could have expected or predicted Payne to return from that meeting, only to encounter a string of texts from his girlfriend that would instigate a downward spiral leading to Payne taking his own life in just over 10 minutes.

Plaintiffs cannot show the County's suicide prevention policy, or any other County customs, was deliberately indifferent to inmate suicide. Plaintiffs cannot show Sheriff Barnes's training or supervision was constitutionally deficient. The municipal defendants are entitled to qualified immunity. This court should grant their motion for summary judgment on each of Plaintiff's constitutional claims.

## III. CONCLUSION

The Municipal Defendants were not deliberately indifferent to a known, substantial risk that Payne would commit suicide. They did not violate Payne's constitutional rights under the 8th and 14th Amendments to the United States Constitution, and they are shielded from any liability by qualified immunity. This could grant the Municipal Defendants' motion for summary judgment and dismiss Plaintiff's federal constitutional claims.

/s/ Michael C. Richards
Michael C. Richards, AT0010828
DENTONS DAVIS BROWN PC
215 10th Street, Suite 1300
Des Moines, Iowa 50309-3993
Telephone:  (515) 288-2500
Facsimile:  (515) 243-0654
E-mail: mike.richards@dentons.com

ATTORNEYS FOR MUNICIPAL
DEFENDANTS AND CROSSCLAIMANTS
JOHN WEAKLAND, JASON BARNES,
AND MADISON COUNTY, IOWA

Copies To:

Robert G. Rehkemper
Cory F. Gourley
GOURLEY, REHKEMPER,
& LINDHOLM, PLC
440 Fairway Drive, Suite 210
West Des Moines, IA 50266
Email: rgrehkemper@grllaw.com
Email: cfgourley@grllaw.com

ATTORNEYS FOR PLAINTIFF
KENT H. PAYNE, INDIVIDUALLY, AND
AS ADMINISTRATOR OF THE ESTATE
OF JORDAN KENT PAYNE

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on February 13, 2023, by:

☐ U.S. Mail                          FAX ☐
☐ Hand Delivered        Overnight Courier ☐
☐ Email                          CM/ECF ☒

Signature:  /s/ Michael C. Richards

Paul J. Statler
STATLER LAW, P.L.L.C.
301 East Walnut Street, Suite 7
Des Moines, Iowa 50309
Email: paul@statlerlaw.net

Glen S. Downey
THE LAW OFFICES OF
GLEN S. DOWNEY, LLC
5214 Ingersoll Avenue
Des Moines, IA, 50312
Email: glen@downey-law.net

ATTORNEYS FOR PLAINTIFF
LESLIE KING-PAYNE, INDIVIDUALLY

Jack Hilmes
Joseph F. Moser
FINLEY LAW FIRM, P.C.
699 Walnut Street, Suite 1700
Des Moines, IA 50309
Email: jhilmes@finleylaw.com
Email: jmoser@finleylaw.com

ATTORNEYS FOR DEFENDANTS AND
CROSSCLAIM DEFENDANTS
EYERLY-BALL COMMUNITY MENTAL
HEALTH SERVICES, AND
SCOTT THOMAS