IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| KENT H. PAYNE, Individually and as the Administrator of the Estate of JORDAN KENT PAYNE, and LESLIE KING-PAYNE, Individually,<br><br>                Plaintiffs,<br><br>    vs.<br><br>JOHN WEAKLAND, JASON BARNES, MADISON CO., IOWA, EYERLY-BALL COMMUNITY MENTAL HEALTH SERVICE, and SCOTT THOMAS,<br><br>                Defendants. | Case No. 4:21-cv-00349 |
| JOHN WEAKLAND, JASON BARNES, and  MADISON CO., IOWA,<br><br>                Cross-Claimants,<br><br>    vs.<br><br>EYERLY-BALL COMMUNITY MENTAL HEALTH SERVICE, and SCOTT THOMAS,<br><br>                Cross-Defendants. | PLAINTIFFS' BRIEF IN RESISTANCE TO DEFENDANTS WEAKLAND, BARNES AND MADISON COUNTY, IOWA'S MOTIONS FOR SUMMARY JUDGMENT |

**COME NOW** Plaintiffs, by and through counsel, and pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 56(b)(3), hereby provides the following Brief in Support of their Resistance to Defendants John Weakland, Jason Barnes and Madison County, Iowa's Motions for Summary Judgment.

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................... 4

SUMMARY JUDGMENT STANDARD ............................................................ 3

FACTS TAKEN IN THE LIGHT MOST FAVORABLE TO PLAINTIFFS ................... 5

LEGAL ARGUMENT ...................................................................................... 18

    I.     THE MUNICIPAL DEFENDANTS ARE NOT ENTITLED TO SUMMARY
          JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY ...................... 17

          A. Weakland is not entitled to qualified immunity and summary judgment
             because he was aware of Jordan's suicidal state and failed to take
             reasonable measures to abate the risk. ....................................................... 21

             1.  Weakland had knowledge that Jordan presented a substantial risk of
                 suicide. ............................................................................................... 22

             2.  Weakland failed to take reasonable measures to abate the risk ............. 26

          B. Defendant Barnes is not entitled to qualified immunity because he failed to
             train, supervise, or control the actions of his subordinates ........................ 32

          C. Defendant Madison County is not entitled to qualified immunity because by
             and through its policymakers, Barnes and Jail Administrator Niblo, it
             maintained a policy or custom of deliberate indifference to inmate's risk of
             suicide. ..................................................................................................... 42

CONCLUSION ................................................................................................ 47

## **INTRODUCTION**

Plaintiffs Kent H. Payne, individually and as administrator of the estate of Jordan Kent Payne ("Jordan" or "Payne"), and Leslie King-Payne , individually (the "Plaintiffs") initiated this action against Defendants John Weakland ("Weakland"), Jason Barnes ("Barnes"), and Madison County, Iowa (the "Defendants")[1] on November 8, 2021 following their son, Jordan Payne's ("Jordan") suicide while in the custody of the Madison County Jail. ((Dkt. No. 1).  Plaintiffs' included claims for violation of Jordan's constitutional rights under 42 U.S.C. § 1983 and the Eighth and/or Fourteenth Amendments of the U.S. Constitution, based on deliberate indifference to a serious medical need (Count I: Defendants Weakland and Barnes); and one count of violation of Jordan's constitutional rights under the Eighth and/or Fourteenth Amendments of the U.S. Constitution, based on deliberate indifference in failing to establish policies, practices, and procedures and failure to properly train and supervise (Count II: Defendant Madison County). (*Id.* at 6).

 In short, the basis of Plaintiffs' constitutional claims are that Jordan expressed an obvious serious medical need, clear risk of suicide, and defendants were deliberately indifferent to that obvious need and failed to take action to prevent Jordan's suicide. Additionally, in the years leading up to Jordan's suicide, the policymakers of Madison County, including Sheriff Barnes, were also deliberately indifferent to the serious risk of inmate suicide by failing to properly train jail staff as required by Iowa law.

---

[1] Eyerly Ball Community Health Services and Scott Thomas are also listed as defendants, who have separately filed a motion for summary judgment.

## FACTS TAKEN IN THE LIGHT MOST FAVORABLE TO PLAINTIFFS[2]

### A. A culture and environment of deliberate indifference.

Defendants recognize, as they must, that inmate suicide is a real and present danger for a county jail. PSDF ¶¶ 36-41. Their awareness of the seriousness of this risk was heightened because another inmate committed suicide in the Madison County Jail in 2016, and that same year, Jordan himself attempted suicide by strangulation in the Madison County Jail.  PSDF ¶¶ 42-44.  However, despite the real and present risk of suicide, Madison County Jail's leader, Sheriff Barnes, has never had or sought out: any training regarding the impact of mental health diagnoses on suicide risk; ways to educate his chief deputy or jail administrator on any correlations between mental health diagnoses or substance abuse disorders and suicide risk; or made an attempt to educate himself on the leading causes of death or statistics related to inmate suicide. PSDF ¶¶ 37-40, 46-49.

While Barnes understood the importance of written operating procedures, the Madison County Standard Operating Procedures ("SOPs") were an afterthought that staff was never required to review, understand, or implement.  PSDF ¶¶ 50, 53, 71, 81, 90, 92-94, 97-98, 104-106, 110-111.  While Barnes considered the SOPs as "how we want things handled and done", PSDF ¶ 53, jailers were never trained or tested on any type of suicide prevention plan and there was no verification regarding a jailer's receipt of SOPs or, more specifically, the written suicide prevention plan. PSDF ¶¶ 71, 81, 90, 92-94, 97-

---

[2] Because Plaintiffs' resistance herein pertains only to Defendants John Weakland, Jason Barnes, and Madison County (the "Defendants"), the summarized facts are those germane to only said Defendants; additional facts relating to codefendants Eyerly Ball and Scott Thomas will be supplemented when appropriate.

98, 104-106, 110-111. Tragically, prior to June 12, 2020, Madison County did not provide nor require any specific suicide prevention training for its officers.  PSDF ¶ 86.

The Madison County Sheriff's Department has never even reviewed the specific risk factors for suicide pursuant to their training programs with their jailers. PSDF ¶ 89. It follows that Madison County does not have any specific testing procedures to test employees on their knowledge of the standard operating procedures, and in fact, does not test. PSDF ¶¶ 90, 94, 97, 106, 110. In addition, prior to June 12, 2020, Madison County did not run any mock drills or simulations related to their suicide prevention plan; and Madison County has never run any type of simulations or drills related to identifying, intervening, or preventing suicide in the facility. PSDF ¶¶ 108-09.

**B. Madison County's written suicide prevention.**

Notwithstanding the lack of suicide risk, prevention training and communication with jail staff regarding such training, Barnes appreciated that written procedures were important for ensuring the safety of inmates in the jail; and Barnes considered the Madison County Jail SOPs as "how we want things handled and done." PSDF ¶¶ 50, 52-54. Madison County's SOPs included a minimal written suicide prevention plan ("Plan"), which mandates: "All staff involved in the booking process, or the supervision of prisoners shall be trained in suicide prevention." PSDF ¶ 57.

Madison County's Plan further states: "If the inmate is violent or suicidal, he/she *may be denied* any or all of his/her linen, mattress, and or all personal items until it has been determined that there is no longer a threat." PSDF ¶ 59 (emphasis added).  This Plan

further grants unguided discretion to jailers to determine an inmates need for suicide

intervention, simply stating:

> The Jailer/Dispatcher *will determine* what type of monitoring is necessary for the
> inmate's protection from him/herself.  The inmate may be moved to another unit
> or holding cell so that staff may have more visual supervision.  The inmate will
> be kept on a special watch, with the Jailer/Dispatcher logging all cell checks in
> 15-minute intervals, or as determined by the Sheriff of Jail Administrator."

PSDF ¶ 62 (emphasis added). Lacking any actual guidance or mandates, the Plan does

not instruct jailers to increase the number or frequency of jail checks or observations of

an inmate if they answer any of the suicide-related questions in the affirmative nor does it

give the jailers any other guidance or directives. PSDF ¶¶ 63-65.

### C. Jail Administrator Niblo.

Jail Administrator Steve Niblo, Weakland's supervisor, was the person in charge

of jail operations and training jailers but does not have any training specific to performing

the administration related responsibilities of the jail, including implementation of a

suicide prevention plan.  PSDF ¶¶ 5, 8, 10, 11, 69-70.  Jail Administrator Niblo admits

that Madison County Jailers were not provided specific guidance or training related to

Madison County's suicide prevention plan. PSDF ¶ 71. It is therefore not surprising that

Jail Administrator Niblo had "no idea" whether a history of depression or other mental

illness, serious illness or injury causing chronic pain, financial problems, substance

abuse, job loss, or family history of suicide would be factors that increased a person's

risk of suicide. PSDF ¶ 74.

Despite his complete lack of training, Jail Administrator Niblo concedes that the

reason for asking the questions contained on the booking intake was to determine if an

inmate would "be a problem" and considers an inmate hurting themselves to "be a problem". PSDF ¶¶ 7, 74-76, 136. Further, despite his lack of training, even Jail Administrator Niblo knew that increased supervision would be prudent if an inmate had a history of prior suicide attempts. PSDF ¶ 79.  Jail Administrator Niblo agrees that protecting individuals from harming themselves is a real concern in a jail setting. PSDF ¶ 41.  Despite this position, Jail Administrator Niblo does not document or have employees sign anything verifying that employees have received the SOP's which contains the Plan.  PSDF ¶ 81.

In sum, the Madison County Jail has no training regarding suicide prevention, no verification that Jail staff receive, review the SOPs, or have adequate knowledge of the Plan, and the staff had no working understanding or guidance concerning suicide risk assessments or suicide prevention. (PSDF, supra.)

**D.  Jailer John Weakland.**

Other than the initial Jailer Certification course at the Iowa Law Enforcement Academy in 2018, Weakland does not recall any training provided to him by Madison County.  PSDF ¶¶ 91, 95.  Weakland further lacks any recollection of even viewing the SOPs, and does not recall ever seeing, having to review, or being tested on the Plan contained therein.  PSDF ¶¶ 92-94, 97. Madison County lacks any record of Weakland receiving or reviewing the SOPs or Plan prior to June 12, 2020. PSDF ¶ 98. While Defendants attempt to claim training was provided pursuant to a police science training program, the records clearly show that this training was not provided to Weakland until 2021, well after Payne's suicide.  PSDF ¶ 99.

Weakland also does not recall *any* specific training regarding prevention of suicide in the Madison County Jail, PSDF ¶ 95, which is corroborated by Dispatcher/Jailer, Angela Henry ("Henry") who also did not receive any suicide prevention training. PSDF ¶ 102. It alarmingly follows that Weakland does not recall having a working knowledge of factors which elevate a person's risk for suicide, PSDF ¶ 96, nor does he recall ever being familiar or having to demonstrate his knowledge regarding Madison County Jail rules or the Iowa Jail Standards.  PSDF ¶ 97.  The *only* procedure that Weakland can remember as it related to concerns for the mental well-being of inmates at the Madison County Jail, is that he would possibly contact Eyerly-Ball.  PSDF ¶ 100.

It cannot be overstated: the jailer and the jail administrator who were responsible for ensuring Jordan's safety lacked any training and education beyond the bare minimum to obtain employment with the Madison County Jail.  The lack of training and tragic consequences bears out with the unfolding of the events surrounding Jordan's incarceration and ultimately, his suicide.

### E.  Timeline of events.

On June 9, 2020, Jordan was booked into the Madison County Jail to serve a 30-day sentence for Contempt.  PSDF ¶¶ 2, 133. Jail Administrator Niblo, who has no formal medical or mental health training, personally performed the booking process of Jordan. PSDF ¶¶ 134-136. During this booking process, Jordan answered "yes" to the following questions:

> Mental illness? Yes;
> Been hospitalized in last 12 months? Yes;
> Ever tried to hurt yourself? Yes;

> Ever tried to kill yourself? Yes;
> Family member/friend attempted suicide? Yes; and
> Any reason why not be jailed? Yes.

PSDF ¶ 139. This was the second time Jail Administrator Niblo had personally booked Jordan Payne. PSDF ¶ 141. A few years earlier, on June 22, 2015, Jail Administrator Niblo booked Payne who answered "yes" to the following questions:

> Have you ever tried to hurt yourself? Yes.
> Have you ever attempted to kill yourself? Yes.
> Has a relative or a friend ever committed suicide? Yes.
>             If yes.  When did it occur and how?   Answer: "Brother 94
> shot himself"

PSDF ¶¶ 141-142.  Jail Administrator Niblo was also personally aware of a 2016 incident in the Madison County Jail where Jordan attempted suicide by strangulation with a telephone cord. PSDF ¶ 143.  Despite these obvious warning signs, Jail Administrator Niblo assigned Jordan to the "Max Cell," alone and without *any* suicide precautions. PSDF ¶¶ 145, 150.

On June 10, 2020, at 14:21:39, Jordan Payne was permitted to utilize Madison County Jails "Chirping" system.  PSDF ¶ 152. This system allows inmates to communicate with other individuals via text messaging ("Chirps"). PSDF ¶ 163. There are no limitations nor guidelines in place in the Madison County Jail regarding inmates' utilization or monitoring of these communications. PSDF ¶¶ 160-162.  Additionally, Madison County makes money from every message inmates send and receive on these devices. PSDF ¶¶ 154-156.

On June 11, 2020, Jordan made several highly-alarming statements to his girlfriend, Christina Dukes (aka Christina McKinley) ("Christina") via the Chirping system. PSDF ¶ 164, 166. He stated:[3]

> "Somethings not right in my head and chest im hearing voices that wont stop wtf is wrong with me";
>
> "I need to talk to eve this is am emergency I need to be back on serequel u don't want to now what im hearing, swallow that apple whole smash head off table";
>
> "Im snapping sober its scary as fuck";
>
> "Im going back to crying and smashing head off wall";
>
> "I javent ate since Monday I vant and wont no appetite";
>
> "Smashing my head off the wall stops voices";
>
> "Somethings dead wrong with me rn I canr explain it I just want it to stop."

PSDF ¶ 166.

On June 11, 2020, Jordan Payne made a request to speak to mental health services which was communicated to Thomas and Eyerly-Ball at approximately 2:10 p.m. the same day.  PSDF ¶ 167.  No mental health services were provided to Jordan on June 11, 2020.

**June 12, 2020.**

Jordan continuing suffering from psychosis and thoughts of self-harm that he communicated to Christina via the unmonitored Chirp system on June 12, 2020. PSDF ¶¶ 165, 168. These written statements included:

> "So youre gonna be mad at me probably sad but I always loved u but im going to listen to the voices."

---

[3] The "chirps" are presented herein as originally written by Jordan Kent Payne.

"My head aint right."

"Truth here my head is telling to rip out my veins with my teeth."

"Baby im scaring myself." (11:33:28)

PSDF ¶ 168.

Shortly after his last message, at 11:37 a.m., Leslie Payne, alerted by Christina of Jordan's statements and actions on the Chirps, placed a telephone call to the Madison County Sheriff's Department to notify them of Jordan's condition.   PSDF ¶¶ 168-170. Leslie spoke to Civil Clerk Linda Barker, reporting that Jordan Payne was "going nuts" and was threating to "chew the veins out of his arm." *Id*. Barker responded that she would "let the jail know and they can monitor the phone calls or whatever." PSDF ¶ 170.

Barker personally notified jail staff that Jordan was saying "he's getting ready to chew his veins out, tear his veins out . . . whoever is monitoring [the] text or chirp . . . I don't want anything to happen on my watch . . . it's not like [Payne] hasn't tried it before. . . you guys can monitor [the Chirping] . . . I did my part, tell John . . ." PSDF ¶ 171-177. Approximately 10 minutes later, Barker had an additional conversation with Henry and Weakland wherein Barker specifically asked Weakland to monitor Payne's Chirps. PSDF ¶ 177. Barker informed Weakland: "[Payne] told his girlfriend he'd be eating or tearing out his veins or something ... just check on him, make sure, I don't want anything happening on our watch". *Id*. The following dialogue then transpired:

Weakland: Hopefully Scott is stopping out today (inaudible).

Barker: I don't want anything to happen on our watch, after I go home I don't care … I'm kidding, I'm kidding, I'm kidding!

11

> Henry: No, I'm not! I don't give a shit!

*Id*. Despite the notice of Payne's threats of self-harm, Weakland did not check on Payne until 12:21 p.m. when Weakland brought Payne his medication and asked if Payne was "ok". PSDF ¶¶ 179-180. In response, Payne made the following statements:

> "I need to talk to a doctor and it would be better."
>
> "I'm just losing it in here."
>
> "I'm doing alright, my head is just not right."

(*Id*.)  A jail check took place at 12:46 p.m.  PSDF ¶ 181.  Approximately forty-five minutes later, Jordan was removed from his cell and escorted to the Multi-purpose room by Weakland to meet with Defendant Scott Thomas ("Defendant Thomas" or "Thomas"). PSDF ¶¶ 182, 210.  Jordan entered the room and was greeted by Thomas at 1:31 p.m. PSDF ¶ 213.  Prior to the meeting, no information concerning Jordan was provided to Thomas by any jail staff except what prescription medications Jordan was taking. PSDF ¶¶ 207-209.

During Jordan's meeting with Thomas, appearing and sounding agitated, Jordan made several objectively suicidal statements, including:

> "I've lost everything.  I've lost my girlfriend, I've lost my house I was going to get, my jeep, I'm going to be homeless when I'm out of here so I'm not doing so well."
>
> "I'm losing everything out there."
>
> "I gave myself a black eye, I'm hearing these things in my fucking head, telling me all sorts of stupid shit and I'm not trying to listen to it."
>
> "I got no roommate, I got no TV, the phone doesn't even work."

"I got a broken ankle, and I got a broken tailbone too."

"I'm not normally this way, I don't know what the hell is going on with me Scott."

"Like, so I get these thoughts in my head and shit like that, and the only person I got to talk to is her and all that shit, and you know I'm afraid she gets called up here and say, you know put him on suicide watch and all that shit, I don't want to kill myself or nothing like that but I got these thoughts in my head and like, chew my veins out, I mean, shit like that.  I don't want these thoughts in my head."

"I went to prison for slitting my wrists (inaudible) called the cops on me."

"I've had like seven suicide attempts in the last year, I lost my kids, I lost everything. I'm not going to kill myself here, but I can't guarantee I won't kill myself when I leave here."

"I got nothing left anymore and I don't want to live. I mean I can't sleep … there's nothing I can do. I'm just thinking, I'm hearing shit, it won't go away, hence the black eye.  I'm not like this normally but I don't want to go on suicide watch."

"I'm going insane in there."

"After I slit my wrist, they brought me here instead of the hospital and chained me to the bed with my bloody wrists."

"I'm pretty much in solitary confinement and I just got here on Tuesday."

"I haven't ate anything."

"I can calm myself down, I just can't keep it calm, does that make sense?"

"I start slapping myself and hitting myself, I didn't do this before, what the fudge is happening to me?"

"I've never done it before, I just want it to stop. Have you ever had a thought telling you to chew your own veins out of your hand, your arm?"

"It's just insanity, I'm going crazy in there."

PSDF ¶ 214.

Jordan's meeting with Thomas concluded at 1:53 p.m. and he was escorted back to the Max Cell, still in an agitated state. PSDF ¶¶ 222, 224. No increased observation periods were undertaken by any member of the Madison County Jail after Jordan's meeting with Thomas. PSDF ¶ 238. Despite Weakland's prior agreement to monitor Jordan's Chirps, no efforts were made to restrict or monitor Jordan's use of the Chirping system. PSDF ¶¶ 177, 245.

Jordan remained visibly and audibly agitated upon return to his cell. PSDF ¶¶ 224, 240. Upon entering his cell, Jordan told Weakland "my girlfriend thinks I'm cheating on her" and that his phone is broken. PSDF ¶¶ 241. Weakland responded callously "while you are in jail?" but promises Jordan that he will come back and check on the phone. PSDF ¶¶ 242-243. After Weakland departed, Jordan picked up his Chirping device and was inundated with numerous messages from Christina. PSDF ¶ 246. Weakland never did check Jordan's Chirp messages, nor did he attempt to monitor them as requested when warned of Jordan's concerning statements regarding self-harm. PSDF ¶ 245.

All of Jordan's movements and statements are captured via the closed-circuit video surveillance system. PSDF ¶¶ 249, 253. These cameras are displayed and accessible by every computer in the jail, including the Sheriff Barnes' computer, the Chief Deputy's computer, the civil clerk, master-control, and the booking rooms. PSDF ¶ 254. The videos, which include audio, are accessible in livestream format. PSDF ¶ 255.

At 2:01:42, Jordan can be seen manipulating a towel or sheet with his hands into a noose. PSDF ¶ 257. In full view of the surveillance video camera and anyone looking into

his cell, Jordan took that noose, walked to the interior jail cell door and secured it to the interior door. PSDF ¶ 258. Jordan then attempted to lift his body, head and neck up to where the towel was secured. *Id.* Unable to get his body elevated high enough to get his neck into the noose, Jordan took the noose down and returned to his bed, still in a visibly agitated state. *Id.*

At 2:03:23, just ten minutes after the conclusion of his meeting with Thomas, Jordan stood up from his bed, noose in hand and walked into the shower stall of his cell. PSDF ¶ 260. This too was in clear view of the surveillance cameras. This is the last anyone would see Jordan alive. Within a minute of entering the shower stall, an audible "thump" and repeated gasping can be clearly heard coming from within the shower, and a reflection or movement can be seen toward the bottom of the door. PSDF ¶ 261. A minute later, movement is detectable again followed by another "thump" and additional "gasping." PSDF ¶ 262. Not once during this time did Weakland check the video monitors or otherwise check on Jordan who was placed in his cell alone, without any suicide prevention measures being taken. In fact, Weakland did not see Jordan for at least another seventy (70) minutes when he finally finds Jordan dead in his shower. PSDF ¶ 273.

The video shows Weakland continuing his day without regard to Jordan. At 2:26, the inmates of the cell next to Jordans exit and leave through the hallway that leads by Jordan cell before Weakland entered their cell to conduct what appears to be an inspection. PSDF ¶¶ 264, 265. Weakland logs a jail check of Jordan's cell at 2:46 p.m. despite not being able to physically observe Jordan in his cell. PSDF ¶ 269. While Weakland claimed that he believed Jordan was in the shower, water is never heard running in Jordan's cell at

any time.  PSDF ¶ 263.  Weakland continues to ignore Jordan until 3:17 p.m. when he enters Jordan's cell and finds him hanging, unresponsive in the shower.  PSDF ¶ 273. Jordan was dead.  PSDF ¶¶ 279, 280.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is a "drastic remedy that should not be granted unless the party has established the right to a judgment with such clarity that there is no room for controversy." *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984) (citations omitted). Torts in particular, including § 1983 torts, "are usually not appropriate for disposition by summary judgment" because they involve "a multitude of factual issues and abstract concepts that become elusive when applied to varying concrete factual situations." *Hughes v. Am. Jawa Ltd*., 529 F.2d 21, 23 (8th Cir. 1976). It is only in the "rare and extraordinary tort case" that the nonmoving party is unable to produce a genuine factual dispute. *Id*. A genuine dispute is one where evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Zubrod v. Hoch*, 907 F.3d 568, 575 (8th Cir. 2018). A material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248.  Additionally, should the court in its assessment find a genuine factual dispute, it must deny summary judgment even if it is convinced the action will ultimately fail. *Hughes*, 529 F.2d at 23.

The party moving for summary judgment has the "initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992). The party moving for summary judgment bears the burden to demonstrate that the record does not contain a genuine dispute of material fact. *Moore v. Martin*, 854 F.3d 1021, 1025 (8th Cir. 2017). If the movant has met this burden, the plaintiff must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific admissible facts showing there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2004). Further, a court considering a motion for summary judgment must view the evidence and inferences that can be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). In particular, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citations omitted).

The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255 (1986). "If reasonable minds could differ as to the import of the evidence", summary judgment is inappropriate. *Id*. at 250. "[W]here material factual disputes exist, especially those which turn on evaluation of witness credibility, it is no injustice to permit the matter to be tried." *Torgerson*, 643 F.3d at 1058.

## <u>LEGAL ARGUMENT</u>

"Indifferent": "marked by a lack of interest, enthusiasm, or concern for something: APATHETIC."[4]

> Barker: I don't want anything to happen on our watch, after I go
>       home **I don't care** … I'm kidding, I'm kidding, I'm kidding!
>
> Henry: No, I'm not! **I don't give a shit!**

(emphasis added) (PSDF ¶ 177).  Nothing better exemplifies the culture of indifference to the safety of inmates at the Madison County Jail, created and maintained by Barnes, his Jail Administrator Niblo, and ultimately put into action by Weakland.  This deliberate indifference to known suicide risks in the Madison County Jail resulted in the preventable death of Jordan Payne. For this deliberate indifference, all defendants must face a jury.

## I.   THE MUNICIPAL DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY.

Where a plaintiff alleges a violation of their constitutional rights, the doctrine of qualified immunity may be raised by government officials as a defense. *Amrine v. Brooks*, 522 F.3d 823, 831 (8th Cir. 2008). A defendant is not entitled to qualified immunity where (1) the facts viewed in the light most favorable to the plaintiff establish a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A right is "clearly established" where, "in light of the pre-existing law" at the time of the violation, the unlawfulness of the official's action was "apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

---

[4] https://www.merriam-webster.com/dictionary/indifferent.

Defendants are not entitled to qualified immunity because they "knew or reasonably should have known that the action [they] took within [their] sphere of official responsibility would violate the constitutional rights of the plaintiff." *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006). Government officials are not entitled to qualified immunity "if earlier cases gave [them] fair warning that [their] treatment of [the plaintiff] was unconstitutional." *Bishop v. Glazier*, 723 F.3d 957 (8th Cir. 2013); *Nelson v. Correctional Med. Srvs.*, 583 F.3d 522, 528 (8th Cir. 2009). The law has been well-established for decades that prison official's deliberate indifference to serious medical needs of an inmate, including a known serious risk of suicide, violates the Eighth Amendment. *Coleman v. Parkman*, 349 F.3d 534, 538 (8th Cir. 2003); *Rellergert v. Cape Girardeau County*, 924 F.2d 794 (8th Cir. 1991).

To establish deliberate indifference, Plaintiffs must show that Jordan suffered from an objectively serious medical need and that the defendants "acted with a 'sufficiently culpable state of mind', namely, that they actually knew of, but deliberately disregarded, [his] medical need[]." *Washington v. Denney*, 900 F.3d 549, 559 (8th Cir. 2018) (quoting *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009)). "Indifference" is apathy or lack of concern. *Rellergert*, 924 F.2d at 797. A "serious medical need" is defined as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity of doctor's attention." *Davis v. Buchannan County*, 11 F.4th 604, 623 (8th Cir. 2021) (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995). A known risk of suicide qualifies as a "serious medical need." *Yellow Horse v. Pennington Cty.*, 225 F.3d 923, 927 (8th Cir. 2000).

**A.      Weakland is not entitled to qualified immunity and summary judgment because he was aware of Jordan's suicidal state and failed to take reasonable measures to abate the risk.**

"Whether an official was deliberately indifferent requires both an objective and subjective analysis." *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2013). To overcome defendant's motion for summary judgment, Plaintiffs must show that the facts, taken in the light most favorable to Plaintiffs' case lead one reasonably to conclude that (1) Weakland had knowledge that Jordan had a substantial risk of suicide, and (2) Weakland failed to take reasonable measures to abate that risk. *Coleman v. Parkman*, 349 F.3d 534, 538 (8th Cir. 2003); *see also Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir.2011). Simply put, an official is deliberately indifferent "if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young v. Selk*, 508 F.3d 868, 873 (8th Cir.2007).

"Although the level of blameworthiness must rise above negligence, a plaintiff does not have to show that the prison officials acted for the very purpose of causing harm or with knowledge that harm w[ould] result." *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir.2015) (citation omitted). The claim that an officer deliberately disregarded a risk is evaluated "in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position." *Id.* A factual determination that a defendant had the requisite knowledge of a substantial risk of serious harm may be inferred from circumstantial evidence or from the very fact that the risk was obvious. *See Farmer*, 511 U.S. at 842. "An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk

of serious harm to the inmate." *Schaub*, 638 F.3d at 915, (citing *Lenz v. Wade*, 490 F.3d

991, 995 (8th Cir. 2007)).

### 1. Weakland had knowledge that Jordan presented a substantial risk of suicide.

"[A] prison official cannot be found liable under the Eighth Amendment for denying

an inmate humane conditions of confinement unless the official knows of and disregards

an excessive risk to inmate health or safety; the official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists, and he

must also draw that inference. *Farmer*, 511 U.S. at 837. "Nevertheless, even under this

subjective standard, a prison official cannot hide behind an excuse that he was unaware of

a risk, no matter how obvious." *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th

Cir. 1995). "Direct evidence of actual knowledge is not required." *Makdessi v. Fields*,

789 F.3d 126, 133 (4th Cir. 2015). "Accordingly, prison officials may not simply bury their

head in the sand and thereby skirt liability." *Id.*

"Whether a prison official had the requisite knowledge of a substantial risk is a

question of fact subject to demonstration in the usual ways, including inference from

circumstantial evidence, and a fact finder may conclude that a prison official knew of a

substantial risk *from the very fact that a risk was obvious.*" *Id.* (emphasis original) (quoting

*Farmer*, 511 U.S. at 842). "Moreover, under this standard for assessing whether deliberate

indifference existed, even a guard able to prove that he was in fact oblivious to an obvious

injury of sufficient seriousness may not escape liability if it is shown, for example, that he

merely refused to verify 'underlying facts that he strongly suspected to be true,' which, if

verified, would have compelled him to realize that the claimant needed immediate medical attention, or that he 'declined to confirm inferences of risk that he strongly suspected to exist." *Id.* (quoting *Farmer,* 511 U.S. at 843, n. 8); *see also Moore v. Jackson*, 123 F.3d 1082 (8th Cir. 1997) (citing "refused to verify" language from *Farmer*).

A determination of what a defendant actually knew will almost certainly turn on an assessment of each party's credibility, for rarely is there direct, let alone irrefutable, evidence of an individual's subjective mental state.  *See Farmer*, 511 U.S. at 842.  Here, Plaintiffs need not rely on inferences.  Any reasonable human being with the information communicated, and otherwise available to Weakland, would have been objectively and subjectively aware that Jordan was suicidal.

As a starting point, a basic review of Jordan's current and prior booking questionnaires raised flags regarding Jordan's mental health and suicide risk.  Jordan answered "yes" during the booking process to questions of whether he had "mental illness", hospitalization in the last 12 months, prior attempts to hurt himself, prior attempts to kill himself, a family member or friend had attempted suicide, and "yes" there was a reason why Payne should not be jailed. PSDF ¶ 139.  Jordan had also previously attempted suicide in that very same jail! PSDF ¶ 143.

Then, in writing, available for Weakland to read for himself, Jordan made multiple statements through use of the jail's Chirp system, clearly communicating that he was experiencing psychosis as well as thoughts of seriously hurting himself.  PSDF ¶¶ 157-66, 168.  These written messages included Jordan describing hearing voices, "snapping", his head not being right and thoughts and reporting of actions of actual self-harm including

"smashing head off wall." PSDF ¶¶ 166, 168.  Jordan described his psychosis as being

persistent with explicit instructions "to rip out my veins with my teeth."  PSDF ¶ 168.

Payne's family did not wait for Weakland to figure things out for himself.  Instead,

family members attempted to be proactive to ensure that Jordan's safety was not

compromised while he was in the custody of Madison County jail.  Jordan's mother

called the jail and warned them of Jordan's statements of self-harm and further

specifically told the jail where these concerning statements could be located.  PSDF ¶¶

169-70.

After Jordan's mother pleaded for help, Linda Barker had a direct and recorded

conversation with Weakland wherein she specifically told him: "You might want to

check Payne, Jordan because he told his girlfriend he'd be eating or tearing out his veins

or something."  PSDF ¶ 177. Although Weakland had easy access to monitoring Jordan's

Chirps, he never attempted to do so. PSDF ¶¶ 157-59, 176-77, 248.  Barker went on to

impress upon Weakland the importance of checking on Jordan, stating: "Just check on

him, make sure, I don't want anything to happen on our watch."  PSDF ¶ 176.  Still,

Weakland did nothing.

Eventually, during the normal course of Weakland's rounds, he finally stopped by

Jordan's cell to deliver medication.  At this time, Jordan specifically told Weakland:

> "I need to talk to a doctor and it would be better."
> "I'm just losing it in here."
> "I'm doing alright, my head is just not right."

PSDF ¶ 180. Weakland was also aware that Jordan had not been eating since he had been

in custody.  PSDF ¶ 215..

Weakland, instead of checking or raising observations and supervision of Jordan, chose instead to rely on "hope," stating "hopefully Scott is stopping out today."  PSDF ¶ 177.  As the saying goes, "hope is not a plan."  Contrary to Defendant's contentions, Weakland did not specifically call Thomas out to the Jail, instead he "hoped" Weakland would stop by consistent with his already scheduled appointments on June 12th.  PSDF ¶¶ 177, 208.  Once Thomas from Eyerly-Ball arrived at the jail, Weakland escorted Jordan to his evaluation.  PSDF ¶ 182.  Weakland did not provide Thomas with any information other than what medications Jordan was taking.  PSDF ¶ 207, 209.  Jordan was evaluated by Thomas for roughly twenty (20) minutes.  PSDF ¶¶ 182, 222.   Following the evaluation, Weakland did not make any attempt to inquire as to Jordan's mental health or self-harm risk with Thomas. PSDF ¶ 232.

Weakland escorted Jordan back to his cell during which time Jordan remained visibly and audibly agitated.  PSDF ¶¶ 239-240.  All of Jordan's movements and statements are captured via the closed-circuit video surveillance system of the Max Cell in which he is housed. PSDF ¶¶ 249, 253.  These cameras are displayed in live-stream format and are accessible by every computer in the jail, including the Sheriff Barnes' computer, the Chief Deputy's computer, the Civil Clerk, master control and the booking rooms.  PSDF ¶¶ 254-255.  Weakland would not have even had to get up from his desk to notice the obvious: Jordan was suicidal and in the process of killing himself. PSDF ¶¶ 254-262.

Had Weakland cared to look, he would have seen Jordan openly and obviously manipulating a sheet or towel into a noose, securing it to the inside cell door in plain view of the camera, and attempting to lift his body, head, and neck up to where the noose was

secured.  PSDF ¶¶ 256-258.  Unable to get his body elevated high enough to get his neck into the noose, Jordan took the noose down and returned to his bed, still in a visibly agitated state before again, in clear view of the surveillance cameras, standing up with the noose in his hand and walking into the shower door of his cell. PSDF ¶¶ 259, 260.  Everything that happened from that point on can still be seen and heard on the surveillance footage including obvious "thumping" and "gagging" sounds coming from the shower. PSDF ¶¶ 261-262. Even after his cell went silent and Jordan was not observable on video, Weakland continued to ignore him for over 70 minutes. PSDF ¶¶ 263-274.

To say that Weakland was not aware of Jordan's serious suicide risk would be to ignore the elephant in the room.  While Weakland claims to have not looked at the elephant standing in front of him, it was there for him to see should he have chosen to open his eyes. Weakland now does his best ostrich impression attempting to duck liability by feigning ignorance but "prison officials may not simply bury their head in the sand and thereby skirt liability." *Makdessi*, 789 F.3d at 133.  The disputed facts establish that Weakland had both an objective and subjective knowledge of Jordan's risk of suicide.

### 2.   Weakland failed to take reasonable measures to abate the risk.

"Once an official knows of a risk, the Eighth Amendment requires the official take reasonable measures to abate the risk. *Coleman*, 349 F.3d at 538.  Here, Weakland failed to comply with even the limited direction he received from his Jail Administrator Niblo during "training" which was to "observe" or "watch to make sure everyone is responsive and not a danger to themselves."  PSDF ¶¶ 84-85.  It would have been apparent to any layperson that *some* measure should have been taken to prevent Jordan from harming

himself.  Instead, Weakland did nothing, "hoping" that Thomas would be swinging in to pay them a visit. PSDF ¶ 177.  Weakland did not check the "Chirps" even after being asked to do that by Barker, nor did he look into Jordan's intake questionnaire. PSDF ¶¶ 172-79.  There is no record that Weakland even ask other jail staff about Payne's threats of self-harm or whether Jordan had exhibited any other signs indicating an elevated risk of suicide.  Consequentially, and despite the understanding that he was threatening to kill himself, Weakland left Jordan unattended in a single-person cell with devices he could (and did) use to commit suicide. PSDF ¶¶ 238-245, 257.

Worse yet, Weakland, knowing that the Chirping system was a source of a problem, left Jordan with unfettered and unmonitored use of the system that the County profited from.  PSDF ¶ 153-165, 177, 245, 248.  More importantly, Weakland did not so much as look at the live-stream monitor that would have told him all he needed to know regarding Jordan's suicidal mindset and actions.  PSDF ¶ 256.  Finally, Weakland, while documenting a jail check of Jordan's cell, walked right by Jordan's cell as he was hanging in the shower, choosing not to fulfill his job requirement of personally observing the individual in the cell. PSDF ¶¶ 266-269, 271-272, 274.

Weakland buried his head in the sand hoping the storm would pass.  "Deliberate steps" to abate a serious risk of suicide, must be reasonably adequate in light of the serious risk at hand. *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012) (citing *Rellergert,* 924 F.2d at 796. Doing nothing is never reasonably adequate.  Weakland's utter lack of effort to abate Jordan's suicide risk was not a reasonable response to Jordans

specific statements of self-mutilation and suicidal ideations; instead, it is the very definition of indifference.

Weakland argues that Thomas' failure to communicate the red flags provided to him in his meeting with Jordan, somehow absolves him of his otherwise dereliction of duty. Weakland attempts to cite *Reece v. Hale*, 58 F.4th 1027 (8th Cir. 2023), in support of this argument. *Reece* however, is clearly distinguishable from the case at hand and does not support Weakland's argument. In *Reece*, the defendants actually provided *qualified* medical assistance to the defendant who had orally consumed a quantity of methamphetamine within a small plastic bag at some point prior to his detention. *Id.* at 1030. At some point during his first few hours at the jail, the bag opened within the detainee's stomach, leading to progressive methamphetamine intoxication and ultimately resulting in his death. *Id.* The detainee had not told any staff of what he'd ingested nor that it may be the cause of his rapidly declining health. *Id.* The defendants in that case though, acted reasonably by constantly observing the detainee, summoning, and providing him repeated medical assistance, and attempting to transfer him to a hospital. *Id.* at 1031-32. The Eighth Circuit, unsurprisingly, found the defendants were entitled to qualified immunity.

Jordan's situation is markedly different. Jordan presented a multitude of signs of suicide risk at his intake and continued making threats of self-harm via the Chirp system. PSDF ¶¶ 139, 166, 168. His family provided even more information about Jordan's self-harm. PSDF ¶¶ 169-170. Weakland then received a specific warning from Linda Barker as to Jordan's state of mind with a specific request to increase observation and

monitoring of Jordan so that nothing would happen to him on their watch. PSDF ¶¶ 171-173, 175-177. Jordan himself, also specifically told Weakland that he was having mental problems.  PSDF ¶¶ 180, 241-244.  While Weakland was unaware of what information was reported during Jordan's meeting with Thomas he still would have been aware that Jordan remained visibly and audibly agitated upon returning to his cell. PSDF ¶¶ 232, 239-244.  Weakland would have also observed this agitation continue if he had chosen to review the live-stream video feed. PSDF ¶¶ 256-263.

Instead of observing Jordan, reviewing Jordan's Chirp messages and/or removing the device from Jordan, Weakland left Jordan with the Chirping device and failed to increase observations or take any suicide precautions whatsoever.  PSDF ¶¶ 238, 245, 248, 256.  Unlike the defendants in *Reese*, Weakland did not increase his observations and monitoring of Jordan.  In fact, he <u>decreased</u> them. PSDF ¶¶ 264-272, 274. Weakland did not even take the time to click a mouse button to pull up the video recording and observe what was going on in Jordan's cell. PSDF ¶¶ 253-256.  Weakland literally did nothing.

It is true that in certain situations, prison officials who lack medical expertise are entitled to rely on opinions of <u>qualified</u> medical staff regarding inmate diagnosis and the decision of whether to refer the inmate to outside doctors or dentists.  *Holder v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011).  In those situations, the law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision.  *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002).

"Prison officials cannot substitute their judgment for *medical* professional's prescription." *Id.* Thomas however, was not licensed in anything.

It is undisputed that Thomas was not a licensed, medical, or mental health professional.  PSDF ¶¶ 30-31, 113, 130-131, 201.  Both Thomas and Eyerly-Ball argue that Thomas was not competent, qualified, or otherwise fit to conduct any sort of mental health evaluation, suicide risk assessment, or to evaluate or assess Jordan in any manner whatsoever. PSDF ¶¶ 131, 201. Jail officials may certainly rely on <u>qualified</u> medical personnel's opinions, but they have no such right to rely on statements of an individual with a bachelor's degree in Sociology who is not a licensed mental health professional. PSDF ¶¶ 30-31, 130-131. This is especially the case when the jail fails to take any action to verify the credentials of the service provider working in their jail. PSDF ¶ 194.

"Where a prisoner needs medical treatment, prison officials are under a constitutional duty to see that it is furnished." *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989).  "Furthermore, where the duty to furnish treatment is unfulfilled, the mere contracting of services with an independent contractor does not immunize the State from liability for damages in failing to provide a prisoner with the opportunity for such treatment." *Id.* "Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." *West v. Atkins,* 487 U.S. 42, 56 (1988).  The duty to provide necessary medical services lies "within the statutory and constitutional obligations of the named

defendants." *Crooks* 872 F.2d at 804.  "In this sense the defendants have a nondelegable

duty to provide medical care when needed."  *Id.*

Additionally, even if Thomas were a licensed mental health professional,

Weakland would not be justified in relying on his passing comments because Weakland

and other jail staff withheld critical information within their knowledge from Thomas.

*McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009).  In *McRaven*, the Eighth Circuit

concluded that the jail staff could not reasonably rely on the nurse's medical opinion

because the officers failed to share the information they had regarding the individual with

the nurse at the operative time.  *Id.*  Here, Weakland did not communicate any of the

information that he or the jail staff were in possession of regarding Jordan, his history,

behaviors and prior statements, to Thomas. PSDF ¶¶ 207-209.  The crucial information

withheld included Jordan's known and long-standing mental health issues, his prior

suicide attempt in that same facility, his history of his brother committing suicide, his

statements of experiencing psychosis, the warning received from Jordan's family

member, Jordan's statements to Weakland that his head was not right, and his booking

intake sheet.  PSDF ¶¶ 44, 139-143, 166-177, 180.

Finally, just as important are the objectively observable facts available to

Weakland even after his passing conversation with Thomas.  Had Weakland chose to

look he would have seen the obvious: Jordan was suicidal.  Weakland cannot and does

not get rewarded for turning a blind eye to the obvious suicidal condition of Jordan.  The

unavoidable conclusion is that Weakland was apathetic and failed to take reasonable

measures to abate Jordan's obvious suicide risk.  At a minimum, there are disputed facts

on this issue, and it will be for the jury to decide.  *Davis v. Hall,* 375 F.3d 703, 719 (8th

Cir.2004).

> **B.  Defendant Barnes is not entitled to Qualified Immunity because he failed to train, supervise, or control the actions of his subordinates.**

"'When properly applied, qualified immunity protects all but the plainly

incompetent or those who knowingly violate the law.'"  *Taylor v. Barkes*, 575 U.S. 822,

825 (2015); quoting *Ashcroft v. al-Kiddi¸*563 U.S. 731, 743 (2011).  Barnes was both

plainly incompetent and knowingly violated the law related to mandatory training for his

jailers on suicide prevention.

"[A] supervisor may be liable for the acts of a subordinate if injury is inflicted upon

the plaintiff as a result of a breach of the supervisor's duty to train, supervise, or control

the actions of subordinates."  *Hahn v. McLey*, 737 F.2d 771, 773 (8th Cir. 1984). "[A]

supervisor may be held individually liable under § 1983 if he directly participates in a

constitutional violation or if a failure to properly supervise and train the offending

employee causes a deprivation of constitutional rights."  *Andrews v. Fowler*, 98 F.3d 1069,

1078 (8th Cir. 1996).  "This requires a showing that the supervisor had notice that the

training procedures and supervision were inadequate and likely to result in a constitutional

violation."  *Id.*

"[A]n Eighth Amendment claimant need not show that a prison official acted or

failed to act believing that harm actually would befall an inmate; it is enough that the

official acted or failed to act despite his knowledge of a substantial risk of serious harm."

*Farmer*, 511 U.S. at 842.  "Whether a prison official had the requisite knowledge of a

substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence [internal cites omitted], and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

Where there is an obvious risk created by a policy gap, a plaintiff need not show some minimum number of injuries to prevail. *See Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 929 (7th Cir. 2004).  A defendant does not get "a 'one free suicide' pass." *Id.* The Supreme Court has expressly acknowledged that evidence of even a single violation of federal rights can trigger liability if the violation was a "highly predictable consequence" of the failure to act.  *Board of County Com'res of Bryan County, Okl v. Brown*, 520 U.S. 397, 409 (1997)

Here, we don't have but a single violation of constitutional rights, instead we have years of Barnes repeatedly and systematically disregarding his constitutional and statutory duty to ensure that his jail staff were educated and trained regarding suicide prevention.  Just as important, we have a history of a suicide attempt by this decedent in this jail, in addition to an earlier successful suicide in this jail under Barnes' watch. PSDF ¶¶ 42, 44, 143; Dkt. No. 43-1 ¶ 176.   Barnes was on notice that suicide is a real and present danger in his jail and was further on notice that failure to train his jailers can and will have tragic consequences.  PSDF ¶¶ 37-40, 42, 46-49, 50; Dkt. No. 43-1 ¶¶ 141, 176.

As Sheriff, Barnes had the ultimate responsibility for inmates in his jail.  Iowa Code section 356.2 imposes this responsibility stating: "The sheriff shall have charge and custody of the prisoners in the jail or other prisons of the sheriff's county…"  Iowa Code

32

§ 356.2.  While Barnes was free to delegate authority for the day-to-day running of the county jail to a jail administrator, it was his ultimate responsibility to adopt and implement appropriate standard operating procedures and ensuring this Department complied with its constitutional and statutory requirements. PSDF ¶¶ 3-4. As Barnes conceded, the "buck" stopped with him. *Id*. Training and supervision of jail employees therefore were Barnes' ultimate responsibility.

The danger of inmate suicide is such a real and present danger that the Iowa Legislature has taken the time to mandate the existence of written suicide prevention plans, documentation of training related to those plans, and the basic minimum requirements of those plans.  Iowa Code § 356.36; Ia.Admin. Code § 201-50.15(6).  The Administrative Code is descriptive regarding what must take place upon an inmate's screening upon intake at a County Jail.  Iowa Administrative Code section 201-50.15(6) specifically provides:

1. Any person who is obviously injured, ill or unconscious shall be examined by qualified medical personnel before being admitted to a jail.

2. Prisoners suspected of having a contagious or communicable disease shall be separated from other prisoners until examined by qualified medical personnel.

3. As a part of the admission procedure, a medical history intake form shall be completed for each person admitted to the jail. *The intake procedure shall include screening for potential self-injury or potential suicide. Jail staff with actual knowledge that there is a substantial risk that a prisoner intends to commit suicide shall take reasonable measures to abate that risk. The jail shall have a written suicide prevention plan. Essential elements of the plan shall include annual training to recognize the potential for suicide, communication between staff, appropriate housing and intervention procedures.*

> 4. During times when there is no means of immediate access to the district court, a person arrested on a charge constituting a simple misdemeanor and believed by the arresting officer/agency to be mentally ill, and because of that illness is likely to physically injure the person's self or others, shall be admitted to the jail only after the arresting officer/agency has demonstrated a reasonable effort to comply with the emergency hospitalization procedure, as provided in Iowa Code section 229.22. *The jail shall have a written plan to provide prisoners access to services for the detection, diagnosis and treatment of mental illness. The plan shall include a mental health screening process at admission.*

(emphasis added).

In effort to comply with what are commonly referred to as the Iowa Jail Standards, Barnes created SOPs for his department which were updated in 2017. PSDF ¶¶ 50, 52, 55, 56. These procedures include portions pertaining to the jail, purporting to address the areas of mental health of inmates as well as suicide prevention. PSDF ¶¶ 57-60, 62. Despite mental health and suicide being inextricably intertwined, both Madison County's mental health and suicide prevention provisions are fatally inadequate.  Their primary fault is that they do nothing to instruct staff on what to do with information they are provided by an inmate or what communication should take place following receipt of that information. PSDF ¶¶ 63-65, 68, 71.

The <u>entirety</u> of the mental health portion of the Madison County SOP's, related to inmates in the jail provides:

> 3. During admission, Madison County Jail staff attempt to establish the mental well being of each person admitted.  If decided during admission that some mental health help is needed the following options are available:
>    i. Clergy
>    ii. Bridge Counseling Group (inmate's expense)
>    iii. Psychiatrist (inmate's expense)
>    iv. MD

v.   AA & Substance Abuse (Thursday evenings)
4. *Inmates will be observed every 15 minutes and activity will be logged.*
5. During the times when there is no means of immediate access to the district court, a person arrested on a charge constituting a simple misdemeanor and believed by the arresting officer/agency to be mentally ill, and because of that illness is likely to physically injury the person's self or others, shall be admitted to the jail only after the arresting officer/agency has demonstrated a reasonable effort to comply with the emergency hospitalization procedures, as provided in Iowa Code 229.22.

(emphasis added) PSDF ¶¶ 137-138; Dkt. No. 43-2 at 0204.

First, the SOPs mandate the existence of the plan stating: "The jail shall have a written plan to provide inmates access to services of the detection, diagnosis and treatment of mental illness." Dkt. No. 43-2 at 0199.  Next, the SOPs specifically require: "a *mental health screening process at admission*." Dkt. No. 43-2 at 0199 (emphasis original).  The SOPs then assign the task of this assessment to Madison County jail staff: "Madison County Jail staff *attempt to establish the mental well-being* of each person admitted.  *If decided during admission* that some mental health help is needed the following options are available…"  PSDF ¶ 137 (emphasis original).

Madison County Jail staff are not qualified to conduct "mental health screening" of inmate's nor to assess their general mental health.  PSDF ¶¶ 136, 183-184.  Madison County does not have a designated medical provider that they are contracted with.  PSDF ¶ 183.  Despite these facts, this policy assigns the task of attempting "to establish the mental well-being of each person admitted" to individuals whose requirements for employment are being 18 years of age, able to read and write in English, good moral character, not by reason of conscience or belief opposed to the use of force, passes

psychological screening, free of contagious disease and passes physical, drug and optical requirements.  Dkt. No. 43-2 at 0198.  Just as absurd, the policy does nothing to guide or direct jailers in determining whether "some mental health is needed" and which resources to utilize in which situations. PSDF ¶¶ 137. Most importantly, the policy does nothing to direct or guide jail staff as to whom and what communication should be made related to an inmate's mental health. PSDF ¶¶ 137, 195.

The Plan is similarly devoid of direction and guidance for jail staff regarding the necessary communication between staff as it relates to information obtained from inmates upon their booking. PSDF ¶¶ 62-68. Specific questions must be asked of the inmates but then merely directs: "The Jailer/Dispatcher *will determine* what type of monitoring is necessary for the inmate's protection from him/herself.  The inmate may be moved to another unit or holding cell so that staff may have more visual supervision.  The inmate will be kept on a special watch, with the Jailer/Dispatcher logging all cell checks in 15-minute intervals, or as determined by the Sheriff of Jail Administrator."  PSDF ¶ 62 (emphasis added).  The Plan is shockingly devoid of instructions on how "the jailer/dispatcher will determine what type of monitoring is necessary."  PSDF ¶¶ 62-68. They have to ask the questions, but what are they to do with affirmative answers to those questions?  Additionally, as every defendant has identified, communication between staff and providers is the key to preventing tragedies within a jail. PSDF ¶¶ 200, 202-06, 234. While they appreciate the importance of communication, the Plan fails to provide any guidance on that crucial point.  PSDF ¶ 195.

While Barnes would have the court believe that the SOPs and Plan were approved by the State Jail Inspectors on an annual basis, this claim is not supported by the facts. The State Jail Inspectors simply confirmed the physical existence of the required policies and procedures.  PSDF ¶ 55.  The Inspectors did not however, inspect, review, or approve those policies in any manner.  *Id.*

The SOPs and Plan deficiencies may not be as big of a deal if there was supplemental training provided by Madison County as required in both the written policy and Iowa Administrative Code.  Barnes' own policy makes it clear that: "The jail shall have a written suicide prevention plan.  Essential elements of the plan shall include *annual* training to recognize the potential for suicide, communication between staff, appropriate housing and intervention procedures." Dkt. No. 43-2 at 0199 (emphasis original).  The training requirements articulated in Madison County's SOP's mimics the requirements of the Administrative Code.  Iowa Administrative Code section 201-50.11, provides in relevant part: "all persons performing jail duties … within the confines of the jail shall meet the following requirements, *and the provisions of this information and training shall be documented*:

    a. The individual shall be fully knowledgeable of the administrative rules referring to jail standards.

    b. The individual shall be *fully knowledgeable of written policies and procedures as adopted by the jail administrator*.
    ….

    e. *The jail administrator shall record by log sheet the signature(s) of all jailers and jail supervisors attesting that they have full knowledge* of the administrative

> rules referring to jail standards *and the written policies and procedures governing the jail*.

Ia.Admin. 201-50.11(a), (b) & (e) (emphasis added).

While violation of state law or a department's own policy, in-and-of-themselves are not sufficient to establish the deliberate indifference standard, the deficiency of the written plan when combined with the utter lack of education and training leave no other conclusion but that Barnes was deliberately indifferent to the suicide risk of inmates in his jail, including Jordan. Procedures and plans are only of use if they are understood and followed by subordinates. "For all intents and purposes, ignoring a policy is the same as having no policy in place in the first place." *Woodward v. Correctional Med. Serv. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (deliberate indifference demonstrated by defendant's condoning of its employees not following policies).

Barnes claims to review his SOPs, including the Plan, yearly, comparing them to the Iowa Jail Standards. PSDF ¶ 56. Doing so placed Barnes on actual notice, on a yearly basis, that he was required to ensure his jailers were specifically trained in the area of suicide prevention with the appropriate documentation of that training being maintained by his jail administrator. PSDF ¶ 56-57. The undisputed facts in this case establish that the mandatory training for jailers which required them to be fully knowledgeable of written policies and procedures as adopted by the jail administrator, was not being undertaken in Madison County. PSDF ¶¶ 71, 90, 92-94, 97-98, 104-106. Notably, Madison County's written job description for a Jailer does not require knowledge or

38

training on suicide prevention.  PSDF ¶ 51; Dkt. No. 43-2 at 0198.  Nor is that training a

pre-requisite for retention as a jailer.  PSDF ¶¶ 86, 95, 102-103; Dkt. No. 43-2 at 0198.

Consistent with the written Jailer job description, Madison County Jailers were not

trained on Madison County's suicide prevention plan.  PSDF ¶ 71, 90, 92-94, 98, 104-106,

110-111.  Madison County did not require nor provide specific suicide prevention training.

PSDF ¶¶ 86, 95, 102-103.  While reliant upon the Iowa Law Enforcement Academy

training, Madison County had not provided the Academy with a copy of their suicide

prevention plan thereby making it impossible for Madison County Jailers to receive

training on their employer's suicide prevention plan.  PSDF ¶ 88.  Additionally, while

Barnes had a rough idea that the 20-hour annual jailer course at the academy, Weakland

himself could not recall having received any training related to suicide prevention.  PSDF

¶¶ 91-100.  Indeed, the Madison County Sheriff's Department has never gone over the

specific risk factors for suicide pursuant to their training programs with their jailers.  PSDF

¶ 89.  Similarly, Madison County does not test their employees on their knowledge of the

standard operating procedures.  PSDF ¶ 90.

In compliance with Barnes' custom of not providing suicide prevention training to

jailers, Weakland does not recall receiving any additional training provided to him by

Madison County other than the training he received from the Iowa Law Enforcement

Academy in 2018 at the Jailer Certification Course.  PSDF ¶ 91.  Weakland does not recall

seeing the Madison County Sheriffs' Department's Standard Operating Procedures, PSDF

¶ 92, nor does he recall ever seeing or having to review Madison County's suicide

prevention plan.  PSDF ¶ 93.  Weakland could not recall any specific training regarding

the prevention of suicide in the Madison County Jail, nor did he have a working knowledge of factors that elevate a person's risk of suicide. PSDF ¶¶ 95, 96.  Madison County's own logs establish Weakland did not receive any suicide prevention training. PSDF ¶¶ 98-99, 101.  Defendants' attempt to claim the jailers received suicide prevention related training through the police sciences program highlights their desperation to identify *some* sort of training. Dkt. No. 48 at 48.  However, this claim is objectively false considering Madison County's own records document that the police science training was not provided until 2021. PSDF ¶ 99.

Henry corroborates Weakland's testimony regarding the lack of training, and further, definitively stated that Madison County did not provide any training specifically related to suicide prevention or intervention.  PSDF ¶¶ 102-103.  Henry also confirms that there was never a time where she was provided the suicide prevention plan and required to read and familiarize herself with the document on an annual basis. PSDF ¶¶ 104-106. Henry has no recollection of having to specifically review the suicide prevention plan contained in the standard operating procedures at any time during her employment other than back in 2017. PSDF ¶ 105.  She also confirmed that Madison County did not run any simulations or practice training for suicide intervention and jailers were never tested on any type of suicide prevention plan. PSDF ¶¶ 107-109.

Shockingly, Jail Administrator Niblo himself had "no idea" whether affirmative answers to any of the booking questions were recognized factors for an elevated risk of suicide.  PSDF ¶ 74.  Jail Administrator Niblo conceded that no instruction is provided to jailers regarding what action to take if an individual answers in the affirmative to any of

the suicide related questions. PSDF ¶¶ 63-74, 76, 80.   As the man in charge of the Jail, Jail Administrator Niblo did not even have a working knowledge of the term "serious mental health disorder."  PSDF ¶ 83.

Ultimately, while verbalizing an appreciation for the danger of suicide, previously experiencing the devastation of suicide in his own facility under his own watch in 2016, creating written procedures purporting to further suicide prevention methods, and being reminded every year of the requirement to train jailers on suicide prevention, Barnes utterly failed to provide his jail staff with the necessary training on suicide prevention.   This was a situation where the risk was so obvious that even the law clearly articulated an affirmative duty for Barnes' to ensure this training was provided to his employees.  *Farmer*, 511 U.S. at 842.   As such, Barnes' abysmal failure to train Madison County jail staff on suicide prevention was a deliberate indifference to the rights of inmates, including Jordan Payne. As bore out by the facts, Jordan's suicide was a clear result of this failure to train.

**C. Defendant Madison County is not entitled to Qualified Immunity because by and through its policymakers, Barnes and Jail Administrator Niblo, it maintained a policy or custom of deliberate indifference to inmates' risk of suicide.**

Municipalities and other local governmental bodies are "persons" within the meaning of section 1983.  *Monell v. New York City Dept. of Social Servs.*, 436 U.S. at 689. The Unites States Supreme Court has required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal "policy" or "custom" that caused the plaintiffs injury.  *Id.* at 694.   "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative

body or of those officials whose acts may fairly be said to be those of the municipality." *Board of County Com'res of Bryan County, Ok.*, 520 U.S. at 403-404 (citing *Monel*, *supra* at 694). "Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.*

The governmental subdivision may be held responsible under § 1983 when injury is inflicted based upon execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy. *Monell*, 436 U.S. at 694. Even "a single action by a municipal official possessing final policymaking authority regarding the action in question constitutes the official policy of the municipality." *Brady v. Fort Bend County*, 145 F.3d 691, 698 (5th Cir. 1998). "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Pembaur v. City of Cincinatti*, 475 U.S. 469, 483 (1986).

In Iowa, administrative regulations have the force and effect of a statute. *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 764 (Iowa 2009). In addition to the statutorily imposed duties upon the Sheriff set out in the previous division, the Iowa Administrative Code also assigns the responsibility for the operation of a county jail facility in compliance with Iowa law to the designated jail administrator. Ia.Admin. § 201-50.1. Jail administrators are legally responsible for adopting and implementing the written policies and procedures of the county jail. Ia.Admin. § 201-50.11(1)(b). It is also the jail administrator's duty to

"record by log sheet the signature(s) of all jailers and jail supervisors attesting that they have full knowledge of the administrative rules referring to jail standards and the written policies and procedures governing the jail's operation." Ia.Admin. § 201-50.11(1)(b)(e). While the Sheriff has ultimate authority over the Jail, the jail administrator is a "policy maker" as well, and the combination of conduct of both Barnes and Jail Administrator Niblo as it relates to their failure to train and act on Jordan's serious risk of suicide represents an act of official Madison County government "policy." *Pembaur*, 475 U.S. at 481.

At the outset of this analysis, it cannot be ignored that Jail Administrator Niblo was directly involved with the intake, booking, processing, and housing assignment of Jordan on June 9, 2020. PSDF ¶¶ 133-135, 145, 148. As the person responsible for the implementation of the County's policies and procedures for the jail, Jail Administrator Niblo himself had actual, first-hand knowledge of Jordan's suicidal tendencies, including his prior suicide attempt in the Madison County Jail, on his watch. PSDF ¶¶ 44, 66-69, 139-143. Past threats or attempts at suicide are considered when determining whether an individual is suicidal even though such past attempts do not necessarily mean the detainee will do so again. *Troutman v. Louisville Metro Dept. of Cor.*, 979 F.3d 472, 487 (6th Cir. 2020). A prior attempt itself is alone sufficient to raise a dispute as to the objective component of suicide risk. *Id.*

With this knowledge firmly in hand, Jail Administrator Niblo then received additional information from Jordan specifically related to his risk for suicide. Jail Administrator Niblo was reminded that Jordan suffers from mental illness, has been

hospitalized in the last 12 months, has tried to hurt himself, has tried to kill himself has had a family member or friend commit suicide. PSDF ¶¶ 139-143. With all of this information firmly in his knowledge, as the person responsible for the implementation of the County's policies and procedures for the jail, Jail Administrator Niblo then assigned Jordan to a cell where he was isolated from other inmates without any suicide precautions being taken, whatsoever. PSDF ¶¶ 5-7, 11, 145, 148-150. Simply put, Niblo set in motion the first dominos in this tragic chain reaction ultimately resulting in Jordan's preventable suicide.

Niblo's indifference to Jordan's suicide risk did not start on June 9, 2020. Niblo has been the Madison County Jail Administrator since 2015. PSDF ¶ 5. During the entirety of his tenure, it was Niblo's legal responsibility to develop and implement Madison County's policies for the jail. PSDF ¶¶ 5-7, 11. The man in charge of the policy implementation of the Madison County jail did not even know what the phrase "serious mental health disorder" meant. PSDF ¶ 83. Niblo was never provided any training himself related to the performance of the administration related responsibilities of the jail. PSDF ¶ 7. Additionally, despite his legal obligation, Niblo does not recall having any involvement in the creation or modification of the Madison County suicide prevention plan as contained in the SOPs. PSDF ¶¶ 11, 61.

While legally responsible for implementing the written jail policies, which would include the suicide prevention policy, Niblo only understood the Plan to require: "When we book somebody in, we ask them specifically those questions." PSDF ¶ 66. Despite the booking form asking the questions, Niblo had "no idea" whether a history of depression or other mental illness, serious illness or injury causing chronic pain, financial problems,

substance abuse, job loss, family history of suicide, would be factors that increased a person's risk of suicide. PSDF ¶ 74.  He even laughed during his deposition when asked whether those questions were utilized to determine if an inmate was a suicide risk, refusing to answer the question but choosing instead to characterize those questions as being uses "to determine if there's a problem." PSDF ¶¶ 75, 76.

Niblo also failed in his legal obligation to "record by log sheet the signature(s) of all jailers and jail supervisors attesting that they have full knowledge of the administrative rules referring to jail standards and the written policies and procedures governing the jail's operation."  Ia.Admin. § 201-50.11(1)(b)(e).  He concedes that he did not document nor have employees signing anything verifying employee receipt of the standard operating procedures.  PSDF ¶ 81.  Further, Niblo concedes that Madison County did not have any testing procedures to test employees on their knowledge of the standard operating procedures. PSDF ¶ 90.

The defiantly indifferent and ignorant Jail Administrator Niblo was also responsible for training the jailers.  PSDF ¶ 69.  Niblo's practical training provided to other jailers, related to prevention of suicide in his jails was to "observe."  PSDF ¶ 85.  Indeed, Madison County jailers were not provided specific guidance or training related to Madison County's suicide prevention plan.  PSDF ¶ 71.  It is no wonder that Henry told Linda Barker after being warned that Jordan was making suicidal statements that she did not "give a shit" what happened to inmates after she went home.  PSDF ¶ 177.   Henry was willing to verbalize that she was indifferent because her supervisors and persons responsible for

training created and maintained a culture of indifference.  Indifference was the Madison County way.

The County's utter failure to ensure jail staff were trained on suicide prevention is thoroughly set out in the division related to Barnes.  It suffices to say, that as it relates to suicide prevention in the Madison County jail, there is an utter dereliction of duty by the policy makers that goes all the way to the top. "Where an official policy is lawful on its face, a plaintiff nevertheless may establish liability by showing that a municipality caused the constitutional violation by providing "inadequate training' for its employees." *Graham v. Barnette*, 5 F.4th 872, 891 (8th Cir. 2021) quoting *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010).

The facts taken in the light most favorable to the Plaintiffs establish Madison County's widespread and long-existing custom and policy of indifference to inmate suicide.  Madison County had what can only be described as a culture of indifference that is highlighted by the fact that they refused to train their jailers on their suicide prevention plan.  This was a conscious and pervasive choice made by the policy makers at the highest levels for the Madison County Jail.  The consequences of Madison County's custom and policy of deliberate indifference to training of employees on suicide prevention, unfold like an unavoidable train wreck in this case.  The chain of events associated with the causal connection have already been laid out in the previous sections.  Suicide was an obvious risk of Madison County's custom and policy of failing to train its employees and Jordan's suicidal state was visible for anyone who cared to look to recognize.  Defendants are not entitled to qualified immunity: they knew or reasonably should have known that their acts

and omissions undertaken within their respective spheres of official responsibilities would violate Payne's constitutional rights. *Gordon*, 454 F.3d 858, 862.  More importantly, many of the numerous facts above are disputed; and accordingly, Defendants' motion for summary judgment must be rejected.

## CONCLUSION

Payne has demonstrated a triable issue of fact on his claim for deliberate indifference to a serious medical need. He displayed symptoms that should have triggered the close and personal observational monitoring by the jail staff. Instead, he was sent to "talk to Scott Thomas" and left alone. As a result, and despite the clear necessity for intervention, Jordan was permitted to commit suicide. A reasonable jury could review and reconcile the many disputed facts and find that Jordan suffered from an objectively serious medical need. A reasonable jury could further find that Defendants knew of this need yet deliberately disregarded it. The Defendants' motion should be denied, and Jordan's claims should go to the jury.

Respectfully Submitted,

GOURLEY, REHKEMPER,
& LINDHOLM, P.L.C.

By: /s/*Robert Rehkemper*
Robert G. Rehkemper,  AT0006553
Cory F. Gourley, AT0002966
440 Fairway, Suite 210
West Des Moines, IA 50266
Telephone No. (515) 226-0500
Email: rgrehkemper@grllaw.com
      cfgourley@grllaw.com

ATTORNEYS FOR PLAINTIFF KENT PAYNE INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE FOR JORDAN PAYNE

_Paul Statler_

Paul J. Statler,  AT0012577
301 East Walnut Street, Suite 7
Des Moines, Iowa 50309
Phone: 515.288.0509 Fax: 515.608.4484
Email: paul@statlerlaw.net
ATTORNEY FOR PLAINTIFF
LESLIE KING-PAYNE, INDIVIDUALLY

Copies to:

Michael Richards
Dentons Davis Brown PC
215 10th ST. Suite 1300
Des Moines, IA 50309
515-288-2500
Mike.richards@dentons.com
ATTORNEY FOR DEFENDANTS
JOHN WEAKLAND, JASON BARNES,
AND MADISON COUNTY, IOWA

Jack Hilmes
Joseph F. Moser
FINLEY LAW FIRM, P.C.
699 Walnut Street, Suite 1700
Des Moines, IA 50309
Email: jhilmes@finleylaw.com
Email: jmoser@finleylaw.com
ATTORNEYS FOR EYERLY-BALL
COMMUNITY MENTAL HEALTH

| CERTIFICATE OF SERVICE |
|---|
| The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on March 13, 2023 |
| By:   ☐ U.S. Mail              ☐FAX<br>        ☐ Hand Delivered      ☐Overnight Courier<br>        ☐Certified Mail         ☒E-Filed |
| Signature: Robert Rehkemper |