IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| KENT H. PAYNE, Individually and as the Administrator of the Estate of JORDAN KENT PAYNE, and LESLIE KING-PAYNE, Individually,<br><br>Plaintiffs,<br><br>vs.<br><br>JOHN WEAKLAND, JASON BARNES, and MADISON COUNTY, IOWA,<br><br>Defendants and Crossclaimants,<br><br>EYERLY-BALL COMMUNITY MENTAL HEALTH SERVICES, and SCOTT THOMAS,<br><br>Defendants and Crossclaim Defendants. | Case No. 4:21-cv-00349<br><br>**DEFENDANT JOHN WEAKLAND, JASON BARNES, AND MADISON COUNTY, IOWA'S REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT** |

COME NOW Defendants John Weakland, Jason Barnes, and Madison County, Iowa (the "Municipal Defendants"), and in Reply to Plaintiffs' Response to the Municipal Defendants' Motion for Summary Judgment, states to the court the following:

## TABLE OF CONTENTS

**ARGUMENT** ................................................................................................................ 2

**I. THE MUNICIPAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**
.................................................................................................................................... 2

   **A. Weakland is entitled to qualified immunity as a matter of law.** ................................ 2

      **1. Payne's risk of suicide was not objectively obvious to Weakland.** ......................... 2

      **2. Weakland took reasonable preventive measures in response to the risk he was apprised of.** ........................................................................................................ 6

**B.**      **Sheriff Barnes's training and supervision of jail staff was not constitutionally deficient, and he is entitled to qualified immunity as a matter of law.** ............................ 12

**C.**      **Madison County is entitled to qualified immunity because it did not maintain a policy or custom that was deliberately indifferent to prisoner suicide.** ............................ 17

**CONCLUSION** ..................................................................................................................... 22

## ARGUMENT

**I.      THE MUNICIPAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

**A. Weakland is entitled to qualified immunity as a matter of law.**

**1. Payne's risk of suicide was not objectively obvious to Weakland.**

Payne's risk of suicide was not so obvious that knowledge of it can be imputed to Weakland. Plaintiffs' authority followed the *Farmer* case discussed in the initial briefing; the U.S. Supreme Court there held that 'substantial risk' can be demonstrated "in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that a risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). But even the cited authority[1] held the risk of injury must be "*so obvious* that the factfinder could conclude that the guard *did* know of it because he could not have failed to know of it." *Id.* (quoting *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995)). That is a high standard; elsewhere it is described as "intentionally contrived obliviousness to a medical need shown to be so obvious that it must be known unless willfully blocked out." *Brice,* 58 F.3d at 106.

---

[1] Plaintiff relies on *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101 (4th Cir. 1995) and *Makdessi v. Fields*, 789 F.3d 126 (4th Cir. 2015), but neither are prisoner suicide cases, and they are of little value under the factual circumstances of the present case.

Plaintiffs also fail to acknowledge that the risk must be obvious *from the point of view of the guard*, not from a post-hoc narrative that weaves together datapoints outside the guard's purview at the time. *See id.*; *see also Rellergert by Rellergert v. Cape Girardeau Co., Mo.*, 924 F.2d 794, 796 (8th Cir. 1991) (stating the measures taken to prevent suicide cannot be evaluated "from an ex post facto perspective," but must be "determined by considering the measures taken in light of the practical limitations on jailers to prevent inmate suicides," applying a subjective knowledge standard).

Plaintiffs' reliance on facts outside of Weakland's purview is misplaced. They claim Payne's risk of suicide was obvious from how he answered the intake questionnaire, his prior suicide attempt at the jail, and Payne's chirp messages. [Plaintiffs' Br. P. 22–23]. But Weakland didn't know about these, and they could not have made Payne's risk of suicide obvious to him.

Specifically, Weakland was not present when Payne was booked into the jail, and there is no indication in the record that Weakland saw the booking report. [Booking Video, MADISON APP 0001]. Even if he had, Payne explicitly stated he was not thinking of hurting himself now; he was not anxious, afraid, or angry; he was not embarrassed or ashamed; he was not under the influence of alcohol; and he was not under the influence of drugs. [Booking Report, MADISON APP 0080]. Further, Payne did not present any scars or marks of attempted suicide, and he was not talking in a strange manner. *Id.*

Weakland was not familiar with Payne prior to the date of the suicide, June 12, 2020, and there is nothing in the record showing Weakland was aware of Payne's prior alleged suicide attempt. [Weakland Depo. Tr. 24:13–21, 52:7–53:13, MADISON APP 0061, 0066]. The record also shows that the "phone incident" in 2015 was likely not a legitimate attempt at suicide but rather an attempt for attention. [Niblo Tr. 55:14–56:8, MADISON APP 0010; Leslie Payne Tr.

70:18–72:20, MADISON APP 0012; Med. Record – 2015 Suicide Attempt p. 1 MADISON APP.

017.3; 2015 Physician Documentation, MADISON APP 0182–185 Barnes Tr. 110:1–22,

MADISON APP 0030; See also Response to Plaintiff's SODF 44].

Finally, Weakland had not seen Payne's chirp messages prior to Leslie Payne's phone call,

[Linda Jail Video, MADISON APP 0002], and then shortly after being apprised of the issue, Payne

met with Thomas, who assured Weakland that Payne wouldn't hurt himself in custody. [Thomas

Depo. Tr. 73:2–5, MADISON APP 0055; *id.* 77:7–78:19, MADISON APP 0056–57; Weakland

Depo. Tr. 27:21–28:6, MADISON APP 0062; *id.* 34:16–23, MADISON APP 0064].

From Weakland's vantage point, Payne's risk of suicide was not obvious. This is clear

from the information available to Weakland during his very limited interactions with Payne:

- Weakland's first recollection of meeting Payne was June 12, 2020—the day Payne committed suicide. [Weakland Depo. Tr. 24:13–21, 52:7–53:13, MADISON APP 0061, 0066].

- At about 8:31:48 am, Weakland arrived at Payne's Cell to give him medication. [Max Cell Video, MADISON APP 0003]. Starting at 8:31:56, they had a very brief conversation, during which Payne asked if Weakland had sent a fax to the magistrate for him. *Id.* Payne is cordial and friendly, and he appeared to be in good spirits. *Id.* After he took his medicine, he said, "I'm good, thank you." *Id.* Their whole conversation lasted about 26 seconds. *Id.*

- Then at 10:23:00 am, in a very brief interaction while Weakland was outside of Payne's cell, Payne asked Weakland about a call "to Eyerly Ball—mental health?" [Max Cell Video, MADISON APP 0003]. Weakland said, "Yeah, he should be in here today," and Payne politely replied, "Cool, thank you" while appearing to retrieve the chirping device through the door. *Id.* Notably, Payne indicated no sense of urgency or inability to wait for an unspecified time.

- At about 11:40 a.m., Leslie Payne called the jail and left the message about Payne texting something about chewing out his veins. This message was relayed to Weakland at 11:56:01. When Barker relayed the message to Weakland, they could observe Payne sleeping on his bed in his cell, and he appear to be OK. [Linda Jail Video, MADISON APP 0002].

- Mere minutes later, starting around 12:01:18, Weakland appeared to serve lunch at Payne's cell. [Jail Check Video, MADISON APP 0005]. Weakland then conducted a cell check at

Payne's cell at 12:02:54. [Jail Check Video, MADISON APP 0005; Cell Check Log, MADISON APP 0152]. During this time, Payne was laying peacefully on his bed. [Jail Check Video, MADISON APP 0005].

- Shortly thereafter, Weakland gave Payne his medications at about 12:21:45, and although Payne said he's "losing it" and wanted to talk to a doctor, he also assured Weakland he was doing alright and said he just needed his Seroquel. [Jail Check Video, MADISON APP 0005].

- Soon after this, at approximately 1:31 pm, Weakland took Payne to his appointment with Scott Thomas from Eyerly Ball. [Jail Check Video, MADISON APP 0005]. During the meeting, Thomas mentioned Weakland had said Payne wasn't eating and wondered if Payne had been eating when he wasn't on duty. [Thomas Interview Video, 1:42:54, MADISON APP 0004]. Weakland was not part of the meeting, did not hear any of the concerning statements Payne said to Thomas, and after the meeting, Thomas assured Weakland that Payne said multiple times he would not hurt himself in custody. [Thomas Depo. Tr. 73:2–5, MADISON APP 0055; *id.* 77:7–78:19, MADISON APP 0056–57; Weakland Depo. Tr. 27:21–28:6, MADISON APP 0062; *id.* 34:16–23, MADISON APP 0064].

- After the interview, Weakland escorted Payne back to his cell, and Henry observed Payne having a casual conversation with Weakland. [Max Cell Video 1:54:14, MADISON APP 0003; Weakland Depo. Tr. 28:7–9, MADISON APP 0062; Henry Depo. Tr. 47:15–48:23, MADISON APP 0045; Angela Henry Statement MADISON App 0132].

- Weakland dropped Payne off at his cell at about 1:54:15. [Jail Check Video, MADISON APP 0005]. Besides sounding a little annoyed that his phone wasn't working, Payne was not visibly disturbed at this time—he did not look like someone who was ten minutes away from committing suicide. [Jail Check Video, MADISON APP 0005]. In fact, just seconds prior to entering his cell, at 1:54:08, Payne tapped the window of the neighboring cell, smiled at the inmate on the other side of the glass, and nodded at him. *Id.*

- At 1:54:29, Weakland told Payne he was going to get things finished and then come check out his Phone, and Payne gave him a friendly, thumbs-up gesture as Weakland left. [Jail Check Video, MADISON APP 0005].

- Approximately ten minutes later, Payne hung himself in the shower. At about 1:55:10, *after* Weakland had left Payne's cell, Payne had begun reviewing the chirp messages from McKinley and then began a downward spiral from there that very quickly led to Payne taking his own life. [Jail Check Video, APP 0005].

Next, it makes sense that Weakland didn't know the extent of Payne's mental condition.

Payne was concealing it to avoid being placed on suicide watch. Concerning his mental status,

Payne told McKinley, "I aint sayn shit so they can strip me naked and chain me to a bed like last

5

time." [Chirp Record p. 25–26, MADISON APP 0116–117]. To further prevent being placed on suicide watch, Payne told McKinley multiple times not to notify the police of his condition. [Chirp Records pp. 7, 9, MADISON APP 0098–100]. Payne even made Thomas swear he wouldn't relay Payne's concerning statements to jail staff. [Thomas Interview Video, 1:36:44, 1:40:09, MADISON APP. 0004]. Payne explicitly told Thomas he was afraid McKinley would call the jail and tell them to put him on suicide watch. [Thomas Interview Video, 1:36:35, MADISON APP 0004]. And he explicitly said, "I don't want to go on suicide watch." [Thomas Interview Video 1:40:55].

Objectively considered from circumstantial evidence, Payne did not present a risk of suicide to Weakland during the very few, very brief interactions they had. The facts here don't even hint at "intentionally contrived obliviousness to a medical need shown to be so obvious that it must be known unless willfully blocked out." *Brice,* 58 F.3d at 106. And contrary to Plaintiffs' averments, this does not depend on a determination of Weakland's credibility. The court can review the jail videos and see for itself Payne's demeanor, behavior, and communication around Weakland, as well as the other information communicated to Weakland and when. No reasonable review of the jail video at 1:54:30—Weakland's last contact with Payne while he was alive— suggests Payne is going to kill himself, much less in approximately ten minutes. [Jail Check Video, MADISON APP 0005].

Weakland was not omniscient, and the law requires the Court to view the evidence from his perspective. Plaintiff's claim that Payne's risk of suicide was obvious to Weakland fails as a matter of law.

## 2. Weakland took reasonable preventive measures in response to the risk he was apprised of.

Plaintiffs claim Weakland turned "a blind eye to the obvious suicidal condition of Jordan," and was "apathetic and failed to take reasonable measures to abate Jordan's obvious suicide risk." [Plaintiffs Br. p. 30]. To ratchet up the hyperbole, Plaintiffs also aver that "Weakland buried his head in the sand hoping the storm would pass," [*id.* at 26], and "Weakland literally did nothing." [*Id.* at 28]. These claims are just false.

The following is undisputed: **(1)** Weakland and the jail appropriately and consistently administered Payne's medications, [Payne Med. Prescriptions (Depo. Ex. 5), MADISON APP 0082–85; DCI Report p. 2, MADISON APP 0069; Payne Medication Record, MADISON App 0086]; **(2)** Weakland and the jail promptly arranged an appointment for Payne with Scott Thomas from Eyerly Ball in response to a request from Payne to address mental health and medication issues and also in response to the call from Leslie Payne about Payne's chirps; [Emails, Plaintiff's A31–A38; Max Cell Video, 10:23:00, MADISON APP 0003; Barnes Depo. Tr. 102:2–20, MADISON APP 0029, Weakland Depo Tr. 25:16–26:16, MADISON APP 0061–62; Thomas Depo. Tr. 34:1–11, MADISON APP 0051]; **(3)** the communications from the Jail and Weakland to Scott Thomas about this appointment were made *both before and after* Leslie Payne's phone call about the concerning chirps, *id.*; **(4)** the communications totaled at least three emails in under 24 hours and a phone call from Weakland after Leslie Payne called the jail, *id.*; **(5)** Weakland in fact took Payne to the appointment with Thomas, who then arranged a follow up appointment with a psychiatrist to address Payne's medication, which was to occur only an hour and a half after the meeting with Thomas. [Thomas Interview Video, MADISON APP 0004; Emails, Plaintiff's A31; Weakland Depo Tr. 26:22–25]; and **(6)** the Jail then expressed its intention to take Payne to this ITP appointment. [Emails, Plaintiffs' A31].

It is useful here to clarify the timeline on the Jail's communications to Scott Thomas and their efforts to establish the mental-health appointment for Payne:

- On June 11, 2020, at 2:10 pm, the jail emailed Scott Thomas, informing him that Payne "requested to talk with you tomorrow." [Emails, Plaintiff's A38].

- On June 12, 2020, at 9:41 am, the Jail independently followed up with Thomas in a second email, stating, "j payne – wants to speak with you." [Emails, A37].

- At 10:23:00 am, Payne asked Weakland about a call "to Eyerly Ball—mental health?" [Max Cell Video, MADISON APP 0003]. Weakland told him, "Yeah, he should be in here today." *Id.* Payne politely replied, "Cool, thank you," not indicating any sense of urgency. *Id.*

- At 11:26 am, still before Leslie Payne's phone call, the Jail sent *another* email to Scott Thomas, stating "[P]ayne does want to see you. Are you coming this afternoon?" [Emails, Plaintiff's A32].

- At about 11:40 am, Leslie Payne called the Jail, reporting the concerning chirp messages. [Linda Barker Statement, MADISON APP 00131; Leslie Phone Call Audio, MADISON APP 0007].

- At 11:56:01, the message from Leslie Payne was relayed to Weakland, during which time Payne was sleeping on his bed. [Linda Jail Video, MADISON APP 0002; Jail Check Video, MADISON APP 0005].

- After the report about Leslie Payne's call, and in direct response to it, Weakland then *called* Scott Thomas to arrange the meeting with Payne. [Weakland Depo Tr. 25:16–26:16, MADISON APP 0061–62; Thomas Depo. Tr. 34:1–11, MADISON APP 0051]. Although unable to recall the time, Thomas confirmed that he did receive a phone call from a jailer at Madison County, asking him to come meet with Payne. [Thomas Depo. Tr. 34:1–11, MADISON APP 0051].

- At 1:30:40, Weakland entered Payne's cell and informed him that Scott Thomas with Eyerly Ball was there to see him. [Max Cell Video, MADISON APP 0003]. Weakland then transported Payne from his cell to meet with Thomas in the Jail's "multipurpose room." [*Id.*; Thomas Interview Video, 1:31:21, MADISON APP 0004]. The meeting lasted until approximately 1:53 pm. [Thomas Interview Video, MADISON APP 0004].

- At 2:18 pm, Scott Thomas emailed the Jail, informing them he had "just scheduled Payne for ITP at 330 pm today. Please acknowledge." [Emails, Plaintiffs A31].

- At 3:09, the Jail responded, "great will plan on it. thanks."

This is not "literally nothing" but instead shows a great deal of effort and action. The legal standards on deliberate indifference have already been briefed and need not be regurgitated in their entirety, but it is worth reiterating here that the Plaintiffs' burden is to show that the measures taken in response to a suicide or self-harm risk were "so inadequate as to be deliberately indifferent to the risk." *Rellergert*, 924 F.2d at 796. And when, as here, prison officials take " 'affirmative, deliberative steps' to prevent suicide, then poor judgment, negligence, and even gross negligence do not constitute deliberate indifference." *Luckert v. Dodge County*, 648 F.3d 808, 818 (8th Cir. 2012). The above reveals *repeated* efforts to arrange mental health services for Payne. This is the antithesis of deliberate indifference.

Plaintiffs' list of other complaints either fail to meet the applicable legal standard or are simply contradicted by the record. For example, Plaintiffs fault the jail for housing Payne in a single-person cell. [Plaintiffs' Br. p. 26]. But the record is well-established showing Payne was housed without a cellmate because he reported having some kind of respiratory infection *during the height of the Covid-19 epidemic*. [Booking Video, MADISON APP 0001; Chirp Messages, Madison App. 0123–0124; *see also* response to Plaintiff's SODP 147]. Weakland also was not the decision maker in Payne's cell assignment, so this doesn't show that Weakland failed to take reasonable preventive measures to prevent suicide. [*See* Booking Video, MADISON APP 0001].

Plaintiffs also complain Weakland wasn't monitoring the chirps or video. But the context and timeline are important here. Weakland wasn't clearly alerted to the problem until Leslie's phone call was relayed to him at 11:56:01, and even then, there was no clear suicide threat, but a cryptic statement about chewing out his veins. [Linda Jail Video, MADISON APP 0002]. Weakland was already aware Payne was scheduled for a mental health appointment, and in fact called to confirm that. [Weakland Depo Tr. 25:16–26:16, MADISON APP 0061–62; Thomas

Depo. Tr. 34:1–11, MADISON APP 0051]. From Weakland's viewpoint, measures were in place to address the problem, and he was in fact conducting regular cell checks. [Cell Check Record, MADISON APP 0146–0152]. Further, it was *after* Weakland returned Payne to his cell that Payne reviewed the chirp messages that precipitated his suicide. [Jail Check Video, 1:55:10 MADISON APP 0005]. And this happened *very* quickly—Payne hung himself in the shower just over 10 minutes after Weakland left the cell. Actions related to the suicide were only visible in the video for mere second. *Id.* And when he left, Weakland told Payne he would "get things finished" and then come check out his phone—showing Weakland was simultaneously occupied with other jail tasks when Payne committed suicide. [Jail Check Video, 1:54:30, MADISON APP 0005]. Although it seems Weakland didn't rush back to the control room and immediately pull up the monitors and Payne's chirp records, deliberate indifference must be evaluated in light of the information the jailer possessed at the time and the practical limitations of his position. *Gregoire*, 236 F.3d at 418–419. At the time, Weakland believed Payne was not a suicide risk, based in part on Thomas's report that Payne wouldn't hurt himself in custody, and Weakland was attending to other jail tasks during the short window of time between the drop off and suicide.

Plaintiffs also fault Weakland for relying on Thomas's statement that Payne wouldn't kill himself in custody because Thomas wasn't a licensed mental health professional and possessed only "a bachelor's degree in Sociology." [Plaintiffs' Br. 29]. Plaintiff's cited authority offers no useful commentary on Thomas's qualifications in the context of this case.[2] Plaintiffs cannot show

---

[2]Plaintiff cites *Holder v. Hirner*, 633 F.3d 336 (8th Cir. 2011) and *Meloy v. Bachmeier*, 302 F.3d 845 (8th Cir. 2002). Nothing in these cases suggest that Weakland was wrong for giving credence to Thomas's report to him after the meeting with Payne. In fact, the former case holds that because the prison officials there lacked medical and dental expertise, they were entitled to rely on a nurse's medical opinion. *Holder*, 633 F.3d at 343. And the latter held, "A prison's medical treatment director who lacks medical expertise cannot be liable for the medical staff's

a jailer is deliberately indifferent to the risk of inmate suicide unless he relies exclusively on PhD-educated sources for his information. That's not what the law requires, and if it were it would be impossible for rural county jails to adhere to. Following the meeting with Payne, Thomas informed Weakland that Payne told him on more than one occasion that he was not going to hurt himself in custody, but he wasn't sure what would happen when he left. [Thomas Depo. Tr. 73:–5, MADISON APP 0055]. Based on this interaction, Weakland explained "he did not feel any extra concern for Jordan Payne," and "there was no concern that Jordan was going to hurt himself." [Weakland Depo. Tr. 27:21–28:6, MADISON APP 0062; Weakland Depo. Tr. 34:16–23, MADISON APP 0064]. The constitution certainly did not *require* Weakland to adopt a posture of complete skepticism toward Thomas, disregard Thomas's report, and then immediately place Payne on suicide watch for no reason apparent to Weakland at the time. As far as Weakland understood, Thomas was the specialist on the issue.

Finally, Plaintiffs allege Weakland failed to pass along "critical information" to Thomas. But again, at the time of the meeting with Thomas, Weakland knew very little. Weakland didn't know about Payne's history, his other alleged suicide attempt, the information in the booking report, or Payne's brother's suicide—and it is improper for Plaintiffs' to impute that knowledge to him in a deliberate indifference analysis. *See Gregoire*, 236 F.3d at 418–419 (holding the court must evaluate the jailer's actions "in light of the information he possessed at the time," and applying a subjective awareness standard with regard to a known risk).

As to what Weakland actually knew—he knew Payne wanted to meet with someone from Eyerly Ball about his medications, that Payne wasn't eating his meals during Weakland's shift,

---

diagnostic decisions. Prison officials cannot substitute their judgment for a medical professional's prescription." *Meloy*, 302 F.3d at 849.

that Payne had said something about visions, and he knew about the chirp where Payne mentioned chewing out his veins. [Linda Jail Video, 11:56:01, MADISON APP 0131; Thomas Interview Video, 1:45:54, MADISON APP 0004]. To begin with, Weakland did tell Thomas that Payne was concerned about his medications and about him not eating his meals; and the record is actually unclear on the extent of what else Weakland reported to Thomas.[3] [Thomas Interview Video, 1:32:11, 1:42:53 MADISON APP 0004]. But more significantly, Payne's own statements during the interview with Thomas revealed not only everything Weakland could have said, but much more, and they included the statements about psychosis and chewing out his veins. [Thomas Interview Video, MADISON APP 0004]. Plaintiffs' insinuation that Thomas was somehow too underinformed to reliably perceive Payne's self-harm risk is not credible; the Thomas Interview Video speaks for itself.

Payne's risk of suicide was not obvious to Weakland, and Weakland took reasonable preventive measures to protect Payne from harm in light of the little he knew. As a matter of law, Weakland was not deliberately indifferent to a known risk of suicide. Plaintiffs' claims fail, and Weakland is shielded from any liability by qualified immunity.

### B. Sheriff Barnes's training and supervision of jail staff was not constitutionally deficient, and he is entitled to qualified immunity as a matter of law.

Plaintiffs' argument that Barnes's training and supervision of jail staff amounted to deliberate indifference to inmate suicide is based most squarely on the following: they claim there was an "utter lack of education and training" for the Madison County jail staff; that Weakland

---

[3]During the Thomas interview, Thomas mentioned Weakland's comment that Payne wasn't eating his meals during Weakland's shifts. [Thomas Interview Video, 1:42:53, MADISON APP 0004]. In deposition, Thomas only *recalled* discussing Payne's medications with Weakland, but the video shows more than that was discussed. [Thomas Depo. Tr. 57:2–11; Thomas Interview Video, 1:32:11, MADISON APP 0004]. But even if Weakland reported nothing, Payne himself relayed to Thomas everything Weakland would have known, and much more.

received no training besides the initial ILEA jailer course and never saw the jail SOP's; that Henry corroborated the "lack of training;" that "there was never a time [Henry] was provided the suicide prevention plan;" and that Barnes "utterly failed" to train the jail staff, referring to such training that presumably did exist as an "abysmal failure." [Plaintiffs' Br. pp. 38–41]. Again, Plaintiffs revert to excessive and hyperbolic allegations in an attempt to distract the Court and sidestep the legal analysis which must be applied to the facts. When viewed through the correct legal lens, it is clear that Plaintiffs' claims fail as a matter of law.

To briefly summarize, jail staff attend the initial 40-hour jailer certification course at the Iowa Law Enforcement Academy ("ILEA") which covered suicide prevention; thereafter, jailers receive 20 hours of annual training from the ILEA; jail staff received a copy of, and were trained on, the Jail's SOP's, which included the suicide prevention policy and policies on prisoner mental health; dispatchers receive the Basic Iowa System Training for use of the NCIC system through the ILEA; the department conducts CPR and First Aid training; and for at least the past couple of years, the department administered online Police Legal Sciences training, which is two hours of required online training administered monthly, which intermittently included topics in suicide prevention.[4] [SOMF 154–172; Jail SOP's, MADISON APP 0200] Although it may not have been covered every year, the ILEA determines the content of the annual trainings, and they do cover suicide prevention.[5] [SOMF 161]. After the initial ILEA Jailer Course, Weakland did in fact

---

[4]It is unclear from the record the extent to which the monthly Police Legal Science courses wee administered before June, 2020. [SOMF 164].

[5]Plaintiffs reference an annual training requirement. [Plaintiffs' Br. p. 37]. As established above, all Jailers were required to attend 20 hours of annual training to maintain their jailer certification, and Weakland attended the annual training. Although it may not have been covered every single year, the annual training did cover suicide prevention as a topic. [SOMF 161]. Even if the ILEA didn't cover suicide prevention in a given year, that would not be sufficient to establish *deliberate indifference* by the Municipal Defendants. Knowing this, Plaintiffs attempt to argue training and supervision were *utterly nonexistent*, which is patently false.

attend the 20-hour annual trainings to maintain his Jailer certification, and his employment file contains certifications and enrollment confirmations for these and other training he received. [SOMF 171–172]. Additionally, Weakland specifically recalled being trained on the Jail's standard operating procedures, which included suicide prevention. [Weakland Depo. Tr. 16:10–16, MADISON APP 0060; Jail SOP's MADISON APP 0202–0203]. Henry confirmed that suicide prevention and intervention was a covered topic in the ILEA jail school, [Henry Depo. Tr. 24:25–2613, MADISON APP 0041–42], and that she reviewed the SOP's when they were revised in 2017. [Henry Depo. Tr. 37–38, Plaintiff's A167–168]. In addition to the above-described training, Barnes communicated to Jail Administrator Niblo the importance of keeping an eye on inmates and doing the best job possible on preventing suicide—and this was disseminated to staff during training, orientation, day-to-day operations, and in meetings. [SOMF 189]. Prior to Payne's suicide, Barnes impressed upon all jail staff that suicide was a real risk, and they needed to pay careful attention and report to the jail administrator or Chief deputy if any action needed to be taken. [SOMF 191]. Barnes explained that jail staff are reminded constantly that they need to pay attention and take suicide prevention seriously. [SOMF 193]. Niblo also explained that he would provide jailers two to four weeks of on-the-job-training before they were sent to the Jail school. [Niblo Depo. Tr. 9:25–10:25, MADISON SUPP APP 0002–0003]. Niblo also explained that he provided verbal on-the-job training to the jailers, [Niblo Depo. Tr. 15:10–16:9, Plaintiff's A123–A124], and he also trained the jailers to observe the inmates, make sure they are responsive, and make sure they are not a danger to themselves. *Id.*; [Niblo Depo. Tr. 24:7–21]. This is not an "utter lack of education and training."

Plaintiffs also complain the jail SOP's, which substantially mirror relevant Iowa Administrative Code provisions, don't instruct jail staff on how to respond or communicate in

response to an inmate's specific answers to initial screening questions during booking.[6] [Plaintiff's Br. pp. 34–36]. It is clear from the policy that the screening questions provide the booking jailer with information about the inmate, and then the jailer uses his or her judgment and discretion in determining the inmate's cell assignment and what other precautions or services may be necessary. [Jail SOP's, MADISON APP 0202–0203]. This discretion is implicit in the Administrative Code's provisions on screening: "At the time of booking, <u>an attempt shall be made (either by observation for marks or scars or direct questioning of the prisoner) to determine if the prisoner is suicidal</u>. Iowa Admin. Code § 201—50.13(1)(*f*) (then listing questions to be asked "to aid in suicide prevention"). Plaintiffs' argument presumes a suicide prevention policy should control all of a jailer's procedures and decisions without the use of individual judgment—as if detecting suicide risk can be expressed universally in policy language and followed like a ministerial task. Plaintiffs cite no authority for this untenable position. When the Administrative Code is reviewed reasonably according to its terms, this is not a "policy gap," and recognizing that correctional officers must use discretion and judgment in evaluating suicide risk does not create the "highly probable consequence" that federal rights will be violated.[7]

---

[6]The Municipal Defendants' SOP's were reviewed annually by a state inspector, and the inspector never provided negative feedback on the suicide prevention policy. [SOMF 182–184]. Plaintiff's attempt to undermine this by claiming the inspector only verified the *existence* of the policies but never substantively reviewed them. [Plaintiffs' Br. p. 37]. That is incorrect and it has no support in the record. Although a full explanation is provided in response to Plaintiff's SODF 55, the bottom line is that Barnes didn't personally *observe* the inspector reviewing the policies, but the inspector provided substantive feedback on the SOP's before, proving that he *did* substantively review them. [Barnes Depo. Tr. 22:5–23:5, MADISON APP 0019; *id.* 30:6–34:23, MADISON APP 0021; *id.* 32:1–18, MADISON APP 0021; Jail Inspection Report (Depo. Ex. 15), pp. 8, 20, 32 MADISON APP 0265, 277, 289].

[7]Plaintiffs cite *Board of County Com'res of Bryan County, Okl v. Brown*, 520 U.S. 397, 409 (1997), and *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 929 (7th Cir. 2004), as authority, but these cases cut *against* their position. In *Brown*, the U.S. Supreme Court held the county there was not liable for their hiring and training decisions in an excessive force case, and court specifically iterated that "§ 1983, Congress did not intend to impose liability

Plaintiffs' also cite no authority that requires jailers to be certified mental health professionals. Plaintiffs complaint "Madison County Jail Staff are not qualified to conduct 'mental health screening' of inmate's nor to assess their general mental health." But Plaintiffs provide no law, and the Municipal Defendants are aware of none, that requires either (1) the booking jailer him- or herself to be a licensed mental health professional, or (2) the jail to contract with such a professional to conduct all of their intake screenings. Although the Iowa Administrative Code requires "screening for potential self-injury or potential suicide," *id.* § 201—50.15(6), it does not require the jailers involved in this task to possess advanced degrees in psychology, certification in mental health screenings, or licensure as a mental health professional.[8] *Id.* § 201—50.10

---

on a municipality unless *deliberate* action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Brown*, 520 U.S. at 400. The court there also explained that, although an "inadequate training" claim *could possibly* be the basis for § 1983 liability 'in limited circumstances,' " it would have to be "a deficient training **program**,' necessarily intended to apply over time to multiple employees." *Id.* at 407 (emphasis added). "If a program does not prevent constitutional violations, municipal decisionmakers *may eventually* be put on notice that a new program is called for," *id.* (emphasis added), but "a pattern of tortious conduct by inadequately trained employees" must be "the 'moving force' behind the plaintiff's injury," "rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident." *Id.* at 407–408.

And the facts of *Woodward* were not only egregious and readily distinguishable, but they actually illustrate the kind of extreme circumstances that meet the deliberate-indifference standard where failure-to-train and deficient-policy claims are at the center of the constitutional challenge. There, a corporate entity provided intake, screening, and mental health services, and the nurses were outright encouraged by their supervisor to disregard written policies and procedures and to refuse people at booking so the entity wouldn't get stuck with the medical bills; nurses were under the influence of drugs and alcohol during their shifts, and they were incapable of performing their duties; the supervisor "acknowledged that the intake directives regarding suicide prevention were often ignored;" the inmate in that case indicated he felt "current suicidal proclivities;" and an expert who reviewed the case said the inmate "came in almost screaming for help," and he had "never seen [a suicide risk] that was more [clearly documented] than this case." *Woodward*, 368 F.3d at 922–926.

[8]The Jail's SOP on requirements for a Jailer/Dispatcher mirror the standards articulated in Iowa Administrative Code, section 201—50.10 and require additional knowledge, skills, and abilities as well. *Compare* [Jail SOP's MADISON APP 0197–0198] *with* Iowa Admin. Code § 201—50.10. Perhaps not realizing the standards came from the code, Plaintiffs' say it is absurd to allow jailers to function with only these qualifications—stating, "Despite these facts, this policy

(governing Minimum standards for jail personnel), *id.* § 201—50.11 (governing training for jail personnel). The law presumes the officers involved in booking and supervising inmates will exercise discretion and judgment in response to the information the code requires them to obtain from the prisoners, even without highly specialized training. *See id.* § 201-50.13(1)(*f*) (governing Admission/classification and security, and stating "At the time of booking, an attempt shall be made (either by observation for marks or scars or direct questioning of the prisoner) to determine if the prisoner is suicidal," then listing questions—which are mirrored in the Jail's SOP's—to aid in suicide prevention). Plaintiffs provide no legal basis for the standards they apply to the Municipal Defendants here, and they go well beyond what is provided in the code.

Although Plaintiffs briefing recites *in form* some of the standards on deliberate indifference in this context, *in substance* Plaintiffs are making a negligence argument—their whole argument is that Barnes and the Jail could have done more. But that is not the standard for "deliberate indifference" that the court must apply; rather, the 8th Circuit holds,

> "Simply laying blame or fault and pointing out what might have been done is insufficient. The question is not whether the jailers did all they could have, but whether they did all the constitution requires."

*Luckert*, 684 F.3d at 818 (quoting *Rellergert*, 924 F.2d at 797).

### C. Madison County is entitled to qualified immunity because it did not maintain a policy or custom that was deliberately indifferent to prisoner suicide.

---

assigns the task of attempting to 'establish the mental well-being of each person admitted' to individuals whose requirements for employment are being 18 years of age, able to read and write in English, good moral character, not by reason of conscience or belief opposed to the use of force, passes psychological screening, free of contagious disease and passes physical, drug and optical requirements. Dkt. No. 43–2 at 0198. **Just as absurd**, the policy does nothing to guide or direct jailers in determining whether 'some mental health is needed' and which resources to utilize in which situations."

Madison County's suicide prevention policy for the Jail clearly is not deliberately indifferent to prisoner suicide; accordingly, Plaintiffs turn their challenge to the actions of "[t]he defiantly indifferent and ignorant Jail Administrator Niblo" in effort to claim he, along with Barnes, maintained a policy or custom that was deliberately indifferent to prisoner suicide. [Plaintiffs' Br. p. 45]. Part of their challenge focuses on specific acts by Niblo, such as his "direct[] involve[ment] with the intake, booking, processing, and housing assignment of Jordan on June 9, 2020," [Plaintiffs' Br. p. 43], and they cite *Brady v. Fort bend County*, 145 F.3d 691, 698 (5th Cir. 1998), for the proposition that, "[A] single action by a municipal official posing final policymaking authority regarding the action in question constitutes the official policy of the municipality . . . ."

But this does not mean that just any of Niblo's acts create *Monell*-liability for the *county*— the inquiry rather concerns "*an unconstitutional government policy* that is inferred from a single decision taken by *the highest officials responsible for setting policy in that area of the government's business*." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985). Even when a *policymaker* acts in a discretionary—rather than policymaking—capacity, liability does not attach:

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

*Pembaur v. City of Cincinnati*, 475 U.W. 469, 481–483 (1986). Further,

> Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority. . . . We hold that municipal *liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question*.

*Id.* at 483.

In an excessive force case, the Eight Circuit described the analytic framework for evaluating failure-to-train-claims where, as here, the municipal policy is facially lawful:

> Where a policy is constitutional on its face, but it is asserted that a municipality should have done more to prevent constitutional violations by its employees, a plaintiff must establish the existence of a "policy" by demonstrating that the inadequacies were a product of deliberate or conscious choice by policymakers. [*City of Canton v. Harris*, 489 U.S. 378, 389 (1989)] The standard of fault in that situation is "deliberate indifference" to constitutional rights. *Id.* at 388, 109 S.Ct. 1197. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." [*Bd. of Cnty. Commrs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403–04 (1997)]. "[A] plaintiff seeking to establish municipal liability on the theory that a *facially lawful* municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Id.* at 407, 117 S.Ct. 1382 (emphasis added). Thus, only where a municipality's failure to adopt adequate safeguards was the product of deliberate indifference to the constitutional rights of its inhabitants will the municipality be liable for an unconstitutional policy under § 1983.

*Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 390 (8th Cir. 2007).

To begin with, Niblo was not a policymaker. When Barnes became Sheriff, he created the jail administrator position and hired Niblo for it to improve the division of labor at the jail. [SOMF 177–181]. The Iowa Administrative code describes a "jail administrator" as "the sheriff, sheriff's designee, or the executive head of any agency operating a jail. The jail administrator shall be responsible for the operation of the facility according to these rules." Iowa Admin. Code § 201—50.1. Here, it is established in the record that Niblo was only in charge of the day-to-day operations at the jail—like a manager that physically worked in the jail—but substantive policy changes needed to be approved by Barnes and the Chief Deputy. [Barnes Depo. Tr. 17:11–18:4, MADISON APP 0017–18]. As to the actual policy in effect, in 2017, Barnes worked with chief Deputy Jim Ascione to revise the SOPs. [SOMF187–188]. Niblo had no recollection of being involved in the creation of the Jail's suicide prevention policy. [Niblo Depo Tr. 12:11–13:6;

A120–121]. Niblo did not "possess[] final authority to establish municipal policy with respect to" the policies at issue in this case, *Pembaur*, 475 U.W. at 481–483, and nor is Niblo "the highest official[] responsible for setting policy in that area of the government's business." *Tuttle*, 471 U.S. at 823–24.

In sum, Niblo was not a decision maker, and Niblo's discretionary actions do not create liability for the County. A county cannot be liable on a *respondeat superior* theory. *Szabla*, 486 F.ed at 389 (citing *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). Plaintiffs claims fail.

Further, the only policy or custom Plaintiffs identify in their claim is a culture of indifference within which Niblo and Barnes maintained "a custom and policy of deliberate indifference to training of employees on suicide prevention," which they claim (again with hyperbolic drama) "unfold[ed] like an unavoidable train wreck." [Plaintiffs Br. 46]. The "culture of indifference" claim is false. It is based on jesting that can be heard between Barker and Henry after Barker had relayed Leslie Payne's phone call, but it does not show that anyone at the jail is indifferent to inmate suicide or that there is a culture of indifference to it. In the Linda Jail video, at around 11:57:00 onward, Barker is talking about Payne's medications, and some discussion back and forth occurs. [MADISON APP 0002]. Then at 11:57:40, before leaving the room, Barker says, "I'm just doing my part reporting it. I don't want nothing to happen on our watch." *Id.* After this she jokes, "After we go home, people can [inaudible]. I'm kidding! I'm kidding!" Henry then enters into the joke, and she says, "No, I'm not, I don't give a shit." *Id.* While this is being said, at 11:57:49, Weakland can be seen in the reflection of the glass in the dispatch room exiting the room through a door. *Id.* A few seconds later, Barker then leaves through another door. *Id.*

In the context of this video, both Barker and Henry explicitly state multiple times they don't want anything to happen to Payne on their watch. The discussion, which is partially inaudible, appears to be about how they feel when they go home; it is specifically not a statement of their alleged indifference to the inmates during their shift. Weakland is not even participating in this discussion, and he can be seen leaving the room as the statement are said. *Id.* Henry and Barker's statements show nothing about Weakland's state of mind. And they show nothing about the County's policies or Barnes's supervision of jail staff, except that the jail staff does not want anyone to harm themselves during their watch. [Linda Jail Video, MADISON APP 0002].

It is worth reiterating that the standard for deliberate indifference for *Monell*-liability to attach in this context is extraordinarily high. Even where a Plaintiff can show flaws in a county's practices, "but has not demonstrated [a] 'continuing, widespread, persistent pattern of constitutional misconduct,' " liability cannot attach. *Luckert*, 684 F.3d at 820. *Monell* explained,

> [A] local government many not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell*, 436 U.S. at 694. The Plaintiff must identify a custom, policy, or practice and show it was "the 'moving force' behind the violations." *Luckert*, 684 F.3d at 820 (quoting *Patzner v. Burkett*, 799 F.2d 1363, 1367 (8th Cir. 1985)). "Moreover, the Plaintiff must show not only that a policy or custom existed, and that it was causally related to the plaintiff's injury, but that the policy itself was unconstitutional." *Id.* (quoting Patzner, 799 F.2d at 1367). That is, "the policy itself [must] reflect[] deliberate indifference . . . to the risk of inmate or detainee suicide." *A.H. v. St. Louis County, Missouri*, 891 F.3d 721, 728 (8th Cir. 2018).

The failure-to-train issues are addressed above and in the initial briefing. The claims are completely without merit. Not only were the jail staff adequately trained, but Plaintiffs' can show no causal connection between any policy or custom and Payne's suicide. The County did not maintain any custom or policy of deliberate indifference toward inmate suicide. Madison County is entitled to qualified immunity, and Plaintiffs' claims fail as a matter of law.

## CONCLUSION

For the above reasons, Plaintiff's claims fail as a matter of law and the Municipal Defendants are entitled to qualified immunity. This court should grant the Municipal Defendants' motion for summary judgment and dismiss Plaintiff's federal constitutional claims.

/s/ Michael C. Richards
Michael C. Richards, AT0010828
DENTONS DAVIS BROWN PC
215 10th Street, Suite 1300
Des Moines, Iowa 50309-3993
Telephone: (515) 288-2500
Facsimile: (515) 243-0654
Email: mike.richards@dentons.com

ATTORNEYS FOR DEFENDANTS
JOHN WEAKLAND, JASON BARNES,
AND MADISON COUNTY, IOWA

Copies To:

Robert G. Rehkemper
Cory F. Gourley
GOURLEY, REHKEMPER,
& LINDHOLM, PLC
440 Fairway Drive, Suite 210
West Des Moines, IA 50266
Email: rgrehkemper@grllaw.com
Email: cfgourley@grllaw.com

ATTORNEYS FOR PLAINTIFF
KENT H. PAYNE, INDIVIDUALLY, AND
AS ADMINISTRATOR OF THE ESTATE
OF JORDAN KENT PAYNE

Paul J. Statler
STATLER LAW, P.L.L.C.
301 East Walnut Street, Suite 7
Des Moines, Iowa 50309
Email: paul@statlerlaw.net

ATTORNEYS FOR PLAINTIFF
LESLIE KING-PAYNE, INDIVIDUALLY

Jack Hilmes
Joseph F. Moser
FINLEY LAW FIRM, P.C.
699 Walnut Street, Suite 1700
Des Moines, IA 50309
Email: jhilmes@finleylaw.com
Email: jmoser@finleylaw.com

ATTORNEYS FOR DEFENDANTS AND
CROSSCLAIM DEFENDANTS
EYERLY-BALL COMMUNITY MENTAL
HEALTH SERVICES, AND
SCOTT THOMAS

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on March 27, 2023, by:

☐ U.S. Mail                          FAX ☐
☐ Hand Delivered          Overnight Courier ☐
☐ Email                            CM/ECF ☒

Signature:  /s/ Michael C. Richards