IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| KENT H. PAYNE, Executor of the Estate of Jordan Kent Payne, and LESLIE PAYNE, | ) ) ) | Case No. 4:21-cv-00349-SMR-HCA |
| Plaintiffs, | ) ) | COMBINED ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT |
| v. | ) ) | |
| JOHN WEAKLAND, JASON BARNES, MADISON COUNTY, IOWA, EYERLY-BALL COMMUNITY MENTAL HEALTH SERVICES, and SCOTT THOMAS, | ) ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiffs Kent H. Payne and Leslie Payne brought this lawsuit after their son Jordan Payne ("Jordan") committed suicide in the Madison County Jail. They allege the above-captioned Defendants violated Jordan's constitutional rights because they were deliberately indifferent to his substantial risk of suicide. Plaintiffs also allege statutory and common law claims for negligence.

The Defendants are (1) John Weakland who was the jailer who directly interacted with Jordan before the suicide and discovered his body; (2) Scott Thomas who was the jail diversion case manager who met with Jordan shortly before he hung himself in his jail cell; (3) Sheriff Jason Barnes who was the Madison County Sheriff; (4) Eyerly-Ball Community Health Services ("Eyerly-Ball") which is a community health organization who employed Thomas; and (5) Madison County, Iowa.

Defendants move for summary judgment on Plaintiffs' federal constitutional claims. They argue that they were not deliberately indifferent to Jordan's risk of suicide. Madison County, Eyerly-Ball, and Barnes maintain that they were not deliberately indifferent to the risks of suicide

by jail inmates and the training and supervision provided to their employees does not violate the United States Constitution.

## I.     BACKGROUND

### A.  *Factual Background*

On June 9, 2020, Jordan was arrested pursuant to a warrant for contempt of court.  [ECF No. 43-2 at 73].  He was sentenced to a 30-day jail term.  *Id*. at 73, 77.  During the jail booking process, Jordan was asked a series of intake questions by Jail Administrator Steve Niblo.  *Id*. at 73, 82–85.  The questions pertained to a variety of topics and many were focused on mental illness and thoughts of self-harm.  *Id*. at 82–85.  At the time of his booking, Jordan was taking the prescription drugs Buspirone and Vraylar.  *Id*. at 17, 86–89.  He was provided these medications by the jail staff according to records.  *Id*. at 73, 90.

The Madison County Jail allows inmates to use a communication system called a "Chirp" which allows them to send text messages, using a device similar to a cell phone, at a rate of $0.10 per message along with additional funding fees.  *Id*. at 34, 92–96.  Madison County receives $0.02 per message sent and received.  *Id*. at 93.  Jordan received a Chirp messaging device which he used to communicate with his girlfriend Christina McKinley, sending and receiving a total of 430 messages during his time at the jail.  *Id*. at 39, 97–134.

Jordan sent messages to McKinley on June 11 indicating that he was struggling with his mental health and was concerned about the consequences if he shared that information with jail staff.  *Id*. at 120.  He said that something was not right "in my head" and that he was "hearing voices."  *Id*. Jordan noted that he wanted to resume taking the prescription drug Seroquel because the voices he was hearing were telling him to commit self-harm.  *Id*. When McKinley asked Jordan if he "t[old] the jailer," he responded that he was not going to say anything because they will "strip

me naked and chain me to a bed like last time." *Id*. at 121.  Less than an hour later, Jordan messaged McKinley that he was "smashing [my] head off wall" to which McKinley pleaded with him to stop smashing his head. *Id*. at 113–14.  He responded that smashing his head "stops voices." *Id*. at 113.  McKinley assured Jordan that she would talk with his mother in the morning about reaching out to Jordan's mental health provider about resuming Seroquel.  *Id*. at 114.

For the remainder of June 11 and into the following morning, Jordan did not tell McKinley that he was experiencing auditory hallucinations or suicidal ideations.  *Id*. at 105, 106–114.  Then at 11:08 am, he messaged McKinley that she was "gonna be mad at me . . .but I'm going to listen to the voices." *Id*. at 105.  This message understandably alarmed McKinley and she asked Jordan what he meant.  *Id*. at 103–04.  He told her "I found a way out of my head." *Id*. at 103.  When McKinley asked him if she needed to call the jail, he asked her not to notify the staff.  *Id*. at 103– 04.  Jordan then made a comment about needing sun and noted that the weather was nice that day. *Id*. at 103.

At 11:17 am, Jordan told McKinley, "Truth here my head is telling me to rip out my veins with my teeth." *Id*. at 102.  McKinley asked Jordan to "stop" and she told him that he needed a doctor.  *Id*.  She then asked him if he wanted her to notify his mother or law enforcement because she was "not just gonna do nothing." *Id*. at 102.  Jordan responded that he did not want law enforcement involved and then pleaded with her to help him, because "all these thoughts won't stop." *Id*. at 101–02.  McKinley then told him that he was "freaking" her out.  *Id*. at 101.  Jordan said that he was "scaring" himself.  *Id*. at 101.  McKinley concluded her communications with Jordan that morning telling him that "If it doesn't get better I'm calling the cops up there I mean it." *Id*. at 101.

At 11:40 am, Jordan's mother Leslie Payne contacted the jail and spoke with jail employee Linda Barker.  *Id.* at 11, 135.  Leslie told Barker that she had heard from McKinley that Jordan was "going nuts" and that he had been communicating with her through the Chirp device.  Leslie informed Barker that Jordan had mentioned chewing the veins out of his arms.  Barker told Leslie that she would "let the jail know and they can monitor the phone calls or whatever."  *Id.* at 110.

Barker then went to the master control dispatch room for the Jail.  She told the dispatch coordinator for the jail, Angela Henry, that Leslie had called about Jordan.  *Id.* at 41, 48.  Barker said that Jordan was "ready to chew out his veins" and made other threats of self-harm.  *Id.* (Linda Jail Video 11:43:39).  She assumed that Jordan was using the Chirp device and noted that the dispatch room was able to monitor the system.  *Id.* (Linda Jail Video 11:44:55).  Barker said that she did not want "anything to happen on my watch" but noted that it was "not like he hasn't tried it before" before concluding that she had done her "part."  *Id.* (Linda Jail Video 11:45:52).  Barker then spoke with Weakland, asking him if he had the capability to monitor the Chirp system.  *Id.* (Linda Jail Video 11:56:01).  Weakland responded that he thought he was able.  Barker told him that he might want to check on Jordan because he had told his girlfriend about wanting to chew out his veins.  Barker, Weakland, and Henry then had the following exchange:

> Barker: Just check on him, make sure, I don't want anything to happen on our watch.
>
> Weakland: Hopefully Scott is stopping out today (inaudible).
>
> Barker: I don't want nothing to happen on our watch, after I go home I don't care . . . I'm kidding, I'm kidding, I'm kidding!
>
> Henry: No, I'm not!  I don't give a shit!

*Id.* (Linda Jail Video 11:57:42–11:57:47).  During this conversation, Weakland noted that Jordan had been having "some weird visions."  *Id.*  Barker was apparently able to see Jordan from her

vantage point in the dispatch room and remarked that he appeared to be sleeping.  *Id*.  Her observation is confirmed by video of Jordan's cell.  Henry later testified that a dispatcher in the control room would be able to see into Jordan's cell from a standing position.  *Id*. at 42–43. Although his cell would not be directly visible from a seated position, there are multiple cameras focused on the interior and nearby vicinity of his cell which are displayed on monitors.  [ECF No. 59-3 at 83–84, 163].

At 12:21 pm, Weakland provided medication to Jordan in his cell.  [ECF No. 43-2] (Max Cell Video at 12:21:34).  Weakland asked him how he was doing, to which Jordan replied that he needed to speak with a doctor "pretty bad."  *Id*.  Jordan also told him that he needed Seroquel.  The two men conversed for a few more moments before Jordan said he was "losing it in here a little bit" but noted that the pill Weakland had given him will "make it better."  *Id*.  Weakland then made a comment about calling someone, which the parties presume was a reference to Thomas.  *Id*.

Jordan later met with Thomas, who was the Jail Division Case Manager with Unity Point Health Eyerly-Ball Community Mental Health Services.  *Id*. at 73.  Thomas explained to Jordan that his job was to screen individuals for possible mental health concerns and discuss service options with them, before referring them for care as appropriate.  *Id*. at 53, 142–43.  Thomas was not tasked with conducting mental health assessments and evaluations, nor was he qualified to administer a suicide risk assessment.  *Id*. at 56.

At his deposition, Thomas said that he had received an email from jail employees on June 11, 2020, stating that Jordan had sought a meeting with him at his next visit to the Madison County Jail.  *Id*. at 57.  He also received a call from Weakland, where Weakland relayed to Thomas that Jordan wished to speak with Thomas about his medications.  *Id*. at 55, 57.  Thomas visited the Madison County Jail on June 12, 2020.  *Id*. at 57.  He met with Jordan at the jail, where they

discussed Jordan's medications, his symptoms, mental health history, and his current life and legal circumstances. *Id*. at 137–39, 140–41.

Immediately prior to Jordan's meeting with Thomas, he received a Chirp message from McKinley stating that she had learned the prior day that Jordan had recently cheated on her but did not say anything to him in light of his mental distress. *Id*. at 100–01. Jordan can be seen reacting to McKinley's message on the jail surveillance camera including shouting and becoming visibly agitated. *Id*. (Max Cell Video at 1:30:10–1:30:34). Moments later, Weakland arrived at his cell to tell him that Thomas was ready to meet him. *Id*.

Throughout the meeting, Jordan was agitated and animated, a characterization that Thomas agreed with during his deposition. [ECF No. 59-3 at 205]. Jordan's speech was fast and rambling. He went into detail with Thomas about the difficulties he was experiencing in life including that he had "lost everything." [ECF No. 43-2] (Thomas Interview Video at 1:32:40). Jordan said that he had lost his girlfriend, house, and Jeep. He remarked that he would be homeless when he left the jail, "so I'm not doing so well." Jordan told Thomas that he was hearing things in his head telling him to do "all sorts of stupid shit and I'm not trying to listen to it." *Id*. (Thomas Interview Video at 1:33:23). He said that he had been using the Chirp messaging system and the only person he had to talk to was McKinley but now she believed he had cheated on her. *Id*. (Thomas Interview Video at 1:33:36).

Jordan detailed his past suicide attempts, which he described as seven in the past year. *Id*. (Thomas Interview Video at 1:40:27). He told Thomas that he was not going to kill himself "here" but he could not "guarantee I won't kill myself when I leave here." *Id*. Jordan explained he had "nothing left anymore and I don't want to live," then adding that "I don't want to go on suicide watch." *Id*. (Thomas Interview Video at 1:40:38). Jordan explained that "I don't want to kill

myself in general" before slamming the table. *Id.* (Thomas Interview Video at 1:41:05). He recounted a previous suicide attempt where he said he slit his wrists but he was taken to jail, rather than the hospital, where they chained him to the bed with bloody wrists. Jordan said that he was effectively in solitary confinement now and he had not eaten since he was booked into jail. He later asked Thomas if Thomas had "ever had a thought telling you to chew your own veins out of your hand, your arm?" After Thomas responded in the negative, Jordan said, "Neither have I, until now." *Id.* (Thomas Interview Video at 1:49:08).

He also told Thomas that he was dissatisfied with a new medication he was taking for his mental health and expressed his desire to resume taking Seroquel, which he believed was more effective for his symptoms. [ECF No. 43-2 at 137–41]. Thomas told Jordan that he would schedule the first available appointment with a psychiatrist. *Id.* at 140–41. The meeting concluded at 1:55 pm. *Id.* at 73. Thomas then spoke with Weakland to confirm his availability to coordinate a telehealth appointment for Jordan. *Id.* at 59, 66. At 2:19 pm, Thomas contacted the jail to inform them that he had scheduled an appointment for Jordan at 3:30 pm the same day. *Id.* at 148.

Early in the meeting, Jordan asked Thomas to keep their conversation confidential. Thomas told him that the substance of his statements would not be shared unless Jordan signed a release, Thomas received a subpoena, or if Thomas felt that Jordan was a danger to himself or others. [ECF Nos. 43-2 at 60; 59-3 at 206]. Thomas did obtain a signed release from Jordan that permitted him to disclose information to law enforcement. [ECF No. 43-2 at 58–59].

Weakland later recalled that Thomas never suggested that he had a concern that Jordan would harm himself, or that he should be closely monitored. *Id.* at 70. Thomas confirmed in his deposition that he did not share any of Jordan's statements during the meeting, including his feelings of hopelessness, auditory hallucinations, or prior suicide attempts. *Id.* at 60–61.

-7-

After the meeting with Thomas, Weakland escorted Jordan back to his cell, known as the Max Cell.  *Id.* at 66.  Henry testified in her deposition that she observed Weakland walking with Jordan and the two appeared to be engaged in a casual conversation.  *Id.* at 49.  When Weakland and Jordan arrived back at the Max Cell, Jordan asked if he could use the telephone on the wall. Jordan explained that his Chirp device did not work and he could not use his phone cards.  He also mentioned that "my girlfriend thinks I'm cheating on her."  In response to Jordan's comment about his girlfriend suspecting him of cheating, Weakland asked, "While you're in jail?"  *Id.* (Jail Check Video at 1:54:30).  Jordan then sighed and turned around.  Weakland told him that he needed to finish some things and then he would inspect the phone.  Jordan gave a thumbs-up as he returned to his cell and picked up his Chirp device.  *Id.* (Jail Check Video at 1:54:34).

The record reflects that, during his meeting with Thomas, Jordan had received numerous messages from McKinley pertaining to his alleged cheating.  *Id.* at 97–101.  While reading these messages, he became visibly upset.  *Id.* (Max Cell Video at 1:55:02).  Jordan is heard on the video audibly denying that he was being dishonest with McKinley, which she had alleged in the messages sent earlier.  *Id.* (Jail Check Video at 1:56:14).  He sent McKinley a handful of messages claiming her information was false, to which she replied that Jordan was lying.  *Id.* at 98.  It was during this time that Jordan can be seen pacing in his cell, as well as standing up and laying down in his bed. *Id.* (Jail Check Video at 1:58:05).  Jordan and McKinley exchanged messages before Jordan's Chirp account ran out of funds and his final message was not delivered.  *Id.* at 97.  Jordan then stood up from his bed and walked across his cell before he shouted.  *Id.* (Jail Check Video at 1:59:36).  He returned to his bed, looked at his Chirp device again before tossing it on the ground and curling up on his bed.  *Id.* (Jail Check Video at 2:00:34).

Approximately one minute elapsed before Jordan stood up from his bed and began manipulating a white sheet into a noose shape. *Id.* (Jail Check Video at 2:01:37). He then tried to affix the noose on the frame of the interior cell door by closing the door. *Id.* (Jail Check Video at 2:02:04). Jordan's multiple attempts at lifting his head and neck through the noose were unsuccessful because he was unable to elevate his body high enough. *Id.* (Jail Check Video at 2:02:20). After returning to his bed, he then stood up from his bed and went into the shower with the noose. *Id.* (Jail Check Video at 2:03:09). At this point, Jordan's activities were out of view of both surveillance cameras due to the obstruction from the shower door. Some movement is visible underneath the shower door through a translucent flap where movement was seen before a thump. *Id.* (Jail Check Video at 2:04:36). Jordan can be heard gagging and gasping for approximately five seconds. *Id.* (Jail Check Video at 2:04:42). There are no discernible sounds or movements at the shower door for about 30 seconds. Then, movement is visible at the bottom of the shower, followed by a thump, and then more gasping and choking noises. *Id.* (Jail Check Video at 2:05:21–2:05:32). No further sounds can be heard in Jordan's cell after this.

At 2:14 pm, Weakland entered the area adjacent to Jordan's cell, spoke to inmates in a different cell, but he did not pass directly by Jordan's cell. *Id.* (Jail Check Video at 2:14:41). The inmates in the cell adjacent to Jordan's left their cell approximately 12 minutes later, and walked past a door leading to it. *Id.* (Jail Check Video at 2:26:50). A couple minutes later, Weakland entered the cell adjacent to the Max Cell that had been vacated by the other inmates to clean the cell before leaving the area through a door opposite where Jordan was housed. *Id.* (Jail Check Video at 2:27:41–2:29:06).

At 2:46 pm, Weakland documented that he had checked Jordan's cell in a Jail Check log. *Id.* at 150. The parties dispute whether in fact he did conduct a check. Plaintiffs contend that

Weakland could not have possibly viewed Jordan's cell for a check at that time because he was not visible on the surveillance footage. [ECF No. 70 ¶ 269]. The Municipal Defendants reject this contention, asserting that "clicking noises" can be heard outside of the Max Cell on the jail check video. *Id*. Several seconds elapse before Weakland can be seen walking through a door adjacent to Jordan's cell to conduct a check at a nearby cell. Weakland later testified that he observed that Jordan was in the shower. [ECF No. 43-2 at 71, 157–58]. He said that it was his typical practice to allow inmates privacy when they were showering or using the toilet. *Id*. at 66. There is no dispute that at no point was the water running in Jordan's cell. [ECF No. 70 ¶ 263].

At 3:16 pm, Weakland approached the Max Cell and called out for Jordan, asking if he was okay. [ECF No. 43-2] (Max Cell Video at 3:16:36). After he did not hear a response, Weakland exited the area. He returned about one minute later and entered Jordan's cell, again calling out his name. *Id*. (Max Cell Video at 3:17:24). Weakland can be seen opening the shower door before yelling Jordan's name upon discovery of his body. *Id*. (Max Cell Video at 3:17:31). He was unable to lift Jordan's body so he hurriedly retrieved a pair of scissors from the dispatch room to cut the bedsheet and told Henry to request help. *Id*. at 69, 157–58. Sheriff's deputies and Winterset police officers entered Jordan's cell within moments. *Id*. (Max Cell Video at 3:18:45). As CPR efforts are undertaken, Weakland can be heard on the video stating that he thought Jordan "was in the shower." *Id*. (Max Cell Video at 3:21:40). Jordan was wheeled away by EMTs at 3:28. *Id*. (Max Cell Video at 3:28:28). Lifesaving efforts were unsuccessful. *Id*. at 165–75.

### B.  *Procedural Background*

Count I of the Complaint asserts a constitutional claim against Weakland, Thomas, and Barnes for violations the Eighth Amendment to the United States Constitution. It alleges that they violated Jordan's right to be free from cruel and unusual punishment through a deliberate

indifference to his mental health needs while he was incarcerated in the Madison County Jail. [ECF No. 1 ¶ 101].

Plaintiffs assert an Eighth Amendment claim against Madison County and Eyerly-Ball in Count II. They claim that those Defendants failed to establish constitutional policies regarding the treatment of inmates who present a significant risk of suicide. The Complaint alleges that Madison County and Eyerly-Ball both failed to properly train and supervise their employees who interact with inmates with a substantial risk of suicide. *Id.* ¶ 104.

Count III pleads a claim for municipal tort liability against Weakland, Barnes, and Madison County. Weakland is alleged to have failed to supervise, protect, and render medical aid to Jordan. This includes providing him with the necessary mental health screening, evaluation, and treatment. *Id.* ¶ 107. Barnes is accused of failing to implement appropriate policies related to suicide prevention, as well as train, supervise and monitor jail staff in the application of a suicide prevention policy. *Id.* ¶ 108. Madison County allegedly knew about the failure to adopt, implement, and enforce sufficient suicide prevention policies but did not remedy the issues. Furthermore, Plaintiffs claim that the municipality did not make available adequate mental health services for inmates incarcerated in its jail. *Id.* ¶ 109.

Count IV is a negligence claim brought against Thomas for failure to warn jail staff about Jordan's suicide risk, as well as a failure to conduct a competent mental health evaluation and suicide risk assessment. *Id.* ¶ 114.

Plaintiffs allege in Count V that Eyerly-Ball was negligent by assigning Thomas to conduct mental health evaluations and suicide risk assessments in light of his lack of professional qualifications. *Id.* ¶ 119. They also claim that Eyerly-Ball failed to adequately supervise and train

Thomas for the duties he was assigned. Finally, Plaintiffs bring a claim for wrongful death in Count VI of the Complaint against Weakland, Barnes, and Thomas.

All Defendants move for summary judgment. [ECF Nos. 43; 46]. Weakland, Barnes, and Madison County (collectively, "Municipal Defendants") argue that they were not deliberately indifferent to Jordan's risk of suicide. They contend that Plaintiffs cannot meet the high standard necessary to establish deliberate indifference. [ECF No. 48 at 26]. Madison County argues that its suicide prevention policy was not deliberately indifferent to inmate suicide and Barnes was not constitutionally deficient in his training and supervision of jail staff regarding the issue.

Eyerly-Ball and Thomas (collectively, "Private Defendants") seek summary judgment on the basis that Plaintiffs cannot establish that they were deliberately indifferent to Jordan's risk of suicide. Thomas contends that he could not have been deliberately indifferent for failing to conduct a mental health evaluation or suicide risk assessment because those are not his job duties. Rather, he is only tasked with screening and referring inmates for appropriate services, which he maintains is what he did with Jordan. Thomas further contends that his actions were reasonable in response to Jordan's mental health situation.

Eyerly-Ball claims that Plaintiffs have not put forth evidence that it failed to properly train, supervise, or discipline Thomas or any of its other employees as it pertains to suicide prevention. Furthermore, Eyerly-Ball insists that there is no evidence that it carries out a policy or custom that is deliberately indifferent to the risk of suicide posed by jail inmates. Eyerly-Ball and Thomas both assert Plaintiffs cannot demonstrate causation between any alleged deliberate indifference by them and Jordan's suicide.

Plaintiffs resist the Motions for Summary Judgment. They argue that the facts demonstrate that Jordan clearly expressed a serious medical condition that presented an obvious suicide risk,

but Defendants were deliberately indifferent to his needs and failed to take reasonable actions in response to the situation.  Plaintiffs contend that none of the Defendants are entitled to qualified immunity based on the evidence in the record.

## II.    DISCUSSION

### A.  Motion for Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that it could cause a reasonable jury to return a verdict for either party."  *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)).  A fact is material for summary judgment purposes if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  A court considering a motion for summary judgment should not make credibility determinations or draw inferences from the facts.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson*, 477 U.S. at 255). Furthermore, at the summary judgment stage, courts must view "the facts in the light most favorable to the nonmoving party and giv[e] that party the benefit of all reasonable inferences that can be drawn from the record."  *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015) (quoting *Johnson v. Wells Fargo Bank, N.A.*, 744 F.3d 539, 541 (8th Cir. 2014)).

To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  But "the nonmoving party [need not] produce evidence in a form that would be admissible at trial in order to avoid summary judgment."  *Id.* at 324.  However, a nonmovant "'must do more than simply show that there is some metaphysical

doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042–43 (2011) (en banc) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). A court's duty in deciding a motion for summary judgment "is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996) (citation omitted). There is no genuine issue for trial if, "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citation omitted).

## B. Qualified Immunity Standard

Plaintiffs bring multiple constitutional claims pursuant to 42 U.S.C. § 1983. Section 1983 creates a federal cause of action against anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Section 1983 "creates a species of tort liability." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305 (1986) (cleaned up) (citations omitted). The Supreme Court has recognized that government officials sued under Section 1983 are entitled to qualified immunity "when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

It has repeatedly emphasized that "the doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up) (quoting *Pearson,* 555 U.S. at 231). The purpose of qualified immunity is to give "ample room for mistaken judgments by protecting all but the plainly incompetent or those who

knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (per curiam) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). "Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639 (1987) (cleaned up) (citation omitted).

The qualified immunity analysis consists of a two-prong analysis: (1) whether the plaintiff has stated a plausible claim for violation of a constitutional or statutory right, and (2) whether the right was clearly established at the time of the alleged deprivation. *Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017) (quoting *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013)). The Supreme Court has concluded that a court may determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. A plaintiff must establish both of the elements, otherwise qualified immunity must be granted. *See Krout v. Goemmer,* 583 F.3d 557, 564 (8th Cir. 2009). Therefore, a court's qualified immunity analysis ends if a plaintiff fails to establish one of the prongs.

Whether a government official's conduct violated clearly established law is an "essentially legal question." *Crawford-El v. Britton*, 523 U.S. 574, 589 (1998) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526–29 (1985)). The plaintiff bears the burden of showing that that the law regarding the asserted constitutional right was clearly established. *Hanson v. Best*, 915 F.3d 543, 548 (8th Cir. 2019) (citation omitted). A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."

*Cent. Specialties, Inc. v. Large*, 18 F.4th 989, 997 (8th Cir. 2021) (quoting *Morgan v. Robinson*,

920 F.3d 521, 523 (8th Cir. 2019)).

### C.  Municipal Defendants' Motion for Summary Judgment

#### 1.  Deliberate Indifference

Plaintiffs allege that Weakland, Thomas, and Barnes violated the prohibition against cruel

and unusual punishment under the Eighth Amendment.  They argue that, as a matter of law, their

conduct during the time Jordan was in the Madison County Jail did not constitute a deliberate

indifference to his risk of suicide.  They claim they are entitled to qualified immunity because

there was no constitutional violation.

Weakland contends that he was not aware of a substantial risk of suicide for Jordan and

Plaintiffs cannot show that he had subjective knowledge about his risk of self-harm.  Weakland

spoke with Thomas after the meeting with Jordan, which led to Weakland believing that Jordan

was not at risk of harming himself.  Even to the extent he was aware of the mental health issues

that Jordan was experiencing, he points out that he took appropriate steps by arranging for Jordan

to meet with Thomas for further evaluation.  [ECF No. 48 at 32].  Weakland argues that this

response shows that he was not deliberately indifferent to Jordan's mental health needs.

Thomas also takes the position that he was not deliberately indifferent to Jordan's suicide

risk.  He urges that he did not provide mental health evaluations and he conducted his job duties

in a reasonable manner.  Thomas insists that he is not a mental health professional and his conduct

cannot be judged against the standard applied to a person in that position.

Barnes argues that there is no allegation that he was personally involved in the arrest and custody of Jordan.  Therefore, he contends that there are no facts to support that his conduct directly violated the Eighth Amendment.[1]

### a.  Legal Standard

The Eighth Amendment "prohibits the infliction of cruel and unusual punishment on those convicted of crimes." *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991).  "The Eighth Amendment's prohibition against cruel and unusual punishment include[s] a right to safe and humane conditions of confinement." *Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008).  The Constitution "does not mandate comfortable prisons" but it also does not tolerate "inhumane" ones.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).  At a minimum, prison officials must provide humane conditions of confinement and ensure that inmates receive adequate food, clothing, shelter, and medical care.  *Farmer*, 511 U.S. at 832.  A "sufficiently serious" violation of these constitutionally-imposed obligations is a violation of the Eighth Amendment.  *Seiter*, 501 U.S. at 298.

The Supreme Court has held that "the medical care a prisoner receives is just as much a 'condition' of his confinement as the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, and the protection he is afforded against other inmates." *Id*. at 303.  When prison officials are deliberately indifferent to the serious medical needs of inmates, that "constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).  Deliberate indifference to an inmate's substantial risk of suicide violates the Eighth Amendment.  *Coleman v. Parkman*,

---

[1] The allegation of supervisory liability against Barnes will be discussed later in the Order.

349 F.3d 534, 538 (8th Cir. 2003) (citation omitted); *see also Olson v. Bloomberg*, 339 F.3d 730,

735 (8th Cir. 2003) (describing the "barometer" for inmate suicide cases as deliberate indifference)

(citation omitted).  The deliberate indifference standard is applied to a pretrial detainee through

the Fourteenth Amendment.  *Perry v. Adams*, 993 F.3d 584, 587 (8th Cir. 2021) ("A pretrial

detainee's deliberate indifference claim is governed by the Fourteenth Amendment which extends

to detainees at least the same protections that convicted prisoners receive under the Eighth

Amendment.").

Deliberate indifference requires that the defendant act with more than mere negligence.

*Farmer*, 511 U.S. at 835.  The mental state for deliberate indifference is not whether the official

should have known about the risk, but whether there was a subjective, conscious awareness of a

substantial risk.  *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000) (citing *Farmer*, 511 U.S. at

839–40).  The standard has been compared to criminal recklessness, meaning that a plaintiff must

establish that a prison official "actually knew that the inmate faced a substantial risk of serious

harm" but did not respond in a reasonable fashion to that risk.  *Drake ex rel. Cotton v. Koss*,

445 F.3d 1038, 1042 (8th Cir. 2006).  It does not require that a plaintiff show that prison officials

"acted for the very purpose of causing harm or with knowledge that harm" would result from the

risk.  *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (citation omitted).

"Deliberate indifference" has a subjective and objective component.  *Jackson v. Buckman*,

756 F.3d 1060, 1065 (8th Cir. 2013) (citing *Scott v. Benson*, 742 F.3d 335, 339–40 (8th Cir. 2014)).

For the objective element, a plaintiff must show that they had a serious medical need or there

existed a substantial risk to their health or safety.  *Scott*, 742 F.3d at 340 (citation omitted).  An

objectively serious medical need must have been "diagnosed by a physician as requiring treatment"

or be "so obvious that even a layperson would easily recognize the necessity for a doctor's

attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)).

Regarding the subjective component, a plaintiff must show that a defendant: (1) knew of the substantial risk of suicide; and (2) disregarded it or failed to take reasonable measures to ameliorate the danger. *Coleman*, 349 F.3d at 538. A prison official's knowledge of a "substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. An allegation of deliberate indifference is assessed within the context of the information known to the official at the time, the practical limitations of the official's position, and other courses of action that would be apparent to an official in the same position. *Letterman*, 789 F.3d at 862.

If knowledge is established, an official is deliberately indifferent if they are aware of a suicide risk, but "failed to take reasonable preventive measures." *Coleman*, 349 F.3d at 540. The reasonability of preventive measures is judged by "whether the measures taken were so inadequate as to be deliberately indifferent to the risk" of suicide. *Luckert v. Dodge Cnty.*, 684 F.3d 808, 818 (8th Cir. 2012) (quoting *Rellergert v. Cape Girardeau Cnty.*, 924 F.2d 794, 796 (8th Cir. 1991)).

### b.   John Weakland

Weakland seeks summary judgment on Count I of the Complaint. He argues that he was not deliberately indifferent to a known risk of suicide and the measures he undertook were reasonable under the circumstances. Accordingly, Weakland says that he is entitled to qualified immunity under the first prong of the inquiry, because there was no constitutional violation. The "clearly established" prong of the qualified immunity analysis is not in dispute because it has long

been established that suicide risk by an inmate is a serious medical need under the Eighth Amendment. *Gregoire*, 236 F.3d at 417.

i. Subjective Knowledge

The Municipal Defendants argue that Plaintiffs cannot establish that Weakland was subjectively aware that Jordan would commit suicide or commit self-harm and disregarded that knowledge.[2]  They urge that the knowledge inquiry must be focused on the information available immediately prior to the suicide.  According to Defendants, "the record is clear that Weakland did not understand Payne to be at risk of suicide or self-harm" at the time that Weakland brought Jordan back to his jail cell.  They rely on the information, or lack thereof, Weakland received by Thomas after the meeting.  Weakland testified at his deposition that he did not remember the specific conversation with Thomas, but said that he did remember that "after we spoke that there was not any concern.  I did not feel any extra concern for Jordan Payne."  [ECF No. 43-2 ¶ 87]. Given his testimony, Defendants argue that Weakland did not have any subjective awareness of a substantial suicide risk to Jordan.  They contend that the summary judgment record reflects that— at the time Thomas spoke with Weakland about the telehealth appointment for Jordan—Thomas relayed that Jordan had said he was not going to harm himself in custody.  *Id*. ¶ 84.

The Municipal Defendants take the position that Plaintiffs cannot demonstrate that Weakland had any knowledge beyond what he testified—that there was no heightened concern for Jordan's suicide risk.  Thomas did not suggest to Weakland that there should be increased supervision for his cell.  *Id*. ¶ 89.  He did not share with Weakland anything about Jordan's mental health history including his previous suicide attempts, his history of depression, or that he was

---

[2] There does not appear to be a dispute among the parties whether Jordan had an objectively serious medical need.

experiencing auditory hallucinations. *Id.* ¶ 91. The Municipal Defendants point out that Weakland was not told about Jordan's personal struggles including his feelings of hopelessness, his relationship problems, or his history of substance abuse. *Id.* They urge that the Court may only consider what Weakland knew in the deliberate indifference analysis, not information that was never shared with him.

Furthermore, the Municipal Defendants maintain that Weakland was entitled to rely on the assessment by Thomas following the meeting. Defendants argue that any concerns raised by Jordan's request for a meeting with Thomas, and the phone call from his mother, were extinguished based on the statements made by Thomas after the meeting. Thomas told Weakland that Jordan would not harm himself in custody. Defendants claim that once Weakland received this information, he no longer had a particularized concern for Jordan. They characterize Plaintiffs' strongest argument as being that Weakland should have known Jordan was a suicide risk, but that is not sufficient for a deliberate indifference claim. [ECF No. 48 at 36]. Failure to properly interpret available information as indicating a suicide risk, the Municipal Defendants argue, is not sufficient knowledge under the deliberate indifference standard.

Plaintiffs respond that a credibility determination is typically necessary to establish the subjective mental state of a person. However, they point out that there was information available to Weakland that would have led any reasonable person to conclude that Jordan had a substantial risk of suicide.

Plaintiffs write that familiarity with Jordan's responses to the booking questionnaire would have indicated that he had been hospitalized for mental illness within the last 12 months and that he had attempted suicide previously. [ECF No. 43-2 at 84]. The questionnaire also noted that Jordan had a family member who previously attempted suicide. *Id.* Jordan was also involved in

an incident at the Madison County Jail in 2015 where he wrapped a telephone cord around his neck. *Id*. at 34. Plaintiffs describe this incident as a suicide attempt, but Defendants deny it was an earnest suicide attempt. [ECF No. 70 ¶ 44]. Niblo testified at his deposition that he believed it was a call for attention. [ECF No. 43-2 at 14]. Niblo referred to it as "the phone incident" and counsel for Plaintiffs called it a "prior incident." *Id*. at 14, 34. According to Defendants, Jordan performed this action in full view of a jail employee who told him to stop. *Id*. at 14, 16, 186–89. He was then transported to the hospital, where he was cleared as not a threat to himself and returned back to custody. *Id*. at 14. Defendants insist that these circumstances undermine the assertion that Jordan's actions were a genuine suicide attempt. [ECF No. 70 ¶ 44].

Plaintiffs argue that Jordan's mother Leslie had called the jail to warn staff that he was communicating suicidal thoughts to McKinley. [ECF No. 43-2] (Leslie Payne Phone Call Audio at 0:33–1:25). After this call from Leslie, Barker had told Weakland that he "might want to check on Payne, Jordan because he told his girlfriend he'd be eating or tearing out his veins or something." *Id*. (Linda Jail Video at 11:56:22). At no point did Weakland access Jordan's messages on the Chirp device. [ECF No. 70 ¶ 248]. Later, Jordan made statements to Weakland that he "need[ed] to talk to a doctor"; that he was "just losing it in here"; and he was "doing alright, my head is just not right." [ECF No. 43-2] (Max Cell Video at 12:21:45–12:22:16). At the conclusion of Jordan's meeting with Thomas, Weakland did not ask about his mental health or risk of self-harm. [ECF No. 59-3 at 110–11].

Plaintiffs also point out that Jordan was still agitated when he returned to his cell. [ECF No. 64 at 24]. Furthermore, all of his movements and statements were captured on closed-circuit video inside his cell which was live streamed and accessible on every computer in the building.

[ECF No. 59-3 at 84, 163]. They emphasize that Jordan's suicide could be seen from any desk in the jail.

The summary judgment record viewed as a whole supports a conclusion that jail officials could have been more aware of Jordan's suicide risk. His behavior in his cell, his Chirp messages, and his statements to Thomas all seem to point to the tragic conclusion. However, the Eighth Circuit has made clear that a deliberate indifference claim should not be analyzed through hindsight. *Reece v. Hale*, 58 F.4th 1027, 1034 (8th Cir. 2023) (holding that courts cannot view conduct "through the lens of 'hindsight's perfect vision'" and a plaintiff must establish more than negligence or "'ordinary lack of due care for the prisoner's safety'" for a successful claim). This is because a should-have-known standard is improper when a constitutional violation is alleged. *See Randle v. Parker*, 48 F.3d 301, 304 (8th Cir. 1995) (describing the "knew or should have known" standard as "nothing more than a common-law tort standard, and it has no place in Eighth Amendment jurisprudence."). The facts must be viewed as known by Weakland at the time, not "from an *ex post facto* perspective." *Rellergert*, 924 F.2d at 796. The undisputed facts do not show deliberate indifference by Weakland.

The information that was known to Weakland indicates a possible heightened risk of suicide but falls short of the "substantial" risk required by the Supreme Court and the Eighth Circuit. *See Farmer*, 511 U.S. at 847; *Gregoire*, 236 F.3d at 418 (holding that "[i]n evaluating an official's response to a known suicide risk, [courts] should be cognizant of how serious the official knows the risk to be").

The summary judgment record reflects that Weakland personally knew about the comments Jordan had made about chewing his veins out, which had been relayed by Barker from

Jordan's mother.  Also, Jordan had told Weakland that he needed to see a doctor because he was "losing it in here" and his head was not right.

However, as the Court already noted, many of the facts identified by Plaintiffs in resistance to the summary judgment motion were not known to Weakland.  There is evidence in the record that Jordan intentionally concealed his thoughts about self-harm because he did not want to be placed on suicide watch.  He apparently had been placed on suicide watch previously and told his McKinley that he was not going to notify jail staff "so they can strip me naked and chain me to a bed like last time."  [ECF No. 43-2 at 120–21].  Jordan also asked McKinley not to notify law enforcement about his mental state.  *Id*. at 102–04.  He made the same request to Thomas, saying, "I don't want to go on suicide watch."  *Id*. (Thomas Interview Video 1:36:44–1:40:55).

There are no facts to show that Weakland viewed any of the Chirp messages sent by Jordan, which reveal significant mental decompensation.  Despite the readily available video streaming of the Max Cell, there is no evidence that Weakland actually viewed the events immediately preceding Jordan's suicide.  Plaintiffs do not claim that Weakland was aware of the information from the booking intake questionnaires or the previous incident with the telephone cord.  Rather, they maintain that this information was "available for Weakland to read for himself."  [ECF No. 64 at 22].  Video of Jordan's cell was also available to Weakland had he "cared to look."  *Id*. at 24.

Plaintiffs cannot establish deliberate indifference on the part of Weakland because they do not show that most of this information, described above, was known to Weakland.  The standard for a deliberate indifference claim pertains to the personal knowledge of the government official.  *Lambert v. City of Dumas*, 187 F.3d 931, 937 (8th Cir. 1999) (requiring that a deliberately indifferent defendant must be "actually and subjectively aware" of a substantial risk of suicide).  There is no "collective knowledge" doctrine for Eighth Amendment violations, as courts have

recognized in the probable cause analysis.[3]  Plaintiffs identify facts that, taken as a whole, describe possible negligence by jail officials but the Court cannot conclude that Weakland himself was deliberately indifferent.

### ii.   Reasonable Measures

The Eighth Circuit has held that a establishing a deliberate indifference claim requires that "the evidence must show that the officers recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Smith v. Lisenbe*, 73 F.4th 596, 600 (8th Cir. 2023) (emphasis in original) (quoting *Krout*, 583 F.3d 567).  The Municipal Defendants argue that Weakland took reasonable steps to address Jordan's mental health needs prior to his meeting with Thomas.

They urge that Weakland went well beyond the constitutional standard for deliberate indifference by promptly arranging a meeting between Jordan and Thomas.  The Municipal Defendants emphasize that Weakland had very limited information regarding Jordan and he nevertheless promptly scheduled an appointment for Jordan to be assessed.

The constitutional standard by which to evaluate the conduct of prison officials in response to learning about a potential suicide risk is "whether the measures taken were so inadequate as to be deliberately indifferent to the risk." *Rellergert*, 924 F.2d at 796.  Whether an inmate actually carries out a suicide should not be factored into the analysis because "tying the suicide to proof of deliberate indifference is tantamount to requiring jailers to provide suicide-proof institutions." *Luckert*, 684 F.3d at 817 (quoting *Rellergert*, 924 F.2d at 796).  Such a strict standard is "not the

---

[3] *See Furlow v. Belmar*, 52 F.4th 393, 402 (8th Cir. 2022) ("The collective knowledge doctrine imputes other officers' finding of probable cause to the arresting officer when multiple officers are involved in an investigation and as long as there is some degree of communication.") (cleaned up).

constitutional test," according to the Eighth Circuit.  *Id*. at 818.  Rather, courts need to consider "the measures taken in light of the practical limitations on jailers to prevent inmate suicides."  *Id*. (citation omitted).  The question for constitutional purposes is "not whether the jailers did all they could have, but whether they did all the Constitution requires."  *Id*. (citation omitted).

The Municipal Defendants urge that the timeline of events here is critical.  They emphasize that after Weakland returned Jordan to his cell, Jordan discovered a series of Chirp messages from McKinley that left him distraught.  It was only about ten minutes after Weakland returned Jordan to his cell that the last audible sounds can be heard on the video.  The Municipal Defendants argue that the actions taken by Weakland based on the limited information known to him were not deliberately indifferent for constitutional purposes.

Plaintiffs respond that Weakland did not take certain steps which would have provided him further information regarding Jordan's suicide risk.  They accuse him of burying his head in the sand by failing to monitor the Chirp messages, personally observe Jordan in the cell, or adequately communicate information to Thomas prior to the meeting.  Plaintiffs reject any dependence by Weakland on Thomas's opinion because Thomas is not a qualified medical provider whose opinion may be properly relied upon.  They point out that Thomas and Eyerly-Ball disclaim any qualification in this respect as well.

The Court finds that Weakland's actions were not so inadequate as to amount to deliberate indifference.  Prison officials are not deliberately indifferent when they take "affirmative, deliberative steps to prevent suicide."  *Luckert*, 684 F.3d at 818.  Here, the record reflects that Weakland took multiple affirmative steps, including a telehealth appointment for Jordan that had been scheduled for an hour and a half after his meeting with Thomas.  Although Plaintiffs characterize Weakland as "hoping" that Thomas would stop at the jail, the record reflects that jail

officials had contacted Thomas twice to relay that Jordan wished to see him on June 12, 2020. [ECF No. 59-3 at 32, 38]. Weakland testified that he called Thomas in response to the phone call from Jordan's mother. [ECF No. 49-3 at 55, 65–66]. These actions contradict Plaintiffs' claim that "Weakland literally did nothing." [ECF No. 64 at 28].

The other shortcomings that Plaintiffs point to cannot be attributable to Weakland or do not meet the constitutional standard. First, the record reflects that Jordan was place in a one-person cell because he reported that he had a respiratory infection. These events occurred in June 2020, during the height of the Covid-19 pandemic. Furthermore, Weakland was not involved in Jordan's cell placement.

Second, despite Plaintiffs' assertions about the qualification of Thomas, they do not argue that the deliberate indifference standard requires Weakland to dismiss information he received from him. Their arguments that he should not have relied on Thomas because he was not a licensed medical professional is essentially a claim of negligence—which is not the constitutional standard.

Finally, the contention by Plaintiffs that the video feed of the cell and Jordan's Chirp messages should have been reviewed must be considered in light of Weakland's knowledge at the time. Jordan and McKinley exchanged a final series of messages immediately preceding his suicide. This occurred over a period of a few minutes after Weakland returned him to his cell. In fact, Weakland had told Jordan that he needed to finish up some tasks and then he would return to his cell to check on his Chirp device. The surveillance video of the cell depicts Jordan's preparations for his suicide, but he is only visible for a few moments.

The Eighth Circuit has held that whether the conduct of jail employees was reasonable must be viewed in light of the practical limitations on them. *Gregoire*, 236 F.3d at 418–19 (holding that an official's actions must be evaluated based on the information available at the time, the

practical limitations, and other courses of action "that would have been apparent to an official in that position"). The conduct of Weakland prior to Jordan's suicide was not deliberately indifferent and did not amount to cruel and unusual punishment as prohibited by the Eighth Amendment.

The Court holds that the evidence in the summary judgment record establishes as a matter of law that Weakland did not act with deliberate indifference regarding Jordan's risk of suicide. He did not have sufficient knowledge of Jordan's suicide risk to satisfy the subjective knowledge element and his actions were not unreasonable based on the information he did receive.

### 2.   Municipal and Supervisory Liability

Plaintiffs bring claims for liability against Barnes and Madison County also. They accuse both Defendants of violating Jordan's constitutional rights through a failure to implement and enforce constitutional policies, practices, and customs as it relates to the risk of jail suicide. Plaintiffs allege that Barnes and Madison County also failed to supervise and train jail employees on suicide prevention to such an extent that it violates the Constitution.

#### a.   Legal Standard

##### i.   Municipal Liability

The Supreme Court has recognized that a municipality falls within the scope of a "person" for purposes of Section 1983, meaning that they be sued for monetary, declaratory, or injunctive relief for an alleged constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). Often referred to as "*Monell* liability," municipal liability under Section 1983 does not extend to strict principal-agent liability, or *respondeat superior*, which is permitted for most employer-employee relationships. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (noting that Congress did not believe it had constitutional authority to impose liability on a municipality for "the conduct of others") (citation and emphasis omitted).

Rather, a municipality may be held liable for a constitutional violation by one of its employees if the violation resulted from the employee's execution of (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise. *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016) (citations omitted) (cleaned up). Claims alleging constitutional violations by local governments are subject to "rigorous requirements of culpability and causation." *Bryan Cnty.*, 520 U.S. at 415.

When determining whether a plaintiff has identified a municipal policy or custom, the distinction between the two must be recognized. *See Corwin*, 829 F.3d at 699–700 ("Policy and custom are not the same thing."). A "policy" must be "an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Corwin*, 829 F.3d at 700 (8th Cir. 2016) (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)). A plaintiff must show "the existence of a 'policy' by demonstrating that the inadequacies were a product of deliberate or conscious choice by the policymakers." *Szabla v. City of Brooklyn Park, Minn*., 486 F.3d 385, 390 (8th Cir. 2007) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1987)).

By contrast, a municipal custom is (1) the continuing, widespread, and persistent pattern of unconstitutional misconduct by the entity's employees; (2) notice of that misconduct by policymaking officials who exhibit deliberate indifference to or tacit authorization of it; and (3) causation between the plaintiff's injury and the custom. *Johnson v. Douglas Cnty. Med. Dep't,* 725 F.3d 825, 828 (8th Cir. 2013) (quoting *Thelma D. ex rel. Delores A. v. Bd. of Educ. of City of St. Louis*, 934 F.2d 929, 932–33 (8th Cir. 1991)).

A claim for municipal liability may also be maintained if a plaintiff can show that the municipality failed to train its employees. *See City of Canton,* 489 U.S. at 387–88 (holding "inadequate training" could be the basis for a Section 1983 claim in "limited circumstances").

## ii. Supervisory Liability

Government officials are personally liable only for their own constitutional violations. *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015) (citing *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010)). Therefore, a supervisor cannot be held liable for an employee's unconstitutional actions on a theory of *respondeat superior*. *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995) (citation omitted). A supervisor may incur liability when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation. *Ottman v. City of Independence, Mo.*, 341 F.3d 751, 761 (8th Cir. 2003) (citing *Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993)).

To succeed on a claim for failure to supervise or train, a plaintiff must establish that the supervisor (1) had notice of the pattern of unconstitutional acts by the subordinate, and (2) was deliberately indifferent to or tacitly authorized the actions. *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir. 2012) (citing *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996)). Such a showing requires that "the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Andrews*, 98 F.3d at 1078 (citing *Thelma D.*, 934 F.2d at 934).

Pointing to a single constitutional violation is "rarely" sufficient for municipal liability under a failure to train theory. *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (holding that a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train.") (quoting *Bryan Cnty.*,

520 U.S. at 409).  It is when policymakers continue to adhere "to an approach that they know or

should know has failed to prevent tortious conduct by employees" that it can be fairly determined

that they "have deliberately chosen a training program that will cause violations of constitutional

rights."  *Connick*, 563 U.S. at 62.

b.  Madison County Suicide Prevention Policy

The Municipal Defendants argue that Madison County's suicide prevention policy (the

"Policy") is not deliberately indifferent to inmate suicide risk.  The policy is set forth in the

Standard Operation Procedures ("SOP") for the Madison County Sheriff's Office.  [ECF No. 43-

2 at 206–07].  The Policy requires that all jail staff that participate in the booking and supervision

of inmates in the Madison County Jail receive training in suicide prevention.  *Id*. at 206.  The

Policy provides the employee with a series of items to look for in an inmate during the booking

process including observations regarding the inmate's behavior (signs of depression and previous

suicide attempts, strange behavior, anxiety, impairment).  *Id*.  There are also mandatory questions

to ask an inmate such as whether they have previously attempted suicide or self-harm or whether

they have current suicidal ideations.  *Id*.  The answers to these questions must be documented on

the booking questionnaire.

If an inmate is deemed to be violent or suicidal, they may be denied certain items in their

cell including linen, mattresses, and other personal items "until it has been determined that there

is no longer a threat."  *Id*.  The jailer or dispatcher on duty is then tasked with determining the type

of monitoring that is needed for the incoming inmate which may consist of cell checks in 15-

minute intervals.  The "special watch" for the inmate shall continue, per the Policy:

> [U]ntil the Sheriff or Jail Administrator feels that it may be removed,
> or the length of the checks can be changed.  This will be decided by
> either questioning the inmate, or by observation that there is no

> longer a threat.  Once the Sheriff or Jail Administrator has deemed
> it safe to lift the special watch, all property removed from the inmate
> will be returned.

*Id*. at 207.  The SOP describes a procedure for response when there is an attempted suicide by an

inmate.  *Id*.

The Municipal Defendants argue that the purpose of the Policy is to prevent suicides,

therefore it is not deliberately indifferent to them.  They contend that a policy "cannot be both an

effort to prevent suicides and, at the same time, deliberately indifferent to suicides."  *Liebe v.

Norton*, 157 F.3d 574, 579 (8th Cir. 1998).

Plaintiffs take the position that Madison County is not entitled to summary judgment on

the *Monell* claim because it maintained a policy or custom of deliberate indifference to the risk of

suicide.  [ECF No. 64 at 41].  Central to this assertion are the actions of Jail Administrator Steve

Niblo, whom they describe as having acted in a "defiantly indifferent and ignorant" manner.  *Id*.

at 42.  This argument, and Plaintiffs' entire theory on *Monell* liability, confuses and ignores the

legal standard on which constitutional claims are to be evaluated.

First, they allege that Niblo was directly involved in the intake, booking, processing, and

housing assignment for Jordan.  *Id*. at 43.  Plaintiffs point out that Niblo had personal knowledge

of Jordan's suicidal tendencies, which is enough to establish his objective risk of suicide.  After

receiving Jordan's intake answers, Niblo assigned him to a single-inmate cell without other suicide

precautions.  According to Plaintiffs, Niblo was responsible for developing and implementing

suicide policies for Madison County.  He also gave responses during his deposition which evinced

a lack of knowledge around mental health and suicide issues.  Niblo did not obtain written

attestation by jail employees that they "have full knowledge of the administrative rules referring

to jail standards and the written policies and procedures governing the jail's operations" as required by the Iowa Administrative Rules. *Id*. at 45.

The problem with Plaintiffs' argument regarding Niblo is that the identified conduct does not create *Monell* liability for Madison County. The Supreme Court has acknowledged that a single incident may be sufficient to demonstrate the existence of an unconstitutional policy for purposes of *Monell*. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). However, it is not enough to point to conduct by a supervisory-level employee, as Plaintiffs attempt to do with Niblo. Such an argument would entirely vitiate the rule that municipalities cannot be held vicariously liable for constitutional violations. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (holding that if "[p]roof of a single incident of unconstitutional activity" was sufficient for liability would essentially "circumvent[] *Monell*'s limitations altogether").

To establish *Monell* liability on a single incident, a plaintiff must point to an unconstitutional government policy that can be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482–83 (1986). It is not enough for municipal liability that the specific official has discretion in the exercise of particular functions. *Id*. at 481.

The record reflects that despite the consistency between his job title and the reference to a "jail administrator" in the Iowa administrative rules, Niblo's position was not the policymaking official contemplated in state regulations. Rather, Niblo was charged with day-to-day operations within the jail, but policy changes were made at the direction of Barnes or the Chief Deputy Sheriff. [ECF No. 43-2 at 21–22]. As such, Niblo did not have the "final authority to establish municipal policy with respect to" the suicide policies as argued by Plaintiffs. *Pembaur*, 475 U.S. at 481.

Accordingly, Niblo's discretionary actions regarding Jordan's intake and cell placement is in no way the equivalent to a municipal policy attributable to Madison County based on his position.  A municipality cannot be held liable for the actions of its employees based solely on a *respondeat superior* theory.  *Szabla*, 486 F.3d at 389.  The Court concludes that the Policy was not unconstitutional as written, and Plaintiffs cannot impute the action of Niblo as equivalent to municipal policy.[4]

### c.   Failure to Train or Supervise

The Municipal Defendants argue that the training and supervision of jail employees by Barnes was constitutional as a matter of law.  There was no tacit authorization from Barnes to violate the Eighth Amendment and the training procedures and supervision were not so inadequate as to make a constitutional violation likely.

### i.   Madison County Jail Employees Training and Supervision

Employees at the Madison County Jail receive training from the Iowa Law Enforcement Academy ("ILEA") which includes a 40-hour jail school and 20 hours of annual training thereafter. [ECF No. 43-2 at 24].  At the time of Jordan's suicide, Barnes required monthly trainings which consisted of CPR and first aid courses.  *Id*.  In 2021, police legal science online training was added. *Id*.  Barnes testified that he believed some of the topics covered in the 20-hour annual jailer training included medication review management, implicit bias training, gambling, inmate suicide prevention, and sexual harassment.  *Id*. at 27.

---

[4] The Court holds that no constitutional violation occurred.  Defendants and Plaintiffs dispute whether Madison County is entitled to qualified immunity, however, "[m]unicipalities do not enjoy qualified immunity." *Thurmond v. Andrews*, 972 F.3d 1007, 1013 (8th Cir. 2020) (citing *Mogard v. City of Milbank*, 932 F.3d 1184, 1192 (8th Cir. 2019)).

The positions of jailer and dispatcher each require eight hours of continuing education. *Id.* at 26. Training for a dispatcher, according to Angela Henry, is 40 hours in duration, the completion of which certified dispatchers to have access to the NCIC system. *Id.* at 44–46. Weakland attended the same ILEA jail school training upon his hire. *Id.* at 63. He also received annual training, but was unsure to what extent he was trained on suicide prevention. *Id.* at 64.

Barnes was charged with supervising the entire Madison County Sheriff's Department. *Id.* at 19–20. The jail administrator position was established by Barnes to have sole responsibility for day-to-day jail operations so the Chief Deputy Sheriff no longer had to split responsibility between the jail and other duties. *Id.* at 19–20. During Barnes's tenure, two inmates have died at the Madison County Jail, besides Jordan. One inmate died of a blood clot after he was transferred to the hospital from the jail. *Id.* at 28.

The other inmate died in 2016 from a suicide. The Municipal Defendants claim that the inmate only intended to "attempt" suicide in order to be transferred to the hospital where he could escape, which they allege he had done previously. [ECF No. 59-1 ¶ 176]. However, the inmate accidentally killed himself during this "attempt." *Id.* Plaintiffs dispute the characterization and reasoning offered by Defendants regarding the suicide attempt. They do not provide their own evidence why the feigned suicide attempt should be disregarded, they only point out that he in fact succeeded at committing suicide. *Id.*

A jail inspector would conduct an annual evaluation of policies and practices for compliance with existing jail standards. *Id.* at 23. One comment from an inspection report opined that, "Madison County Jail is a clean, well-maintained and well-managed facility." *Id.* at 26. The SOPs were revised by Barnes and then-Chief Deputy Sheriff Jim Ascione in 2017. *Id.* at 22. Barnes stated that the SOPs are the default manual for employee duties.

Madison County also maintained a "jail diversion" program with Eyerly-Ball. *Id.* at 32. The goal of the program was to assist inmates with their medications and provide resources if an inmate was experiencing a mental crisis at the jail. *Id.* at 29. Under this program, Eyerly-Ball would connect inmates with a mental health providers available through telecommunications. *Id.* at 36.

The Municipal Defendants argue that the problem leading to Jordan's suicide was not the policies or training provided by Madison County, but the fact that Jordan was experiencing a mental health crisis that he concealed from the jail employees because he did not want to be placed on suicide watch. [ECF No. 48 at 51]. Furthermore, he was provided a meeting with Thomas upon request, who himself scheduled an appointment with a provider beginning only an hour and a half after the meeting.

Plaintiffs maintain that Barnes's deliberate indifference as it pertains to the training and supervision of jail employees is evidenced by the "utter lack of education and training." [ECF No. 64 at 38]. They allege that Weakland's suicide training was limited to the initial ILEA jailer course, that Weakland never viewed the SOPs, and Henry's training and supervision was similarly inadequate. *Id.* at 39–41. Plaintiffs maintain that the SOPs for the jail were inadequate because they did not track provisions in the Iowa Administrative Code governing jail operations. *Id.* at 34. They fault the SOPs for not instructing jail employees on the proper response to specific answers to booking questions.

The Court agrees with the Municipal Defendants that Plaintiffs' claims regarding proper suicide prevention policy need not set forth a rigid procedure that obviates the need for the exercise of individual employee judgment. The Iowa Administrative Code contemplates such discretion by noting that at the time an inmate is booked into custody, jail officials should attempt to

determine if an individual is suicidal by observing for marks or scars or by directly asking. Iowa Admin. Code § 201–50.13(1)(*f*). The absence of any point-by-point, flowchart analysis does not render a policy constitutionally infirm.

Even less persuasive is Plaintiffs' contention that the jail employees at Madison County are not qualified to conduct a mental health screening or assess the general mental health of an inmate. They provide no authority to support their assertion that it amounts to cruel and unusual punishment if jail intake employees are not so equipped. The arguments advanced by Plaintiffs on this claim amount to negligence at best, but fall far short of the deliberate indifference required by the Constitution.

### D.  Eyerly-Ball and Scott Thomas Motion for Summary Judgment

#### 1.  Section 1983 Claims and Qualified Immunity for Private Actors

Although Section 1983 claims are brought primarily against state and local government officials, the statute is not strictly limited to public employees and governmental entities. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Rather, the law specifies its scope as persons "acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48–49 (1988) ("The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'") (citation omitted). This means that private actors can be held liable under Section 1983 if their actions are "fairly attributable to the State." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (citation omitted). A common instance where courts have found that a private actor is acting under the color of state law is in the provision of medical services to incarcerated persons. *Davis v. Buchanan Cnty., Mo.*, 11 F.4th 604, 617 (8th Cir. 2021); *Langford*

*v. Norris*, 614 F.3d 445, 457 (8th Cir. 2010); *Montano v. Hedgepeth*, 120 F.3d 844, 849–50 (8th Cir. 1997).

The availability of qualified immunity as a defense to Section 1983 claims for private actors is not coextensive with its availability for government employees. *See Domina v. Van Pelt*, 235 F.3d 1091, 1096 (8th Cir. 2000) (noting that private persons "are not necessarily shielded from liability under § 1983 by the immunity afforded public officials.") (citation omitted). The determination whether a private individual is entitled to assert a qualified immunity defense is evaluated according to the factors set forth by the Supreme Court. *See Filarsky*, 566 U.S. at 384 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976)). The two factors to consider are: (1) "the general principles of tort immunities and defenses" available at common law; and (2) the policy reasons for which the Supreme Court has applied protections from suit under Section 1983. *Id*.

The Eighth Circuit recently addressed the issue of qualified immunity for contract medical providers at a detention facility in *Buchanan County*. In that case, the private defendants provided "on-site licensed practical nursing coverage to the jail." *Buchanan Cnty*., 11 F.4th at 614. The panel weighed the two factors described by the Supreme Court in *Filarsky*, noting that the policy considerations for extending qualified immunity are "avoiding unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing harmful distractions from carrying out the work of government that can often accompany damages suits." *Buchanan Cnty*., 11 F.4th at 620 (cleaned up). The Eighth Circuit observed that there was "no firmly rooted tradition of immunity" for similar defendants, noting that all other circuit courts to consider the issue concluded the same. *Id*. at 617 (collecting cases).

The purposes of qualified immunity also did not favor extending it to those defendants. The first and most important policy consideration for qualified immunity, "unwarranted timidity," was not as prominent for a private company. *Id*. at 620 (quoting *Richardson v. McKnight*, 521 U.S. 399, 409 (1997)). Concerns about timidity in taking necessary action is reduced in the context of private companies by marketplace competition, according to the panel. *Id*.

The second policy consideration is attracting talented candidates to work in public service. *Id*. at 621. The Eighth Circuit noted that "private firms insure themselves to cover claims against themselves and their employees, are not subject to various 'civil service law restraints,' and, unlike the government, may 'offset any increased employee liability risk with higher pay or extra benefits.'" *Id*. (quoting *Richardson*, 521 U.S. at 411). The *Buchanan County* panel found this consideration did not support qualified immunity for defendants.

The third and final policy consideration weighed by the Eighth Circuit was harmful distractions precipitated by lawsuits. The court acknowledged that lawsuits could distract private employees as well as public employees, but noted that doctors and nurses routinely face litigation risks in their line of work. *Id*. at 622 (quoting *Tanner v. McMurray*, 989 F.3d 860, 870 (10th Cir. 2021)). This makes the specter of a lawsuit less daunting to professionals who have experienced it before, again not favoring qualified immunity for the defendants in that case. *Id*.

The *Buchanan County* court concluded that in light of the lack of historic application of qualified immunity to such defendants, and its analysis in balancing the policy factors, "these medical defendants, as employees of large firms systematically organized to perform a major administrative task for profit, are not entitled to assert the defense of qualified immunity." *Id*. at 622.

Plaintiffs argue that *Buchanan County* stands for the proposition that "private medical providers and their employees contracted to perform medical services on behalf of government agencies may not assert the defense of qualified immunity." [ECF No. 56 at 16]. This overstates the holding in that case, because the panel acknowledged that qualified immunity may be available to a defendant, such as an individual physician, who was "performing a limited and discrete task for the state." *Buchanan Cnty.*, 11 F.4th at 619. The defendants in that case were "factually dissimilar" because they were employees of a "systematically organized private firm[], tasked with assuming a major lengthy administrative task." *Id.* The Eighth Circuit contrasted the duties with the private defendants in *Buchanan County* with those in other cases, including *Filarsky*.[5]

The Private Defendants, for their part, also misstate the qualified immunity analysis for non-government defendants. They claim that the two-factor inquiry is disjunctive, that is, "private individuals are entitled to assert qualified immunity if their claim is supported by historical practice *or* based on public policy considerations." [ECF No. 69-1 at 2] (emphasis added). The Private Defendants draw this disjunctive distinction from a pre-*Filarsky* case from the United States Court of Appeals for the Tenth Circuit. *See Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.*, 413 F.3d 1163, 1166 (10th Cir. 2005). They urge that the second factor, public policy reasons for extending a qualified immunity defense to private actors, weighs in their favor. Nevertheless, the

---

[5] *See Est. of Jensen by Jensen v. Clyde*, 989 F.3d 848, 855–57 (10th Cir. 2021) (individual physician working part time with a county jail could assert qualified immunity); *Perniciaro v. Lea*, 901 F.3d 241, 254 (5th Cir. 2018) (psychiatrist-employees of Tulane University—an employer "not 'systematically organized' to perform the 'major administrative task' of providing mental-health care at state facilities"—could assert qualified immunity from claims arising from their work at a state mental health facility); *Est. of Lockett ex rel. Lockett v. Fallin*, 841 F.3d 1098, 1109 (10th Cir. 2016) (private physician engaged by a prison to administer an execution could assert qualified immunity).

conjunctive/disjunctive distinction is relatively unimportant because the analysis considers the weight of factors, not the satisfying of elements.

The Private Defendants first contend that this case is distinguishable from *Buchanan County* because Eyerly-Ball does not provide medical care or healthcare at the Madison County Jail. Furthermore, they are not systematically organized to provider a major administrative task at the jail either. Rather, the jail diversion program at the Madison County Jail is only a small portion of Eyerly-Ball's business. They argue that this minor service weighs in favor of qualified immunity because the case law denying qualified immunity to private defendants significantly relied on the scale and resources of the defendants in those cases. *See, e.g., Buchanan Cnty.*, 11 F.4th at 617; *Sanchez v. Oliver*, 995 F.3d 461, 467 (5th Cir. 2021) ("[A] major corporation in the business of administering correctional health care services" with over a billion dollars in revenue annually); *Est. of Clark v. Walker*, 865 F.3d 544, 550–51 (7th Cir. 2017); *McCullum v. Tepe*, 693 F.3d 696, 704 (6th Cir. 2012). The Private Defendants maintain that they are not similarly situated to the entities in those cases that were denied qualified immunity for two reasons.

First, Eyerly-Ball was not a medical provider or health care provider for the Madison County Jail. It "simply provides a limited service at the Madison County Jail, its Jail Diversion program, whereby inmates' mental health needs are identified so that inmates can be referred to the proper mental health care from other, licensed mental health providers." [ECF No. 69-1 at 7]. These services are provided through a jail diversion case manager, which was Thomas's position. According to the Private Defendants, these duties are in "stark contrast" to other cases where entities provided systematically organized health care services. *Id*. at 8. They insist that a further distinction can be drawn from the fact that Thomas was also not a licensed health care professional.

The Private Defendants insist that these distinctions are relevant because they alter the analysis of policy considerations applied to non-government defendants in other cases. Because Thomas is not a medical professional, he is not accustomed to the "constant threat of claims leading to litigation" that has been noted in other cases. *Id*.

Also, they contend that Eyerly-Ball is not systematically organized to perform large administrative tasks and it was "not formed for the purpose of providing jail diversion services at local jails." *Id*. at 9. Eyerly-Ball is a community health center that provides mental health services in 20 counties throughout Iowa. Its jail diversion program is "an extremely small portion" of the services it provides as an entity. *Id*. The Private Defendants urge that this is much different than organization that were in the business of providing services to jails. Thomas's duties at the Madison County Jail were limited to meeting with inmates at the request of the inmate or law enforcement, and then coordinating further care for the inmate as necessary.

The determination about the applicability of qualified immunity here is a close call. However, the Court holds that the Private Defendants have not substantially distinguished their circumstances from *Buchanan County*, where the Eighth Circuit roundly rejected the availability of qualified immunity for the defendants in that case. Notwithstanding this conclusion, the Court finds that the Private Defendants are entitled to summary judgment on the deliberate indifference claims anyway.

### 2.   Deliberate Indifference Claims

#### a.   Scott Thomas

The Private Defendants argue that Plaintiffs cannot meet their burden of showing that Thomas acted with deliberate indifference to Jordan's risk of suicide. They insist that the reasonableness of his actions must be judged in light of the scope of his duties and the extent of

his involvement with Jordan.  The Private Defendants reject the characterization by Plaintiffs that Thomas's job duties consisted of him conducting mental health evaluations.  Furthermore, they contend that he did not have authority to place inmates under additional supervision or direct the jail to do so.

As the jail diversion case manager, Thomas's duties included screening inmates for possible mental health concerns, discuss available treatment options with those individuals, and refer them when appropriate.  [ECF No. 46-2 at 11].  The Private Defendants maintain that it was not his role to conduct a suicide risk assessment, but only served as a liaison to inmates and an information gatherer.  [ECF No. 59-2 ¶¶ 14–17].  Because Thomas's duties were limited in scope, they argue that he did not act unreasonably because it was not his job to perform a suicide risk assessment or otherwise evaluate Jordan's mental health status.  Rather, this was the job of the medical provider that Jordan was scheduled to see after his meeting with Thomas.

Plaintiffs respond that Thomas introduced himself to Jordan as an employee of a "mental health agency" and did not otherwise limit the scope of his contact with him.  During the meeting, Jordan proceeded to convey a litany of personal issues that he was experiencing, which Thomas conceded were factors that would increase and individuals suicide risk—this would be apparent even to a non-professional like himself.  [ECF No. 59-3 at 184–88].  Plaintiffs insist that an inference may be appropriately drawn that Thomas had sufficient facts to know that a risk of self-harm to Jordan was high.

Plaintiffs write that because Thomas had sufficient knowledge that Jordan had a substantial risk of suicide, the analysis must proceed to whether his actions in response were reasonable, or deliberately indifferent.  [ECF No. 56 at 22–23].  On this issue, they argue that Thomas did not notify jail employees that they should pay closer attention to Jordan.  [ECF No. 59-3 at 195–97].

What Thomas did, according to Plaintiffs, was "worse than nothing" because he told Weakland that Jordan would not harm himself. [ECF No. 56 at 23]. They argue that this representation by Thomas led staff at the Madison County Jail to not personally observe Jordan for the next hour, which enabled him to successfully commit suicide. *Id.* Plaintiffs maintain that case law clearly established that it is deliberate indifference to fail to share information that would lead a reasonable person to conclude that an inmate is a suicide risk.

The summary judgment record establishes as a matter of law that Thomas was not deliberately indifferent under governing case law. Following his meeting with Jordan, Thomas took affirmative steps to assist him, including scheduling a mental health appointment less than two hours after speaking with him. Thomas then contacted jail employees by phone and email to confirm that there would be staff to facilitate the appointment.

As the Private Defendants correctly point out, Jordan told Thomas multiple times during his meeting that he was not going to kill himself in the jail. Jordan caveated these statements by adding that he was not sure about what he would do when released from jail. Thomas relayed these statements to Weakland at the conclusion of the meeting, which Plaintiffs do not dispute. However, Plaintiffs argue that Thomas was deliberately indifferent by sharing what Jordan told him, without providing additional details from the meeting.

The failure to tell Weakland and other staff at the Madison County Jail about Jordan's other statements does not constitute deliberate indifference. Clearly, his assurances about not harming himself in jail were not credible and perhaps Thomas should have provided more information before departing. But as the Court has already discussed, the deliberate indifference standard is much higher than Thomas's alleged failure to share more information. The Eighth Circuit has repeatedly held that the deliberate indifference standard is not whether jail employees did all that

they could have done, but whether they did what the Constitution requires.  *See Rellergert*, 924 F.2d at 797.

b.   Eyerly-Ball

Plaintiffs allege a claim against Eyerly-Ball for failure to properly train and supervise Thomas with respect to suicide prevention.  Inadequate training can be the foundation of a claim for liability under Section 1983 when the failure to train amounts to a deliberate indifference to the constitutional rights of persons who interact with the employees of the governmental entity.[6]

The elements that comprise a claim for failure to train are: (1) the entity's hiring and training practices are inadequate; (2) the entity was deliberately indifferent to constitutional rights in the adoption of the hiring and training practices; and (3) the inadequacy of the entity's hiring and training practices cause injury to the plaintiff.  *Andrews*, 98 F.3d at 1076.  The standard to show inadequacy of training or hiring requires a plaintiff to establish that, given the duties assigned to the employee(s) "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that the entity "can reasonably be said to have been deliberately indifferent to the need" for adequate training and hiring practices.  *Id.* at 1076 (citing *City of Canton*, 489 U.S. at 390).  Such a failure to provide adequate training and hiring practices essentially "represent[s] a policy" which the entity may be held liable if injury results.  *City of Canton*, 489 U.S. at 390.

The first inadequacy identified by Plaintiffs is the decision of Eyerly-Ball to hire Thomas despite his lack of professional mental health credentials.  They assert that Eyerly-Ball was aware that Thomas did not have training in mental health evaluations but hired him for the job anyway.

---

[6] There is no dispute that Eyerly-Ball may be properly sued under Section 1983 for engaging in conduct fairly attributable to the state.

The Private Defendants reject this description of Thomas's duties, again reiterating that his job was a jail diversion case manager—not a medical provider.  They argue that Plaintiffs' claims rely on this incorrect premise which is refuted by undisputed facts in the record.  The Private Defendants write that the job of jail diversion case manager requires a bachelor's degree in human services, social sciences, or a related field, along with two years of experience in a human services field.  [ECF No. 46-2 at 50–54].  At the time of his hiring, Thomas met these qualifications.

The Private Defendants contend that Plaintiffs' position regarding inadequate training for Thomas is also wrong.  Plaintiffs claim that Eyerly-Ball did not provide Thomas with any specialized training regarding mental health examinations or suicide screening.  The Private Defendants point out that there is plenty of evidence in the record that Eyerly-Ball requires significant suicide prevention training for the employees in its jail diversion program.  In fact, annual suicide prevention training is a requirement for all employees at Eyerly-Ball.  [ECF No. 46-2 at 33–34].  Thomas was previously a master-level instructor for the crisis prevention institute. *Id*. at 8–9, 55–56.

Plaintiffs rely on the contract between Eyerly-Ball and the Madison County Jail to support their position that Eyerly-Ball had actual knowledge that its employees would interact with inmates presenting a variety of mental health conditions.  These interactions between Eyerly-Ball employees and inmates at the jail would require timely and accurate interventions, as well as diagnosis and treatment, according to Plaintiffs.  Plaintiffs insist that Eyerly-Ball understands that recognition of risk factors is important for suicide prevention.  They fault the entity for failing to equip Thomas with the necessary training to appropriately respond to the needs presented by inmates at the Madison County Jail.

-46-

Plaintiffs point out that Eyerly-Ball did not have any standard operating procedures or protocols for providing mental health services to inmates.  They also maintain that Eyerly-Ball did not have policies or procedures for crisis response, suicide evaluations, or mental health assessments for inmates either.  Plaintiffs claim that Thomas was not "inadequately trained" but rather "he was untrained."  [ECF No. 56 at 29].

Plaintiffs also argue that Eyerly-Ball had a deliberately indifferent policy toward the risk of suicide that was evidenced by the decision to send Thomas to the jail, despite his lack of professional qualifications.  They maintain that the decision to dispatch Thomas as a case manager was not an isolated incident, but was the regular practice of Eyerly-Ball.  Plaintiffs claim that Eyerly-Ball cannot rely on Thomas's lack of qualification as a defense to the claim.  According to them, Eyerly-Ball was obligated to provide a qualified person to fulfill their contractual obligations with Madison County.

The scope of contractual obligations owed by Eyerly-Ball are the subject of significant dispute between the parties.  Plaintiffs repeatedly assert that the entity was "contracted to provide mental health services."  [ECF No. 56 at 33].  The Private Defendants take the position that the contract with the Madison County Jail consisted of screening and coordination duties.

Thomas's supervisor Monica Van Horn testified that he was no longer responsible for developing client crisis plans or precommitment screenings, as was reflected in the written job description for jail diversion case manager.  [ECF No. 70 ¶ 26].  Thomas testified similarly that he was not tasked with coordinating precommitment screenings or developing client crisis at the time of his meeting with Jordan.  *Id*.  Van Horn also testified that Eyerly-Ball did not "provide mental health services in the jail."  *Id*. ¶ 19.

The Court cannot conclude that Eyerly-Ball was deliberately indifferent in its contact with Jordan during his time at the Madison County Jail.  Although Plaintiffs repeatedly assert that Eyerly-Ball had a contractual obligation to provide mental health services to the Madison County Jail, that does not establish a constitutional violation.  The record reflects that mental health services for inmates at the Madison County Jail, such as psychiatric evaluations, were provided by Integrated Telehealth Partners ("ITP").  [ECF No. 46-2 at 24–26].  Plaintiffs' response is that "Eyerly-Ball is contracted to provide mental health services to Madison County.  Any subcontract it enters into is still considered the action of Eyerly-Ball under their contractual obligations." [ECF No. 59-2 ¶ 41].

This is unpersuasive.  Plaintiffs argue that Eyerly-Ball was deliberately indifferent because Thomas was insufficiently qualified and trained to address the mental health needs of inmates at the Madison County Jail.  They also apparently take the position that the constitutionality of Eyerly-Ball's policies may only be evaluated through Thomas.  Plaintiffs do not address the fact that—subcontract or not—Eyerly-Ball would contact ITP when an inmate was in need of mental health services.  There is no allegation by Plaintiffs that ITP staff was unqualified.  If Eyerly-Ball's policy for addressing inmate mental health needs was not reasonable, it was no more than negligent.  This again falls short of the constitutional standard for deliberate indifference.

## E.  Remaining Claims

Defendants filed a motion for judgment on the pleadings, arguing that Jordan's parents, Kent Payne and Leslie King-Payne, cannot bring claims as individuals for violations of Jordan's constitutional rights.  [ECF No. 53].  Given the disposition of the motions for summary judgment on the constitutional claims, the motion for judgment on the pleadings is DENIED AS MOOT. [ECF No. 53].

The Private Defendants request that the Court decline to exercise supplemental jurisdiction over the state law claims for negligence and wrongful death if the federal constitutional claims are dismissed.  [ECF No. 50 at 25].  Courts may decline to exercise supplemental jurisdiction if it has dismissed all the claims over which it had original jurisdiction.  28 U.S.C. § 1367(c)(3).

Plaintiffs ask the Court to exercise supplemental jurisdiction over the remaining claims given the extent of litigation that has already occurred in this case, fairness to the parties, and the close relationship between the federal claims and the remaining claims over which the Court has supplemental jurisdiction.  [ECF No. 56 at 36].

The exercise of supplemental jurisdiction over state claims is within the discretion of the district court.  *See McManemy v. Tierney*, 970 F.3d 1034, 1040–41 (8th Cir. 2020) ("We rarely overturn this 'purely discretionary' call") (quoting *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 359 (8th Cir. 2011)).  The factors to be considered when determining the exercise of supplemental jurisdiction are "judicial economy, convenience, fairness, and comity."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  It is also relevant to consider whether the supplemental jurisdiction over a state claim involves a novel issue or "well-settled principles of state law."  *Thomas v. United Steelworkers Local 1938*, 743 F.3d 1134, 1141 (8th Cir. 2014).  The Court agrees with Plaintiffs that "[g]iven the substantial amount of time and judicial resources expended in this case," and the familiar principles of law implicated by the remaining state claims, exercise of supplemental jurisdiction by the Court is proper.  *Id.*

### III.   CONCLUSION

For the reasons discussed above, the Motion for Partial Summary Judgment filed by Madison County, John Weakland, and Jason Barnes is GRANTED.  [ECF No. 43].  The Motion for Partial Summary Judgment filed by Eyerly-Ball Community Health Services and Scott Thomas

is GRANTED.  [ECF No. 46].  Count I and Count II of the Complaint are dismissed.  Defendants'

Motion for Partial Judgment on the Pleadings is DENIED AS MOOT.  [ECF No. 53].  The Court

will retain supplemental jurisdiction over the remaining state law claims.

IT IS SO ORDERED.

Dated this 29th day of March, 2024.

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT