IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| KENT H. PAYNE, Individually and as the Administrator of the Estate of JORDAN KENT PAYNE and LESLIE KING-PAYNE, | ) ) ) ) ) | CASE NO. 4:21-cv-00349 |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | **DEFENDANTS EYERLY-BALL COMMUNITY HEALTH SERVICES AND SCOTT THOMAS'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| JOHN WEAKLAND, JASON BARNES, MADISON COUNTY, IOWA, EYERLY-BALL COMMUNITY MENTAL HEALTH SERVICES and SCOTT THOMAS, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

COME NOW the Defendants, Eyerly-Ball Community Mental Health Services ("Eyerly-Ball") and Scott Thomas ("Thomas"), pursuant to Federal Rule of Civil Procedure 56, LR 56(a)(2) and 7(d), and for their Brief in Support of Motion for Summary Judgment, state as follows:

## TABLE OF CONTENTS

FACTUAL BACKGROUND .......................................................................................................2

SUMMARY JUDGMENT STANDARD.....................................................................................3

ARGUMENT ...............................................................................................................................4

    I.    PLAINTIFFS CANNOT ESTABLISH THE DUTY ELEMENT OF THEIR CLAIMS OF NEGLIGENCE AND WRONGFUL DEATH AGAINST DEFENDANT SCOTT THOMAS ...........................................................................5

        A.    Thomas Had no Duty to Conduct a Mental Health Evaluation or a Suicide Risk Assessment of Payne and no Corresponding Duty to Warn Jail Staff of Payne's Risk of Suicide .........................................................................................................................7

B.    Thomas Had no Duty to Place Payne on Suicide Watch or Under Increased Monitoring or Supervision Because He Had no Authority or Control Over Payne's Level of Supervision at the Jail ................................................................................10

II.    PLAINTIFFS CANNOT ESTABLISH THE CAUSATION ELEMENT OF THEIR CLAIMS AGAINST THOMAS OR EYERLY-BALL ...........................................13

    A.    Plaintiffs Cannot Prove Causation Without Expert Testimony.................................14

    B.    Plaintiffs Cannot Establish Causation Beyond Speculation and Conjecture............17

III.    PLAINTIFFS CANNOT ESTABLISH THEIR CLAIMS OF NEGLIGENCE, MEDICAL NEGLIGENCE, AND RESPONDEAT SUPERIOR AGAINST DEFENDANT EYERLY-BALL..............................................................................................23

    A.    Plaintiffs Cannot Establish a Claim for "Medical Negligence" Against Eyerly-Ball Because Neither Eyerly-Ball nor Thomas Provided Medical Care or Treatment to Payne 24

    B.    Eyerly-Ball Did Not Have a Duty of Ordinary Care in Negligence to Assign a Licensed, Qualified Mental Health Professional to Conduct Mental Health Evaluations or Suicide Risk Assessments of Inmates at the Jail .............................................................26

    C.    Plaintiffs Cannot Establish That Eyerly-Ball Was Negligent in Failing to Supervise or Train Thomas .......................................................................................................................28

IV.    PLAINTIFFS CANNOT ESTABLISH A CLAIM FOR PUNITIVE DAMAGES AGAINST THOMAS OR EYERLY-BALL .........................................................................32

    A.    Plaintiffs Cannot Recover Punitive Damages Absent a Valid Underlying Claim....33

    B.    Plaintiffs Cannot Establish That Thomas or Eyerly-Ball Acted With a Willful and Wanton Disregard for Payne's Rights or Safety .................................................................34

CONCLUSION ........................................................................................................................38

## FACTUAL BACKGROUND

Eyerly-Ball and Thomas incorporate their Statement of Material Facts in Support of Motion for Summary Judgment as if set forth fully herein. These Defendants also incorporate this Court's "Factual Background," establishing the undisputed facts of this case, as set forth in the Court's Combined Order on Motions for Partial Summary Judgment. Dkt No. 87, p. 2–10.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c)(2) provides: "The judgment should be rendered if the pleadings, the discovery, and disclosure materials on file, and any Affidavits show that there is no genuine issue as to any material fact and the Movant is entitled to judgment as a matter of law." An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the dispute over it might affect the outcome of the suit under governing law. *Id.* The moving party has the burden of demonstrating the absence of a genuine issue of material fact with affidavits, depositions, answers to interrogatories, and admissions. *Celotex Corporation v. Catrett*, 477 U.S. 317, 323 (1986).

The court should "view the evidence in light most favorable to the non-moving party and give that party the benefit of all reasonable inferences." *The United States v. City of Columbia*, 914 F2d 151, 153 (8th Cir. 1990). Still, the non-moving party cannot rely on mere allegations or denials. *Krenik v. County of LeSuer*, 47 F3d 953, 957 (8th Cir. 1995). The non-moving party must instead demonstrate the existence of specific facts that create a genuine issue for trial.

Summary judgment is a useful pretrial tool to determine whether any case merits a trial. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary Judgment is not disfavored as a procedural shortcut, but rather as an integral part of the Federal Rules as a whole, designed to secure the just, speedy, and inexpensive determination of every action. *Id.* Summary Judgment is designed to avoid "useless, expensive, and time-consuming trials where there is actually no

genuine, factual issue remaining to be tried." *Reynolds v. Ret. Hous. Found.*, No. 4:18-CV-00152, 2020 WL 12918324, at *2 (S.D. Iowa June 26, 2020) *(citing Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir. 1976)).

## **ARGUMENT**

On March 29, 2024, this Court issued its Combined Order on Motions for Partial Summary Judgment, dismissing all of Plaintiffs' federal claims for "deliberate indifference." *See* Dkt. No. 87. In the same order, this Court elected to retain supplemental jurisdiction over the remaining state law claims. *Id.* As such, Plaintiffs' remaining claims include only the following:

- Negligence/Medical Negligence/Wrongful Death;

- Respondeat Superior;

- Negligent Training or Supervision; and

- Punitive Damages.

Based upon the undisputed facts set forth herewith and as already established by this Court, Plaintiffs cannot establish a prima facie case necessary to present these claims to a jury. Defendants contend they are entitled to summary judgment as a matter of law and request this Court enter the same to avoid a needless, expensive, and time-consuming trial. *Reynolds*, 2020 WL 12918324, at *2.

I.   **PLAINTIFFS CANNOT ESTABLISH THE DUTY ELEMENT OF THEIR CLAIMS OF NEGLIGENCE AND WRONGFUL DEATH AGAINST DEFENDANT SCOTT THOMAS**

Count IV of Plaintiffs' Complaint asserts a negligence claim against Scott Thomas. Count VI of Plaintiffs' Complaint asserts a wrongful death claim against Scott Thomas. Plaintiffs allege that Thomas was negligent in failing to warn Madison County Sheriff's Department of Jordan Payne's risk of self-harm and/or suicide and failing to conduct a competent mental health evaluation or suicide risk assessment of Jordan Payne. (Complaint, ¶ 114; Dkt. No. 1). Plaintiffs also allege that Thomas failed to place Payne under suicide watch and have him monitored as a suicide risk. *Id.* at ¶ 125. Plaintiffs cannot establish a legal duty on the part of Thomas to undertake any of the above actions with respect to Payne.

"An actionable claim of negligence requires the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages." *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009) (citations omitted). "The threshold question in any tort case is whether the defendant owed the plaintiff a duty of care." *Mastbergen v. City of Sheldon,* 515 N.W.2d 3, 4 (Iowa 1994). According to the Iowa Supreme Court, the "law of duty [is] alive and well." *McCormick v. Nikkel & Assocs., Inc.*, 819 N.W.2d 368, 371 (Iowa 2012). "Whether a duty arises out of a given relationship is a matter of law for the court's determination." *Id.* "Because the existence of a duty is a question of law for the courts to resolve, it may appropriately be addressed by way of summary adjudication." *Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 52 (Iowa 1999).

Iowa has adopted the Restatement Third's approach to the duty analysis, which provides that: "(a) An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm; (b) In exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification." *Thompson*, 774 N.W.2d at 834-835; Restatement (Third) of Torts: Phys. & Emot. Harm § 7 (2010). Since *Thompson*, when the Iowa Supreme Court adopted the duty analysis laid out in the Restatement (Third) of Torts, Iowa courts are to consider two factors in making a duty determination: (1) the relationship between the parties; and (2) public policy. *DeSousa v. Iowa Realty Co.*, 975 N.W.2d 416, 420 (Iowa 2022) (citing *McCormick*, 819 N.W.2d at 371 ("In short, a lack of duty may be found if either the relationship between the parties or public considerations warrants such a conclusion.")). In determining the existence of a duty, Iowa courts look to statutes, prior judicial rulings, and general legal principles. *Kolbe v. State,* 625 N.W.2d 721, 725 (Iowa 2001).

The Iowa Supreme Court has reiterated that under the Restatement (Third) of Torts, "control remains an important consideration in whether a duty exists and liability normally follows control." *Lukken v. Fleischer*, 962 N.W.2d 71, 77 (Iowa 2021). "The reason is simple: The party in control . . . is best positioned to take precautions to identify risks and take measures to improve safety." *McCormick*, 819 N.W.2d at 374.

### A. Thomas Had no Duty to Conduct a Mental Health Evaluation or a Suicide Risk Assessment of Payne and no Corresponding Duty to Warn Jail Staff of Payne's Risk of Suicide

As stated, a lack of duty may be found where the relationship of the parties warrants such a conclusion. *McCormick*, 819 N.W.2d at 371. Here, the relationship between Thomas and Payne warrants the conclusion that Thomas did not owe Payne a duty to prevent him from committing suicide. The relationship between Thomas and Payne was not a physician-patient relationship or a mental health professional-patient relationship. Rather, the relationship was simply one between a Jail Diversion Case Manager and a jail inmate, through which Thomas was to provide a limited role as a liaison between inmates and the proper services they may need, including mental health and psychiatric services. As a Jail Diversion Case Manager, and not a psychiatrist or mental health professional, Thomas did not conduct a mental health evaluation or suicide risk assessment of Payne, nor was it his duty to do so.

Thomas does not provide mental health evaluations to inmates housed at Madison County Jail or any other jail.  (*See* Defs' SOF ¶¶ 5-15). His role is limited to referring inmates to qualified mental health professionals. *Id.* According to Thomas's job description, "[t]he position of Jail Diversion Case Manager exists to assist clients in the areas of service referrals, collaborating with other resources to secure mental health services for jail inmates, and ensure inmates begin utilizing assigned services when released from jail." *Id.* at ¶ 6. In his role as a Jail Diversion Case Manager employed by Eyerly-Ball, it is Thomas's responsibility to screen individuals for possible mental health concerns, discuss with those individuals what options are available for mental health services, and then refer the

individuals to the appropriate services. *Id.* at ¶ 8. Mr. Thomas is not a mental health professional who engages in evaluating and treating inmates' mental health issues but is simply an information gatherer who serves as a liaison and refers inmates to the appropriate mental health professionals. *Id.* at ¶¶ 11-12. As a Jail Diversion Case Manager, it was not Thomas's role to conduct suicide risk assessments at the jail. *Id.* at ¶ 13. Rather, he was to connect inmates to the appropriate services based on his conversation with them. *Id.* at ¶ 14. One of the entities that Thomas makes referrals to is Integrated Telehealth Partners ("ITP"), which provides mental health services such as psychiatric evaluations to inmates at the Madison County Jail pursuant to contract. (¶¶ 36-41). If concerns about an inmate's health or safety arise during Thomas's conversation with an inmate, Thomas does not make any recommendations to the jail but simply informs the jail of what the inmate has expressed to him. *Id.* at ¶ 16.

As this Court has found, "Thomas was not tasked with conducting mental health assessments and evaluations, nor was he qualified to administer a suicide risk assessment." (Order on Motions for Partial Summary Judgment, p. 5; Dkt. No. 87). Instead, "[t]he record reflects that mental health services for inmates at the Madison County Jail, such as psychiatric evaluations, were provided by Integrated Telehealth Partners ("ITP"). *Id.* at p. 48. Plaintiffs attempt to impose a duty of care upon Thomas that simply does not comport with his role or qualifications or the nature of the relationship between Thomas and Payne. Thomas plainly was not tasked with, nor was he qualified to perform a mental health evaluation or suicide risk assessment of Payne. Thus, he had no duty to perform such evaluations or assessments. Because he had no duty to perform such evaluations or

assessments, it follows that he had no duty to warn the jail staff of Payne's risk of suicide. Thomas merely had a duty to inform the jail staff of what Payne had expressed to him during the screening interview and to refer Payne to the appropriate mental health services, not a duty to assess Payne's suicide risk himself. The relationship between the parties warrants the conclusion that Thomas had no duty to conduct a mental health evaluation or a suicide risk assessment of Payne and no corresponding duty to warn jail staff of Payne's risk of suicide.

Similarly, Thomas's failure to conduct a mental health evaluation or suicide risk assessment of Payne or to warn the jail staff of a suicide risk did not create a risk of physical harm to Payne. The law of duty provides that "an actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." Restatement (Third) of Torts: Phys. & Emot. Harm § 7(a) (2010). However, "[a]n actor whose conduct has not created a risk of physical . . . harm to another has no duty of care to the other unless a court determines that one of the affirmative duties . . . is applicable." *Id.* at § 37. Similarly, "there is no duty of care when another is at risk for reasons other than those created by an actor's conduct." *Kindig v. Newman*, 966 N.W.2d 310, 324 (Iowa Ct. App. 2021) (citing *Hoyt*, 829 N.W.2d at 776 n.4).

Here, the task of performing mental health evaluations and suicide risk assessments of jail inmates was specifically delegated to psychiatrists at ITP. Thus, Thomas's failure to perform such assessments was not "conduct [that] create[ed] a risk of physical harm" to Plaintiff because the performance of such assessments was otherwise arranged for. It defies logic to suggest that Thomas had a duty to perform a mental health evaluation and suicide

risk assessment because the failure to do so creates a risk of harm to Payne when the performance of such assessments was the responsibility of another entity. Therefore, in addition to the lack of a relationship giving rise to a duty, Thomas had no duty because his conduct did not create a risk of physical harm to Payne.

**B. Thomas Had no Duty to Place Payne on Suicide Watch or Under Increased Monitoring or Supervision Because He Had no Authority or Control Over Payne's Level of Supervision at the Jail**

The relationship between Thomas as a Jail Diversion Case Manager and Payne as a jail inmate did not give rise to a duty on the part of Thomas to place Payne on suicide watch or under increased supervision. It is not within Thomas's scope of practice as a Jail Diversion Case Manager to advise or direct the jail with respect to how to properly handle an inmate's medical condition or a perceived risk to the inmate's health or safety. (Defs' SOF ¶ 15). If concerns about an inmate's health or safety arise during Thomas's conversation with an inmate, Thomas does not make any recommendations to the jail. *Id.* at ¶ 16. In fact, according to Madison County Sherriff Jason Barnes, Scott Thomas does not have any authority to direct the jailers at Madison County Jail. Id. at ¶ 17. Rather, jailers make their own decisions based on information provided to them by Scott Thomas. *Id.* The record is devoid of any evidence that Thomas was tasked with or had the ability to direct the jail staff to place inmates on suicide watch or to increase their monitoring or supervision of an inmate. As a matter of law, Thomas cannot be held to have had a duty to take such action given the lack of a relationship giving rise to such a duty.

Similarly, Thomas did not have a duty to place Payne on suicide watch or under increased supervision because he had no control over the jail staff's actions. As stated,

"control remains an important consideration in whether a duty exists and liability normally follows control." *Lukken v. Fleischer*, 962 N.W.2d 71, 77 (Iowa 2021). This is because "[t]he party in control . . . is best positioned to take precautions to identify risks and take measures to improve safety." *McCormick*, 819 N.W.2d at 374. The "control rule," which permeated Iowa precedents on the issue of duty, persists under the Restatement (Third). *Id.* Indeed, while section 7 of the Restatement (Third) provides that "[a]n actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm," this is subject to "an articulated countervailing principle or policy," such as the control rule. *Id.* (citing Restatement (Third) of Torts: Phys. & Emot. Harm § 7 (2010)).

Here, the jail had control over whether to direct its staff members to increase their monitoring or supervision of Payne. There is simply no evidence that Thomas had any control over Payne's level of supervision at the jail or that he himself could have implemented any measures to increase Payne's supervision. Thomas's relationship to Payne and his lack of control over the jail staff's supervision of Payne warrant the conclusion that Thomas had no duty to place Payne on suicide watch or under increased supervision.

Indeed, once Thomas completed his interview of Payne, scheduled Payne for an appointment with ITP, and turned Payne back over to the control of the jail staff, he did not have a continuing duty to protect Payne from a risk of suicide. In *Morris v. Legends Fieldhouse Bar & Grill, LLC*, the Iowa Supreme Court held that the defendant had no duty to the plaintiff when the plaintiff was no longer under the defendant's control. 958 N.W.2d 817 (Iowa 2021). There, the defendant strip club's security guard had ejected an intoxicated patron outside and offered him a cab ride. *Id.* at 819. The patron refused the cab offer and

left on foot. *Id.* Over thirty minutes later and nearly a half mile away, he was struck and killed by a drunk driver. *Id.* The district court granted the strip club's motion for summary judgment, ruling that the club owed no continuing duty to the patron after he walked away from its premises. *Id.*

In affirming the district court's finding of no duty, the Iowa Supreme Court noted:

> Liability generally follows control. *See Est. of McFarlin v. State*, 881 N.W.2d 51, 64 (Iowa 2016). "The reason is simple: The party in control ... is best positioned to take precautions to identify risks and take measures to improve safety." *McCormick*, 819 N.W.2d at 374. Beach Girls had no control over [Plaintiff] after he left, and it had no control over [the drunk driver] before he arrived . . . He could have waited for his friend just outside the building. He wasn't ordered to leave the parking lot. He didn't drive away drunk behind the wheel of a motor vehicle. [Plaintiff] departed that August night on foot and walked over a half mile before he laid down in the travel lane of Raccoon River Drive. We hold that Beach Girls' relationship with [Plaintiff], and its duty of care for his safety, ended after he refused its offer of a cab ride and chose to walk away from its parking lot. Beach Girls was entitled to a "no-duty" summary judgment based on the undisputed facts.

*Id.* at 826.

Here, following Thomas's interview of Payne, Thomas left the jail and scheduled Payne for the first available appointment with a psychiatrist from ITP, which was to take place at 3:30 p.m., approximately ninety minutes after the interview concluded. (Defs' SOF ¶ 36). Thomas notified the jail of Payne's appointment, and Payne was taken back to his jail cell to await the appointment, at which point he hung himself just ten minutes after meeting with Thomas. *Id.* at ¶¶ 37, 42. Similar to *Morris*, Thomas's relationship with Payne and any duty of care for Payne's safety ended when he scheduled Payne for an appointment with ITP and released him to the control of the jail staff. Thomas had no control over whether the jail staff increased their supervision of Payne after he was taken back to his cell. Accordingly, as

in *Morris*, Thomas is entitled to a no-duty summary judgment because he did not have control over Payne's supervision after the screening interview ended.

## II.    PLAINTIFFS CANNOT ESTABLISH THE CAUSATION ELEMENT OF THEIR CLAIMS AGAINST THOMAS OR EYERLY-BALL

In addition to the negligence and wrongful death claims against Thomas, Plaintiffs assert a claim for "negligence and/or medical negligence and/or respondeat superior" against Eyerly-Ball. (Complaint Count V; Dkt. No. 1). Plaintiffs cannot establish that any acts or omissions on the part of Thomas or Eyerly-Ball caused Payne's death by suicide. "An actionable claim of negligence requires the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages." *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009) (citations omitted). Iowa courts "have held that causation has two components: cause in fact and legal cause." *Sweeney v. City of Bettendorf*, 762 N.W.2d 873, 883 (Iowa 2009)(citing *Faber v. Herman*, 731 N.W.2d 1, 7 (Iowa 2007)).

The conduct of a defendant is a "factual cause of harm when the harm would not have occurred absent the conduct." *State v. Tribble*, 790 N.W.2d 121, 127 (Iowa 2010) (*citing* Restatement (Third) of Torts: Phys. & Emot. Harm § 26 (2010) (hereinafter "Restatement (Third)"). Iowa Courts "have traditionally labeled this straightforward, factual cause requirement of causation the 'but-for' test." *Tribble*, 790 N.W.2d at 127 (citing *State v. Marti*, 290 N.W.2d 570, 585 (Iowa 1980)). Under the but-for test:

> the defendant's conduct is a cause in fact of the plaintiff's harm if, but-for the defendant's conduct, that harm would not have occurred. The but-for test also implies a negative. If the plaintiff would have suffered the same harm had the

defendant not acted negligently, the defendant's conduct is not a cause in fact of the harm.

*Garr v. City of Ottumwa*, 846 N.W.2d 865, 869–70 (Iowa 2014), *reh'g denied* (June 4, 2014).

To assess the existence of a causal connection, the court will first review the claims of negligence asserted against the defendant, and then evaluate the evidence presented to support the claim that the negligent acts caused the injuries. *See id.* at 870. The plaintiff carries the burden of proving by a preponderance of the evidence that if the defendant had not acted tortiously the plaintiff's harm would not have occurred. *Sweeney v. City of Bettendorf*, 762 N.W.2d 873, 884 (Iowa 2009) (summary judgment granted on issue of causation because there was no evidence direct supervision would have prevented injury of plaintiff being struck by a baseball bat at game); Restatement (Third) § 26 (2010).

**A.   Plaintiffs Cannot Prove Causation Without Expert Testimony**

The issue of whether Defendants' acts or omissions ultimately caused Payne's death is one of a complex nature requiring the aid of expert testimony. "Lay persons sitting as the trier of fact generally lack the knowledge to render a competent judgment as to negligence and proximate cause in complex matters requiring professional expertise." *Eventide Lutheran Home for the Aged v. Smithson Elec. & Gen. Constr., Inc.,* 445 N.W.2d 789, 791 (Iowa 1989). "Expert testimony is required to create a jury question on causation when the causal connection 'is not within the knowledge and experience of an ordinary layperson.'" *Susie v. Family Health Care of Siouxland, P.L.C.*, 942 N.W.2d 333, 337 (Iowa 2020) (quoting *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 793 (Iowa 2009)); *Vaughn v. Ag Processing, Inc.,* 459 N.W.2d 627, 636 (Iowa 1990) ("Questions of causation which are beyond the understanding of a

layperson require expert testimony."). Under Iowa law, a party need not introduce expert testimony only "if all the primary facts can be accurately and intelligibly described to the jury, and if they, as [persons] of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation." *Thompson v. Embassy Rehab. & Care Ctr.*, 604 N.W.2d 643, 645 (Iowa 2000).

Whether a suicide is the result of the negligence of another party often presents a complex question that is beyond the understanding of the average layperson. In *Mulhern*, the Iowa Supreme Court held that expert testimony was required to generate a jury question as to a hospital's negligence in a case involving the alleged failure to prevent suicide. *Mulhern v. Catholic Health Initiatives*, 799 N.W.2d 104, 123 (Iowa 2011).

Several other courts have held that expert testimony is necessary to establish causation in suicide cases given the complex nature of the issues involved. For example, the Supreme Court of Vermont held that expert testimony was required to establish causation in a suicide case where the alleged failure to conduct a sufficient suicide-risk evaluation, among other allegations, "involve[ed] complex psychiatric/medical issues relating to the causes, warning signs, and prevention of suicide[,] [which were] "plainly not issues within a lay juror's common knowledge and experience." *Wilkins v. Lamoille Cnty. Mental Health Servs., Inc.*, 2005 VT 121, 179 Vt. 107, 889 A.2d 245, 253 (2005). Similarly, the Supreme Court of New Hampshire held that because "[s]uicide is not easily explained or understood" and "[i]ts causes, prevention, triggers and warning signs cannot be readily calculated," and because "the average person lacks the experience, training or education about the complexities of

suicide" expert testimony is required to establish a causal link between the defendant's alleged negligence and the decedent's suicide. *Estate of Joshua T. v. State,* 150 N.H. 405, 840 A.2d 768, 772 (2003).

Here, whether Payne would not have committed suicide but for Defendants' conduct is a highly complex issue involving the intersection of medical or psychiatric issues and jail condition issues, both of which are beyond the understanding of laypersons. For example, the triggers and warning signs of suicide and whether an individual's words or behaviors are the result of suicidal ideations or the result of underlying mental health conditions, substance abuse issues, or medication interactions are issues that are not understood by non-experts. Similarly, whether certain medical or psychiatric interventions such as therapy or prescribing certain medications would ultimately prevent an individual from committing suicide, considering their medical conditions, medication and substance use, and prior social history, is beyond the understanding of the average layperson juror. As recognized in *Wilkins,* whether the failure to conduct a sufficient suicide-risk evaluation is the cause of an individual's suicide is "plainly not [an] issue[] within a lay juror's common knowledge and experience." *Wilkins,* 889 A.2d at 253. Such issues require medical and/or psychiatric expert testimony in order to generate a jury question on causation in this case.

Similarly, whether the conditions and practical realities of the jail setting would have more likely than not allowed for the prevention of Payne's suicide presents issues that are beyond the knowledge of laypersons. For example, Plaintiffs in this case assert that Payne should have been placed on "suicide watch" or some form of increased monitoring. Such an assertion begs the question of whether placing a jail inmate on suicide watch always or more

16

often than not prevents that inmate from ultimately committing suicide. The average layperson does possess sufficient knowledge about jails to determine whether or not there are ways for an inmate to commit suicide despite being on suicide watch. Such issues require testimony from a law enforcement or jail administration expert to generate a genuine issue of material fact on the causation element in this matter.

Plaintiffs lack expert testimony establishing a causal connection between Eyerly-Ball and Thomas's acts or omissions and Payne's death by suicide. Plaintiffs designated two experts in this matter: Dr. Joseph V. Penn and Peter E. Perroncello. (Defs' SOF ¶ 50). Mr. Perroncello's opinions are limited to issues related to Defendants Weakland, Barnes and Madison County. *Id.* at ¶ 51. Plaintiffs designated Dr. Penn to testify regarding the standard of care, Eyerly-Ball and Thomas's breach of the standard of care, and the causal connection between such breaches and Payne's resulting death. *Id.* at ¶ 52. While Dr. Penn expresses opinions regarding Eyerly-Ball and Thomas's standard of care and alleged failure to comply with the standard of care, Dr. Penn's report is devoid of any opinions discussing a causal connection between any of the alleged failures and Payne's suicide. *Id.* at ¶ 53. Therefore, Plaintiffs cannot establish their claims against Eyerly-Ball and Thomas because they lack the requisite expert testimony to generate a fact issue on the element of causation.

**B. Plaintiffs Cannot Establish Causation Beyond Speculation and Conjecture**

Even if expert testimony is not required to establish causation in this case, the record lacks sufficient evidence of a causal connection between Defendants' acts or omissions and Payne's suicide. Plaintiffs carry the burden of proving by a preponderance of the evidence

that but-for Defendants' conduct, Payne's death would not have occurred. *See State v. Tribble*, 790 N.W.2d 121, 127 (Iowa 2010); Restatement (Third) § 26.

In order to establish the prima facie element of causation, "[t]he proof must establish causal connection beyond the point of conjecture. It must show more than a possibility." *Ramberg v. Morgan*, 218 N.W. 492, 498 (Iowa 1928). "Mere guesswork about what might have occurred is not enough." *Sweeney*, 762 N.W.2d at 884. To establish that substantial evidence supports a causal connection between a defendant's action and plaintiff's injuries, plaintiff must show "something more than the evidence is consistent with plaintiff's theory of causation." *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 792 (Iowa 2009). Rather, "[t]he evidence must show plaintiff's theory of causation is reasonably probable—not merely possible, and more probable than any other hypothesis based on such evidence." *Id.* at 793 (citation omitted); *see also Chenoweth v. Flynn*, 99 N.W.2d 310, 313 (Iowa 1959) ("Mere possibility does not ordinarily generate a jury question, it leaves the jury to speculate upon a speculation."); *Crawford v. Mitros*, 5 N.W.3d 3 (Iowa Ct. App. 2024)("*DeBurkarte* teaches us that, when we have both evidence of what the better outcome would be and evidence of the likelihood of achieving it, causation has been established. 393 N.W.2d at 137. *Susie* teaches us that when one of those two links in the causation chain is missing—in that case, missing proof of the likelihood of the better outcome—the claim fails. 942 N.W.2d at 339–40."); *Belhak v. Smith*, No. 22-2048, 2024 WL 2042465, at *7 (Iowa Ct. App. May 8, 2024).

Here, Plaintiffs cannot prove beyond mere speculation and conjecture that but-for Eyerly-Ball and Thomas's acts or omissions, Payne would not have committed suicide. First, with respect to Plaintiffs' assertion that Thomas failed to adequately warn the jail staff of

18

Payne's risk of self-harm, Plaintiffs cannot establish that such an alleged failure to warn caused Payne's death by suicide given that the Madison County Jail was already aware of the types of suicidal signs or risk factors that Payne exhibited in his screening interview with Thomas before Thomas even met with Payne. In other words, at the time Thomas conducted his screening interview with Payne, Madison County Jail staff were already aware of all potential suicide risk factors or symptoms that Thomas became aware of during his interview with Payne. (*See* Defs' SOF, ¶ 43). According to Plaintiffs' Complaint, During the interview with Thomas on June 12, 2020, Jordan Payne made the following statements:

    a.  "I'm not doing so well, I lost everything, girlfriend, jeep, house. Going to be homeless."
    b.  "I gave myself a black eye. I'm hearing these fucking things in my head, all sorts of stupid shit I'm not trying to listen to it."
    c.  "I'm not in good shape right now."
    d.  "Like I'm getting these thoughts in my head, shit like that."
    e.  "I've got these thoughts in my head that are like chew my veins out and I mean shit like that."
    f.  "I've had seven suicide attempts in the last year."
    g.  "I've got nothing left."
    h.  "I can't sleep, there's nothing I can do. I'm sitting there and I'm just thinking and then I'm hearing shit and I tell it to go away, hence the black eye."
    i.  "I want to start fucking slapping myself or start hitting myself."

(Complaint, ¶ 72; Dkt. No. 1).

Plaintiffs also assert that "Jordan Payne was physically and demonstrably agitated during his interview with Defendant Thomas." *Id.* at ¶ 73. Madison County Jail staff were well aware of the same or similar statements and behaviors exhibited by Payne prior to the time that Thomas made his first contact with Payne. While being booked into jail on June 9, 2020, Payne responded to intake screening questions from jailers wherein he indicated that he had mental illness, had previously tried to hurt himself, had previously tried to kill

himself, and had a family member or friend previously commit suicide. *Id.* at ¶ 28. According to Plaintiffs' Complaint, "[p]rior to June 9, 2020, Jordan Payne had a documented history of suicide attempts and suicidal ideations, known to the Madison County Sheriff's Department. *Id.* at ¶ 29. Indeed, the Madison County Sheriff's Department was aware of several suicide attempts by Payne, either while he was in their custody or as a result of responding to his suicide attempt. *Id.* at ¶¶ 32-34. Further, Madison County Jail staff were specifically informed by Plaintiff Leslie Payne that Payne was "going nuts" and that he was threatening self-harm by stating he wanted to "chew the veins out of his arms." *Id.* at ¶¶ 55-56.

Accordingly, the comments Payne made to Thomas during the screening interview regarding prior suicide attempts and mental illness, the fact that he was "freaking out" and wanted to "chew his veins out," and the fact that Payne was agitated were all things that the Madison County Jail was specifically aware of prior to Thomas's involvement with Payne. They continued to be aware of those facts after Thomas's interview with Payne, when Payne was returned to their exclusive supervision. Thus, even if Thomas would have notified the jail staff of each and every detail of his interview with Payne, he wouldn't have provided them with any information they didn't already know. It defies logic to suggest that Thomas's failure to notify jail staff that Payne was exhibiting alleged suicidal indications somehow caused Payne's death by suicide when the jail staff was already aware of the same information. It is pure speculation that the jail staff would have acted any differently, such as by placing Payne on suicide watch, in response to any additional detail provided by Thomas given that they were already aware of the same information and yet did not place Payne under suicide watch. Indeed, when asked whether he felt that Eyerly-Ball or Scott Thomas

should have communicated better with the jail staff, Sherriff Jason Barnes testified: "I don't know what he would have said that would have changed anything." (Defs' SOF ¶ 54). No witness has testified that any additional comments from Thomas would have caused the jail to act differently. Thus, it is pure speculation to conclude that Payne would not have killed himself if Thomas would have provided the jail staff with additional detail regarding his observations of Payne.

Similarly, even if Thomas would have gone beyond his expertise and the scope of his duties as a Jail Diversion Case Manager and conducted a "competent" mental health evaluation and suicide risk assessment as Plaintiffs assert he should have, there is no evidence that the outcome would have been any different. Again, Thomas did not have the authority to direct the jail staff to place Payne on suicide watch or under additional supervision. Thus, even if Thomas had conducted a competent mental health evaluation and suicide risk assessment and thereafter told the jail staff to place Payne on suicide watch, there is no indication that the jail staff would have acted any differently, especially in light of the fact that they were already aware of the same alleged suicide risks that Thomas observed during his screening interview with Payne.

Further, even if Thomas would have gone beyond his authority and directed the jail staff to increase their monitoring or supervision of Payne and even if the jail staff implemented some form of increased monitoring or supervision, there is no evidence from which to conclude that such increased monitoring would have more likely than not prevented Payne from committing suicide. Sheriff Barnes testified that "elevated monitoring" of an inmate means "make sure you're looking – make sure you're paying

attention." Id. at ¶ 56. Sheriff Barnes also testified that if jailers determine that they need to keep an eye on an inmate based on potential suicide risks, they are to notify the Jail Administrator, who will then direct them on what they need to do. *Id.* at ¶ 57. The Madison County Sheriff's Office Standard Operating Procedures provide that "the jailer/dispatcher will determine what type of monitoring is necessary for the inmate's protection from him/herself. The inmate may be moved to another unit or holding cell so that staff may have more visual supervision. The inmate will be kept on special watch, with the jailer/dispatcher logging all cell checks in 15-minute intervals, or as determined by the Sheriff or Jail Administrator." *Id.* at ¶ 55.

First, it is not clear exactly what form of increased monitoring or supervision would have occurred if Thomas had directed jail staff to increase their monitoring and supervision of Payne, as the jail staff have discretion as to what type of monitoring is necessary. We do not know whether the jailers or the Jail Administrator would have decided to move Payne to a different cell for more visual supervision. It is speculative to conclude that jailers would have prevented Payne's death simply by making sure they were paying attention. Furthermore, it is speculative to conclude that cell-checks every fifteen minutes would have prevented Payne from committing suicide. This is especially true given that Payne hung himself just ten minutes after going back to his cell following the screening interview with Thomas. *Id.* at ¶ 42. Thus, it cannot be established by a preponderance of the evidence that but-for the failure to place Payne under increased monitoring or supervision, his death by suicide would not have occurred.

In sum, Plaintiffs cannot establish that but-for the acts or omissions of Thomas, Payne would not have killed himself. Even if Thomas would have done everything Plaintiffs allege he should have done, a factfinder would have to engage in speculation to conclude that Payne's suicide would have been prevented. The same is true with respect to causation as it relates to the claims against Eyerly-Ball. There is no evidence that the outcome would have been different if Eyerly-Ball assigned a "qualified" individual to conduct a mental health evaluation or suicide risk assessment of Payne or if Eyerly-Ball would have adequately trained or supervised Thomas. "Mere guesswork about what might have occurred is not enough" to establish causation. *Sweeney*, 762 N.W.2d at 884. Because Plaintiffs' theory of causation against Thomas and Eyerly-Ball is based on mere possibilities rather than probabilities, Plaintiffs cannot establish a genuine issue of material fact on the element of causation. *Chenoweth*, 99 N.W.2d at 313 ("Mere possibility does not ordinarily generate a jury question, it leaves the jury to speculate upon a speculation.").

## III. PLAINTIFFS CANNOT ESTABLISH THEIR CLAIMS OF NEGLIGENCE, MEDICAL NEGLIGENCE, AND RESPONDEAT SUPERIOR AGAINST DEFENDANT EYERLY-BALL

Count V of Plaintiffs' Complaint asserts a claim of "Negligence and/or Medical Negligence and/or Respondeat Superior" against Eyerly-Ball. Plaintiffs allege that Eyerly-Ball was negligent in failing to use and exercise that degree of skill, care, and learning ordinarily possessed and exercised by a Mental Health Service provider in similar circumstances. (Complaint, ¶ 119; Dkt. No. 1). Plaintiffs further allege that Eyerly-Ball was negligent in assigning and permitting an unlicensed, unqualified individual to conduct mental health evaluations and suicide risk assessments. *Id.* Plaintiffs also allege that Eyerly-Ball was

negligent in failing to supervise Thomas and in failing to train Thomas in basic suicide risk assessment, identification, and prevention. *Id.* Lastly, Plaintiffs allege that Eyerly-Ball is liable for the acts or omissions of Thomas committed within the scope of his employment. *Id.* Plaintiffs cannot establish the prima facie elements of the claims asserted in Count V.

### A. Plaintiffs Cannot Establish a Claim for "Medical Negligence" Against Eyerly-Ball Because Neither Eyerly-Ball nor Thomas Provided Medical Care or Treatment to Payne

Individuals or entities having no involvement in providing medical care to the plaintiff cannot be held liable for medical negligence, which is a claim based on an injury to the plaintiff caused by a medical provider's breach of the applicable standard of care. To establish a prima facie case of medical negligence under Iowa law, a plaintiff must establish: (1) the applicable standard of care; (2) a breach of the applicable standard of care by the defendant; and (3) a causal connection between the defendant's breach and the plaintiff's claimed injury. *Oswald v. LeGrand*, 453 N.W.2d 634, 635 (Iowa 1990); *Daboll v. Hoden*, 222 N.W.2d 727, 734 (Iowa 1974).

With respect to the standard of care, "[a] physician owes a duty **to his patient** to exercise the ordinary knowledge and skill of his or her profession in a reasonable and careful manner **when undertaking the care and treatment of a patient**." *J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 260 (Iowa 1999) (*emphasis added*). "Doctors are held to such reasonable care and skill as is exercised by the ordinary physician of good standing under like circumstances." *Surgical Consultants, P.C. v. Ball,* 447 N.W.2d 676, 678 (Iowa Ct. App.1989). Similarly, a hospital must use the degree of skill, care, and learning ordinarily possessed and exercised by other hospitals in similar circumstances. *Dickinson v. Mailliard*,

175 N.W.2d 588, 596 (Iowa 1970); *Clites v. State*, 322 N.W.2d 917, 919 (Iowa Ct. App. 1982). The duty owed by a medical professional or medical facility to their patients arises from the contractual relationship entered into between the two. *See J.A.H. ex rel. R.M.H*, 589 N.W.2d at 260. Thus, the duty is based upon privity. *Id.*

Here, Thomas is not a physician or any other type of medical professional. Thomas is not a mental health professional who engages in evaluating and treating inmates' mental health issues. (Defs' SOF ¶ 11). At all times relevant to this matter, Defendant Scott Thomas was employed by Eyerly-Ball as a Jail Diversion Case Manager. *Id.* at ¶ 2. Thomas has a bachelor's degree in sociology and does not have any education or training as a medical professional. *Id.* at ¶ 19. As this Court found, "Thomas was not tasked with conducting mental health assessments and evaluations, nor was he qualified to administer a suicide risk assessment." (Order on Motions for Partial Summary Judgment, p. 5; Dkt. No. 87). Further, Thomas did not provide medical care or treatment to Payne and there was no physician-patient or other similar relationship between Thomas and Payne. Rather, Thomas simply conducted a screening interview of Payne and subsequently referred him to a psychiatrist at ITP. (Defs' SOF ¶¶ 29-36). Thus, because Thomas is not a medical provider and did not provide medical care or treatment to Payne, Thomas cannot be held to the standard of care of a reasonable medical provider under the circumstances. *See J.A.H. ex rel. R.M.H*, 589 N.W.2d at 260. Therefore, Eyerly-Ball cannot be held liable for medical negligence under a respondeat superior theory based on Thomas's conduct.

Nor can Eyerly-Ball be held liable for medical negligence based on its own alleged failure to exercise the degree of skill, care, and learning ordinarily possessed and exercised by

a medical facility in similar circumstances. Eyerly-Ball did not engage in providing medical care or treatment to Payne. Eyerly-Ball and its employees did not provide mental health services or treatment to inmates at the Madison County Jail. (Defs' SOF ¶ 38). The services provided to the Madison County Jail were limited to the Jail Diversion Program, which involves the coordination of mental health services through other providers, particularly after an inmate's release from jail. Eyerly-Ball does not provide mental health treatment or evaluations to inmates, but assists in coordinating services with Madison County and CIC's other contracted providers, including ITP. *Id.* at ¶ 39. As this Court has stated, "[t]he record reflects that mental health services for inmates at the Madison County Jail, such as psychiatric evaluations, were provided by Integrated Telehealth Partners ("ITP"). (Order on Motions for Partial Summary Judgment, p. 48; Dkt. No. 87). Because Eyerly-Ball in no way provided medical care or treatment to Payne and did not establish a patient-provider relationship with Payne, it cannot be held liable for medical negligence.

### B. Eyerly-Ball Did Not Have a Duty of Ordinary Care in Negligence to Assign a Licensed, Qualified Mental Health Professional to Conduct Mental Health Evaluations or Suicide Risk Assessments of Inmates at the Jail

Under Iowa law, "a lack of duty may be found if either the relationship between the parties or public considerations warrants such a conclusion." *DeSousa v. Iowa Realty Co.*, 975 N.W.2d 416, 420 (Iowa 2022). Here, the relationship between Eyerly-Ball and inmates at the jail and public policy considerations warrant the conclusion that Eyerly-Ball had no duty to send licensed mental health professionals to the jail to perform mental health evaluations and suicide risk assessments of inmates.

The record establishes that ITP, not Eyerly Ball, was responsible for providing services to jail inmates through licensed mental health professionals. Eyerly-Ball and its employees did not provide mental health services or treatment to inmates at the Madison County Jail. (Defs' SOF ¶ 38). The services provided to the Madison County Jail were limited to the Jail Diversion Program, which involves the coordination of mental health services through other providers, particularly after an inmate's release from jail. Eyerly-Ball does not provide mental health treatment or evaluations to inmates, but assists in coordinating services with Madison County and CIC's other contracted providers, including ITP. *Id.* at ¶ 39. ITP provides mental health services such as psychiatric evaluations to inmates at the Madison County Jail pursuant to contract. *Id.* at ¶ 40. As this Court has stated, "[t]he record reflects that mental health services for inmates at the Madison County Jail, such as psychiatric evaluations, were provided by Integrated Telehealth Partners ("ITP"). (Order on Motions for Partial Summary Judgment, p. 48; Dkt. No. 87).

In determining the existence of a duty, Iowa courts look to statutes, prior judicial rulings, and general legal principles. *Kolbe v. State,* 625 N.W.2d 721, 725 (Iowa 2001). No statute, case, or other legal principle imposes a duty upon an entity providing Jail Diversion services at a jail to assign licensed and qualified mental health professionals such as psychologists or psychiatrists to perform mental health evaluations or suicide risk assessments of jail inmates. Eyerly-Ball only performed Jail Diversion services at the jail and did not perform mental health evaluations or suicide risk assessments. Because Eyerly-Ball did not perform mental health evaluations or suicide risk assessments at the jail whatsoever, it had no duty to ensure that it provided licensed and qualified professionals to perform such

27

services. Further, Eyerly-Ball had no duty to provide such services at the jail in the first place given that licensed mental health professionals from ITP were available to provide such services to inmates.

### C. Plaintiffs Cannot Establish That Eyerly-Ball Was Negligent in Failing to Supervise or Train Thomas

As part of their negligence claim against Eyerly-Ball, Plaintiffs allege that Eyerly-Ball was negligent in its "failure to supervise Defendant Thomas" and "failure to train Defendant Thomas in basic suicide risk assessment, identification, and prevention." (Complaint, ¶ 119; Dkt. No. 1). Under Iowa law, "[a] person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless . . . in the employment of improper persons or instrumentalities in work involving risk of harm to others [or] in the supervision of the activity." *Godar v. Edwards*, 588 N.W.2d 701, 708 (Iowa 1999) (citing Restatement (Second) of Agency § 213 (1957)). "The tort of negligent hiring is based on the principle that a person conducting an activity through employees is subject to liability for harm resulting from conduct in the employment of improper persons involving risk of harm to others." *Id.* (citing 27 Am.Jur.2d *Employment Relationship* § 473, at 913 (1996)). Under Iowa law, "such a claim likewise includes an action for negligent retention and negligent supervision." *Id.* at 709. A negligent retention or supervision claim requires proof that an employer failed "to exercise ordinary care in supervising the employment relationship so as to prevent the foreseeable misconduct of an employee from causing harm to others." *Est. of Fields by Fields v. Shaw*, 954 N.W.2d 451, 457 (Iowa Ct. App. 2020). "At its core, this claim requires proof the employer reasonably should have foreseen the risk of harm to third parties." *Id.*

28

To prove negligent supervision, a plaintiff must show: (1) the employer knew, or in the exercise of ordinary care should have known, of its employee's unfitness at the time the employee engaged in wrongful or tortious conduct; (2) through the negligent supervision of the employee, the employee's incompetence, unfitness, or dangerous characteristics proximately caused injuries to the plaintiff; and (3) there is some employment or agency relationship between the employee and the defendant employer. *Est. of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 680 (Iowa 2004). Further, a claim of negligent supervision or training "must include as an element an underlying tort or wrongful act committed by the employee." *Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 53 (Iowa 1999).

First, Eyerly-Ball cannot be liable for negligently supervising or training Thomas because Plaintiffs cannot establish a viable underlying tort claim against Thomas. Because a claim of negligent supervision or training requires proof of an underlying tort committed by an employee, the Iowa Supreme Court has held that "an employer cannot be held liable for negligent supervision or training where the conduct that proper supervision and training would have avoided is not actionable against the employee." *Schoff*, 604 N.W.2d at 53. As discussed above in sections I and II, Plaintiffs cannot establish the duty or causation elements of their claims against Thomas. Therefore, Plaintiffs cannot establish a negligent training or supervision claim against Eyerly-Ball.

Second, with respect to Plaintiffs negligent supervision claim, there is no evidence that Thomas was unfit to serve as a Jail Diversion Case Manager at the time of his allegedly tortious conduct or that Eyerly-Ball knew or should have known of his unfitness. As stated, in order to prove negligent supervision, a plaintiff must show that the employer knew, or in

the exercise of ordinary care should have known, of its employee's unfitness at the time the employee engaged in wrongful or tortious conduct. *Est. of Harris*, 679 N.W.2d at 680.

Here, the record is devoid of any evidence that Thomas was unqualified or otherwise unfit to serve as a Jail Diversion Case Manager. The qualifications for the position of Jail Diversion Case Manager are a bachelor's degree in a human services, social sciences, or related field, as well as two years of experience in a human services field. (Defs' SOF ¶ 18). At the time Scott Thomas applied for the Jail Diversion Case Manager position with Eyerly-Ball in 2015, he had a Bachelor of Science degree in sociology and many years of experience in the human services field dating back to the 1990's. *Id.* at ¶ 19. Thus, there is no evidence that Thomas was unqualified to serve in the position he was hired for. Further, Plaintiffs have not alleged or produced evidence of any prior misconduct on the part of Thomas such that Eyerly-Ball knew or should have known that he possessed dangerous characteristics or was unfit to continue serving in his role. Accordingly, Plaintiffs cannot establish a genuine issue of material facts as to Thomas's unfitness or Eyerly-Ball's knowledge of his alleged unfitness. *See Jones v. Schneider Nat., Inc.*, 797 N.W.2d 611, 617 (Iowa Ct. App. 2011) (finding no genuine issue of material fact as to the plaintiff's negligent hiring claim where the plaintiff presented no evidence of a poor safety record or a lack of sufficient expertise and experience).

Lastly, with respect to Plaintiffs' negligent training claim, there is no evidence of the applicable standard of care with respect to training Jail Diversion Case Managers or that Eyery-Ball breached such a standard of care by failing to properly train Thomas for his position. "It is axiomatic that proof of the applicable standard of care and its breach are

required to recover in tort." *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 (Iowa 2016) (*citing Thompson v. Kaczinski,* 774 N.W.2d 829, 834 (Iowa 2009)). As discussed in *Alcala*, there must be evidence of an employer's standard of care for training its employees and evidence that such a standard was breached. *Id.* at 708. In that case, a plaintiff who fell on the defendant's icy sidewalk alleged that the defendant was negligent for failing to properly train its employees on deicing procedures. *Id.* at 701. However, as noted by the Iowa Supreme Court, "[n]o witness testified as to the standard of practice for training employees on deicing walkways or what employees *should be* taught on that subject." *Id.* at 702-703. Accordingly, the issue was whether the district court erred by submitting the negligent training theory without any testimony on the standard of care for training or its breach. *Id.* at 708. Finding that "[n]o expert or lay witness testified about *any* shortcoming in [defendant's] training or what training should be provided," the Court held that there was insufficient evidence to support a negligent training instruction or specification of negligence. *Id.* at 709.

Here, despite the fact that it was not within his job duties to conduct mental health evaluations or suicide risk assessments, Thomas did receive extensive training and instruction in the area of suicide prevention. According to Monica Van Horn, the director of Eyerly-Ball's Crisis Services Department that oversees the Jail Diversion Program, suicide prevention training is an annual requirement for continued employment with Eyerly-Ball for all employees. (Defs' SOF ¶ 20). Thomas received a Certificate of Completion indicating that he successfully completed the Eyerly-Ball Annual Training in 2018. *Id.* at ¶ 21. Additionally, Thomas successfully completed the Applied Suicide Intervention Skills Training (ASIST) workshop in 2019. *Id.* at ¶ 22. Further, in 2016, Thomas completed the requirements for the

Nonviolent Crisis Intervention Instructor Certification Program, which allowed him to instruct the Eyerly-Ball Staff on issues relating to crisis intervention. *Id.* at ¶ 23. In fact, Thomas was at one time a Master-Level Instructor for the Crisis Prevention Institute, which involves instruction on suicide prevention and intervening in suicide situations. *Id.* at ¶ 24-25.

Thus, Thomas is sufficiently trained with respect to suicide prevention, even though that is not within the scope of his job duties. Even if it was within Thomas's job duties to conduct mental health evaluations and suicide risk assessments, Plaintiffs have not presented any evidence of what Eyerly-Ball should have done differently with respect to training Thomas. Plaintiffs' Complaint raises the bare assertion that Eyerly-Ball "fail[ed] to train Defendant Thomas in basic suicide risk assessment, identification, and prevention." (Complaint, ¶ 119; Dkt. No. 1). As was the case in Alcala, "[n]o expert or lay witness testified about *any* shortcoming in [Eyerly-Ball's] training or what training should be provided" with respect to suicide prevention. *Alcala*, 880 N.W.2d at 709. Because Plaintiffs have not produced any testimony or other evidence of the standard of care for training Thomas or that Eyerly-Ball breached such a standard of care, Plaintiffs cannot raise a genuine issue of material fact as to their negligent training claim.

## IV.   PLAINTIFFS CANNOT ESTABLISH A CLAIM FOR PUNITIVE DAMAGES AGAINST THOMAS OR EYERLY-BALL

In their Complaint, Plaintiffs request punitive damages against Defendants Thomas and Eyerly-Ball. According to Plaintiffs, Defendants Thomas and Eyerly-Ball acted with a willful and wanton disregard for the rights and safety of Payne. (Compliant, ¶¶ 115, 120;

Dkt. No. 1). First, because Plaintiffs cannot establish a valid underlying claim against Thoams or Eyerly-Ball, Plaintiffs cannot recover punitive damages from these Defendants. Second, Plaintiffs cannot meet the high burden of establishing that Thomas or Eyerly-Ball acted willfully and wantonly.

### A. Plaintiffs Cannot Recover Punitive Damages Absent a Valid Underlying Claim

In order to recover punitive damages under Iowa law, Plaintiffs must establish "[w]hether, by a preponderance of clear, convincing, and satisfactory evidence, **the conduct of the defendant from which the claim arose** constituted willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1(1)(a) (*emphasis added*). Accordingly, punitive damages are merely incidental to the main cause of action. *Campbell v. Van Roekel*, 347 N.W.2d 406, 410 (Iowa 1984). Indeed, Iowa Code § 668A.1(1)(a) "contemplates the existence of an underlying claim, not a free-floating bid for punitive damages based on willful and wanton conduct." *Conner v. Decker*, 941 N.W.2d 355, 2019 WL 6358296, *5 (Iowa Ct. App. 2019). In other words, a claim for punitive damages "do[es] not constitute an independent cause of action." *Scott v. Gen. Cas. Ins. Co.*, 662 N.W.2d 373, 2003 WL 288959, *5 (Iowa Ct. App. 2003).

As discussed above, Plaintiff cannot raise a genuine issue of material fact as to their causes of action against Thomas and Eyerly-Ball. Accordingly, Plaintiffs' claims for punitive damages must be dismissed.

**B. Plaintiffs Cannot Establish That Thomas or Eyerly-Ball Acted With a Willful and Wanton Disregard for Payne's Rights or Safety**

In order to recover punitive damages under Iowa law, Plaintiffs must establish "[w]hether, by a preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1(1)(a). Such damages are appropriate only when actual or legal malice is shown. *McClure v. Walgreen Co.,* 613 N.W.2d 225, 231 (Iowa 2000); *Schultz v. Sec. Nat'l Bank,* 583 N.W.2d 886, 888 (Iowa 1998). Actual malice is characterized by such factors as personal spite, hatred, or ill will. *Schultz,* 583 N.W.2d at 888. Legal malice is shown by wrongful conduct committed or continued with a willful or reckless disregard for another's rights. *Id.* Willful and wanton in the context of Iowa Code section 668A means that "the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." *Kuta v. Newberg,* 600 N.W.2d 280, 288 (Iowa 1999) (citations omitted); *Fell v. Kewanee Farm Equip. Co.,* 457 N.W.2d 911, 919 (Iowa 1990). Conduct "may be reckless without being willful and wanton" as courts have required "evidence of a persistent course of conduct to show no care with disregard of consequences." *Miranda,* 836 N.W.2d at 34 (*quoting Vipond v. Jergensen,* 148 N.W.2d 598, 600-01 (1967)); *Cawthorn v. Catholic Health Initiatives Iowa Corp.,* 743 N.W.2d 525, 529 (Iowa 2007).

Merely objectionable conduct is insufficient to meet the standards of section 668A.1. *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines, Inc.,* 510 N.W.2d 153, 156 (Iowa 1993); *Beeman v. Manville Corp. Asbestos Disease Compensation Fund,* 496 N.W.2d 247,

255 (Iowa 1993). Likewise, negligent conduct is not sufficient. *Cawthorn v. Catholic Health Initiative Iowa Corp.,* 743 N.W.2d 525, 529 (Iowa 2007). Further, "[a]n award of punitive damages is not appropriate where room exists for reasonable disagreement over the relative risks and utilities of the conduct at issue." *Larson v. Great W. Cas. Co.*, 482 N.W.2d 170, 174 (Iowa Ct. App. 1992).

Here, this Court has already made significant findings of fact and conclusions of law, determining Thomas and Eyerly-Ball were *not* deliberately indifferent to Payne's risk of suicide. In doing so, the Court applied the standards applicable to deliberate indifference claims, which are substantially similar to the standards applicable to punitive damages claims. Both standards generally require evidence of a conscious disregard of a high risk to the plaintiff's safety. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (deliberate indifference requires a showing that the defendant "knows of and disregards an excessive risk to inmate health or safety . . ."); *Yellow Horse v. Pennington Cnty.*, 225 F.3d 923, 927 (8th Cir. 2000) (deliberate indifference can be established if the defendant "[knew] of and disregard[ed] an excessive risk to [plaintiff's] health or safety."); *Kuta*, 600 N.W.2d at 288 (willful and wanton conduct for purposes of punitive damages means that "the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences.").

Thus, while the standard required to prove deliberate indifference may be nominally higher than the standard required to prove willful and wanton conduct for purposes of punitive damages, the Court's previous findings are highly relevant to the punitive damages

Case 4:21-cv-00349-SMR-HCA   Document 98-2   Filed 07/01/24   Page 36 of 39

inquiry and dictate the conclusion that punitive damages are not warranted in this matter. Specifically, the Court found as a matter of law that Thomas was not deliberately indifferent in that he took affirmative steps to assist Payne following his screening interview, including scheduling a mental health appointment less than two hours after speaking with him. (Order on Motions for Partial Summary Judgment, p. 44; Dkt. No. 87). Thomas then contacted jail employees by phone and email to confirm that there would be staff to facilitate the appointment. *Id.* With respect to Thomas's alleged failure to adequately warn the jail staff about Payne's risk of suicide following the screening interview, the Court noted the following:

> As the Private Defendants correctly point out, Jordan told Thomas multiple times during his meeting that he was not going to kill himself in the jail. Jordan caveated these statements by adding that he was not sure about what he would do when released from jail. Thomas relayed these statements to Weakland at the conclusion of the meeting, which Plaintiffs do not dispute. However, Plaintiffs argue that Thomas was deliberately indifferent by sharing what Jordan told him, without providing additional details from the meeting.

> The failure to tell Weakland and other staff at the Madison County Jail about Jordan's other statements does not constitute deliberate indifference. Clearly, his assurances about not harming himself in jail were not credible and perhaps Thomas should have provided more information before departing. But as the Court has already discussed, the deliberate indifference standard is much higher than Thomas's alleged failure to share more information.

*Id.*

Based on the undisputed facts and the findings of the Court, it is clear that Thomas's conduct was at most negligent. There is simply no evidence that Thomas engaged in willful and wanton conduct amounting to a conscious disregard for Payne's rights or safety.

Because merely negligent conduct does not support an award of punitive damages, Plaintiffs' claim for punitive damages against Thomas must be dismissed. *Cawthorn,* 743 N.W.2d at 529.

With respect to the deliberate indifference claim against Eyerly-Ball, the Court provided the following discussion:

> **The Court cannot conclude that Eyerly-Ball was deliberately indifferent in its contact with Jordan during his time at the Madison County Jail**. Although Plaintiffs repeatedly assert that Eyerly-Ball had a contractual obligation to provide mental health services to the Madison County Jail, that does not establish a constitutional violation. The record reflects that mental health services for inmates at the Madison County Jail, such as psychiatric evaluations, were provided by Integrated Telehealth Partners ("TTP"). [ECF No. 46-2 at 24–26]. Plaintiffs' response is that "Eyerly-Ball is contracted to provide mental health services to Madison County. Any subcontract it enters into is still considered the action of Eyerly-Ball under their contractual obligations." [ECF No. 59-2 ¶ 41].
>
> This is unpersuasive. Plaintiffs argue that Eyerly-Ball was deliberately indifferent because Thomas was insufficiently qualified and trained to address the mental health needs of inmates at the Madison County Jail. They also apparently take the position that the constitutionality of Eyerly-Ball's policies may only be evaluated through Thomas. Plaintiffs do not address the fact that—subcontract or not—Eyerly-Ball would contact ITP when an inmate was in need of mental health services. There is no allegation by Plaintiffs that ITP staff was unqualified. **If Eyerly-Ball's policy for addressing inmate mental health needs was not reasonable, it was no more than negligent**. This again falls short of the constitutional standard for deliberate indifference.

(Order on Motions for Partial Summary Judgment, p. 48; Dkt. No. 87 (*emphasis added*).

Again, it is clear that Eyerly-Ball's conduct does not meet the high standard necessary to recover punitive damages and at the very most amounted to negligence. Indeed, the Court specifically found as much. Therefore, Plaintiffs' punitive damages claim against Eyerly-Ball must be dismissed. *Cawthorn,* 743 N.W.2d at 529.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, Defendants Eyerly-Ball and Thomas respectfully request that the Court grant their Motion for Summary Judgment and dismiss Counts IV, V, and VI of Plaintiffs' Petition, as well as grant any additional relief the Court deems just and proper.

　　　　　　　　　　　　　　　　　　　　　 _/s/ Joseph F. Moser_
　　　　　　　　　　　　　　　　　　Jack Hilmes　　　　　　(AT0003523)
　　　　　　　　　　　　　　　　　　Joseph F. Moser　　　　(AT0011413)
　　　　　　　　　　　　　　　　　　FINLEY LAW FIRM, P.C.
　　　　　　　　　　　　　　　　　　699 Walnut Street, Suite 1700
　　　　　　　　　　　　　　　　　　Des Moines, IA  50309
　　　　　　　　　　　　　　　　　　Telephone:  (515) 288-0145
　　　　　　　　　　　　　　　　　　Fax:  (515) 288-2724
　　　　　　　　　　　　　　　　　　E-mail:  jhilmes@finleylaw.com
　　　　　　　　　　　　　　　　　　　　　　　jmoser@finleylaw.com
　　　　　　　　　　　　　　　　　　ATTORNEYS FOR DEFENDANTS
　　　　　　　　　　　　　　　　　　EYERLY-BALL COMMUNITY MENTAL
　　　　　　　　　　　　　　　　　　HEALTH SERVICES and SCOTT THOMAS

Original filed.

Copy to:

Robert G. Rehkemper
Cory F. Gourley
440 Fairway Drive, Suite 210
West Des Moines, IA 50266
Telephone: (515) 226-0500
Email: rgrehkemper@grllaw.com
cfgourley@grllaw.com

Paul J. Statler
301 East Walnut Street, Suite 7
Des Moines, Iowa 50309
Telephone: 515.288.
Email: paul@statlerlaw.net
ATTORNEYS FOR PLAINTIFFS

Michael C. Richards

Katie E. Anderegg
DENTONS DAVIS BROWN PC
215 10th Street, Suite 1300
Des Moines, Iowa 50309
Telephone: (515) 288-2500
Fax: (515) 243-0654
Email: mike.richards@dentons.com
Email: katie.anderegg@dentons.com
ATTORNEYS FOR DEFENDANTS
JOHN WEAKLAND, JASON BARNES,
AND MADISON COUNTY, IOWA


CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing instrument was served upon one of the attorneys of record for all parties to the above-entitled cause by serving the same on such attorney at his/her respective address/fax number as disclosed by the pleadings of record herein, on June 24, 2024 by:

☐ U.S. Mail                    ☐ FAX
☐ Hand Delivered               ☐ UPS
☐ Federal Express              ☒ Electronic Filing
☐ Other _____

*/s/ Joseph F. Moser* _____