IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| KENT H. PAYNE, Individually and as the Administrator of the Estate of JORDAN KENT PAYNE, and LESLIE KING-PAYNE, Individually, <br><br>         Plaintiffs, <br><br>  vs. <br><br> JOHN WEAKLAND, JASON BARNES, MADISON CO., IOWA, EYERLY-BALL COMMUNITY MENTAL HEALTH SERVICE, and SCOTT THOMAS, <br><br>         Defendants. | Case No. 4:21-cv-00349 <br><br><br><br><br><br> PLAINTIFFS' STATEMENT OF DISPUTED FACTS IN RESISTANCE TO DEFENDANTS EYERLY-BALL COMMUNITY MENTAL HEALTH SERVICE AND SCOTT THOMAS'S SECOND MOTION FOR SUMMARY JUDGMENT |

**COME NOW** Plaintiffs, by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 56(b)(3), hereby provides the following Statement of Disputed Facts in Support of their Resistance to Defendants Eyerly-Ball Community Health Services and Scott Thomas's Second Motions for Summary Judgment:

1

### A.    The Parties.

1.    Jordan Payne ("Jordan"), the son of Plaintiffs Kent H. Payne and Leslie Payne, died after committing suicide by hanging in the Madison County Jail on June 12, 2020. (Autopsy Report, p. 2; App. A002)

2.    Jordan was booked into the Madison County Jail on June 9, 2020, to serve a thirty-day sentence for Contempt.  (Exhibit 4 – Booking Form; App.A003).

3.    During the booking process, Jordan answered "yes" to the following questions:

12. Mental illness? Yes;
13. Been hospitalized in last 12 months? Yes;
26. Ever tried to hurt yourself? Yes;
27. Ever tried to kill yourself? Yes;
29. Family member/friend attempted suicide? Yes; and
30. Any reason why not be jailed? Yes.

(Exhibit 4, Booking Questionnaire, App A005).

4.    Jason Barnes ("Barnes") is currently and has been the duly elected Madison County Sheriff since 2014.  (Barnes depo, pp. 4, 11-15; App. A110.).

5.    Steve Niblo is and was the Jail Administrator on June 9 through 12, 2020 and oversaw the day-to-day operations of the jail since taking that position in 2015. (Barnes Depo, pp. 12, line 12-15 and pp. 13-lines 13-16: App. A112, A113).

6.    Jail Administrator Niblo ran the jail.  (Barnes depo, p. 17, lines 19-21; App. A114)

7.   Jailer John Weakland ("Weakland") and Dispatcher Angela Henry ("Henry") were on duty on July 12, 2020, at the Madison County Jail.  (Exhibit 17; Barnes depo, p. 43, lines 11-17; App. A182, A115)

8.   Weakland was the designated jailer on June 12, 2020. (Barnes Depo, *Id.*).

9.   Defendant, Eyerly Ball Community Mental Health Services ("Eyerly-Ball"), was the contracted mental health provider for the Madison County Jail. (Barns Depo, p. 82, lines 12-20; Central Iowa Community Services Provider and Program Participation Agreement, EB27-39; App. A119, A041);

10. Defendant, Scott Thomas ("Thomas"), was employed by Eyerly-Ball (Thomas Depo, pp. 27-28, lines 21 – 01; App. A076-A077).

11. Thomas was the only individual that would provide mental health services at the Madison County Jail.  (Barnes Depo., pp. 103-104, lines 19-04; App. A125-A126).

12. Thomas' employment with Eyerly-Ball took him to the Madison County Jail where he met with Jordan Payne on June 12, 2020. (Thomas depo, p. 60, lines 1-3; App. A092).

**B.    The Harm to Be Avoided.**

13. Suicide has been the leading cause of correctional institution deaths every year since 2000.  https://bjs.ojp.gov/content/pub/pdf/mlj0016st.pdf

3

14.   Suffocation, including hanging and self-strangulation accounted for nearly 90% of suicide deaths in local jails.

(https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/sljsfp0019st.pdf, p. 1)

15.   Suicide was the leading cause of death in the Madison County Jail. (Barnes depo, p. 59-60, 63; App. A116-A117 ).

**C.     Eyerly-Ball's Contract with Madison County to Provide Mental Health Services.**

16.   Eyerly-Ball is a community health center that provides mental health services in twenty counties in Iowa. (Van Horn depo, pp. 8, lines 14-17; App. A132).

17.   Eyerly-Ball is in the business of providing mental health care services. (Van Horn depo, p. 27, lines 6-8; App. A141).

18.   Madison County is a member of the Central Iowa Community Services ("CICS") (Van Horn Depo, p. 24, lines 7-11; App. A139).

19.   A function of CICS is to coordinate services between the mental health system and the judicial system by facilitating and developing protocols for identifying county jail inmates needing mental health treatment and to secure such treatment for those individuals.  (Eyerly-Ball Response to Plaintiffs' Request for Production of Documents, CICS contract, EB28-E29, EB47, CICS FY 2020 Management Plan EB 67, EB75; App.A164-A168, A059, A060, A062)

4

20.   Such services include providing mental health services in jail including "evaluation, medication management and therapy services." (CICS FY2020 Management Plan, EB75; App. A062)

21.   Pursuant to that charge, CICS, on behalf of Madison County and other participating counties, contracted with Eyerly-Ball to be the "qualified provider" for mental health services in the Madison County Jail as that term is defined in Chapter 24 of the Iowa Administrative Code. (CICS Contract, EB27-29; CICS FY2024 Management Plan, p. EB81; App. A041-A043, A064 .)

22.   Pursuant to their contract with CICS, Eyerly-Ball was obligated to provide services which included "Jail Diversion/Intensive Case Management – Madison County," "Therapy Evaluation," "Psychiatric Evaluation, "Mobile Crisis Response Service," (CICS Contract, EB27, 28; Attachment A, EB29, EB35-36; App. A041-A042, A043, A049-A050)

23.   Madison County and specifically Madison County Sheriff's Office is covered by the mobile crisis response service provided by Eyerly-Ball.  (Thomas depo., pp 36-37, lines 06 – 09; App. A078-A079)

24.   Eyerly-Ball was also contracted to provide the services enumerated in the Regional Management Plan developed pursuant to Iowa Code section 331.393 [Renumbered to Iowa Code § 225C.60 by 2023 Acts, ch 140, §15(1)(f), effective

July 1, 2023], as approved by the Director of the Department of Human Services. (*Id.*, EB28; App. A042).

25.  "Core Services" to be provided by Eyerly-Ball under the Regional Management Plan to the covered counties, including Madison County, included "[m]ental health services in jails" and "Basic Crisis Response." (*Id.* EB68, EB75; App. A061, A062)

26.  "Mental health services in jails under the Regional Management Plan included "[e]valuation, medication management and therapy services."  (*Id.*).

27.  The Plan also covered "Crisis prevention training" which encompasses "Educational and Training services, Safety training for law enforcement, first responders, etc., regarding mental health awareness such as Crisis Intervention Training (CIT)." *Id.*

28.  Pursuant to Eyerly-Ball CICS Agreement, "[t]he relationship between CICS and Provider is solely that of independent contractors." (CICS Contract, EB31; App. A045).

29.   The term of the contract between CICS and Eyerly-Ball was for a term of one (1) year, and the Agreement provides several provisions relating to the termination rights of CICS and Eyerly-Ball.  (CICS Contract, EB32-33; App. A046-A047).

30.   Additionally, pursuant to said Agreement, Eyerly-Ball was required to carry professional liability and comprehensive general liability insurance, at its own expense. (CICS Contract, EB31; App. A045).

31.   Pursuant to their Agreement with CICS, Eyerly-Ball was compensated a flat fee of $6,147.00 monthly for "Jail Diversion/Intensive Case Management Services in Madison County Jail." (CICS Contract, EB37; Client Account Summary Record, EB 92-94; App. A051, A184).

32.   Eyerly-Ball was compensated $78,059.68 for services provided between January 1, 2020, and December 31, 2020. (*Id.*)

33.   Eyerly-Ball was the designated and contracted CICS mental health provider at the Madison County Jail on June 12, 2020. (Penn Sup., p. 2, ¶1(a)-(b); App. A224).

34.   As the contracted CICS mental health provider at the Madison County Jail, Eyerly-Ball had a duty and obligation to provide timely crisis services and crisis psychiatric evaluations to inmates.  (Penn Sup., p. 3, ¶ (1)(c); App. A225).

**D.    Thomas' Role with Eyerly Ball**

35.Thomas was employed by Eyerly-Ball on June 12, 2020, as a "Jail Diversion Case Manager." (Thomas Depo, pp. 27-28, lines 21 – 01; App. A076-A077).

36. The written job description for "Jail Diversion Case Manager" identified the following relevant essential Functions/Responsibilities:

- Meets with incarcerated individuals at county jails at request of law enforcement personnel; assists inmates in obtaining referrals to mental health services; *assists mental health professionals in determining physical and mental health and substance abuse care needs of inmates*. (emphasis added) (Dep. Exhibit 6, p. 1; Thomas depo, p. 38, lines 1 – 15; EB App. 047)

- Either through post-incarceration services or through referrals from County Mental Health Services, determines appropriate provider of services, assists client in applying for services, ***provides direct client services until client is able to begin services with the referral source***, *assists with the development of a client crisis plan*… (emphasis added) (Depo Exhibit 6, p. 1, EB App. 047)

- Responds to calls from law enforcement personnel related to mental health issues, ***assists in the development of client crisis plans;*** refers individuals to appropriate mental health services; provides follow-up with client as needed. (emphasis added)

(Depo Exhibit 6, p. 1; EB App. 047) (Emphasis added).

37. Pursuant to the Job Description, Thomas was also required to complete "all annual education and competency requirements as required." (Depo Exhibit 6, p. 2; EB App. 048).

38. According to Thomas' immediate supervisor, Monica Van Horn ("Van Horn"), Thomas' job description required him to meet with inmates in the jail and "screen for any current presentations of mental health symptoms to see if they

needed mental health care while in jail." (Van Horn Depo., p. 25, lines 3-10; App. A140)

39.   Thomas' role was to ask questions to find out "what's going on presently" which Van Horn explained included "seeing kind of what is going with folks in terms of current distress levels and different presentation of maybe depressive symptoms, anxiety symptoms, things like that."  (Van Horn Depo., p. 27, lines 13-24; App. A141).

40.   Thomas describes his job responsibilities to include: "*to screen individuals for possible mental health concerns* and discuss options for services and then refer to services."  (emphasis added) (Thomas depo, p. 28, lines 4-6; App. A077).

41.   He has explained: "It's, it's a routine part of my job to come to this jail on a regular basis to meet with all inmates that stay here more than a day or two to do a mental health scree, and to assess them for needs for services."  (Thomas June 12, 2020, Interview, p. 2 lines 15-18; App. A105.)

42.   When asked by an investigator what he did for the screening, Thomas responded in part: "I do a, what I typically use is a brief jail mental health screen on an individual which consists of eight basic questions … So, I do the basic screen with them to, to assess whether there is any type of a need or a concern there."  (Thomas June 12, 2020, Interview, p. 3 lines 6-8 and 13-15; App. A106 )

43.   For inmates at the Madison County Jail to obtain any mental health services, they had to go through Thomas first.  (Thomas depo, p. 52, lines 18-21; App. A087)

44.   Thomas has a bachelor's degree in sociology.  (Thomas depo, p. 8, lines 1-2; App. A069).

45.   Thomas does not hold any professional certifications or licenses of any kind.  (Thomas depo. p. 9, lines 19-24; App. A070).

46.   According to Van Horn, Thomas could perform a Columbia Suicide Screening which is a screening tool for suicide risk.  (Van Horn depo., p. 31, lines 14-17; App. A144).

**E.     Madison County Reliance on Eyerly Ball and Thomas**

47.   Pursuant to their Agreement with CICS, Eyerly-Ball was obligated to ensure that "[a]t all times, Provider and the providers it employes or contracts with to provide services to CICS individuals shall have all necessary licenses and certifications to perform the Covered Services." (CICS Contract, EB30; App. A044).

48.   Although Thomas was not licensed as a mental health professional of any kind, Thomas was the sole provider for mental health care and sole Eyerly-Ball employee to see inmates at Madison County Jail. (Barnes depo, pp. 103-104, lines 19 – 04; App. A125-A126)

10

49.  If Madison County had an inmate in their jail that was having a mental crisis or an issue or needed assistance of some type mentally, Madison County could contact Eyerly-Ball.  (Barns Depo, p. 94, lines 14-18; App. A120).

50.  When mental health assistance was requested by Madison County, Eyerly-Ball would send Scott Thomas. (Barns Depo, p. 94, line 17; App. A120).

51.  Barnes understood that Eyerly-Ball was there to help inmates who were having mental health crises.  (Barnes Depo, p. 98, lines 9-11; App. A121).

52.  Barnes and Madison County Jail relied on Eyerly-Ball as it related to mental health of inmates.  (Barnes Depo., p. 100, lines 20-25; App. A122).

53.  When Madison County would call Eyerly-Ball it was Jail Administrator Niblo's understanding that Thomas and Eyerly-Ball would "provide mental health services."  (Niblo depo, p. 43, lines 22-25; App. A161).

54.  Madison County would comply with any professional recommendations related to the mental health of an inmate provided by Eyerly-Ball. (Barnes Depo., p. 101, lines 3-7 &14; App. A123).

55.  When Madison County contacted Eyerly-Ball with a mental health need, they would send Scott Thomas to assist.  (Barns Depo., p. 103, lines 19-22; App. A126)

56.  It was Barnes' understanding that when a mental health need arose and Eyerly-Ball was contacted, Thomas would "come in and meet with the inmate, and

then they would make a determination what the best move is from this point on."
(Barnes Depo., p. 104, lines 7-10; App. A127).

57.   Barnes was led to believe that Thomas was in a position to evaluate or
at least make a preliminary assessment of the inmates' mental health conditions
and suicide risk.  (Barnes Depo., p. 104, lines 11-15; App. A127).

58.   Thomas would screen inmates, including Jordan Payne's "mental
state."  (Niblo depo, p. 39, lines 15-16; App. A160).

59.   According to Weakland, Eyerly-Ball was "our contact for any mental
health problems."  (Weakland depo, p. 25-26, lines 025-02; App. A150-A151).

60.   Weakland understood Thomas' role to be evaluating Jordan Payne's
"mental health."  (Weakland depo, p. 27, lines 12-18; App. A152).

61.   If Thomas identified concerning behaviors or statements, especially
those considered to be elevated risk factors for suicide, Barnes expected those
concerns to be communicated to him and jail staff.  (Barnes Depo., p. 105, lines
10-14; App. A128).

62.   Barnes expected Thomas to communicate to him and his jail staff if he
identified any concerning behaviors or statements that could be considered
elevated risk factors for Jordan.  (Barnes depo, p. 105, lines 15-23, p. 106, lines 14-
20; App. A128-A129).

63.   Having Eyerly-Ball as a contracted mental health provider, Barnes expected effective communication back from Eyerly-Ball. (Barnes Depo., p. 106, lines 10-13; App. A129).

64.   Such communication was part of Madison County's agreement with Eyerly-Ball. (Barnes Depo., pp. 105-106; App. A128-A129).

65.   If an Eyerly-Ball employee identified an inmate as an elevated suicide risk, Barnes expected them to share that information with him so that he could do his best to keep that inmate safe.  (Barnes Depo., p. 106, lines 14-24; App. A129)

66.   Barnes recognized that it is hard to take action to protect an inmate if that information is withheld.  (Barnes Depo, p. 106-107, lines 25-03; App.A129-A130)

67.   If alerted to an inmates elevated suicide risk, Madison County would place the inmate under direct observation and take away anything that they could hurt themselves with. (Barnes Depo, p. 108, lines 2-9, and 19-22; App. A131)

**F.    Professional Standard of Care.**

68.   Plaintiffs have designated Dr. Joseph V. Penn, MD CCHP FAPA, a physician who is Board Certified in General Psychiatry, Forensic Psychiatry, Child and Adolescent Psychiatry and who is a Diplomate with the American Board of Psychiatry and Neurology as an expert who will opine on the standard of care for the medical and mental health care providers, Scott Thomas and Eyerly-Ball's

13

failure to comply with the basic minimum standards of care as it relates to Jordan and the causal connection between Thomas and Eyerly-Balls' failure to comply with the applicable standards and the resulting preventable death of Jordan. (Plaintiffs Designation of Experts, p. 2, App. A189)

69.   Dr. Penn is the Director of Mental Health Services for University of Texas Medical Branch, Correctional Managed Care and is also a Clinical Professor of Psychiatry in the Department of Psychiatry and Behavioral Sciences, at the UTMB Medical School in Galveston Texas.  (Penn CV, p. 3; App. A197).

70.   Within his position as the Director of Mental Health Services for UTMB Correctional Managed Care, Dr. Penn oversees the provision of psychiatric, psychological and mental health services of approximately 80% of the entire Texas state jail and state adult prison populations house within the Texas Department of Criminal Justice facilities. (Penn Initial Report, p. 2; EB App., 092)

71.   According to Dr. Penn, "[t]he standard of care for the evaluation and treatment of a patient such as Jordan Payne in a jail setting is timely access to quality mental health treatment and services and suicide prevention practices for custody and health care staff."  (Penn Initial Report, p. 29, ¶ 1; EB App., 119).

72.   Dr. Penn further explained the standard of care that "whether a county jail directly provides medical or mental health services, or as in Madison County Jail, where the jail contracted with an outside community mental provider for

mental health services (e.g., Eyerly Ball) – it is the standard of care that timely

mental health evaluation and screening be available and provided." (Plaintiffs'

Second Supplemental Initial Disclosures, Attachment E, Penn Sup. p. 4, ¶ 3; App.

A224).

73.   According to the National Commission on Correctional Health Care

(NCCHC) Jail Standards all custody and health care staff should receive ongoing

education on suicide prevention practices. (Penn Sup. P. 6, ¶ 9; App. A228).

74.   "[W]hether Eyerly Ball did nor did not render "mental health treatment

or evaluations," as mental health system and professionals they had a professional

and ethical duty to take additional precautions prior to any clinical involvement

with any Madison County jail inmate. In particular they had a duty to instruct,

train and explain to their case manager/jail diversion staff that they had an ethical

and clinical duty to communicate in a timely manner at all times with jail staff, the

appropriate course of action to safely deal with any inmates who they learned of or

during the course of any meeting had suicide risk, suicidal ideation, intent or plan,

or posed any acute or non-acute risk of self-harm." (Penn Supp, p. 7; App. A230).

75.   As the contracted mental health provider, Eyerly Ball was obligated to

make it clear to Madison County Jail staff that Thomas was not qualified and did

not and will not perform mental health evaluations or assessments or evaluate

inmates for potential suicide concerns. They were obligated to make it explicitly

clear that his role was solely for case management and jail diversion purposes. (Penn Sup. p. 7, ¶12; App. A230)

76.   "[A]t a minimum, given Scott Thomas' role as being the only individual from Eyerly Ball to set foot in the Madison County Jail, and his admission to at least assessing individuals for determination of potentially appropriate services, and due to the well-known risk of suicide attempts and completed suicide within correctional settings, and in particular in jail settings, Mr. Thomas should have received mandatory and ongoing training on basic suicide prevention practices and procedures." (Penn Sup. p. 8; App. 231).

77.   "[A]ny individual who carries out any ongoing or substantive work in a jail that interacts with inmates should receive/be trained in basic suicide prevention practices/procedures.  This important public health and safety initiative is also clearly stated and emphasized in the State of Iowa Administrative Code…" (Penn Sup. p. 8; App. 231).

78.   "Eyerly Ball should have had the ability to facilitate having a qualified and licensed mental health professional respond to the Madison County Jail in a more timely manner and to evaluate Mr. Payne.  In summary, Scott Thomas was the only person ever to come to the Jail – Mr. Payne clearly required the skill set, qualifications and expertise of a qualified mental professional.  In my professional opinion, Eyerly Ball should have maintained more timely crisis/emergency clinical

services to facilitate an emergency mental health evaluation by a qualified mental health professional without requiring an initial meeting with Mr. Thomas." (Penn Sup., p. 5; App. 228)

79.   "Eyerly Ball as Mr. Thomas' employer should have set expectations by policies, procedures and practices that Mr. Thomas and other similarly situated case managers/jail diversion staff be appropriately trained, receive additional new employee and annual or similar established frequency training and therefore be better trained and qualified to identify recognized suicide risk factors (that elevate a jail inmates risk of suicide) and be trained on how to assess, evaluate, manage and how to communicate and work more effectively with jail/custody staff to reduce suicide risks." (Penn Sup., p. 6 ¶ 8; App. 229)

80.   Thomas should have been trained and received supervision by Eyerly Ball staff and leadership to NOT make statements that an inmate "will be ok" or that he was otherwise NOT a suicide risk when he was not qualified to make such determinations. (Penn Sup., p. 8 ¶¶ 14 & 15; App. 231).

81.   Even if Thomas was, as Eyerly Ball contends, only providing Jail Diversion and /or Intensive Case Management services, "Eyerly Ball was still under an existing contract and understanding with Madison County Jail and Sheriff's Department and had a duty and obligation to provide timely crisis services and a crisis psychiatric evaluation. The Madison County Sheriff's

Department relied on the recommendations from Mr. Scott Thomas regarding his mental health needs and custody supervision to protect him from self—harm and suicide." (Penn Sup Rpt., p. 3 ¶ 1(c); App. A226)

### G.     Eyerly-Ball Failure to Train Thomas

82.     Eyerly-Ball's certification with CARF International requires employees to receive annual specific training related to suicide prevention or intervention. (Van Horn depo, p. 17, lines 20-25 & p.18, lines 1-14; App. A138 – A139).

83.     While Eyerly-Ball was contracted to provide mental health services to incarcerated inmates, Monica Van Horn, director of Eyerly-Balls crisis service department under which the jail diversion programs fall, did not have any knowledge regarding statistics related to inmate suicides. (Van Horn depo, pp. 9, lines 5-9 & p.28, lines 9-13; App. A134, A143).

84.     Eyerly-Ball as a community mental health provider appreciates the risk of suicide and further understands that it is important for everyone to be aware of risk factors for suicide. (Van Horn Depo, pp. 13-14, lines 21-04; App. A135-A136).

85.     Van Horn was aware that suicide is the ninth leading cause of death in Iowa but was unaware that it is the leading cause of death in correctional institutions. (Van Horn depo, p.28, lines 19-24; App. A143).

18

86.    Despite the statistics, Van Horn, as the supervisor of the Eyerly-Ball jail diversion programs did not believe it was important for Thomas to have an understanding of the peculiar risk factors of suicide that are applicable to incarcerated individuals. (Van Horn depo, pp. 30-31, lines 10-03; App. 144-145).

87.    Van Horn denied that knowledge of those risk factors by Thomas would change what he does.  (Van Horn depo, p. 30 & 31, lines 23-03; App. A144 - A145).

88.    Van Horn considers the National Alliance for Mental Illness a governmental agency or authority that would be a reliable source in identifying and describing recognized factors that increase a person's risk of suicide.  (Van Horn Depo, p. 16, lines 5-15; App. A137).

89.    For suicide prevention, the quicker concerns are addressed the better. (Van Horn Depo, p. 17, lines 13-15; App. A138).

90.    Early identification or diagnosis is a focal point of suicide prevention. (Van Horn depo, p. 17, lines 16-19; App. A138).

91.    Despite Eyerly-Ball's services verbalized concern with suicide prevention and intervention, Thomas has not received any training related to identifying individuals who may be at greater risk of suicide. (Thomas depo, p. 26, lines 8 – 10; App. A075).

92.    Thomas' precise sworn testimony was as follows:

Q.   (By Mr. Rehkemper)  Has Eyerly Ball ever provided you with any
      specific training related to identification of individuals who may be at
      greater risk of suicide?
A.   I don't recall having that kind of training.
Q.   Have you ever received any of that type of training from any other entity
      or agency?
A.   Can you say the parameters again, please?
Q.   Any training related to identifying individuals who may be at greater risk
      of suicide?
A.   I don't recall anything specific.

(Thomas depo, pp. 25-26, lines 24 – 04; App. A074-A075).

93.   Thomas had not received any training, certifications, or instruction,

prior to June 12, 2020, related to individual, relationship, community, or societal

factors that are recognized as increasing an individual's risk of self-harm and/or

suicide.  (Scott Thomas Answer to Interrogatory 6; App. A179).

94.   Neither Eyerly-Ball nor Thomas have produced in discovery, any

documentation or materials for any training Thomas received while employed at

Eyerly-Ball.  (Thomas & Eyerly-Ball's Response to Plaintiffs' First Request for

Production of Documents, No. 5; App. A167).

95.   Thomas was never asked or required to familiarize himself with

Madison County Jail standard operating procedures.  (Thomas depo, p. 51, lines 10

– 13; App. A086).

96.   Thomas was not required to familiarize himself with Madison County's

written suicide prevention plan.  (Thomas depo, p. 51, lines 14-17; App. A086).

97.   Thomas does not hold any professional certifications or licenses specific to the field of mental health or human services.  (Thomas depo, pp. 9-10, lines 25 – 03; App. A070-A071).

98.   Thomas is not a licensed mental health provider. (Thomas depo, p. 42, lines 3-5; App. A081).

99.   Thomas is not qualified to provide or administer a suicide risk assessment.  (Thomas depo, p. 53, lines 16 – 18; App. A088).

100. Thomas does not even know what a suicide assessment looks like. (Thomas depo, p. 53, lines 19 – 21; App. A088).

101. Prior to June 12, 2020, Eyerly-Ball did not have any standard operating procedures or protocols related to mental health services provided to inmates in county jails. (Thomas & Eyerly-Ball's Response to Plaintiffs' First Request for Production of Documents, No. 2; App. A166).

102. Prior to June 12, 2020, Eyerly-Ball did not have any policies or procedures related to crisis response, suicide assessments or mental health evaluations and interventions of inmates of county jails.  (Thomas & Eyerly-Ball's Response to Plaintiffs' First Request for Production of Documents, no. 6; App. A167-A168).

103. Monica Van Horn had not trained Scott Thomas at the time of his interaction with Jordan.  (Van Horn depo, p. 39, lines 4-5; App. A148).

104. Thomas is admittedly not qualified to conduct suicide risk assessments or provide mental health services to inmates. (Thomas depo, p. 53, lines 13-18; App. A087).

### H.   Thomas' Interaction With Jordan

105.  At some point on June 11, 2020, Jordan made a request to speak to mental health services which was communicated to Thomas and Eyerly-Ball at approximately 2:10 p.m. on June 11, 2020. (Scott Thomas e-mails with Madison County, EB26; App. A183)

106. At 11:37 on June 12, 2020, Leslie Payne, Jordan's mother, placed a telephone call to the Madison County Sheriff's Department and spoke to Linda Barker, reporting that Jordan Payne was "going nuts" and was threating to "chew the veins out of his arm." (Leslie Phone Call Audio; App. A066)

107.  At 12:21:45, Weakland brought Jordan his medication and asked if he was "ok."  Jordan made the following statements:

- "I need to talk to a doctor and it would be better." (12:21:49)

- "I'm just losing it in here." (12:22:04)

- "I'm doing alright, my head is just not right." (12:22:16)

(Jail Check Video; App. A007).

108. As a result of concerns for Jordan's mental health, Weaklend set up an appointment for Jordan to see Thomas with Eyerly-Ball.  (Weakland Depo, p. 25, lines 25-02; p. 26, lines 12-21; App. A150, A151)

109. At 1:30:56, Jordan is removed from his cell and escorted to the Multi-Purpose room by Weakland to meet with Thomas. (Jail Check Video @ 1:30:56; App. A007; Weakland depo, pp. 26, lines 22-25; App. A151).

110. When Thomas arrived at the Madison County Jail, Jordan was in an acute mental health crisis and care attendant to the seriousness of that crisis was required. (Penn Report, p. 31; EB App. 121).

111. When Thomas arrived at the Madison County Jail, Weakland informed Thomas of the medications Jordan was taking and nothing more.  (Thomas depo, p. 57, lines 2 – 13; App. A090).

112. According to Thomas: "I knew before I went in to meet with him that he was on psychiatric medications… I already know, when I walked in there, that he had mental health concerns, and he was on psychiatric medications."  (Thomas June 12, 2020, Interview, p. 4, lines 2-10; App. A107)

113. Thomas was aware prior to meeting him that Jordan had specifically requested his services the previous day but chose to wait until the following day when he was already planning to be at the Madison County Jail.  (Thomas depo, p. 59, lines 11-25; App. A091).

114. Thomas did not request nor receive any additional information from the Jail such as the information Jordan provided to the jail upon his booking. (Thomas depo, p. 56, lines 11-20; App. A089).

115. Thomas met with Jordan in the Multi-Purpose room of the Madison County Jail. (Thomas depo, p. 60, lines 12 -13; App. A092).

116. Jordan entered the multi-Purpose room at 1:31:22. (Multi-Purpose Room Video, App. A008).

117. Thomas made the following introduction:

> "I'm Scott from Eyerly-Ball, have you ever heard of Eyerly-Ball before? … We are a mental health agency… What we do is meet with folks who are in jail here, see if there are any mental health concerns that they have …. We see if they have any mental health concerns…"

(Multi-Purpose Room Video @ 1:31:38 – 1:32:12; Transcript – Multi Purpose Room, pp. 3-4; App. A008, A011-A012).

118. During the initial portion of their meeting, Jordan made the following statements:

- I've lost everything. I've lost my girlfriend, I've lost my house I was going to get, my jeep, I'm going to be homeless when I'm out of here so I'm not doing so well at all. (1:32:40, p. 5, lines 1-4)

- I'm losing everything out there. (1:33:19, p. 5, line 19)

- I gave myself a black eye because I'm hearing these fucking things in my head telling me all sorts of stupid shit, and I'm not trying to listen to it. (1:33:23, p. 5, lines 20-23)

- I'm not in good shape right now. (1:33:34, p. 6, line 3)

24

- I got my girlfriend just now that thinks I'm cheating on her.  (1:33:36, p. 6 lines 5-6)

- I went to prison and built myself back up and now I'm not doing so well. I'm not doing great.  (1:33:47, p. 6, lines 8-10)

- I got no TV and I'm stuck in a room for weeks, nothing.  I mean I got no no roommate, I got no tv. I got a phone doesn't work. (1:34:09, p. 6, lines 13-16)

- Well, hey, I've got a broken [inaudible] ankle, I've got a broken tailbone too. (1:34:58, p. 7, lines 11-13)

- I'm not normally this way, I don't know what the hell is wrong with me, Scott.  I'm not this way at all. (1:35:22, p. 7, lines 23-25)

- I've got one of those Chirp things that you can text back and forth with outside and stuff.  Yeah, right now my girlfriend thinks I cheated on her four weeks ago so I know that's gone. (1:36:19, p. 9, lines 2-9)

- Like, I'm getting these thoughts in my head and shit like that, and the only person I got to talk to was her and all that shit, and I'm afraid that she might just call up here and say, you know, put him on suicide watch and all that shit.  I don't [inaudible]. But I got these thoughts in my head that are like: Chew my veins out.  I mean, shit like that.  Like I don't want these thoughts in my head.  (1:36:30, p. 9, lines 6-17)

- Well, I wouldn't say completely sober.  I smoke weed. I smoke that -- religiously. (1:37:18, p. 10, lines 4-8)

- I went to prison for slitting my wrists (inaudible) called the cops on me. (1:37:56, p. 10, lines 22-23)

119.  Less than ten minutes into their conversation, Jordan asked Thomas if what he told him was confidential.  Thomas assured Jordan that anything Jordan told was confidential and could not be shared with anybody absent a lawfully

issued subpoena.  (Multi-Purpose Room Video @ 11:40:12, pp. 12-13, lines 23-13;

App. A008, A021-A022).

120.   Thomas' promise of confidentiality was sealed with a fist-bump and

upon securing a promise of confidentiality, Jordan preceded to share the following:

- I've had like seven suicide attempts in the last year, I lost my kids, I lost everything. I'm not going to kill myself here, but I can't guarantee I won't kill myself when I leave here. (1:40:27, p. 13, lines 15-19)

- I got nothing left anymore, and I don't know – I mean, I can't sleep.  I can't – There's nothing I can do.  I'm sitting here, and just I'm thinking, and I'm hearing shit, and this wont go away, hence the black eye. (1:40:38, p. 13, lines 20-24)

- I'm [inaudible] to kill myself here.  I don't want to.  I'm not going to [inaudible] that … I don't want to kill myself in general [slamming the table], I'm sorry. (1:41:05, p. 14, lines 2-7)

- I'm going insane in there. (1:41:20)

- After I slit my wrist, they brought me here instead of taking me to the hospital … and they chained me to the bed with my bloody wrists. (1:42:20, p. 15, lines 4-8)

- I'm pretty much in solitary confinement, and I did nothing wrong.  I just got here on m-, m-, -- Tuesday. (1:42:40, p. 15, lines 9-12)

- I haven't ate anything. I won't eat anything.  I'm afraid [inaudible] the food.  I haven't ate one meal since I've been here.  (1:42:44, p. 15, lines 9-14)

  **Thomas responded** – "That's what John was saying, he was worried you hadn't been eating. He thought maybe you were eating when he wasn't around." (1:42:55)

- I can calm myself down, I just can't keep it calm, does that make sense? (1:44:00, p. 16, lines 9-10)

- Then [inaudible] started fucking slapping myself or start hitting myself.  I didn't do this before.  What the fudge is happening to me?  I'm going insane? (1:44:14; p. 16 Lines 13-16)

- Is it bad? [referring to black eye] Thomas responds, "it's a little purple." (1:48:52, p. 20, line 19)

- I've never done it before, but I just want it to stop. Have you ever had a thought to, like, chew your own veins out of your frickin hand -- or arm? (1:48:54, p. 20, lines 20-23)

- And neither have I. Neither have I.  Until now. What the shit?  It's just insane [inaudible] crazy in there.  (1:49:08, p. 21, lines 1-3)

(Multi-Purpose Room Video @ 1:40:12 – 1:49:14, App. A008).

121. Jordan's speech was fast, rambling and he was visually and auditorily agitated and animated throughout his conversation with Thomas. (Multi-Purpose Room Video, App. A008).

122. Thomas identified that Jordan appeared agitated and animated during their meeting. (Thomas depo, p. 64, lines 6 – 11; App. A093).

123. Thomas recalled Jordan reporting that he was feeling anxious and depressed as well as relaying psychosis.  (Thomas depo, p. 65, lines 1 – 10; App. A094).

124. Thomas considered the information communicated to Jordan in that interview to be protected health information "unless I felt that he was a danger to himself or others." (Thomas depo, p. 68, lines 9 – 18; App. A095).

125. During the interview Thomas requested and received information regarding Jordan's medication, medical and mental health history. (Transcript, Multi-Purpose Room Video, pp. 19, 21-25; App. 028, A030-A034)

126. During the interview with Thomas, Jordan signed authorizations for releases of information to allow Eyerly-Ball to communicate information "to law enforcement agencies, providers or agencies who have arranged with the counties or regions to perform related duties on behalf of the counties and regions…" (Exhibit 30, Payne Release, App. A181; Thomas depo, pp. 69-70; App. A096-A097).

## I.   Thomas' Knowledge of Risk of Harm

127. Thomas acknowledges that there are recognized factors that increase a person's risk of suicide in his profession. (Thomas depo, p. 23, lines 10-12; App. A072).

128. Thomas recognizes that the following are factors that are recognized in his profession as being risk factors for elevated risk of suicide:

- A history of self-harm is a recognized factor that increases a person's risk of suicide. (Thomas depo, p. 23 & 24, lines 25-02).

- A family history of suicide is a recognized factor that increases the risk of suicide. (*Id.,* pp. 24, lines 3-8).

- Criminal or legal problems is considered a recognized risk factor for elevated risk of suicide. (*Id.*, pp. 26-27, lines 20 – 03).

- Job loss or financial problems (*Id.*, p. 27, lines 4-5)

- History of depression (*Id.,* line 6-7).

- Substance abuse. (*Id.* line 8-9).

- Sense of hopelessness. (*Id.* line 10-11).

- Loss of relationship or the potential for loss of relationship. (*Id.* at lines 12-14).

- Social isolation. (*Id.* at lines 15-16).

- High-conflict relationships. (*Id* at lines 17-18).

- Conflicts related to sexual orientation. (*Id.* at lines 19-20).

(Thomas depo, pp. 23-24, 26-27: App. A072-A073, A075-A076).

129.  Thomas agrees that the Center for Disease Control would be a government agency that would have reliable information in determining factors that elevate a person's risk of suicide. (Thomas depo., p. 25, lines 5-14; App. A074).

130.  Thomas recognizes that a "serious mental illness" includes "psychosis, severe depression, bipolar disorder, a chronic condition."  (Thomas depo, p. 28, lines 17- 20; App. A077).

**J.     Thomas's Recognized Duty to Communicate**

131.  Thomas recognized that if someone is in custody, there needs to be some disclosure of information, some sharing of information with the custodial agency.  (Thomas depo, p. 70, lines 21 – 25; App. A097).

132.  If Madison County informed Thomas that they were dealing with a potentially suicidal inmate, Thomas would not decline to assist, but would go to the jail to meet with an inmate to "explore the issues" and "what was going on with them."  (Thomas depo, p. 47, lines 9 – 22; App. A082).

133.  If Thomas identified a concern that the individual may be a danger to himself, he would notify the jailer on duty immediately after his interview was over. (Thomas depo, pp. 47 – 48, lines 23 – 04; App. A082-A083).

134.  When asked by an investigator what he was required to do for "people that would throw the red flag as harming themselves or somebody else" Thomas responded: "What, what I do in working with the jail is, whoever the jailer is that I'm working with that day, I, I make sure that they're aware of the conversation that I had of anything that raises a red flag and of concerns."  (Thomas June 12, 2020, Interview, pp. 10-11, lines 17-02; App. A108-A109)

135.  If an individual was "checking all the boxes" for suicidal risk factors, Thomas understood it to be important to relay the information being provided to

him by the inmate, to Madison County, to fulfill his job obligations with Eyerly-Ball.  (Thomas depo, p. 49, lines 1-18; App. A084).

136.  Thomas understood it was important for him to provide jail staff with the information necessary to guide their decision-making.  (Thomas depo., p. 49 & 50, lines 24-23; A084-A085)

137.  While not qualified to perform assessments or evaluations, Thomas agrees that it is still important to fulfill his job obligations with Eyerly-Ball to communicate information to Madison County if an inmate provided him with information indicating that he was at an elevated risk of suicide.  (Thomas depo, p. 49, lines 14-18; App. A084).

138.  Specifically, Thomas testified under oath:

> Q.  It would be imperative, in fact consistent with what you are hired and paid to do to forward that information on to the jail, who's ultimately in control of that person's supervision?
>
> A.  Yes.

(Thomas depo, p. 49, lines 19-23)

139. Thomas' supervisor, Van Horn also concurred that if an inmate identifies thoughts of self-harm during an interview, it would be important for Thomas to relay that information to the jail.  (Van Horn depo, p. 32, lines 9-16; App. A146).

140. According to Van Horn, when presented with a patient who communicates known suicidal risk factors such as psychosis, thoughts of self-harm, prior suicide attempts, nothing to look forward to, Thomas' role would be to set up an ITP appointment but also to then relay and communicate the information, including the identified suicidal risk factors, to the jail.  (Van Horn depo, p. 36, lines 7-18; App. A147)

141. Van Horn concedes that Thomas should have relayed any statements of concern to the jail.  (Van Horn depo, p. 39, lines 6-9; App. A147).

142. Thomas recognizes that if communication is not adequately made about concerns, it is hard to take action to prevent a tragedy. (Thomas depo, p. 50, lines 10 – 18; App. A085).

**K.    Thomas' Failure to Exercise Reasonable Care**

143.    Jordan left the multi-Purpose room at 1:53:47. (Multi-Purpose Room Video, App. A008).

144.    Upon Jordan's exit from the multi-purpose room nobody asked for assistance in keeping an extra eye on Jordan.  (Henry depo, pp. 48-49, lines 24-02; App. A163-A164)

145.    Jordan re-entered the Max Cell, still in an agitated state. (Jail Check Video; App. A007)

146. Following his conversation with Jordan, Thomas informed Weakland that "he was not going to hurt himself in custody, but he was not sure what would happen when he left."  (Thomas depo, p. 73, lines 2-5; App. A098).

147. Both Thomas and Weakland agree that Thomas did not share any of the concerning statements made by Jordan during Thomas' evaluation of Jordan. (Weakland depo, pp. 32-33, lines 12-06; App. A156-A157).

148. Thomas concedes he did not relay any of the following to jail staff:

- Jordan reported attempting suicide seven times in the prior year.
- Jordan had a history of depression.
- Jordan had a history of severe mental illness.
- Jordan had a current injury that was causing him pain.
- Jordan communicated hearing voices.
- Jordan specifically told him that he thought about eating his veins.
- Jordan reported difficulty sleeping.
- Jordan had a history of substance abuse.
- Jordan communicated a sense of hopelessness or concern that he had nothing left.
- Jordan reported having relationship problems.

(Thomas depo, pp. 77-78; App. A099-A098).

149. Thomas believed the information about Jordan not hurting himself while in the jail was "important for them to know for caring for him, supervising him."  (Thomas depo, p. 73, lines 9-13; App. A098).

150. Thomas did not suggest to Weakland or anyone else with Madison County that Jordan's level of supervision should be increased.  (Weakland depo, p. 28 lines 4-6; App. A143; Barnes depo, p. 107, lines 17-19; App. A130).

151. Weakland recalls Thomas informing him that there was no concern that Jordan was going to hurt himself.  (Weakland depo, pp. 27-28, lines 23-04; App. A152-A153).

152. Based upon his conversation with Thomas, Weakland remembers that he was led to believe that there was not any concern for Jordan's wellbeing or safety. (Weakland depo, p. 34, lines 16-23; App.A157 )

153. As a result of his conversation with Thomas, Weakland returned Jordan to his cell and continued as business as usual with no suicide watch or mitigation efforts being made by Madison County.  (Weakland depo, p. 35, lines 4-7; App. A158 )

154. Thomas left the jail after the previously mentioned brief conversation with Weakland and scheduled Jordan's ITP appointment for 3:30 that afternoon. (Thomas depo, pp.80, line 25, p.84, lines 5-7; App. A101, A103).

155. Within the ITP appointment request, Thomas did not make any specific request for a suicide assessment even though he could do so. (Thomas depo, p. 82, lines 2 – 5; App. A102).

156. "Because Mr. Thomas was not a licensed or qualified mental health professional and therefore not qualified to perform a mental health evaluation nor a suicide risk assessment, it was inappropriate for him to communicate in anyway to John Weakland that Mr. Payne was safe, or had been cleared, or that he did not require any

additional custody supervision or a suicide watch and precautions." (Penn Sup., p. 4, ¶ 4; App. ).

157. "In my professional opinion Mr. Thomsas was not trained, supervised, licensed or otherwise appropriately qualified to provide the requisite/necessary emergency mental health evaluation or suicide risk assessment that Mr. Payne required. He certainly was not qualified to 'clear' Mr. Payne or to provide any other type of verbal or written mental health 'clearance' to jail staff."   (Penn Sup. p. 5, ¶ 6; App. 228 )

## L.    The Tragic Consequence of Thomas' Silence

158. Jordan returned to his cell at 1:54:16. (Payne – Post Thomas Meeting Video @ 1:54:16; App. A067).

159. Jordan was still agitated and emotional. *Id.*

160. No increased observation periods were undertaken by Weakland or any member of the Madison County Jail after Jordan was returned to his cell. (Payne – Post Thomas Meeting Video; App. 067  )

161. Jordan informed Weakland that the phones did not work and "now my girlfriend thinks I'm cheating on her."  (*Id.* at 1:54:16 – 1:54:30).

162. Weakland told Jordan: "Let me get things finished and I'll come figure out that phone."  (*Id.* at 1:54:32).

163. That was the last contact that Weakland had with Jordan alive. (*Id.* at 1:54:32 – 3:17:45).

164. At 2:01:42, Jordan can be clearly seeing manipulating a towel or sheet with his hands into a noose. (Payne – Post Thomas Meeting Video; App. 067).

165. At 2:02:05, in full view of the surveillance video cameras, Jordan walks to the interior jail cell door, secures the towel to the interior door, and attempts to lift his head and neck up to where the towel is located.  (*Id.*)

166. Unable to get his body elevated high enough to get his neck into the noose, Jordan takes the towel down and returns to his bed in a visibly agitated state.  (*Id.*)

167. At 2:03:23, Jordan takes the towel and walks into the shower door and closes the door, all in clear view of the surveillance video cameras. (*Id.*)

168. At 2:04:40, an audible "thump" can be heard coming from within the shower, and a reflection or movement can bee seen toward the bottom of the door. Audible gasping is also heard. (*Id.*)

169. At 2:05:25 movement is observable again followed by another "thump" sound and "gasping." (*Id.*)

170. Weakland is not observable in the area until at 3:17:23 when he enters Jordan's cell, calls his name, opens the shower door, and finds Jordan hanging. (Jail Check Video @ 3:17:23; App. 007).

171. Emergency Medical responders were unable to revive Jordan and he was pronounced dead. Cause of death was Suicide, manner of death, hanging. (Report of Autopsy, p. 2; App. A001).

**M.     Breach of the Professional Standard of Care.**

172.  The standard of care was breached by Scott Thomas, Eyerly Ball Community Mental Health services … because they:

1) Failed to identify the potential lethality of Mr. Payne's past suicide attempts,

2) Failed to identify and evaluate his changes in mental status, emotional lability and clinical instability.

3) Failed to conduct and document a thorough and clinically indicated suicide risk assessment,

4) Failed to share and communicate vital information regarding Mr. Payne with each other in a timely manner and

5) Failed to conduct a detailed and thorough intake mental health assessment/evaluation and implement a suicide prevention plan/treatment plan.

(Penn Initial Report, p. 29 ¶ 2; EB App. 119).

173. Thomas should have provided more timely communication to jail staff. Thomas "failed to identify and instead minimized the level of severity of Mr.

Payne's suicide risk and accepted his verbal statements at face value without additional clinical inquiry into possible inconsistencies and risk factors." (Penn Initial Report, p. 30; EB App. 120).

174. "Because Mr. Thomas was not a licensed or qualified mental health professional and therefore not qualified to perform a mental health evaluation or a suicide risk assessment, it was inappropriate for him to communicate in anyway to John Weakland that Mr. Payne was safe, or had been cleared, or that he did not require any additional supervision or a suicide watch and precautions … Mr. Thomas failed to communicate the need for Mr. Payne to be placed on a suicide watch or increased level of supervision by custody until he could undergo the crisis/emergency psychiatric evaluation.  Mr. Thomas did not engage in appropriate and timely communication with jail staff regarding Mr. Payne's emotional lability and risk of self harm even if his role was solely as a jail diversion/case manager and not a qualified mental health professional." (Penn Sup. p. 4 ¶ 4; App. A227).

175. "In other words, Scott Thomas should have explained to jail staff that until Mr. Payne could be properly evaluated by a qualified mental health professional that it would be better to err on the side of caution and maintain a higher level of custody supervision due to his emotional lability and acute clinical status." (Penn Sup., p. 4; App. A227)

176. "Thomas was not trained, supervised, licensed or otherwise appropriately qualified to provide the requisite/necessary emergency mental health evaluation or suicide risk assessment that Mr. Payne required.  He certainly was not qualified to "clear" Mr. Payne or to provide any other type of verbal or written mental health "clearance" to jail staff."  (Penn Sup., p. 5; App. A228).

177. "Thomas' selective communication of Jordan Payne's statement that he wouldn't hurt himself while in jail, while leaving out the fact that Mr. Thomas checked all the elevated risk factor boxes provided the Madison Conty jail staff with a sense of false security that a mental health professional had "cleared" Mr. Payne and found him to be safe and not require a suicide watch and suicide precautions.  Mr. Thomas himself should have known or recognized his background training and qualifications and his role and function and that he should not make statements to this effect if he was not trained or otherwise unqualified." (Penn Sup., p. 8, ¶ 15; App. A231).

178. Eyerly Ball failed to adequately train and supervise Thomas and failed to provide Thomas with appropriate clinical supervision or back up. (Penn Initial Report pp. 29-30, ¶ 4; EB App. 119-120).

179. Eyerly-Ball failed to identify Jordan's imminent risk for suicide/lethal attempts, failed to conduct suicide risk assessment(s) and implement suicide prevention practices, failed to monitor Jordan's activities and keep him safe, and

delayed in providing him timely and appropriate mental health and psychiatric

diagnostic evaluation, and psychotropic medications, and did not conduct

additional mental health re-evaluation and treatment planning and follup up

services respectively.  (Penn Sup. p. 9, ¶ 17; App. A232)

**Expert Designations**

180.   Plaintiffs timely designated Dr. Penn. (See ¶ 68).

181.   Plaintiffs also designated Dennis Klien, M.D., of the State Medical

Examiner's Office who certified Jordan's cause of death to be "Suicide."

(Plaintiffs Designation of Experts, p. 3; App. A190)

Respectfully Submitted,

GOURLEY, REHKEMPER,
& LINDHOLM, P.L.C.

By: /s/*Robert Rehkemper*
Robert G. Rehkemper,  AT0006553
Cory F. Gourley, AT0002966
440 Fairway, Suite 210
West Des Moines, IA 50266
Telephone No. (515) 226-0500
Email: rgrehkemper@grllaw.com
ATTORNEYS FOR PLAINTIFF KENT
PAYNE INDIVIDUALLY AND AS
ADMINISTRATOR OF THE ESTATE FOR
JORDAN PAYNE

Paul J. Statler,  AT0012577
301 East Walnut Street, Suite 7
Des Moines, Iowa 50309

Phone: 515.288.0509 Fax: 515.608.4484
Email: paul@statlerlaw.net
ATTORNEYS FOR PLAINTIFF
LESLIE KING-PAYNE, INDIVIDUALLY

Copies to:

Jack Hilmes
Joseph F. Moser
FINLEY LAW FIRM, P.C.
699 Walnut Street, Suite 1700
Des Moines, IA 50309
Email: jhilmes@finleylaw.com
Email: jmoser@finleylaw.com
ATTORNEYS FOR EYERLY-BALL
COMMUNITY MENTAL HEALTH

| CERTIFICATE OF SERVICE | | | |
|---|---|---|---|
| The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on March 6, 2023 | | | |
| By: | ☐ U.S. Mail | | ☐ FAX |
| | ☐ Hand Delivered | ☐ Overnight Courier | |
| | ☐ Certified Mail | | ☒ E-Filed |
| Signature: Robert Rehkemper | | | |

Michael Richards
Dentons Davis Brown PC
215 10th ST. Suite 1300
Des Moines, IA 50309
515-288-2500
Mike.richards@dentons.com
ATTORNEY FOR DEFENDANTS
JOHN WEAKLAND, JASON BARNES,
AND MADISON COUNTY, IOWA