IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| KENT H. PAYNE, Individually and as the Administrator of the Estate of JORDAN KENT PAYNE and LESLIE KING-PAYNE, <br><br> Plaintiffs, <br><br> vs. <br><br> JOHN WEAKLAND, JASON BARNES, MADISON COUNTY, IOWA, EYERLY-BALL COMMUNITY HEALTH SERVICES, and SCOTT THOMAS, <br><br> Defendants. | Case No.: 4:21-CV-00349 <br><br><br> PLAINTIFFS' BRIEF IN RESISTANCE TO DEFENDANTS EYERLY-BALL COMMUNITY HEALTH SERVICES AND SCOTT THOMAS' <u>SECOND</u> MOTION FOR SUMMARY JUDGMENT |

**COME NOW** Plaintiffs, by and through counsel, and pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 56(b)(3), hereby provides the following Brief in Support of their Resistance to Defendants Eyerly-Ball Community Health Services and Scott Thomas' Second Motion for Summary Judgment.

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 3

SUMMARY JUDGMENT STANDARD ......................................................................... 3

CRITICAL DISPUTED FACTS ..................................................................................... 4

FACTS TAKEN IN THE LIGHT MOST FAVORABLE TO PLAINTIFFS .................... 5

LEGAL ARGUMENT ................................................................................................... 14

    I.    SCOTT THOMAS OWED A LEGAL DUTY TO JORDAN PAYNE ........... 14

A. Thomas' Special Relationship to Jordan Triggered his Duty of Reasonable Care. ........................................................................ 18

B. Thomas Voluntarily Undertook Performing a Service to Jordan and Therefore Owed Him a Duty of Reasonable Care. ..................................... 20

C. Thomas' Own Conduct Increased the Risk of Harm to Jordan Thereby Triggering his Duty of Reasonable Care. ..................................... 25

D. Thomas' Lack of Physical Control Over Jordan is Irrelevant to his Duty of Reasonable Care. ................................................. 29

II. CAUSATION IS A QUESTION FOR THE JURY ........................................ 32

A. Expert Testimony and Causation. .............................................. 33

III. A FACT QUESTION EXISTS REGARDING WHETHER EYERLY BALL WAS NEGLIGENT .......................................................... 37

A. Plaintiffs Do Not Need to Establish a Claim that Meets the Elements of Medical Negligence ..................................................... 37

B. Eyerly-Ball Owed Jordan a Duty to Exercise Reasonable Care ................ 38

C. A Fact Question Exists Regarding Whether Eyerly-Ball was Negligent In Failing to Train and Supervise Thomas. ................................. 42

D. Respondeat Superior is Applicable to Eyerly-Ball ..................................... 47

IV. SUFFICIENT EVIDENCE SUPPORTS PUNITIVE DAMAGES .................. 48

CONCLUSION ............................................................................. 49

## **INTRODUCTION**

This is a supplemental state-law claims for negligence in failing to identify, treat, and warn jail staff of the obvious mental health needs and suicide risk of Decedent, Jordan Payne ("Jordan"), while he was being held at the Madison County Jail. Defendant Scott Thomas ("Thomas") is an employee of Defendant Eyerly-Ball Community Mental Health Services ("Eyerly-Ball") who met with Jordan to "assess" his mental health needs, immediately prior to Jordan's suicide. Thomas did not identify or communicate to jail staff that based upon information provided by Jordan, Jordan was in an acute mental health crisis, and was an imminent suicidal risk. Instead, Thomas affirmatively represented to jail staff that Jordan would *not* do anything to harm himself and there were no concerns for Jordan's wellbeing or safety. Jordan committed suicide approximately eleven (11) minutes after Jordan's meeting with Thomas was complete.

## **SUMMARY JUDGMENT STANDARD**

Rule 56 of the Federal Rules of Civil Procedure govern motions for summary judgment and provide that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining the existence of an issue of fact exists, the district court is to view all the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986). A genuine issue of fact

exists when there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Id*. at 248.  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. The moving party bears the burden of showing that there is no evidence which supports a necessary element of the nonmoving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the movant meets its initial burden, the nonmoving party must then show that there is a genuine issue of fact for trial. *Anderson*, 477 U.S. at 250.

## CRITICAL DISPUTED FACTS

Central to the issues in this case are the following disputed facts:

1. Whether Eyerly-Ball was a provider of mental health services to inmates at the Madison County Jail.

2. The nature and extent of Thomas' duties and obligations in his role as an employee of Eyerly-Ball providing mental health services to inmates at the Madison County Jail.

3. Whether Thomas was adequately trained and supervised in the performance of his job responsibilities with Eyerly-Ball for the provision of mental health services to inmates at the Madison County Jail.

"Disputed questions of fact, from which reasonable minds might draw varying conclusions, are for the determination of the jury."  *Kuehn v. Jenkin*, 251 Iowa, 557, 100 N.W.2d 604, 562 (Iowa, 1959).

4

## FACTS IN THE LIGHT MOST FAVORABLE TO PLAINTIFFS

Jordan Payne, son of Plaintiffs Kent H. Payne and Leslie Payne, died after committing suicide by hanging in the Madison County Jail on June 12, 2020. Plaintiffs' Statement of Disputed Facts ("PSDF") ¶ 1. Just hours before his suicide, Jordan's family had notified Madison County of Jordan's mental health crisis which included reports of psychosis, self-harm and that Jordan was "going nuts." PSDF ¶ 102.  In response, the Jailer, John Weakland ("Weakland"), scheduled Jordan to see Thomas, an employee of Eyerly-Ball. PSDF ¶ 104.

Thomas was called to the Madison County Jail specifically to evaluate and assess Jordan in response to Jordan's specific request to see someone for his mental health concerns. PSDF ¶¶ 102, 103, 105.  Madison County Sheriff's Office contracted with Eyerly-Ball to provide inmates with "mental health services" which included, evaluation, medication management, therapy services and crisis intervention PSDF ¶¶ 16-26. Thomas, an unlicensed individual with a degree in Sociology was the only person that Eyerly-Ball would send to Madison County Jail in furtherance of their contractual obligation to provide "mental health services" to Madison County Jail inmates. PSDF ¶¶ 44-48.

Eyerly-Ball is contracted through the Central Iowa Community Services (CICS) to provide mental health services to inmates at the Madison County Jail.  PSDF ¶¶ 16-26. Eyerly-Ball was the designated and contracted CICS mental health provider for the Madison County Jail on June 12, 2020.  PSDF ¶ 24-25, 33.  As the contracted CICS mental health provider at the Madison County Jail, Eyerly-Ball had a duty and obligation to

provide timely crisis services and crisis psychiatric evaluations to inmates.  PSDF ¶ 34. Pursuant to the contract between CICS and Eyerly-Ball, Eyerly-Ball was contractually obligated to provide services which included "Jail Diversion/Intensive Case Management – Madison County," "therapy evaluation," "Psychiatric evaluation," and "Mobile Crisis Service." PSDF ¶ 22.  Madison County and Madison County Sheriff's Office are covered by the mobile crisis response services provided by Eyerly-Ball. PSDF ¶ 23.

Eyerly-Ball was also contracted to provide the services enumerated in the Regional Management Plan to Madison County, as approved by the Director of the Department of Human Services. PSDF ¶ 24. "Core services" to be provided by Eyerly-Ball under the Regional Management Plan to the covered counties, including Madison County, included "Mental health services in jails." PSDF ¶ 2. "Mental health services in jails under the Regional Management Plan include 'Evaluation, medication management, and therapy services." PSDF ¶ 26. The Plan also covered Basic Crisis Response which includes engaging in initial crisis screenings.  PSDF ¶ 25; Ia. Admin. Code § 441-24.32(1).

Thomas was not a licensed mental health professional within its definition of the Iowa Code or Iowa Administrative Code.  PSDF ¶ 104, 174.  He could however perform a Columbia Suicide Screening, which is a screening tool for suicide risk.  PSDF ¶ 46. Thomas' written job description requires him to assess and assist inmates in a mental health crisis.  PSDF ¶ 36. Thomas' title was "Jail Diversion Case Manager."  PSDF ¶¶ 35, 36. The written job description for "Jail Diversion Case Manager" identified the following relevant essential Functions/Responsibilities:

- Meets with incarcerated individuals at county jails at request of law enforcement personnel; assists inmates in obtaining referrals to mental health services; *assists mental health professionals in* <u>*determining physical and mental health and substance abuse care needs of inmates*</u>.

- Either through post-incarceration services or through referrals from County Mental Health Services, *determines appropriate provider* of services, assists client in applying for services, ***<u>provides direct client services until client is able to begin services with the referral source</u>***, *assists with the development of a client crisis plan…*

- *Responds to calls from law enforcement personnel related to mental health issues*, ***<u>assists in the development of client crisis plans</u>***; refers individuals to appropriate mental health services; provides follow up with client as needed.

(emphasis added) PSDF ¶ 36.

According to Thomas' immediate supervisor, Monica Van Horn ("Van Horn"), Thomas' job description required him to meet with inmates in the jail and "screen for any current presentations of mental health symptoms to see if they needed mental health care while in jail." PSDF ¶ 38.  According to Van Horn, Thomas' role was to ask questions to find out "what's going on presently" which Van Horn explained included "seeing kind of what is going with folks in terms of current distress levels and different presentation of maybe depressive symptoms, anxiety symptoms, things like that."  PSDF ¶ 39.

Thomas himself describes his job responsibilities to include: "*to screen individuals for possible mental health concerns* and discuss options for services and then refer to services." PSDF ¶ 40.  Thomas has explained: "It's, it's a routine part of my job to come to this jail on a regular basis to meet with all inmates that stay here more than a day or two to do a mental health screen, and to assess them for needs for services."  PSDF ¶ 41. When asked what he did for the screening, Thomas responded in part: "I do a, what I typically

use is a brief jail mental health screen on an individual which consists of eight basic questions … So, I do the basic screen with them to, to assess whether there is any type of a need or a concern there." PSDF ¶ 42.

Anytime an inmate at Madison County jail wanted to obtain any mental health services, the inmate would have to meet with Thomas first. PSDF ¶ 43. Thomas was the only individual from Eyerly-Ball that would assist inmates at the Madison County Jail. PSDF ¶ 48. Anytime Madison County needed assistance with an inmate with mental health issues, they would contact Eyerly-Ball or Thomas directly. PSDF ¶¶ 49, 50. Madison County relied on Eyerly-Ball as it related to mental health of inmates. PSDF ¶ 52-54. When Madison County would call Eyerly-Ball, the jail employees understood that Thomas and Eyerly-Ball would provide mental health services to the inmates. PSDF ¶¶ 52-57. Eyerly-Ball was Madison County's contact for mental health problems, and it was understood that Thomas' role was evaluating Jordan's "mental health." PSDF ¶¶ 52-60. If an Eyerly-Ball employee identified an inmate as an elevated suicide risk, Madison County—specifically Sheriff Barnes—expected that information to be shared with them so that they could do their best to keep that inmate safe. PSDF ¶ 65.

Consistent with the mutual understanding between Madison County and Eyerly-Ball, Thomas never limited his assistance with inmate mental health concerns due to his lack of qualifications or competency. PSDF ¶ 132. If the jail was dealing with a potentially suicidal individual, Thomas would not decline to assist, but would go to the jail to meet with that individual to "explore the issues" and "[see] what was going on with them." *Id.*

If Thomas identified a concern that the individual may be a danger to themselves, he would notify the jailer on duty immediately after the interview was over. PSDF ¶¶ 132-33.

Because of his role assisting inmates with their mental health issues in a custodial setting, Thomas' job required him to receive annual suicide prevention training. PSDF ¶ 76-77, 82. Eyerly-Ball did not provide that training to Thomas, nor did they ensure that he received that training from other sources. PSDF ¶¶ 91-94. Thomas did not have any training, certifications, or instruction, related to individual, relationship, community, or societal factors that are recognized as increasing an individual's risk of self-harm and/or suicide. *Id.* In fact, Thomas noted that he did not know what a suicide assessment looks like. PSDF ¶ 100.

With this background in mind, Jordan was removed from his cell and escorted to the Multi-Purpose Room by Weakland to meet with Thomas at 1:30:56. PSDF ¶ 105. Thomas met with Jordan in the multi-purpose room of the Madison County Jail, beginning at 1:31:22 p.m., on June 12, 2020. PSDF ¶¶ 115. Welcoming Jordan, Thomas made the following introduction:

> "I'm Scott from Eyerly-Ball, have you heard of Eyerly-Ball before?... We are a mental health agency… what we do is meet with folks who are in jail here, see if there are any mental health concerns that they have… we see if they have any mental health concerns…"

PSDF ¶ 116. Jordan then proceeded to share his concerns regarding his mental health with Thomas. Jordan's statements to Thomas during this evaluation would leave even an untrained person to conclude that Jordan was suicidal. Jordan shared the following with Thomas:

- I've lost everything.  I've lost my girlfriend, I've lost my house I was going to get, my jeep, I'm going to be homeless when I'm out of here so I'm not doing so well at all. (1:32:40, p. 5, lines 1-4)

- I'm losing everything out there. (1:33:19, p. 5, line 19)

- I gave myself a black eye because I'm hearing these fucking things in my head telling me all sorts of stupid shit, and I'm not trying to listen to it. (1:33:23, p. 5, lines 20-23)

- I'm not in good shape right now. (1:33:34, p. 6, line 3)

- I got my girlfriend just now that thinks I'm cheating on her.  (1:33:36, p. 6 lines 5-6)

- I went to prison and built myself back up and now I'm not doing so well. I'm not doing great.  (1:33:47, p. 6, lines 8-10)

- I got no TV and I'm stuck in a room for weeks, nothing.  I mean I got no  no roommate, I got no tv. I got a phone doesn't work. (1:34:09, p. 6, lines 13-16)

- Well, hey, I've got a broken [inaudible] ankle, I've got a broken tailbone too. (1:34:58, p. 7, lines 11-13)

- I'm not normally this way, I don't know what the hell is wrong with me, Scott. I'm not this way at all. (1:35:22, p. 7, lines 23-25)

- I've got one of those Chirp things that you can text back and forth with outside and stuff.  Yeah, right now my girlfriend thinks I cheated on her four weeks ago so I know that's gone. (1:36:19, p. 9, lines 2-9)

- Like, I'm getting these thoughts in my head and shit like that, and the only person I got to talk to was her and all that shit, and I'm afraid that she might just call up here and say, you know, put him on suicide watch and all that shit. I don't [inaudible]. But I got these thoughts in my head that are like: Chew my veins out.  I mean, shit like that.  Like I don't want these thoughts in my head. (1:36:30, p. 9, lines 6-17)

- Well, I wouldn't say completely sober.  I smoke weed. I smoke that -- religiously. (1:37:18, p. 10, lines 4-8)

- I went to prison for slitting my wrists (inaudible) called the cops on me. (1:37:56, p. 10, lines 22-23)

PSDF ¶118.  Less than ten minutes into their conversation, Jordan asked Thomas if what he told him was confidential.  Thomas assured Jordan that anything Jordan told him was confidential and could not be shared with anybody absent a lawfully issued subpoena.

PSDF ¶119.  Thomas' promise of confidentiality was sealed with a fist-bump and upon securing a promise of confidentiality, Jordan preceded to share the following:

- I've had like seven suicide attempts in the last year, I lost my kids, I lost everything. I'm not going to kill myself here, but I can't guarantee I won't kill myself when I leave here. (1:40:27, p. 13, lines 15-19)

- I got nothing left anymore, and I don't know – I mean, I can't sleep.  I can't – There's nothing I can do.  I'm sitting here, and just I'm thinking, and I'm hearing shit, and this wont go away, hence the black eye. (1:40:38, p. 13, lines 20-24)

- I'm [inaudible] to kill myself here.  I don't want to.  I'm not going to [inaudible] that … I don't want to kill myself in general [slamming the table], I'm sorry. (1:41:05, p. 14, lines 2-7)

- I'm going insane in there. (1:41:20)

- After I slit my wrist, they brought me here instead of taking me to the hospital … and they chained me to the bed with my bloody wrists. (1:42:20, p. 15, lines 4-8)

- I'm pretty much in solitary confinement, and I did nothing wrong.  I just got here on m-, m-, -- Tuesday. (1:42:40, p. 15, lines 9-12)

- I haven't ate anything. I won't eat anything.  I'm afraid [inaudible] the food.  I haven't ate one meal since I've been here.  (1:42:44, p. 15, lines 9-14)

  **Thomas responded** – "That's what John was saying, he was worried you hadn't been eating. He thought maybe you were eating when he wasn't around." (1:42:55)

- I can calm myself down, I just can't keep it calm, does that make sense? (1:44:00, p. 16, lines 9-10)

- Then [inaudible] started fucking slapping myself or start hitting myself.  I didn't do this before.  What the fudge is happening to me?  I'm going insane? (1:44:14; p. 16 Lines 13-16)

- Is it bad? [referring to black eye] Thomas responds, "it's a little purple." (1:48:52, p. 20, line 19)

- I've never done it before, but I just want it to stop. Have you ever had a thought to, like, chew your own veins out of your frickin hand -- or arm? (1:48:54, p. 20, lines 20-23)

- And neither have I. Neither have I.  Until now. What the shit?  It's just insane [inaudible] crazy in there.  (1:49:08, p. 21, lines 1-3)

PSDF ¶ 120.

Jordan's speech was fast, rambling and he was visually and audibly agitated and animated throughout his conversation with Thomas. PSDF ¶ 121. Thomas identified that Jordan appeared agitated and animated during their meeting. PSDF ¶ 122. Thomas recalled Jordan reporting that he was feeling anxious and depressed as well as relaying psychosis. PSDF ¶ 123.

While admittedly untrained, uncertified, and unqualified to assess an individual's mental health or perform suicide evaluations, Thomas knew that the following are factors that are recognized in his profession elevating an individual's risk of suicide: a history of self-harm, family history of suicide, criminal or legal problems, job loss or financial problems, history of depression, substance abuse, sense of hopelessness, loss of relationship or the potential for loss of relationship, social isolation, high-conflict relationship, and conflicts related to sexual orientation.  PSDF ¶¶ 127-30.  Jordan's

statements to Thomas checked every one of those imminent suicide risk factor boxes. PSDF ¶¶ 118, 120, 128. Within approximately twenty-five minutes, Thomas witnessed Jordan exhibiting eleven recognized factors elevating Jordan's risk of suicide.  PSD ¶ 128.

Following Thomas' assessment of Jordan, Jordan was returned to his cell at 1:54:47, still in an agitated state.  PSDF ¶¶ 143, 145.  Thomas had a short interaction with Weakland but did not share any of Jordan's statements that revealed he was an imminent suicide risk with any member of the jail staff.  PSDF ¶¶ 146. Thomas concedes he did not relay any of the following to jail staff:

- Jordan reported attempting suicide seven times in the prior year.
- Jordan had a history of depression.
- Jordan had a history of severe mental illness.
- Jordan had a current injury that was causing him pain.
- Jordan communicated hearing voices.
- Jordan specifically told him that he thought about eating his veins.
- Jordan reported difficulty sleeping.
- Jordan had a history of substance abuse.
- Jordan communicated a sense of hopelessness or concern that he had nothing left.
- Jordan reported having relationship problems.

PSDF ¶ 148. Thomas did not suggest to Weakland or anyone else with Madison County that Jordan's level of supervision should be increased.  PSDF ¶ 150.  Instead, Thomas affirmatively represented to Weakland that "he [Jordan] was not going to hurt himself in custody, but he was not sure what would happen when he left."  PSDF ¶ 146.  Weakland remembers that Thomas' statements led him to believe that there was no any concern for Jordan's wellbeing or safety.  PSDF ¶ 151-52.  As a result of Thomas' affirmative

representation that Jordan would not harm himself, no increased observation periods were undertaken by any member of the Madison County Jail.  PSDF ¶ 153

By 2:03 p.m., less than ten minutes after leaving his interview with Thomas, in clear view of the jail closed-circuit security cameras, Jordan began the process of attempting to kill himself by strangulation in his cell. PSDF ¶¶ 158, 164-69.   The last sound is heard from Jordan at 2:05:25 p.m. PSDF ¶ 169.  Jordan is not personally observed by another human until 3:17 p.m. when Jailer Weakland found him hanging, unresponsive in the shower. PSDF ¶ 170.  Jordan's cause of death was certified as Suicide.  PSDF ¶ 171.

## **LEGAL ARGUMENT**

### **I.    SCOTT THOMAS OWED A DUTY TO JORDAN PAYNE.**

Plaintiffs have sued Thomas for Negligence.  (Complaint and Jury Demand, Count IV, p. 22, ¶¶ 113-117, Dkt. 1).  Negligence, by definition, is "failure to act as a reasonable and prudent person in similar circumstances."  *Bartlett v. Chebuhar*, 479 N.W.2d 321, 322 (Iowa 1992).  Plaintiffs' specifications of Thomas' negligence include:

a.   Failing to act as a reasonable and prudent person in similar circumstances.

b.   Failure to warn Madison County Sheriff's Department of Jordan Payne's risk of self-harm and/or suicide.

c.   Failure to conduct a competent mental health evaluation of Jordan Payne. and

d.   Failure to conduct a competent suicide risk assessment of Jordan Payne.

(Complaint and Jury Demand, Count IV, p. 22, ¶ 114, Dkt. 1).  Plaintiffs also identified a separate Count for the Wrongful Death of Jordan Payne.  (*Id.* at ¶¶ 123-131).  The core of Plaintiffs' claims against Thomas is that he failed to act as a reasonable person under the circumstances to prevent Jordan's suicide.

Thomas callously argues that "the relationship between Thomas and Payne warrants the conclusion that Thomas did not owe Payne a duty to prevent him from committing suicide." (Defendants' Brief, p. 7). Thomas' rational is that since he was not qualified and did not conduct a formal mental health evaluation or suicide risk assessment, he owed no duty to Jordan.  (*Id.*)  In other words, and as ludicrous as it sounds, according to Thomas, he could have sat at the table in the multi-purpose room of the Madison County Jail and watched Jordan commit suicide before his very eyes, and he would have had no legal duty to intervene or alert anyone.  Such an argument strains credulity and fundamental concepts of basic humanity. It is also contrary to well-established law.

As a starting point, Thomas conflates the court's legal determination of the existence of a duty with the jury's role of determining the extent of the duty that is owed.  Thomas argues that he was not required to administer a formal suicide risk assessment, mental health evaluation, nor was he required to notify jail staff of Jordan's condition nor place Jordan on suicide watch.  (Defendants' Brief, Div. IA & IB).  Those arguments are directly related to the scope or extent of any duty owed to Jordan.  They are NOT related to whether the law imposes a duty to exercise reasonable care in Thomas' dealing with Jordan. "The existence of a duty is a separate inquiry from the nature or extent of the actor's obligation

with respect to that duty." *Brown v. United States*, 583 F.3d 916, 920 (6th Cir. 2009); Prosser, Torts (4th ed), § 53, p. 324. It is "in the jury room, where the question of whether the defendant breached the duty is determined." *Morris v. Legends Fieldhouse Bar & Grill, LLC,* 958 N.W.2d 817, 831 (2021).

"Generally, an actionable claim of negligence requires the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages." *St. Malachy Roman Catholic Congregation of Geneseo v. Ingram*, 841 N.W.2d 338, 346 (Iowa 2013). "The issue of whether a particular duty arises out of parties' relationship is always a matter of law for the court to decide." *Id.* quoting *Dettmann v. Kruckenberg*, 613 N.W.2d 238, 251 (Iowa 2000). "A legal duty is defined by the relationship between the individuals; it is a legal obligation imposed upon one individual for the benefit of another person or particularized class of persons." *J.A.H. ex rel. R.M.H. v. Waddle & Assoc. P.C.*, 589 N.W.2d 256, 258 (Iowa 1999). In determining whether there is a duty, the Court looks at the following factors: "(1) the relationship between the parties; (2) reasonable foreseeability of harm to the person who is injured; and (3) public policy considerations." *Id.* The factors are not distinct elements but must be considered using a balancing approach and ultimately, "whether a duty exists is a policy decision." *Id.*

At the outset, a balancing of the three duty analysis factors mandate a conclusion that Thomas owed Jordan a duty of reasonable care to prevent his suicide. First, Jordan was an inmate in a correctional institution suffering from a mental health crisis. PSDF ¶

16

110.   Thomas was employed by the contracted mental health provider for the county jail having custody of Jordan.  PSDF ¶ 35.  Thomas responded to a custodial setting for the specific purpose of assisting Jordan with his mental health needs. PSF ¶ 108. Jordan confided in Thomas and provided him with information that Thomas himself considered protected medical information.  PSDF ¶ 124.  Thomas further provided Jordan with written waivers that allowed Thomas to (1) facilitate the connection of treatment specific services, and (2) communicate as necessary with Jordan's custodian, the Madison County Jail. PSDF ¶ 125.

Second, suicide was a real and present risk of harm for Jordan and the potential harm of Jordan's suicide was foreseeable.   Suicide and mental health go hand-in-hand. According to the National Alliance on Mental Health, recognized by Eyerly-Ball's Monica Van Horn to be a reliable government resource: "suicides are a psychiatric emergency" and "research has found that 46% of people who die by suicide had a known mental health condition."[1]  PSDF ¶ 88.  It is also well known that "jail suicides are frequent relative to suicides of free people or even a prison (as distinct from jail) inmates." *Estate of Boncher v. Brown County*, 272 F.3d 484, 486 (7th Cir. 2001).  "America faces an epidemic of suicide by individuals in custody."  *Hyatt v. Thomas*, 843 F.3d 172, 180 (5th Cir. 2016). "According to the Bureau of Justice Statistics, suicide has been the leading cause of death in jails every year since 2000."  *Id.*  Suicide was also the leading cause of death in the

---

[1] https://www.nami.org/About-Mental-Illness/Common-with-Mental-Illness/Risk-of-Suicide  (Last accessed, July 22, 2024).

Madison County Jail. PSDF ¶ 15.  Jordan specifically communicated that he had previously attempted suicide.  PSDF ¶ 3.  Jordan further openly communicated all the imminent suicide risk factors to Thomas.  PSDF ¶¶ 118, 120, 127. The harm of Jordan's suicide was foreseeable.

Third, public policy considerations certainly impose a duty on an individual providing services to at-risk inmates, on behalf of a mental health provider, to, at a minimum, be competent to identify signs of imminent inmate suicide and to then take reasonable action upon identification of those signs to prevent the suicide.  To conclude otherwise would be to allow the jail-suicide epidemic to fan itself into a wildfire of death, without a care for the victims it consumes.  The conclusion that Thomas owed Jordan a duty to exercise reasonable care is also supported by specific legal principles imposing such a duty.

### A. Thomas' Special Relationship to Jordan Triggered His Duty of Reasonable Care.

A duty may arise out of a special relationship between a defendant and an individual harmed.  Restatement (Third) of the Law, Torts: Liability for Physical and Emotional Harm, § 40.  "An actor in a special relationship with another owes the other a duty of reasonable care with regard to risk that arise within the scope of the relationship."  *Id.* § 40(a).  "[W]hen a person is involuntarily held in state custody, and thus wholly dependent upon the state, the state takes on an affirmative duty to provide for his or her 'safety and general well-being.'"  *Charles v. Orange Cty.*, 925 F.3d 73, 82 (2nd Cir. 2019); quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).

Custodial settings impose a duty upon the custodian to protect the inmate from known harm.  Restatement (Third) of the Law, Torts: Liability for Physical and Emotional Harm, § 40(b)(7).  As previously explained, suicide is a known harm in county jails.  *Estate of Boncher*, 272 F.3d at 486; *Hyatt*, 843 F.3d at 180.  For this reason, consistent with the Restatements, Iowa law has long recognized that the custodial setting imposes an affirmative duty to prevent suicide of individuals who are in the custody of a county jail.  A "duty to prevent, arises where, by reason of physical custody or by reason of a protective status, a person owes a duty to prevent a potential decedent from committing suicide."  *Cutler v. Klass Whicher & Mishne*, 473 N.W.2d 178, 182 (Iowa 1991).  "Examples are situations where the decedent is confined in a hospital or jail."  *Id.*

While Thomas did not personally have custody of Jordan, he assumed the affirmative duty of exercising reasonable care for Jordan's safety and general well-being, which included communicating observed warnings signs and risk factors to Jordan's custodians to prevent his suicide.  In this situation, the privately contracted company and their employee assume the role and corresponding duty of the government entity.  "A party who assumes a duty under a contract for the safety of the public or certain individuals … owes a positive duty to the public or individual who benefits under the contract." *Lane v. Coe College*, 581 N.W.2d 214, 217 (Iowa Ct. App. 1998); citing *Giarratano v. Weitz Co.*, 259 Iowa 1292, 147 N.W.2d 824, 831 (Iowa 1967).  See also *West v. Atkins*, 487 U.S. 42, 48 (1988) (provision of medical services to inmates is state action fairly attributable to the State); *Montago v. Hedgepath*, 120 F.3d 844, 849-50 (8th Cir. 1997) (even private

physicians working in state prisons, who help to fulfill the state's Eighth Amendment obligations to inmates and who are typically the only health professionals available to care for incarcerated persons, are persons who may fairly be said to be state actors).

Whether Thomas was required to conduct a formal mental health evaluation or a formal suicide risk assessment of Jordan does not impact the existence of his legal duty owed by Thomas to Jordan, to effectively communicate warning signs and risk factors for the purpose of suicide prevention. *Cutler*, 473 N.W.2d at 182. The duty to exercise reasonable care for Jordan was triggered by Jordan's status as a custodial inmate. The legal duty was to exercise reasonable care in preventing an inmate's suicide. *Id.* The special relationship created that duty.

### B. Thomas Voluntarily Undertook Performing a Service to Jordan and Therefore Owed Him a Duty of Reasonable Care.

"One who undertakes to do an act or perform a service for another has a duty to exercise care, and is liable for injury resulting from his failure to do so…." *McCrady v. Sino*, 254 Iowa 856, 866, 118 N.W.2d 592, (1962); quoting 65 C.J.S., Negligence, section 4(b), page 343. When an actor undertakes to render services to another and knows or should know that the services will reduce the risk of physical harm to the other, that person has a duty of reasonable care to the other in conducting the undertaking if: "(a) the failure to exercise such care increases the risk of harm beyond that which existed without the undertaking, or (b) the person to whom the services care rendered or another relies on the actor's exercising reasonable care in the undertaking." Restatement (Third) Torts: Liability for Physical and Emotional Harm, § 42, Duty Based on Undertaking (previously

Restatement (Second) of Torts, § 323, analyzed and applied in suicide prevention case of *Jain v. State*, 617 N.W.2d 293 (Iowa 2000)).

Section 42 of the Restatement (Third) of Torts further explains the application of this section.  As a threshold matter, the actor must render a service that is undertaken to reduce the risk of harm to another.  (Comment (d)).  "An undertaking entails an actor voluntarily rendering a service, gratuitously or pursuant to contract, on behalf of another." *Id.* "The actor's knowledge that the undertaking serves to reduce the risk of harm to another, or of circumstances that would lead a reasonable person to the same conclusion, is a prerequisite for an undertaking under this section." *Id.* "[T]he requirement that the actor increase the risk of harm means that the risk to the other person is increased beyond that which existed in the absence of the actor's undertaking." (Comment (f)).  "This requirement is often met because the plaintiff or another relied on the actor's performing the undertaking in a nonnegligent manner and declined to pursue an alternative means for protection." *Id.*

The entire point of Thomas interacting with Jordan at the Madison County Jail was to reduce the risk of harm to Jordan by screening, assessing, identifying and communicating information critical to the care of Jordan's mental health.  Thomas' written job description charges him with the duty to respond to calls from law enforcement personnel related to mental health issues and to "assist in the development of *client crisis plans*."  (emphasis added) PSDF ¶ 36.  Thomas' job description also requires him to "provide direct client services until the client is able to begin services with the referral

source." PSDF ¶ 36.  Thomas himself described one of his roles as "*to screen individuals for possible mental health concerns* and discuss options for services and then refer to services." (emphasis added) PSDF ¶ 40.  Within this line, Thomas' supervisor, Monica Van Horn explained that Thomas' job description required him to meet with inmates in the jail and "screen for any current presentations of mental health symptoms to see if they needed mental health care while in jail." PSDF ¶ 38.  He was to find out "what's going on presently" which Van Horn explained included "seeing kind of what is going with folks in terms of current distress levels and different presentation of maybe depressive symptoms, anxiety symptoms, things like that." PSDF ¶ 39.

Thomas' job duties specifically include responding "to calls for law enforcement personnel related to mental health issues, assists in the development of client crisis plan." PSDF ¶ 36.  Statutorily, assisting with crisis responses involves assessing suicide lethality and client's safety needs.  Iowa Code section 331.393 (2020)[2], mandated "[t]he mental health … services provided by counties operating as a region shall be delivered in accordance with a regional service system management plan…"  Basic crisis response services for "qualified providers" of mental health services, such as Eyerly-Ball, under a Regional Management Plan are specifically spelled out in Chapter 24 of the Iowa Administrative Code.  The Administrative Code explains that basic crisis response includes crisis evaluations.  "Crisis evaluation consists of two components: crisis screening and

---

[2] As of July 1, 2023, section 331.393 has been renumbered to Iowa Code section 225C.60, but the mandates of that code section remain the same.

crisis assessment." Ia.Admin.Code § 441-24.32.  The initial crisis screening is completed

by a crisis response staff, i.e., Thomas, and the subsequent crisis assessment is completed

by a licensed mental health professional, i.e. (ITP Provider).  Ia. Admin.Code § 24.32(1).

"The purpose of crisis screening is to determine the presenting problem and appropriate

level of care."  Ia.Admin.Code § 24.32(1).  "Crisis screening ***includes a brief assessment***

***of suicide lethality,*** substance use, alcohol use and ***safety needs***."  (emphasis and extra

emphasis added) *Id.* Subsection (a).  "Crisis screening can be provided through contact

with crisis response staff and through communication with the individual."  *Id.*

The Administrative Code's description of "crisis screening" is consistent with

Thomas' understanding of his job responsibilities.  Thomas understood it was the

responsibility of his job to screen the inmate and communicate any concerns related to an

elevated suicide risk for an inmate he screened to jail personnel.  PSDF ¶ 130-135.  He

conceded that it would be imperative, and in fact, consistent with what he was hired and

paid to do, to forward such information to the jail.  PSDF ¶ 137.  Thomas' immediate

supervisor, Van Horn, also concurred with that responsibility.  PSDF ¶ 139-40.  By the

statements of Thomas and Van Horn, they themselves concede a duty was owed to

Jordan.

It is undisputed that Madison County Sheriff's Office relied on Thomas to provide

mental health services to their inmates.  PSDF ¶¶ 51-67.  They further relied on Thomas

to perform that undertaking in a nonnegligent manner as he was the only provider of

mental health services within the confines of the Jail.  *Id.*  Madison County also relied

upon Thomas to timely and accurately express any concerns regarding the mental health of inmates he assessed so that remedial measures could be undertaken if appropriate. *Id.* If so alerted, Madison County would place the inmate under direct observation and take away anything that they could hurt themselves with.  PSDF ¶ 67.

The Restatements also adopt this position. "A defendant whose conduct creates a risk of physical or emotional harm can fail to exercise reasonable care by failing to warn of the danger if: (1) the defendant knows or has reason to know; (a) of that risk; and (b) that those encountering the risk will be unaware of it; and (2) a warning might be effective in reducing the risk of harm."  Restatement (Third) of Torts: Liability for Physical and Emotional harm, § 18, Negligent Failure to Warn.  "Even if the defendant adequately warns of the risk that the defendant's conduct creates, the defendant can fail to exercise reasonable care by failing to adopt further precautions to protect against the risk if it is foreseeable that despite the warning some risk of harm remains."  *Id.* subsection (b).

Whether Thomas was required to administer a formal suicide assessment or mental health evaluation is irrelevant to the fundamental question of whether a duty to exercise reasonable care existed.  At a minimum, Eyerly-Ball was required to provide a basic crisis response which includes a "crisis screening."  Thomas was qualified to provide a "crisis screening" and if Thomas was not providing that service, who was? This screening required an assessment of suicide lethality, and the safety needs of the client.  Fact of the matter remains the entire point of Thomas' presence at the Madison

24

County Jail during his visit with Jordan was to reduce the risk of harm to Jordan consistent with Thomas' job description and own understanding of his responsibilities. Both Madison County and Jordan relied upon Thomas performing his job competently and thus, a duty to exercise reasonable care was triggered.

### C. Thomas' Own Conduct Increased the Risk of Harm to Jordan Thereby Triggering his Duty of Reasonable Care.

Assuming for the sake of argument, when Thomas entered the Madison County Jail to meet with Jordan, despite the special relationship and his employment, Thomas owed Jordan no more duty than a member of the public performing a jail visit. Even with that assumption, Thomas' own affirmative conduct in this case created a risk of physical harm to Jordan, thereby triggering a duty to exercise reasonable care.

The "duty of reasonable care accompanies each individual in most all activities of life…" *Feld v. Borkowski*, 790 N.W.2d 72, 76 (Iowa 2010). An actor has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm. Restatement (Third) of Torts, § 7(a). It is only in the exceptional case, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases where a court may decide that the defendant has no duty. *Id.* at § 7(b).

"[O]ne may assume a duty, where a duty would otherwise not lie, by voluntarily performing an affirmative act." *Keller v. Clark Equip. Co.*, 1981 U.S. Dist. LEXIS 14893, * 94; citing *Clairmont v. State Bank of Burleigh Cty. Trust*, 295 N.W.2d 154, 158 (N.D. 1980); *Pirocchi v. Liberty Mutual Insurance Co.*, 365 F.Supp. 277, 281 (E.D.Pa. 1973); and Prosser, *Law of Torts* § 56 (4th Ed. 1971). Standards of conduct and practice giving

rise to the existence of a legal duty, may be evidenced by expert testimony, by licensing and accreditation standards, by the accreditation requirements of professional associations and published ethical standards and practices. *Menzel v. Morse*, 362 N.W.2d 465, 471 (Iowa 1985).

Thomas knew, even before meeting with Jordan that "he had mental health concerns, and he was on psychiatric medications." PSDF ¶ 112. Then, upon introduction, Thomas specifically represented to Jordan that he was there in a capacity of providing mental health services to him. Thomas introduced himself to Jordan, explaining:

> "I'm Scott from Eyerly-Ball … have you heard of Eyerly-Ball before?... We are a *mental health agency*… what we do is meet with folks who are in jail here, *see if there are any mental health concerns that they might have… we see if they have any mental health concerns*…"

(emphasis added) PSDF ¶ 117. Thomas did not limit the scope of his contact with Jordan in any way, shape, or form. Thomas did not make any statements that he was not there to assist Jordan with his mental health needs, nor did he make any statements stating that he was just there to process paperwork and schedule future appointments for Jordan.

Thomas requested and received information regarding Jordan's medication and medical and mental health history PSDF ¶ 125. Importantly, Thomas facilitated Jordan disclosing basic suicidal screening information to him by affirmatively promising Jordan that everything disclosed would remain confidential. PSDF ¶ 119. Thomas specifically promised Jordan that he would not share any information with anyone short of being court-ordered to disclose information through a subpoena. *Id.* Upon receipt of that guarantee by Thomas, Jordan further raised the suicide risk red flags by disclosing his

suicidal past, mental health struggles, psychosis, hopelessness, isolation, mental health history, substance abuse history, social isolation, the fact that he had nothing to live for upon his release, and physical evidence of his infliction of self-harm. PSDF ¶ 120,

Once Thomas obtained the information from Jordan in response to his promise of confidentiality, Thomas' reasonable duty of care toward Jordan was triggered, if it didn't already exist.  Thomas himself recognized that the information provided by Jordan were recognized signs and symptoms of an elevated suicide risk.  PSDF ¶ 128.  Once Thomas was in receipt of Jordan's fragile mental health disclosures, he had a duty not to hold onto them while an obvious risk of harm befell Jordan.  The duty to warn is predicated upon superior knowledge and arises when one may reasonably foresee danger of injury or damage to another less knowledgeable unless warned of the danger.  *Baumler v. Hemesath*, 534 N.W.2d 650, 653-54 (Iowa 1995).  Thomas had knowledge of the foreseeable danger of injury to Jordan, knowledge of information that the jail was not privy to.  As such, his legal duty was thereby triggered.

Thomas concedes that his duty of care required, at a minimum, communication of the disclosed recognized signs and symptoms of elevated suicide risk to jail staff. PSDF ¶¶ 133-35.  This sentiment was echoed by Thomas' immediate supervisor, Van Horn. PSDF ¶¶ 140-41. Thomas affirmatively placed himself in a relationship and position of trust upon which Jordan relied.  Based upon that affirmative conduct, a duty of reasonable care was triggered to utilize and handle the information provided to Thomas in a reasonable and prudent manner to avoid any harm befalling Jordan.

Unfortunately for Thomas, and tragically for Plaintiffs, Thomas' affirmative conduct, creating a risk of physical harm to Jordan did not end with Thomas doing nothing after receiving the information from Jordan.  Instead, most egregiously, Thomas engaged in additional affirmative conduct that further escalated and increased the risk of harm to Jordan.  After receiving information from Jordan under the promise of confidentiality that even an untrained person could identify as marking Jordan as an elevated suicide risk, Thomas specifically represented to jail staff that Jordan would *not* hurt himself.  PSDF ¶ 146.  Admittedly unqualified to make such statements, Thomas affirmatively represented to jail staff that Jordan did *not* have a medical need and would be just fine. PSDF ¶¶ 146-147.  Thus, not only did not adequately warn of the dangerous condition he affirmatively represented that it did not exist!

As opined by Plaintiffs' expert; "Because Mr. Thomas was not a licensed or qualified mental health professional and therefore not qualified to perform a mental health evaluation nor a suicide risk assessment, it was inappropriate for him to communicate in any way to John Weakland that Mr. Payne was safe, or had been cleared, or that he did not require any additional custody supervision or a suicide watch and precautions."  PSDF ¶ 156.  "In my professional opinion Mr. Thomas was not trained, supervised, licensed or otherwise appropriately qualified to provide the requisite/necessary emergency mental health evaluation or suicide risk assessment that Mr. Payne required.  He certainly was not qualified to 'clear' Mr. Payne or to provide any other type of verbal or written mental health 'clearance' to jail staff."  PSDF ¶ 157.

Assuming everything to be fine, no additional precautions or observations were made of Jordan, the next observation occurring over eighty-minutes later after Jordan had killed himself. PSDF ¶¶ 152-153, 160.  Thomas' own conduct triggered his duty to exercise reasonable care toward Jordan.

### D.  Thomas' Lack of Physical Control Over Jordan Is Irrelevant to His Duty.

The fact that Thomas did not have lawful custody over Jordan at the time he committed suicide does not relieve him of his duty to exercise reasonable care because Thomas was negligent during the time that he had the capacity to prevent or mitigate the harm.  The "control" analysis to a legal duty focuses on whether a claimed at-fault party had the capacity to manage, minimize or mitigate a risk of harm.    See, *McCormick v. Nikkel & Assoc.*¸819 N.W.2d 368, 371 (Iowa 2012).    If a defendant had the ability to manage, minimize or mitigate a risk of harm during the critical time, a legal duty exists to do so, even after control is relinquished.  However, if there was nothing that a defendant could reasonably do to control harm befalling another, they cannot be said to have a duty to accomplish the impossible.  *Id.*

 In *McCormick*, the court concluded that a subcontractor that *properly* performed electrical work on the jobsite, then locked up the work and transferred control to the property owner did not owe a duty of care to an employee of the owner who was electrocuted six days later when the owner's own conduct caused the harm.  *Id.* at 369.  In *Lukken v. Fleischer*, 962 N.W.2d 71 (Iowa 2021), the court sensibly concluded that because the zip-line braking system had been completely replaced by a different supplier before the

incident, the prior braking system supplier could not be said to have a duty to the plaintiff. *Id*. at 76. "Because Challenge Quest owed no duty of care associated with the zip line's braking system after its own braking system had been uninstalled, no cause of action for negligence exists as a matter of law." *Id.*

The difference between the "no control" cases and Thomas in this case is that a factual dispute exists as to what Thomas could have and should have done to manage, minimize or mitigate the harm to Jordan, during the timeframe that Thomas could have acted. Plaintiffs' complaint is that Thomas failed to act appropriately during the time his action could reasonably be expected to make a difference in the ultimate outcome. Thomas' failure to identify the existing imminent risk of harm, and his failure to communicate and warn those who regained custody of Jordan so that they could implement the appropriate remedial measures, was fully within his control. Restatement (Third) of Torts: Liability for Physical and Emotional harm, § 18, Negligent Failure to Warn. Further, it was fully within Thomas' control to avoid affirmatively representing to jail staff that Jordan would not harm himself while in custody.

Thomas' conduct in this case would be similar to the subcontracter in *McCormick v. Nikkel & Associates* affirmatively telling the property owner that he had deenergized the work site when he had done no such thing. Certainly, in that circumstance, the subcontractor would be deemed to still have control over the harm, thereby triggering its duty of reasonable care. Thomas' situation is similar to circumstances where a school may be held liable for injuries to students occurring after school hours and off school grounds

when the school's negligence started the casual chain leading to the ultimate harm. See *Mitchell v. Cedar Rapids Cmty. Sch.Dist.*, 832 N.W.2d 689, 701 (Iowa 2013). It is also similar to a physician's failure to diagnose and disclose a medical condition to a patient or even failure of a physician to disclose test results to parents indicating a severe disability of an unborn child. See *Plowman v. Fort Madison Cmty. Hosp.*, 896 N.W.2d 393 (Iowa 2017). It is the duty owed at the time of the negligent conduct that is the focus of the control analysis. Just because McDonalds handed over control of the hot coffee does not relieve them of their duty of reasonable care in regulating the temperature of the coffee. It really is that simple.

Thomas' attempted reliance on *Morris v. Legends Fieldhouse Bar & Grill, LLC*, 958 N.W.2d 817 (Iowa 2021), completely misses the point as well. In *Miller,* the club did not have custody, nor did it have the lawful authority to retain custody of the patron. The club did not have the ability to control the patron once he was ejected from the property. Had either the security guard or the club restrained the patron of his freedom of movement in that situation, they themselves would be subject to liability for false imprisonment. Instead, the security officer exercised reasonable care by offering a safe ride home which was declined by the patron. Once ejected, the club no longer had the ability to legally control the movements or conduct of the patron. Thus, their duty was extinguished.

In stark contrast, substituting the *Morris* characters into our fact pattern, Security Guard Thomas, by virtue of his employment with the Club, was called in to assess Patron

Jordan.  In furtherance of that assessment, Security Guard Thomas swore secrecy to Patron Jordan resulting in Patron Jordan sharing critical information unknowable to the establishment or any other security guards.  Any reasonable person would have taken the information obtained by the Security Guard Thomas as indicative of a risk of harm to Patron Jordan.  Instead of offering a reasonable safe alternative, Security Guard Thomas, turned Patron Jordan back over to the Club and another security guard for his continued custody without disclosing the information he himself identified as critical.  Not only did Security Guard Thomas not share that information he recognized was crucial to Patron Jordan's avoidance of harm, he voluntarily, affirmatively represented to the Club that Patron Jordan was not at risk of that specific harm.  The precise harm that Security Guard Thomas represented would not befall Patron Jordan is the precise danger that ended up occurring.

Thomas had necessary control of his actions at the time that was crucial for action to be taken.  As such, he had a duty to exercise reasonable care and his failure to do so gives rise to liability.

## II.    CAUSATION IS A QUESTION FOR THE JURY.

"General questions of negligence, contributory negligence, and proximate cause are for the jury; it is only in exceptional cases they may be decided as matters of law." Ia.R.App.P. 6.904(2)(j).  "Causation is a question for the jury, 'save in very exception cases where the facts are so clear and undisputed, and the relation of cause and effect so apparent to every candid mind, that but one conclusion may be fairly drawn therefrom.'"

*Thompson*, 774 N.W.2d at 836; quoting *Lindquist v. Des Moines Union Ry.*, 239 Iowa 356, 362, 30 N.W.2d 120, 123 (1947).

The conduct of a defendant is a factual cause of harm when the harm would not have occurred absent the conduct.  *Garr v. City of Ottumwa*, 846 N.W.2d 865, 869 (Iowa 2014).  "There may be more than one cause in fact of a plaintiff's damages."  *Id.* at 871 (Iowa 2014). "An actors tortious conduct need only be *a* factual cause of the other's harm."  (Emphasis original) *State v. Hennings*, 791 N.W.2d 828, 836 (Iowa 2010); Restatement (Third) of Torts § 26 cmt.c at 347.  Causation involves an evaluation into the foreseeability of the risk created by the defendant's act or omission.  See *Thompson v. Kaczinski*, 774 N.W.2d 829, 835 (Iowa 2009).

### A. Expert Testimony and Causation.

The cause of Jordan's death is undisputed.  Jordan's **<u>cause</u>** of death has been certified as "suicide."  PSDF ¶ 178.  This cause of death was certified by an expert witness, Dr. Dennis Klein of the State Medical Examiner's Office. PSDF ¶ 178.  This expert has been disclosed and properly designated.  *Id.*  Dr. Penn has also been designated as an expert witness for Plaintiffs regarding the standards of care applicable to Thomas and Eyerly-Ball, their failures to comply with those standards, and the causal connection between the failure to comply with the standards of care and Jordan's ultimate suicide.  PSDF ¶ 177.  This combination of expert testimony meets the necessary threshold of probability or likelihood of a causal connection sufficient to generate a fact

question for the jury.  *Hansen v. Cent. Iowa Hosp. Corp.*, 686 N.W.2d 476, 485 (Iowa 2004).

Furthermore, "[e]xpert testimony is not necessary to establish causation in all negligence cases.  *Garr v. City of Ottumwa*, 846 N.W.2d 865 872 (Iowa 2014).  "[I]t is unnecessary to present expert testimony on causation in those situations in which the subject is within the common experience of lay persons."  *Id.* "When the causal connection between the tortfeasor's actions and the plaintiff's injury is within the knowledge of an ordinary layperson, the plaintiff does not need expert testimony to create a jury question on causation."  *Doe v. Cent. Iowa Health Syst.*, 766 N.W.2d 787, 793 (Iowa 2009).  "The probability of causal connection necessary to generate a jury question need not come solely from one witness."  *Oak Leaf Country Club, Inc., v. Wilson*, 257 N.W.2d 739, 747 (Iowa 1977).

This is not a complex medical malpractice case where Plaintiffs allege complicated medical deficiencies in treatment caused a medical injury that ultimately resulted in the death of a family member. See e.g. *Est. of Butterfield v. Chautauqua Guest Home, Inc.*, 987 N.W.2d 834 (Iowa 2023).   The mechanism and effect of the alleged injury caused by the Defendants' negligence simply is not in issue in this case.  In fact, Thomas contends that he was not providing medical or mental health care to Jordan at any time.  Defendants' Statement of Material Facts, ¶ 11.  In situations where a professional provides merely "nonmedical, administrative, ministerial or routine care" expert testimony is not required.  *Id.* at 841.

This case is straight-forward.  Thomas had a duty to prevent Jordan's suicide. He had a duty to identify and effectively communicate Jordan's risk factors and warnings signs that indicated he was an imminent suicide risk.  Instead of sharing that information with jail staff, Thomas did worse.  Thomas affirmatively represented to jail staff that Jordan would not harm himself while in jail. PSDF ¶ 146.  No additional supervision or suicide prevention precautions were taken as a result of Thomas' representation. PSDF ¶ 153. Eleven minutes later, Jordan committed suicide.  PSDF ¶¶ 158-69.  Plaintiffs are not required to present expert testimony on an issue that a jury can figure out for themselves. A decedent's state of mind at the time of suicide involves factual questions that ordinarily must be decided by the jury and not by way of summary judgment motions.  *Roohbakhsh v. Bd. of Trs. Of the Neb. State Colleges*, 409 F.Supp. 3d 719, 734 (D.Neb., 2019)

In *Mulhern v. Catholic Health Initiatives*, 799 N.W.2d 104 (Iowa 2011) the Court merely stated in passing dictum that expert testimony was required to generate a jury question as to the defendant's negligence related to the suicide of a patient three-weeks after she had been released from the hospital's custody. *Id.* at 106.  The court did NOT however distinguish between whether that testimony was required to establish the standard of care or specifically, cause of death. *Id.*  Certainly, the Court did not impose a bright-line rule that in all suicide cases, expert testimony relating specifically to causation is required.  Neither do the other cases cited by Defendants.

Importantly, all cases cited by Defendants requiring expert testimony for causation of suicide claims involved suicides taking place in non-custodial settings.  The decedents

in all of those cases either were never held in custody or had been released by a medical provider only to commit suicide at a later, far-removed, date. *Wilkins v. Lamoille County Mental Health Serv.*, 889 A.2d 245, 247 (Vt. 2005) (Suicide assessment concluded decedent was not a suicide risk and she was subsequently discharged with instructions on following up with mental health care. Six days later, the decedent committed suicide); *Estate of Joshua T. v. State*, 840 A.2d 768 (N.H., 2003) (Expert testimony required for claim that New Hampshire Division of Children Youth and Families negligently placed foster child in a home where he ultimately committed suicide.)

The reason expert testimony regarding causation is often required in NON-Custodial cases is, "[t]raditionally suicide has been considered an intentional or intervening act for which the alleged tortfeasor cannot be held responsible." *Cutler*, 473 N.W.2d at 182. Thus, to overcome the presumption of intentional intervening action in non-custodial cases, expert testimony is appropriate to establish the otherwise lacking causal connection. In stark contrast, an inmate cannot be held responsible in whole or in part for the breach of the duty to exercise care for his own well-being because his custodian has already assumed that duty. *Tomfohr v. Mayo Foundation*, 450 N.W.2d 121, 125 (*Min. 1990); cited with approval in *Mulhern*, 799 N.W.2d at 120. In these situations, when the actions taken by the individual are the very acts which the care provider had a duty to prevent, the provider's own failure to prevent suicide should not create its own defense. *Id.* No further causal connection is required because the causal connection is inherent in the care-providers duty to prevent the act of suicide. This is

entirely consistent with the affirmative duty to prevent suicide as spelled out in *Cutler*,

473 N.W.2d at 182.

    As such, the facts in this case are sufficient to establish at least a fact question

regarding whether Jordan's suicide was a natural and probable cause of Defendants'

negligence.  See *Bouton v. Missouri*, 2023 U.S. Dist. LEXIS 12670, *26-32, 2023 WL

402018 (E.D.Mo. 2023).

## III.    A FACT QUESTION EXISTS AS TO WHETHER EYERLY-BALL WAS NEGLIGENT.

    Plaintiffs remaining cause of action against Eyerly-Ball is for Negligence.

(Complaint, Count V, p, 23, ¶ 119, Dkt. 1). The specifications of Negligence alleged

against Eyerly-Ball are as follows:

    a.  Failing to use and exercise that degree of skill, care, and learning ordinarily possessed and exercised by a Mental Health Service provider in similar circumstances.
    b.  Assigning and permitting an unlicensed, unqualified individual to conduct mental health evaluations.
    c.  Assigning and permitting an unlicensed, unqualified individual to conduct a suicide risk assessment.
    d.  Failure to supervise Defendant Thomas.
    e.  Failure to train Defendant Thomas in basic suicide risk assessment, identification, and prevention.
    f.  By and through the actions and/or omissions of its employees, Defendant Thomas, acting within the scope of their employment.

(Complaint, Count V, p, 23, ¶ 119, Dkt. 1).

### A.  Plaintiffs Do Not Need to Establish a Claim that Meets the Elements of Medical Negligence.

    Plaintiffs have never alleged that a physician-patient relationship existed between

Jordan and Thomas.  (Eyerly-Ball Brief, p. 24).  Division V of Plaintiffs' Complaint,

contained the heading "Medical Negligence" because under Iowa Code section 147.1, Eyerly-Ball and, potentially, Thomas, depending upon any licensing or certifications that he may be shown to have had in discovery, could arguably qualify as "health care providers" pursuant to Iowa Code sections 147.140, and 147.136A.  As such, with an abundance of caution, Plaintiffs complied with the requirements of Iowa Code section 147.140, to ward off any motions to dismiss by Eyerly-Ball and/or Thomas for failure to comply with those statutory requirements.  See *Jorgensen v. Smith*, 2 N.W.3d 868 (Iowa 2024).

The existence of a physician-patient relationship is not a prerequisite for Plaintiffs' causes of action against Eyerly-Ball under Count V.  The basis of the cause of action is one of professional and ordinary negligence. For the reasons explained in the following subsection, Eyerly-Ball owed a duty to exercise ordinary and professional reasonable care in the provision of mental health services to inmates at the Madison County Jail, including Jordan.

### B.  Eyerly-Ball Owed Jordan a Duty to Exercise Reasonable Care.

Eyerly-Ball was in the business of providing mental health services. PSDF ¶ 17 Consistent with that business, Eyerly-Ball contracted to be the mental health provider for the Madison County Jail. PSDF ¶ 21. Pursuant to their contractual undertaking, Eyerly-Ball promised to provide "Core Services" which specifically included "mental health services in jails" and "Basic Crisis Response."  PSDF ¶ 25.  "Mental health services in jails under the Regional Management Plan included "[e]valuation, medication

management and therapy services." PSDF ¶ 26.  Eyerly-Ball contractually undertook the

responsibility of providing these services to inmates at the Madison County Jail in

addition to also providing "Jail Diversion/Intensive Case Management – Madison

County," "Therapy Evaluation," "Psychiatric Evaluation, and "Mobile Crisis Response

Services."  PSDF ¶ 25, 27. "Basic crisis response" includes provision of "crisis

screening" services.  Ia.Admin.Code § 441-24.32(1).

  How Eyerly-Ball went about providing mental health services to inmates at

Madison County Jail was within their control and discretion subject to civil liability for

negligent performance.  However, Eyerly-Ball contracted to ensure that inmates at

Madison County Jail, including Jordan, received adequate mental health services, which

legally included crisis screening services.  Thus, the legal responsibility for ensuring

reasonable care was used in providing those services, fell squarely on Eyerly-Ball's

shoulders.

  Eyerly-Ball's attempts to pass-on performance of their contractual obligations to

Independent Contractors, such as ITP, does not alleviate their duty to exercise reasonable

care in the provision of mental health services to inmates at the Madison County Jail.

First, ITP would not, by definition, provide "crisis screening."  Ia.Admin.Code § 441-

24.32(1).  ITP would only arguably perform the subsequent "crisis assessment.

Ia.Admin.Code § 441-24.32(2).  Regardless, the law has been crystal clear for over fifty

years that when "[a] party who assumes a duty under a contract for the safety of the

public or certain individuals cannot delegate the duty to an independent contractor, even

when it is the independent contractor who is doing the actual work." *Lane v. Coe College*, 581 N.W.2d 214, 217 (Ia.Ct.App. 1998); citing *Giarratono v. Weitz Co.*, 259 Iowa 1292, 147 N.W.2d 824, 831 (Iowa 1967).

Where one person owes another a contractual duty to act, the law imposes upon the person owing that duty the further duty of acting with due care in the performance of his contract…" *Giarratano*, 147 N.W.2d at 832. "[P]erformance of the contract may be delegated to another but this delegation does not relieve the contract of the duty to act, or of his duty to act with due care." *Id.* Thus, Eyerly-Ball's subcontracting out work that they themselves had contracted to provide, does not and cannot relieve them of their originally contracted duty of care.

The specific principles of tort liability regarding duties owed to others, previously set forth in Division I, are equally applicable to Eyerly-Ball in the same manner that they are applicable to Thomas. First, Eyerly-Ball owed a duty of reasonable care to prevent inmate suicide, arising out of the special relationship created by their provision of services to Jordan who was in custody. *Cutler*, 473 N.W.2d at 182. "An actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of that relationship." *Hoyt v. Gutterz Bowl & Lounge, LLC*, 2011 Iowa App. LEXIS 1276, *11; Quoting Restatement (Third) of Torts, § 40(a).

Second, Eyerly-Ball as the contracted mental health service provide for the Madison County Jail inmates, owed a duty of reasonable care arising out of their contractual duty to provide services to the inmates at Madison County Jail. Restatement

(Third) of Torts, § 42, Duty Based on Undertaking.  This included Eyerly-Ball's legal obligation to provide a "crisis screening" to Jordan.  Ia.Admin.Code 24.32(1).  If Thomas was not providing Jordan with the initial crisis screening, who was?  Either Eyerly-Ball was providing crisis screening through Thomas, or they failed to perform a service that they were statutorily mandated to provide.  Either way, Eyerly-Ball breached it's legal duty to exercise reasonable care.

As the contracted provider of professional services, Eyerly-Ball owed a duty to those it served to use the degree of skill, care and learning ordinarily possessed and exercised by a mental health service provider in similar circumstances.  Restatement (Third) of Torts, § 12, Knowledge and Skills; See also *Est. of Butterfield v. Chautauqua GuestHome, Incl*, 987 N.W.2d 834 (Iowa 2023) (Healthcare); *Laden & Pearson, PC v. McFadden*, 965 N.W.2d 189, 2021 Iowa App. LEXIS 498, 2021 WL 2448377 (Iowa App. 2021) (Legal); *Rowedder v. Helkenn*, 2009 Iowa App. LEXIS 453 (Real Estate Professional).  As the Restatement's make clear: "If an actor has skills or knowledge that exceed those possessed by most others, these skills or knowledge are circumstances to be taken into account in determining whether the actor has behaved as a reasonably careful person."  *Id.*  Additionally, "[a]n actor's departure from the custom of the community, or of others in like circumstances, in a way that increases risk is evidence of the actor's negligence but does not require a finding of negligence."  Restatement (Third) of Torts, § 13, Custom.

Because Eyerly-Ball was contracted by Madison County to provide mental health services, including crisis response services to inmates at the Madison County jail, and because Jordan was an inmate, Eyerly-Ball owed a duty to exercise reasonable care in the provision of services to Jordan.  No other conclusion is warranted under the disputed facts of this case.

### C.  A Fact Question Exists Regarding Whether Eyerly-Ball was Negligent in Failing to Train and Supervise Thomas.

An employer may be independently liable for its failure to train and/or supervise its employees.  See generally *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699 (Iowa 2016). Iowa has recognized the torts of negligent training and supervision based upon the principles set forth in Restatement (Second) of Agency, § 213.  *Godar v. Edwards,* 588 N.W.2d 701, 709 (Iowa 1999).  The Restatement provides:

A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:

(a)  In giving improper or ambiguous orders of in failing to make proper regulations; or

(b)  In the employment of improper persons or instrumentalities in work involving risk of harm to others:

(c)  In the supervision of the activity; or

(d)  In permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

Restatement (Second) of Agency, § 213.  A necessary element of a claim for negligence under this section is an underlying tort or wrongful act committed by the employee. *Schoff v. Combined Insurance Co. of America*, 604 N.W.2d 43, 53 (Iowa 1999).  For the reasons set forth in Division I, a fact question exists as to whether Thomas was negligent.

To support a claim of negligent training and/or supervision, there must simply be some evidence of testimony establishing evidence of a standard of care for training employees on a particular topic, and a corresponding breach of that standard. *Alcala*, 880 N.W.2d at 708.  It bears repeating, suicide is a known risk for inmates in jails.  *Estate of Boncher*, 272 F.3d at 486.  "America faces an epidemic of suicide by individuals in custody."  *Hyatt*, 843 F.3d at 180.  As such, those individuals working with inmates must be adequately trained and competent to identify inmates who are at an elevated risk for suicide and intervene when appropriate.  That is why, according to the National Commission on Correctional Health Care (NCCHC) Jail Standards all custody and health care staff should receive ongoing education on suicide prevention practices.  PSDF ¶ 70.  Similarly, Eyerly-Ball's accrediting agency requires annual suicide prevention training and certification.  PSDF ¶ 79.

Dr. Penn has also provided his opinion as it relates to the standard of care in the mental health services industry, as requiring the following:

- "[W]hether Eyerly Ball did nor did not render "mental health treatment or evaluations," as mental health system and professionals they had a professional and ethical duty to take additional precautions prior to any

clinical involvement with any Madison County jail inmate.  In particular they had a duty to instruct, train and explain to their case manager/jail diversion staff that they had an ethical and clinical duty to communicate in a timely manner at all times with jail staff, the appropriate course of action to safely deal with any inmates who they learned of or during the course of any meeting had suicide risk, suicidal ideation, intent or plan, or posed any acute or non-acute risk of self-harm." PSDF ¶ 71

- "[A]t a minimum, given Scott Thomas' role as being the only individual from Eyerly Ball to set foot in the Madison County Jail, and his admission to at least assessing individuals for determination of potentially appropriate services, and due to the well-known risk of suicide attempts and completed suicide within correctional settings, and in particular in jail settings, Mr. Thomas should have received mandatory and ongoing training on basic suicide prevention practices and procedures." PSDF ¶73

- "[A]ny individual who carries out any ongoing or substantive work in a jail that interacts with inmates should receive/be trained in basic suicide prevention practices/procedures.  This important public health and safety initiative is also clearly stated and emphasized in the State of Iowa Administrative Code…"  PSDF ¶74

- "Eyerly Ball as Mr. Thomas' employer should have set expectations by policies, procedures and practices that Mr. Thomas and other similarly situated case managers/jail diversion staff be appropriately trained, receive additional new employee and annual or similar established frequency training and therefore be better trained and qualified to identify recognized suicide risk factors (that elevate a jail inmates risk of suicide) and be trained on how to assess, evaluate, manage and how to communicate and work more effectively with jail/custody staff to reduce suicide risks." PSDF ¶ 76

- Thomas should have been trained and received supervision by Eyerly Ball staff and leadership to NOT make statements that an inmate "will be ok" or that he was otherwise NOT a suicide risk when he was not qualified to make such determinations. PSDF ¶77

Despite these industry standards of care, Van Horn, the supervisor of Eyerly-Ball's jail diversion program did not believe it was important for Thomas to have an understanding of the peculiar risk factor of suicide that are applicable to incarcerated individuals. PSDF ¶83. In fact, Van Horn denied that knowledge of those risk factors by Thomas would have changed what he did. PSDF ¶84. Consistent with this indifference, Eyerly-Ball did not have any standard operating procedures or protocols related to mental health services provided to inmates in county jails. PSDF ¶98. Nor did they have any

policies or procedures related to crisis response, suicide assessments or mental health

evaluations and interventions of inmates of county jails. PSDF ¶99

 Thomas himself has said that he has not received any training related to

identifying individuals who may be at greater risk of suicide.  PSDF ¶88. Thomas'

precise sworn testimony was as follows:

> Q.  (By Mr. Rehkemper)  Has Eyerly Ball ever provided you with any specific training related to identification of individuals who may be at greater risk of suicide?
>
> A.  **I don't recall having that kind of training.**
>
> Q.  Have you ever received any of that type of training from any other entity or agency?
>
> A.  Can you say the parameters again, please?
>
> Q.  Any training related to identifying individuals who may be at greater risk of suicide?
>
> A.  **I don't recall anything specific.**

(emphasis added) PSDF ¶ 89.  Thomas had not received any training, certifications, or

instruction, prior to June 12, 2020, related to individual, relationship, community, or

societal factors that are recognized as increasing an individual's risk of self-harm and/or

suicide.  PSDF ¶90.  Neither Eyerly-Ball nor Thomas have produced in discovery, any

documentation or materials for any training Thomas received while employed at Eyerly-

Ball.  PSDF ¶91.

 The fact that Eyerly-Ball claims that paper certificates, not produced in discovery,

PSDF ¶__, establish Thomas was adequately trained to perform his duties as Jail

Diversion Manager, does not resolve the disputed fact question regarding their failure to train and failure to properly supervise Thomas in the performance of his employment duties.  Indeed, Thomas' own concessions refute Eyerly-Ball's claims.  As such, these disputes are appropriately resolved by the jury.

### D.  Respondeat Superior Applies to Eyerly-Ball.

The well-established rule is that under the doctrine of *respondeat superior*, and employer is liable for the negligence of an employee committed while the employee is acting within the scope of his or her employment.  *Jones v. Blair*, 387 N.W.2d 349, 355 (Iowa 1986).  "A claim of vicarious liability under the doctrine of *respondeat superior* rests on two elements: proof of an employer/employee relationship, and proof that the injury occurred within the scope of that employment."  *Biddle v. Sartori Mem'l Hosp.*, 518 N.W.2d 795, 797 (Iowa 1994).  There is no medical care exception to vicarious liability.  See *Wolbers v. Finley Hosp.*, 673 N.W.2d 728, 734 (Iowa 2003) (hospital may be vicariously liable for the negligence of its emergency-room caregivers).

There is no dispute that Thomas was an employee of Eyerly-Ball, acting within the scope of his employment at the time he assessed Jordan. PSDF ¶¶ 10-12.  As such, his negligence is imputed to his employer through the doctrine of *respondeat superior.  Id.* There is no necessity of a physician-patient relationship to establish Eyerly-Ball's vicarious liability.  There is no question that Thomas was an employee of Eyerly-Ball working within the scope of his employment at the time he assessed Jordan.  As such, any

negligence of Thomas is imputed to Eyerly-Ball as his employer.  Any assertions to the contrary are patently frivolous.

## IV.    SUFFICIENT EVIDENCE SUPPORTS PUNITIVE DAMAGES.

To support punitive damages a Plaintiff must prove by a preponderance of clear, convincing, and satisfactory evidence that the defendant's acted with "willful and wanton disregard."  Iowa Code § 668A.1.  In the context of punitive damages, the phrase "willful and wanton" means "[t]he actor has intentionally done an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow and which is usually accompanied by a conscious indifference to the consequences."  *McClure v. Walgreen Co.*, 613 N.W.2d 225, 230 (Iowa 2000).

The basis of Plaintiffs' claim for punitive damages against Eyerly-Ball is that Eyerly-Ball knowingly assigned an individual who was unfit, untrained and unqualified to appropriately address serious mental health needs of inmates such as Jordan.  Eyerly-Ball was contracted to provide mental health services to inmates at the Madison County Jail which included basic crisis response services.  In response to an obvious mental health crisis being experienced by Jordan, the only person, Thomas, that Eyerly-Ball sent to address the crisis, was admittedly unqualified to assist.  Eyerly-Ball and Thomas both knew that Madison County Jail and its staff relied upon them to be the mental health providers for their inmates.  Despite this fact, neither Eyerly-Ball nor Thomas ever corrected this mis-reliance, instead opting to continue cashing the County's checks for services that should have been performed but that Thomas was incompetent to perform.

Thomas' lack of qualifications demonstrated themselves when, despite eleven well-recognized signs of imminent suicide risk being disclosed to him, Thomas affirmatively represented to jail staff that Jordan would not harm himself while he was in custody.  Both Thomas and Eyerly-Ball concede that this representation was not one that Thomas was qualified to make.  There are sufficient facts, taken in the light most favorable to Plaintiffs to allow the issue of Punitive Damages to at least be presented at trial.  If the evidence adduced at trial does not generate a jury question, then the court may consider this issue upon a properly made Motion for Directed Verdict.  However, at this stage, an arguable factual dispute exists making summary judgment inappropriate.

## <u>CONCLUSION</u>

For all the reasons set forth above, Eyerly-Ball Community Health Service and Defendant Scott Thomas' Motion for Summary Judgment should be denied in its entirety and this case should proceed to a jury.

Respectfully Submitted,
GOURLEY, REHKEMPER,
& LINDHOLM, P.L.C.

By: /s/*Robert Rehkemper*
Robert G. Rehkemper,  AT0006553
440 Fairway, Suite 210
West Des Moines, IA 50266
Telephone No. (515) 226-0500
Email: rgrehkemper@grllaw.com
ATTORNEYS FOR PLAINTIFF KENT
PAYNE INDIVIDUALLY AND AS
ADMINISTRATOR OF THE ESTATE FOR
JORDAN PAYNE

_Paul Statler_

Paul J. Statler,  AT0012577
301 East Walnut Street, Suite 7
Des Moines, Iowa 50309
Phone: 515.288.0509 Fax: 515.608.4484
Email: paul@statlerlaw.net
ATTORNEYS FOR PLAINTIFF
LESLIE KING-PAYNE, INDIVIDUALLY

Copies to:

Jack Hilmes
Joseph F. Moser
FINLEY LAW FIRM, P.C.
699 Walnut Street, Suite 1700
Des Moines, IA 50309
Email: jhilmes@finleylaw.com
Email: jmoser@finleylaw.com
ATTORNEYS FOR EYERLY-BALL
COMMUNITY MENTAL HEALTH
AND SCOTT THOMAS

Michael Richards
Dentons Davis Brown PC
215 10th ST. Suite 1300
Des Moines, IA 50309
515-288-2500
Mike.richards@dentons.com
ATTORNEY FOR DEFENDANTS
JOHN WEAKLAND, JASON BARNES,
AND MADISON COUNTY, IOWA

| CERTIFICATE OF SERVICE | | |
|---|---|---|
| The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on July 22, 2024 | | |
| By: | ☐ U.S. Mail | ☐ FAX |
| | ☐ Hand Delivered | ☐ Overnight Courier |
| | ☐ Certified Mail | ☒ E-Filed |
| Signature: Robert Rehkemper | | |