IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| KENT H. PAYNE, Individually and as the Administrator of the Estate of JORDAN KENT PAYNE and LESLIE KING-PAYNE, | ) ) ) ) ) | CASE NO. 4:21-cv-00349 |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | **DEFENDANTS EYERLY-BALL COMMUNITY MENTAL HEALTH SERVICES and SCOTT THOMAS'S** |
| JOHN WEAKLAND, JASON BARNES, MADISON COUNTY, IOWA, EYERLY-BALL COMMUNITY MENTAL HEALTH SERVICES and SCOTT THOMAS, | ) ) ) ) ) ) | **REPLY TO PLAINTIFFS' RESISTANCE TO MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | ) ) | |

**COME NOW** the Defendants, Eyerly-Ball Community Mental Health Services ("Eyerly-Ball) and Scott Thomas ("Thomas"), pursuant to Federal Rule of Civil Procedure 56, LR 56(d) and 7(g), and for their Reply to Plaintiffs' Resistance to Motion for Summary Judgment, state as follows:

## TABLE OF CONTENTS

**INTRODUCTION** ...........................................................................................................2

**MISSTATEMENTS OF UNDISPUTED FACTS** ........................................................2

**ARGUMENT** ...............................................................................................................6

   **I.**   **PLAINTIFFS CANNOT ESTABLISH THOMAS OWED A LEGAL DUTY**.....................6

     **A.**   **No Duty Based on a "Special Relationship"**..................................................6

     **B.**   **No Duty Based on a Voluntary Undertaking** ...............................................8

     **C.**   **No Duty Based on Conduct Creating a Risk of Harm**................................10

   **II.**  **PLAINTIFFS CANNOT GENERATE A GENUINE ISSUE OF MATERIAL FACT ON THE ELEMENT OF CAUSATION** ......................................................................13

**A.   Expert Testimony is Required** ...................................................................................13

**B.   Even if Expert Testimony is not Required, Plaintiffs Lack Sufficient Evidence of Causation** ...........................................................................................................................16

**III.   PLAINTIFFS CANNOT ESTABLISH THEIR CLAIMS AGAINST EYERLY-BALL** ..17

**A.   Duty of Care** ............................................................................................................17

**B.   No Genuine Issue of Fact Exists as to Plaintiffs' Negligent Training and Supervision Claims** ...........................................................................................................................18

**IV.   THE RECORD LACKS SUFFICIENT EVIDENCE TO SUPPORT A CLAIM FOR PUNITIVE DAMAGES** ............................................................................................................19

## INTRODUCTION

Plaintiffs' Resistance is founded upon repeated, inaccurate or misleading characterizations of key facts and issues that are critical to the validity of Plaintiffs' arguments. Plaintiffs' arguments quickly erode in light of the true, undisputed, material facts. When the Court considers the undisputed, material facts—particularly those it has already established in its prior rulings, the Court must find that Defendants Scott Thomas and Eyerly-Ball are entitled to summary judgment as a matter of law on all remaining claims.

## MISSTATEMENTS OF UNDISPUTED FACTS

Key to Plaintiffs' arguments, for example, Plaintiffs assert that "Thomas had knowledge of the foreseeable danger of injury to Jordan, knowledge of information that the jail was not privy to." (Resistance, p. 27). However, the undisputed facts in the record clearly reflect that the jail was, in fact, privy to essentially the same information that Thomas possessed. In other words, at the time Thomas conducted his screening interview with Payne, Madison County Jail staff were already aware of all potential suicide risk factors or symptoms of which Thomas became aware during his interview with Payne, including but not limited to prior suicide attempts, feelings of hopelessness, relationship problems, self-harm, mental illness, family history of suicide, and agitation while in the jail. (*See* Defs' SOF, ¶¶ 43-49). Such

2

undisputed facts are critical to the issue of causation and whether any additional communication to the jail staff from Thomas would have more likely than not prevented Payne's suicide. Notably, as discussed more fully below, Plaintiffs make no attempt to engage in the above facts and rebut Defendants' substantive arguments regarding causation.

Further, Plaintiffs assert that "Thomas specifically represented to jail staff that Jordan would *not* hurt himself" and that Thomas "affirmatively represented to jail staff that Jordan did not have a medical need and would be just fine." (Resistance, p. 28). Similarly, Plaintiffs rely on their expert's opinion, which is based on the erroneous premise that Thomas somehow "cleared" Payne from a mental health perspective by allegedly communicating to jail staff that Payne did not require additional supervision or a suicide watch. *See id.* Plaintiffs significantly mischaracterize Thomas's communication with the jail staff, as is evident in comparison to those undisputed facts already conclusively established by this Court's prior ruling.

During the screening interview, Payne told Thomas "I'm not 'gonna kill myself here. But I can't guarantee I won't kill myself when I leave here." (Defs' SOF, ¶ 32). After the interview concluded and before leaving the jail, Thomas notified jailer Weakland of exactly what Payne had told him during the interview – that Payne did not want to kill himself while in jail but that he was unsure about things outside of jail. *Id.* at ¶ 35. Specifically, Thomas testified that "I let [Weakland] know that Jordan had specifically told me on more than one occasion that he was not going to hurt himself in custody, but he was not sure what would happen when he left." (Thomas Dep. 73:2-5; Defs' App. at 020). Thus, it is clear that Thomas did not "specifically represent[ ] to jail staff that Jordan would not hurt himself." Rather, Thomas simply relayed to the jail staff that *Jordan* said he would not hurt himself *while in custody*,

while also providing the additional information regarding Jordan's comments about being unsure when he left the jail.

It is also clear that Thomas never "affirmatively represented to jail staff that Jordan did not have a medical need and would be just fine." There is simply no evidence that Thomas ever mentioned anything about Jordan not having a medical need or being "just fine." Similarly, there is no evidence that Thomas ever "cleared" Payne or in any way communicated to the jail staff that he did not require additional supervision or a suicide watch. In fact, Thomas scheduled Payne for a psychiatric evaluation with ITP and notified the jail staff of the appointment, which would signal to the jail staff that there was in fact a medical need and that Payne was not just fine. Plaintiffs' attempts to manufacture "affirmative representations" that simply never occurred in arguing that Thomas's communication to the jail staff caused the jail to take no further action and ultimately caused Payne's suicide must be rejected in light of the undisputed, material facts in the record. Plaintiffs cannot simply "make-up" or twist facts to suit their needs in an effort to avoid summary judgment.

Additionally, Plaintiffs assert that Thomas was "the only provider of mental health services within the confines of the Jail." (Resistance, p. 23). First, Thomas did not provide mental health services or treatment to inmates at the Madison County Jail. (Defs' SOF, ¶ 38). Further, ITP provides mental health services such as psychiatric evaluations to inmates at the Madison County Jail, and Payne was in fact scheduled for a psychiatric appointment with ITP that was to occur approximately ninety minutes after Thomas's screening interview with Payne ended. (*Id.* at ¶¶ 36-41). Indeed, as this Court has found, "Thomas was not tasked with conducting mental health assessments and evaluations, nor was he qualified to administer a

suicide risk assessment." (Order on Motions for Partial Summary Judgment, p. 5; Dkt. No. 87). Instead, "[t]he record reflects that mental health services for inmates at the Madison County Jail, such as psychiatric evaluations, were provided by Integrated Telehealth Partners ("ITP"). *Id.* at p. 48. Thus, Plaintiffs again misrepresent the facts in an attempt to manufacture a duty on the part of Thomas that does not comport with his role or the nature of his relationship with Payne in light of the fact ITP was the provider of mental health services at the jail.

Lastly, Plaintiffs represent to the Court that Thomas had no training related to suicide risk identification and prevention and that Thomas was unqualified to perform his duties. (*See* Resistance, p. 46, 48). Plaintiffs' version of the facts is central to several of Plaintiffs' arguments, including those relating to the negligent training and supervision claim against Eyerly-Ball and the punitive damages claim against Eyerly-Ball. However, Plaintiffs once again misstate the record. The record is clear that Thomas was abundantly qualified for his role as a jail diversion case manager and that he received extensive training and certification in suicide prevention and crisis intervention. (Defs' SOF, ¶¶ 18-25). The fact that Thomas testified to not recalling whether he had received specific training does not negate the clear evidence that he did in fact receive extensive training related to suicide prevention.

In sum, even when the facts are viewed in the light most favorable to Plaintiffs, Plaintiffs fail to generate a genuine issue of material fact on any of their claims.

## ARGUMENT

### I.   PLAINTIFFS CANNOT ESTABLISH THOMAS OWED A LEGAL DUTY

Plaintiffs appear to have largely abandoned the argument that Thomas had a duty to conduct a formal mental health evaluation or suicide risk assessment of Payne. (*See, e.g.,* Plaintiffs' Reply, p. 20, 24). Instead, Plaintiffs heavily focus on Thomas's alleged failure to effectively communicate Payne's risk of suicide to the jail staff. Plaintiffs must first establish the threshold issue of whether Thomas owed a duty of care to Payne. In arguing the existence of a legal duty on the part of Thomas, Plaintiffs point to several provisions of the Restatement (Third) addressing situations where a duty is owed. No such duty was owed by Thomas in this case.

### A.  No Duty Based on a "Special Relationship"

Plaintiffs first argue that Thomas had a "special relationship" with Payne triggering a duty of care under section 40 of the Restatement (Third). Under that section, "(a) An actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship. (b) Special relationships giving rise to the duty provided in Subsection (a) include:

> (1) a common carrier with its passengers,
> (2) an innkeeper with its guests,
> (3) a business or other possessor of land that holds its premises open to the public with those who are lawfully on the premises,
> (4) an employer with its employees who, while at work, are:
>> (a) in imminent danger; or
>> (b) injured or ill and thereby rendered helpless,
> (5) a school with its students,
> (6) a landlord with its tenants, and
> (7) a custodian with those in its custody, if:

(a) the custodian is required by law to take custody or voluntarily takes custody of the other; and

(b) the custodian has a superior ability to protect the other.

Restatement (Third) of Torts: Phys. & Emot. Harm § 40 (2012).

Plaintiffs focus on duties owed by custodians under subsection 7. "The custodial relationships that courts have recognized as imposing an affirmative duty include day-care centers and the children for whom they care, hospitals and their patients, nursing homes with their residents, camps and their campers, parents and their dependent minor children, and, of course, the classic jailer-inmate relationship." *Id.* at *cmt. n.*

Clearly, there was no jailer-inmate relationship between Thomas and Payne. Further, as Plaintiffs concede, Thomas did not personally have custody of Payne. (*See* Resistance, p. 19). Recognizing Thomas's lack of custody of Payne, Plaintiffs attempt to argue that Thomas owed the same duty to Payne that is owed by jailers working for the state. Plaintiffs argue that Eyerly-Ball and Thomas "assum[ed] the role and corresponding duty of the government entity" in this case, citing *Lane v. Coe College*. However, *Lane* does not stand for such a proposition, but instead for the proposition that certain contracts impose nondelegable duties. *Lane v. Coe Coll.*, 581 N.W.2d 214, 217 (Iowa Ct. App. 1998) (noting that "[a] party who assumes a duty under a contract for the safety of the public or certain individuals cannot delegate the duty to an independent contractor, even when it is the independent contractor who is doing the actual work" and holding that Coe College had a nondelegable duty to maintain and repair its food service facilities even though it hired an independent contractor).

The *West* and *Montago* cases cited by Plaintiffs are also inapposite, as those cases involve the issue of whether physicians who contracted to provide medical services to inmates were

acting under color of state law such that they could be held liable under section 1983 or the Eighth Amendment, not whether the physicians had custody over inmates such that they owed a tort duty to the inmates under a "special relationship" theory. *See West v. Atkins*, 487 U.S. 42 (1988); *Montago v. Hedgepath*, 120 F.3d 844 (8th Cir. 1997).

In sum, contrary to Plaintiffs' contention, Thomas did not owe a duty to Payne due to a "special relationship" under section 40 of the Restatement. The relationship between Thomas and Payne simply does not fall within any of the relationships enumerated in that section.

### B. No Duty Based on a Voluntary Undertaking

Plaintiffs next argue that Thomas owed a duty under section 42 of the Restatement (Third) because Thomas undertook performing services to Payne. That section provides that "An actor who undertakes to render services to another and who knows or should know that the services will reduce the risk of physical harm to the other has a duty of reasonable care to the other in conducting the undertaking **if**:

> (a) **the failure to exercise such care increases the risk of harm beyond that which existed without the undertaking**, or

> (b) the person to whom the services are rendered or another relies on the actor's exercising reasonable care in the undertaking.

Restatement (Third) of Torts: Phys. & Emot. Harm § 42 (emphasis added).

"The requirement that the actor increase the risk of harm means that the risk to the other person is increased beyond that which existed in the absence of the actor's undertaking." *Id.* at *cmt. f.* "Cases interpreting [former section 42] have made it clear that the increase in the risk of harm required is not simply that which occurs when a person fails to do something that

he or she reasonably should have. . . Rather, . . . the defendant's negligent performance must somehow put the plaintiff in a worse situation than if the defendant had never begun performance. . ." *Jain v. State*, 617 N.W.2d 293, 299 (Iowa 2000) (applying former version of section 42) (citations omitted). Simply put, Plaintiffs cannot establish a duty under section 42 because they cannot establish the requirement that Thomas increased the risk of harm beyond that which existed without his undertaking.

Here, Thomas undertook to render services at the Madison County Jail, which in this case involved Thomas performing a screening interview of Payne and referring him to the appropriate resources. Payne was not on suicide watch or placed under increased supervision at the jail prior to the screening interview with Thomas. Following the interview with Thomas, Payne was sent back to his cell and continued to be under the same level of supervision that was present prior to the interview. Nothing Thomas did placed Payne in a worse situation than he was in before. Because Payne was in the exact same position before and after Thomas's undertaking, Thomas's alleged failure to adequately warn the jail staff of Payne's risk of suicide did not increase Payne's risk of harm beyond that which existed in the absence of Thomas's undertaking. Accordingly, a basic prerequisite to the imposition of a duty under section 42 is simply not present in this case. Therefore, Thomas did not owe a legal duty under section 42. *See Jain*, 617 N.W.2d at 299 (holding that university employees had no duty to prevent student's suicide by notifying the dean and the student's parents of his risk of suicide where no actions of the university employees increased his risk of self-harm).

Plaintiffs also make passing reference to Restatement (Third) section 18 regarding a defendant's failure to warn the plaintiff of a risk. Section 18 does not impose any duty on a

party but instead establishes that a party may breach the reasonable duty of care by failing to warn. *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 18, *cmt. a* (2010) ("A failure to warn of the risks created by the actor's conduct can be negligence on the part of the actor under § 3."); Restatement (Third) § 3 ("A person acts negligently if the person does not exercise reasonable care under all the circumstances."). Thus, section 18, which involves whether an actor was negligent rather than whether an actor owed a duty, provides no aid to Plaintiffs' argument that Thomas owed a duty in this matter.

### C.  No Duty Based on Conduct Creating a Risk of Harm

Plaintiffs correctly point out that "an actor ordinarily has a duty to exercise reasonable care **when the actor's conduct creates a risk of physical harm**." Restatement (Third) of Torts: Phys. & Emot. Harm § 7(a) (2010) (emphasis added). The corollary of this rule is that "[a]n actor whose conduct has not created a risk of physical . . . harm to another has no duty of care to the other unless a court determines that one of the affirmative duties . . . is applicable." *Id.* at § 37. Stated another way, "there is no duty of care when another is at risk for reasons other than those created by an actor's conduct." *Kindig v. Newman*, 966 N.W.2d 310, 324 (Iowa Ct. App. 2021) (citing *Hoyt*, 829 N.W.2d at 776 n.4). This is true "even though the actor may be in a position to help." Restatement (Third) § 37, *cmt. b.*

As established above, none of the affirmative duties under the Restatement are applicable. Thus, the issue is whether Thomas's conduct created a risk of physical harm to Payne. As argued in Defendants' original brief, Thomas's failure to perform a mental health examination and suicide risk assessment of Payne was not conduct that created a risk of harm

to Payne. (Defs' MSJ Brief, p. 9-10). The same is true with respect to Thomas's conduct in providing information to the jail staff following the screening interview.

When the risk of harm to the plaintiff is present due to some third-party conduct or external force regardless of the defendant's conduct, the defendant owes no duty of care to the plaintiff. *See Kindig*, 966 N.W.2d at 324. For example, in *Kindig*, a group of individuals borrowed a party bus owned by The Press Box Bar and Grille ("Press Box") for a bachelor party. *Id.* at 315. One of the group members, Jacob, agreed to be the designated driver. *Id.* Following an altercation, one of the group members pursued battery claims against other group members while also bringing negligence claims against Jacob and the Press Box. *Id.*

As for the claim against the Press Box, the plaintiff argued that its failure to impose restrictions on the partygoers, such as limiting alcohol consumption, amounted to conduct that created a risk of physical harm to him sufficient to establish a duty of care. *Id.* at 324. Pursuant to the above authority, the Iowa Court of Appeals disagreed and concluded that Press Box's relevant conduct in providing its bus for the party did not create a risk of physical harm to the plaintiff. *Id.* Instead, the Court concluded that "the risk of harm was created by the partygoers themselves drinking to the point of intoxication and fighting with one another." *Id.* Therefore, the Court held that the Press Box owed the plaintiff no general duty of care under section 7 of the Restatement. *Id.* Applying the same principles, the Court further held that Jacob, the driver, owed no duty of reasonable care to the plaintiff because his conduct (driving the bus as a designated driver) did not create the risk of harm at issue, which was the risk of injuries through fighting. *Id.*

Here, Thomas's relevant conduct in conducting a screening interview of Payne, referring him to a psychiatric professional with ITP, and communicating with the jail staff regarding the interview did not create a risk of harm to Payne. As in *Kindig*, where the risk of harm to the injured plaintiff was created by the partygoers drinking to the point of intoxication and fighting with one another rather than the Press Box's failure to impose restrictions such as limiting alcohol consumption, the risk of harm to Payne was created by external factors causing him to have suicidal ideations rather than by Thomas's alleged failure to communicate the risk to the jail staff. *Kindig*, 966 N.W.2d at 324. In other words, the risk of harm to Payne through suicide was already present prior to Thomas's involvement with Payne. Thomas did not create the risk, nor did he increase the risk, as discussed above in section B. While the Press Box or the bus driver in *Kindig* perhaps could have prevented or mitigated the risk of injury to the plaintiff by imposing certain restrictions on the partygoers' actions, the Court nonetheless held there was no duty under section 7 because they did not *create* the harm. *Id.* Absent creation of the risk of harm and absent some affirmative duty, there is no duty of care even if the defendant may be in a position to help. Restatement (Third) § 37, *cmt. b.* Therefore, because Thomas did not create the risk of harm to Payne through any of his conduct, he owed no duty of care under section 7 of the Restatement, even if he could have done something more to help Payne by providing more detailed information to the jail staff.

In arguing that Thomas's conduct did create a risk of harm to Payne, Plaintiffs take significant liberties in characterizing the facts of this case. Plaintiffs assert that "Thomas had knowledge of the foreseeable danger of injury to Jordan, knowledge of information that the jail was not privy to. As such, his legal duty was thereby triggered." (Resistance, p. 27).

Plaintiffs also argue that Thomas affirmatively represented to the jail staff that there was no danger to Payne and "cleared" him from a mental health perspective by allegedly communicating to jail staff that Payne did not require additional supervision or a suicide watch. *Id.* at p. 28. Plaintiffs conclude that such conduct caused the jail to assume everything was fine, thereby failing to take any additional precautions or observations of Payne. *Id.* at p. 29. Therefore, Plaintiffs argue, Thomas's own conduct triggered his duty of care to Payne. *Id.*

As set forth in Defendants' Statement of Facts and Brief and reiterated above in the Introduction herein, Plaintiffs' characterization of the above facts is unsupported by the evidence. Without repeating the relevant facts, in short, the jail was already aware of Payne's risk of suicide and Thomas never made any affirmative representations that everything was fine with Payne. Thus, nothing Thomas did created a risk of harm to Payne. Even assuming for the sake of argument that Plaintiffs' version of the facts is true such that the jail was entirely unaware of Payne's suicide risk and Thomas affirmatively represented that Payne was under no risk, Thomas still did not create the risk that Payne would commit suicide. As stated, the risk was present prior to Thomas's involvement with Payne. Accordingly, no duty arises pursuant to section 7 of the Restatement.

## II. PLAINTIFFS CANNOT GENERATE A GENUINE ISSUE OF MATERIAL FACT ON THE ELEMENT OF CAUSATION

### A. Expert Testimony is Required

First, Plaintiffs attempt to argue that they have produced sufficient expert testimony as to causation in this case. Plaintiffs assert that the cause of Payne's death was suicide and that an expert witness, Dr. Klein of the State Medical Examiner's Office, certified that the cause of death was suicide. For one thing, both the autopsy report and Plaintiffs' certification of

expert witnesses for Dr. Klein state: cause of death: hanging; manner of death: suicide. (Autopsy Report, Pls' App. at A01; Pls' Certification of Experts, Pls' App. at A191). Thus, there is no expert testimony stating that the cause of death was suicide. Further, the issue is not whether there is expert testimony as to what physically caused Payne's death but whether there is expert testimony establishing a causal connection between the actions of Eyerly-Ball and Thomas and Payne's death by suicide. There is no such testimony in the record.

Plaintiffs then argue that expert testimony is not necessary to establish causation in this case. Plaintiffs reference to cases involving "nonmedical, administrative, ministerial or routine care" where expert testimony may not be required is of no aid to the causation analysis. Such cases address whether expert testimony is required to establish the medical standard of care and a breach thereof, not whether expert testimony is required to establish a causal connection between the negligence and the injury. *See Kastler v. Iowa Methodist Hosp.*, 193 N.W.2d 98, 102 (Iowa 1971) (holding that the plaintiff was not required to introduce expert testimony on the standard of care where the patient fell while showering because showering patients involved "routine care."); *Cockerton v. Mercy Hosp. Med. Ctr.*, 490 N.W.2d 856, 858 (Iowa App. 1992) (expert testimony not required on the standard of care in cases involving routine or ministerial care).

Plaintiffs also argue that this case is "straight-forward" and that a jury is able to decide for themselves whether Defendant's actions caused Payne's death by suicide. However, as stated in Defendants' original brief, because "[s]uicide is not easily explained or understood" and "[i]ts causes, prevention, triggers and warning signs cannot be readily calculated," and because "the average person lacks the experience, training or education about the complexities

14

of suicide" expert testimony is required to establish a causal link between the defendant's alleged negligence and the decedent's suicide. *Estate of Joshua T. v. State*, 150 N.H. 405, 840 A.2d 768, 772 (2003). Plaintiffs fail to offer any authority or explanation as to how laypersons are able to adequately determine causation in a suicide case such as this despite lacking knowledge regarding various medical, psychiatric, and societal factors that contribute to suicide risk and whether a county jail such as the Madison County Jail would have the proper conditions and protocols to prevent a suicide even if increased monitoring of the inmate was implemented. Whether Payne's suicide would have ultimately been prevented but-for Defendants' conduct is far from "straight-forward" and must be established through expert testimony.

Plaintiffs' attempt to distinguish Defendants' authorities on the basis that they involve suicides occurring after the decedent had been released from their care-provider's custody is unpersuasive. First, as Plaintiffs recognize, neither Eyerly-Ball nor Thomas ever had custody of Payne. Further, Payne's suicide occurred after Thomas had left the jail. Thus, with respect to Eyerly-Ball and Thomas, this is a non-custodial scenario where the suicide occurred while Payne was not in any way under their control, similar to the cases cited by Defendants. Additionally, Thomas was never Payne's "care-provider" and therefore Plaintiffs' assertion that "no further causal connection is required because the causal connection is inherent in the care-providers duty to prevent the act of suicide" is inapplicable. (Resistance, p. 36). Thus, there must be expert testimony to establish that but-for Defendants' conduct, Payne's suicide while in the jail would not have occurred.

**B. Even if Expert Testimony is not Required, Plaintiffs Lack Sufficient Evidence of Causation**

Plaintiffs correctly note that causation is ordinarily a jury question. *See Thompson,* 774 N.W.2d at 836. "In some cases, however, causation may be decided as a matter of law." *Garr v. City of Ottumwa*, 846 N.W.2d 865, 870 (Iowa 2014) (citing *Faber v. Herman*, 731 N.W.2d 1, 11 (Iowa 2007) (deciding as a matter of law there was no causation between attorney's negligence and the damages sought by the plaintiff); *Gerst v. Marshall,* 549 N.W.2d 810, 818-819 (Iowa 1996) (upholding district court's grant of summary judgment where plaintiffs failed to produce sufficient evidence on causation); *see also Sweeney v. City of Bettendorf*, 762 N.W.2d 873 (Iowa 2009) (holding the plaintiffs  failed to generate a genuine issue of fact on the element of causation).

Further, Plaintiffs must establish causation beyond mere speculation and conjecture, as "[m]ere guesswork about what might have occurred is not enough." *Sweeney*, 762 N.W.2d at 884. Indeed, "[m]ere possibility does not ordinarily generate a jury question, it leaves the jury to speculate upon a speculation." *Chenoweth v. Flynn*, 99 N.W.2d 310, 313 (Iowa 1959).

Plaintiffs do not explain how the facts establish causation beyond mere possibility. Notably, Plaintiffs offer no response to Defendants' argument that Plaintiffs cannot prove the outcome would have been any different absent Defendants' conduct. Plaintiffs' arguments regarding causation fail to address the critical facts surrounding the jail's prior knowledge of Payne's risk of suicide, Thomas's inability to control the jail staff's actions, and the uncertainty as to what form of increased monitoring, if any, would have been implemented by the jail and whether any such increased monitoring would have ultimately prevented Payne from committing suicide. (*See* Defs' MSJ Brief, p. 18-23). Even when viewed in the light most

favorable to Plaintiffs, the facts simply do not generate a jury question on the element of causation given the significant guesswork that a jury would have to engage in to conclude that Payne would not have committed suicide absent Defendants' conduct.

### III.   PLAINTIFFS CANNOT ESTABLISH THEIR CLAIMS AGAINST EYERLY-BALL

#### A. Duty of Care

Plaintiffs assert that "the specific principles of tort liability regarding duties owed to others . . . are equally applicable to Eyerly-Ball in the same manner that they are applicable to Thomas." (Resistance, p. 40). Defendants agree that a similar duty analysis applies to both Thomas and Eyerly-Ball. For the reasons stated above in section I, Eyerly-Ball owed no duty to Payne due to a special relationship, a voluntary undertaking, or conduct creating a risk of harm to Payne.

In arguing that Eyerly-Ball owed a duty based on contractual undertakings, Plaintiffs erroneously assert that Eyerly-Ball subcontracted their work out to ITP. (Resistance, p. 39-40). Thus, Plaintiffs argue that Eyerly-Ball had a non-delegable duty with respect to the work performed by ITP. However, ITP was not a subcontractor of Eyerly-Ball. Rather, ITP contracted directly with CICS to provide psychiatric services to inmates at the Madison County Jail. (Defs' SOF, ¶¶ 39-41). Accordingly, Plaintiffs' citations to case law regarding delegation of duties to independent contractors are inapposite. Plaintiffs' attempt to saddle Eyerly-Ball with duties owed by ITP must be rejected.

**B. No Genuine Issue of Fact Exists as to Plaintiffs' Negligent Training and Supervision Claims**

Plaintiffs' negligent training claim is based on the erroneous assertion that Thomas had no training related to suicide risk identification and prevention. However, as set forth in Defendants' Statement of Facts and Brief and reiterated in the Introduction herein, Thomas received extensive training and certification in suicide prevention and crisis intervention. (Defs' SOF, ¶¶ 20-25).[1] The fact that Thomas testified to not recalling whether he had received specific training does not negate the clear evidence that he did in fact receive extensive training related to suicide prevention.

Plaintiffs' expert Dr. Penn opines that Eyerly-Ball should have required Thomas to undergo mandatory and ongoing training on basic suicide prevention practices and procedures. (*See* Resistance, p. 44-45). The record clearly establishes that Eyerly-Ball did in fact do just that. Dr. Penn also opines that Eyerly-Ball should have trained and instructed Thomas with respect to communicating with jail staff and how to appropriately deal with inmates who show signs of suicide risk. *See Id.* There is no evidence in the record that Eyerly-Ball failed to provide such training or instruction. Thus, the record lacks sufficient evidence to generate a genuine issue of material fact as to negligent training.

---

[1] Plaintiffs again argue that the Court may not consider some of Scott Thomas's training certificates because they were not produced in discovery and are not supported by an affidavit or sworn statement. (Pls' Response to Defs' SOF 22; Pls' Resistance, p. 46). However, neither of the authorities cited by Plaintiffs state that a document must be produced in discovery or supported by an affidavit or sworn statement to be considered by a court for purposes of summary judgment. Fed. R. Civ. P. 56(c)(1)(A) (statement of fact for summary judgment purposes must be supported by citing materials such as depositions, documents, electronically stored information, affidavits or declarations, interrogatory answers, or other materials); *Banks v. Deere*, 829 F.3d 661, 667 (8th Cir. 2016) (stating that inadmissible hearsay in an unsworn affidavit cannot form the basis of a genuine issue of fact). In any event, there is ample evidence of Thomas's training in suicide prevention, including in his deposition and in Van Horn's deposition. (Defs' SOF, ¶¶ 20, 24-25).

With regard to negligent supervision, Plaintiffs must prove as a prima facie element of the claim that Eyerly-Ball knew, or in the exercise of ordinary care should have known, of Thomas's unfitness at the time he engaged in wrongful or tortious conduct. *Est. of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 680 (Iowa 2004). The record reflects that Thomas was abundantly qualified for the position of Jail Diversion Case Manager. (Defs' SOF, ¶¶ 18-19). Plaintiffs have not offered any evidence to the contrary. Further, Plaintiffs have not alleged or produced evidence of any prior misconduct on the part of Thomas such that Eyerly-Ball knew or should have known that he possessed dangerous characteristics or was unfit to continue serving in his role. Accordingly, Plaintiffs cannot establish a genuine issue of material facts as to Thomas's unfitness or Eyerly-Ball's knowledge of his alleged unfitness. *See Jones v. Schneider Nat., Inc.*, 797 N.W.2d 611, 617 (Iowa Ct. App. 2011) (finding no genuine issue of material fact as to the plaintiff's negligent hiring claim where the plaintiff presented no evidence of a poor safety record or a lack of sufficient expertise and experience).

## IV.     THE RECORD LACKS SUFFICIENT EVIDENCE TO SUPPORT A CLAIM FOR PUNITIVE DAMAGES

Plaintiffs have made clear that their claim for punitive damages is based on the assertion that Thomas was unfit, untrained, and unqualified to appropriately address the mental health needs of inmates such as Payne. (Resistance, p. 48). In order to establish a claim for punitive damages on this basis, Plaintiffs must prove that Eyerly-Ball was reckless in employing Thomas for his role.

An award of punitive damages is intended both to punish and deter willful, wanton, or reckless conduct. *Seraji v. Perket*, 452 N.W.2d 399, 401 (Iowa 1990) (citing *Briner v. Hyslop*, 337 N.W.2d 858, 865 (Iowa 1983)). The Iowa Supreme Court "has established that these purposes

would not be well served by a rule that granted punitive damages against an employer whose own conduct did not constitute legal malice." *Id.* Indeed, "[i]t is the reckless conduct of the employer that the rule seeks to punish and deter." *Id.* In accordance with these principles, the Iowa Supreme Court adopted the "complicity rule" with respect to an employer's liability for punitive damages. *Briner v. Hyslop*, 337 N.W.2d 858, 861 (Iowa 1983). Under the complicity rule, punitive damages may be awarded against an employer if "the agent was unfit and the principal was reckless in employing him." *Id.* (citing Restatement (Second) of Torts § 909 (1979)).

Under Iowa law, whether or not an employer was reckless in hiring or retaining an employee can be shown in two ways. First, "[a]n employer acts with reckless disregard if it intentionally does or fails to do something it has a duty to do or not to do." *Seraji*, 452 N.W.2d at 402 (*citing Meyer v. Nottger,* 241 N.W.2d 911, 918-19 (Iowa 1976)). Second, "[a]n employer also acts recklessly if it realizes that there is a strong probability that certain consequences will result from an act or that a reasonable person in its position would know of that probability." *Id.* (citing *Thompson v. Bohlken,* 312 N.W.2d 501 at 505 (Iowa 1981)).

A plaintiff must present sufficient evidence of recklessness in order to survive summary judgment on a punitive damages claim against an employer based on the alleged unfitness of their employee. In *Seraji*, the Iowa Supreme Court held that the plaintiff could not establish punitive damages against a defendant employer based on their alleged recklessness in hiring a semi-truck driver who collided with the plaintiff on a highway given that the plaintiff failed to present evidence establishing either of the two ways that an employer can be shown to be reckless. *Seraji*, 452 N.W.2d at 403. Given that there was evidence that the employee had a

poor driving record, the plaintiff argued the employer exhibited reckless conduct in failing to delve more deeply into the employee's driving and employment record at the time of hiring. *Id.* at 402.

However, with respect to the first way a plaintiff can show an employer's recklessness in hiring an employee, which is an intentional failure to comply with a duty, the Court noted that the plaintiff had "shown no duty on the part of [the employer] to check more closely into [the employee's] driving or employment record prior to hiring him." *Id.* This was based on the fact that the plaintiff did not produce any evidence that the employer's hiring procedures were inconsistent with state or federal requirements or with the employer's company policy. *Id.*

The Court similarly found that the Plaintiff had failed to submit sufficient evidence with respect to the second way a plaintiff can show an employer's recklessness, which is where the employer hires the employee despite the fact that they knew or reasonably should have known that there was a strong probability that certain consequences would follow from the hiring. Despite significant evidence of the employee's poor driving record, including the fact that his license had been revoked on at least one occasion, that he had been convicted of speeding on at least four occasions, and that he had also been convicted of driving without a license, the Court found that there was "no showing that a reasonable person in [the employer's] position would have known that [the employee] was unfit" to be hired for the truck driving position. *Id.* In sum, while the plaintiff asserted that the employer failed to properly screen the employee prior to hiring him, the Iowa Supreme Court found it was "clear, however, that these failures did not constitute reckless conduct" as contemplated under Iowa law. *Id.*

Here, Plaintiffs cannot establish that Eyerly-Ball was reckless in employing Thomas to act as a Jail Diversion Case Manager at the Madison County Jail. As stated, the record reflects that Thomas was abundantly qualified for the position of Jail Diversion Case Manager. (Defs' SOF, ¶¶ 18-19). Thus, Plaintiffs cannot establish that by assigning Thomas to provide Jail Diversion services at the jail, Eyerly-Ball "intentionally [did] or fail[ed] to do something it has a duty to do or not to do." *Seraji*, 452 N.W.2d at 402. Similar to the situation in *Seraji*, there is "no showing that a reasonable person in [Eyerly-Ball's] position would have known that [Thomas] was unfit" to perform such services. *Id.*

Further, Plaintiffs cannot establish that Eyerly-Ball "realize[d] that there [was] a strong probability that certain consequences [would] result from an act or that a reasonable person in its position would know of that probability." *Id.* In other words, Plaintiffs cannot establish that Eyerly-Ball knew or should have known that there was a strong probability that harm would result to jail inmates by virtue of the fact that it assigned Thomas to perform Jail Diversion services. ITP rather than Eyerly-Ball was in fact responsible for providing mental health services to jail inmates through licensed professionals and Thomas's role was to assess potential mental health needs and make referrals to ITP. Thus, there is no basis to conclude that Eyerly-Ball knew or should have known that assigning a person who is not a qualified mental health professional such as Thomas to act as a Jail Diversion Case Manager would result in inmates' mental health needs being unmet such that there was a strong probability that harm to the inmates would follow.

Indeed, this Court has already recognized that the respective roles between Eyerly-Ball and ITP precludes any notion that Eyerly-Ball was reckless with respect to addressing the

mental health needs of inmates. In ruling on Defendants' first Motion for Summary Judgment
with respect to Plaintiffs' deliberate indifference claim against Eyerly-Ball, the Court provided
the following discussion:

> **The Court cannot conclude that Eyerly-Ball was deliberately**
> **indifferent in its contact with Jordan during his time at the**
> **Madison County Jail**. Although Plaintiffs repeatedly assert that Eyerly-
> Ball had a contractual obligation to provide mental health services to the
> Madison County Jail, that does not establish a constitutional violation.
> The record reflects that mental health services for inmates at the
> Madison County Jail, such as psychiatric evaluations, were provided by
> Integrated Telehealth Partners ("ITP"). [ECF No. 46-2 at 24–26].
> Plaintiffs' response is that "Eyerly-Ball is contracted to provide mental
> health services to Madison County. Any subcontract it enters into is still
> considered the action of Eyerly-Ball under their contractual obligations."
> [ECF No. 59-2 ¶ 41].
>
> This is unpersuasive. Plaintiffs argue that Eyerly-Ball was deliberately
> indifferent because Thomas was insufficiently qualified and trained to
> address the mental health needs of inmates at the Madison County Jail.
> They also apparently take the position that the constitutionality of
> Eyerly-Ball's policies may only be evaluated through Thomas. Plaintiffs
> do not address the fact that—subcontract or not—Eyerly-Ball would
> contact ITP when an inmate was in need of mental health services. There
> is no allegation by Plaintiffs that ITP staff was unqualified. **If Eyerly-**
> **Ball's policy for addressing inmate mental health needs was not**
> **reasonable, it was no more than negligent**. This again falls short of
> the constitutional standard for deliberate indifference.

(Order on Motions for Partial Summary Judgment, p. 48; Dkt. No. 87 (*emphasis added*).

Again, it is worth repeating that ITP was not a subcontractor of Eyerly-Ball and that
ITP separately contracted with CICS. In any event, as the Court noted, "subcontract or not—
Eyerly-Ball would contact ITP when an inmate was in need of mental health services." *Id.* It
was not reckless for Eyerly-Ball to conclude that inmates' mental health needs would be
sufficiently met through initial screening by Thomas followed by referrals to mental health
professionals at ITP. It is clear that Eyerly-Ball's conduct does not meet the high standard

necessary to recover punitive damages and at the very most amounted to negligence. Therefore, the Court must dismiss Plaintiffs' claim for punitive damages.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, Defendants Eyerly-Ball and Thomas respectfully request that the Court grant their Motion for Summary Judgment and dismiss Plaintiffs' claims against them, as well as grant any additional relief the Court deems just and proper.

*/s/ Joseph F. Moser*
Jack Hilmes                    (AT0003523)
Joseph F. Moser            (AT0011413)
FINLEY LAW FIRM
699 Walnut Street, Suite 1700
Des Moines, IA  50309
Telephone:  (515) 288-0145
Fax:  (515) 288-2724
E-mail:  jhilmes@finleylaw.com
              jmoser@finleylaw.com
ATTORNEYS FOR DEFENDANTS
EYERLY-BALL COMMUNITY MENTAL
HEALTH SERVICES and SCOTT THOMAS

Original filed.

Copy to:

Robert G. Rehkemper
Cory F. Gourley
440 Fairway Drive, Suite 210
West Des Moines, IA 50266
Telephone: (515) 226-0500
Email: rgrehkemper@grllaw.com
cfgourley@grllaw.com

Paul J. Statler
301 East Walnut Street, Suite 7
Des Moines, Iowa 50309
Telephone: 515.288.

Email: paul@statlerlaw.net
ATTORNEYS FOR PLAINTIFFS

Michael C. Richards
Katie E. Anderegg
DENTONS DAVIS BROWN PC
215 10th Street, Suite 1300
Des Moines, Iowa 50309
Telephone: (515) 288-2500
Fax: (515) 243-0654
Email: mike.richards@dentons.com
Email: katie.anderegg@dentons.com
ATTORNEYS FOR DEFENDANTS
JOHN WEAKLAND, JASON BARNES,
AND MADISON COUNTY, IOWA


CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing instrument was served upon one of the attorneys of record for all parties to the above-entitled cause by serving the same on such attorney at his/her respective address/fax number as disclosed by the pleadings of record herein, on July 29, 2024 by:

☐ U.S. Mail              ☐ FAX
☐ Hand Delivered         ☐ UPS
☐ Federal Express        ☒ Electronic Filing
☐ Other _____


*/s/ Fonda M. Davis* _____