IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| KENT H. PAYNE, Individually and as the Administrator of the Estate of JORDAN KENT PAYNE and LESLIE KING-PAYNE, | ) ) ) ) ) | CASE NO. 4:21-cv-00349 |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | **DEFENDANTS EYERLY-BALL COMMUNITY MENTAL HEALTH SERVICES and SCOTT THOMAS'S** |
| JOHN WEAKLAND, JASON BARNES, MADISON COUNTY, IOWA, EYERLY-BALL COMMUNITY MENTAL HEALTH SERVICES and SCOTT THOMAS, | ) ) ) ) ) ) | **REPLY TO PLAINTIFFS' STATEMENT OF DISPUTED FACTS IN RESISTANCE TO MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | ) ) | |

COME NOW Defendants Eyerly-Ball Community Mental Health Services ("Eyerly-Ball") and Scott Thomas ("Thomas"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56(d), and for their Reply to Plaintiffs' Statement of Disputed Facts in Resistance to Motion for Summary Judgment, state as follows:

## A.   The Parties.

1.   Jordan Payne ("Jordan"), the son of Plaintiffs Kent H. Payne and Leslie Payne, died after committing suicide by hanging in the Madison County Jail on June 12, 2020. (Autopsy Report, p. 2; App. A002).

### RESPONSE: Admit.

2.   Jordan was booked into the Madison County Jail on June 9, 2020, to serve a thirty-day sentence for Contempt. (Exhibit 4 – Booking Form; App.A003).

1

**RESPONSE: Admit.**

3.   During the booking process, Jordan answered "yes" to the following

questions:

12.  Mental illness? Yes;
13.  Been hospitalized in last 12 months? Yes;
26.  Ever tried to hurt yourself? Yes;
27.  Ever tried to kill yourself? Yes;
29.  Family member/friend attempted suicide? Yes; and
30.  Any reason why not be jailed? Yes.

(Exhibit 4, Booking Questionnaire, App A005).

**RESPONSE: Admit.**

4.   Jason Barnes ("Barnes") is currently and has been the duly elected Madison

County Sheriff since 2014.  (Barnes depo, pp. 4, 11-15; App. A110.).

**RESPONSE: Admit.**

5.   Steve Niblo is and was the Jail Administrator on June 9 through 12, 2020 and

oversaw the day-to-day operations of the jail since taking that position in 2015. (Barnes Depo,

pp. 12, line 12-15 and pp. 13-lines 13-16: App. A112, A113).

**RESPONSE: Admit.**

6.   Jail Administrator Niblo ran the jail.  (Barnes depo, p. 17, lines 19-21; App.

A114).

**RESPONSE: Admit**.

7.   Jailer John Weakland ("Weakland") and Dispatcher Angela Henry ("Henry") were on duty on July 12, 2020, at the Madison County Jail.  (Exhibit 17; Barnes depo, p. 43, lines 11-17; App. A182, A115).

**RESPONSE: Admit.**

8.   Weakland was the designated jailer on June 12, 2020. (Barnes Depo, *Id.*).

**RESPONSE: Admit.**

9.   Defendant, Eyerly Ball Community Mental Health Services ("Eyerly- Ball"), was the contracted mental health provider for the Madison County Jail. (Barns Depo, p. 82, lines 12-20; Central Iowa Community Services Provider and Program Participation Agreement, EB27-39; App. A119, A041);

**RESPONSE: Denied. Plaintiffs misrepresent the scope of Eyerly-Ball's contract with CICS, particularly as applied to the Madison County Jail. The *only* services provided to Madison County Jail were those of the Jail Diversion/Intensive Case Management program. EB 27–39; Pls' App. A041–53. Eyerly-Ball did not provide mental health services in the Madison County Jail. See Deposition of Monica Van Horn; p. 45; ln. 4–9. ("We didn't provide mental health services in the jail, but we did have the jail diversion program.").**

10. Defendant, Scott Thomas ("Thomas"), was employed by Eyerly-Ball (Thomas Depo, pp. 27-28, lines 21 – 01; App. A076-A077).

**RESPONSE: Admit.**

3

11. Thomas was the only individual that would provide mental health services at the Madison County Jail.  (Barnes Depo., pp. 103-104, lines 19-04; App. A125-A126).

**RESPONSE: Denied. Professionals from ITP provided mental health services such as psychiatric evaluations to inmates at the Madison County Jail pursuant to contract. (Defs' SOF, ¶¶ 39-41).**

12. Thomas' employment with Eyerly-Ball took him to the Madison County Jail where he met with Jordan Payne on June 12, 2020. (Thomas depo, p. 60, lines 1-3; App. A092).

**RESPONSE: Admit.**

B. **The Harm to Be Avoided.**

13. Suicide has been the leading cause of correctional institution deaths every year since 2000.  https://bjs.ojp.gov/content/pub/pdf/mlj0016st.pdf

**RESPONSE:    Objection hearsay and improper citation to a document that is not part of the record. Without waving the objections, the Defendants admit that the cited document states this but affirmatively states that in the prisoner suicide context, "[t]he inadequate medical care analysis focuses on the particular risk of suicide posed by the specific prisoner, rather than on the generalized threat of suicide among the population of prisoners as a whole."** *Hott v. Hennepin County Minnesota***, 260 F.3d 901, 905 (8th Cir. 2001).**

14. Suffocation, including hanging and self-strangulation accounted for nearly 90%

of suicide deaths in local jails.

(https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/sljsfp0019s

t.pdf, p. 1).

**RESPONSE: Objection hearsay and improper citation to a document that is not part
of the record. Without waving the objections, the Defendants admit that the cited document
states this but affirmatively states that in the prisoner suicide context, "[t]he inadequate
medical care analysis focuses on the particular risk of suicide posed by the specific prisoner,
rather than on the generalized threat of suicide among the population of prisoners as a
whole."** *Hott v. Hennepin County Minnesota*, **260 F.3d 901, 905 (8th Cir. 2001).**

15. Suicide was the leading cause of death in the Madison County Jail. (Barnes

depo, p. 59-60, 63; App. A116-A117).

**RESPONSE: Denied. The cited testimony is limited to Barnes' personal
knowledge and is limited to the timeframe of 2016-2020. (Barnes depo, p. 59-60, 63;
Pls' App. A117-A119).**

**C.** **Eyerly-Ball's Contract with Madison County to Provide Mental
Health Services.**

16. Eyerly-Ball is a community health center that provides mental health services

in twenty counties in Iowa. (Van Horn depo, pp. 8, lines 14-17; App. A132).

**RESPONSE: Admit.**

17.   Eyerly-Ball is in the business of providing mental health care services. (Van Horn depo, p. 27, lines 6-8; App. A141).

**RESPONSE: Admit that Eyerly-Ball is in the business of providing mental health services. Deny that Eyerly-Ball provided mental health services at the Madison County Jail. (Defs' SOF, ¶ 38; Van Horn Dep. 45:4-9; App. at 065; E-B Ans. to Pl.s' Interrogatory No. 6; App. at 066-069).**

18.   Madison County is a member of the Central Iowa Community Services ("CICS") (Van Horn Depo, p. 24, lines 7-11; App. A139).

**RESPONSE: Admit.**

19.   A function of CICS is to coordinate services between the mental health system and the judicial system by facilitating and developing protocols for identifying county jail inmates needing mental health treatment and to secure such treatment for those individuals. (Eyerly-Ball Response to Plaintiffs' Request for Production of Documents, CICS contract, EB28-E29, EB47, CICS FY 2020 Management Plan EB 67, EB75; App.A164-A168, A059, A060, A062).

**RESPONSE: Admit.**

20.   Such services include providing mental health services in jail including "evaluation, medication management and therapy services." (CICS FY2020 Management Plan, EB75; App. A062).

**RESPONSE: Admit that the document says what it says.**

21.   Pursuant to that charge, CICS, on behalf of Madison County and other participating counties, contracted with Eyerly-Ball to be the "qualified provider" for mental health services in the Madison County Jail as that term is defined in Chapter 24 of the Iowa Administrative Code. (CICS Contract, EB27-29; CICS FY2024 Management Plan, p. EB81; App. A041-A043, A064).

**RESPONSE: Denied. Plaintiffs misrepresent the scope of Eyerly-Ball's contract with CICS, particularly as applied to the Madison County Jail. The *only* services provided to Madison County Jail were those of the Jail Diversion/Intensive Case Management program. EB 27–39; App. A 39–50. Eyerly-Ball did not provide mental health services in the Madison County Jail. See Deposition of Monica Van Horn; p. 45; ln. 4–9. ("We didn't provide mental health services in the jail, but we did have the jail diversion program.").**

22.   Pursuant to their contract with CICS, Eyerly-Ball was obligated to provide services which included "Jail Diversion/Intensive Case Management – Madison County," "Therapy Evaluation," "Psychiatric Evaluation, "Mobile Crisis Response Service," (CICS Contract, EB27, 28; Attachment A, EB29, EB35-36; App. A041-A042, A043, A049-A050).

**RESPONSE: Denied. Plaintiffs misrepresent the scope of Eyerly-Ball's**

7

**contract with CICS, particularly as applied to the Madison County Jail. The** *only* **services provided to Madison County Jail were those of the Jail Diversion/Intensive Case Management program. EB 27–39; Pls' App. A041–53. Eyerly-Ball did not provide mental health services in the Madison County Jail.** *See* **Deposition of Monica Van Horn; p. 45; ln. 4–9. ("We didn't provide mental health services in the jail, but we did have the jail diversion program.").**

23.   Madison County and specifically Madison County Sheriff's Office is covered by the mobile crisis response service provided by Eyerly-Ball.  (Thomas depo., pp 36-37, lines 06 – 09; App. A078-A079).

**RESPONSE: Admitted as to Madison County but denied as applied to the Madison County Jail. Plaintiffs misrepresent the scope of Eyerly-Ball's contract with CICS, particularly as applied to the Madison County Jail. The** *only* **services provided to Madison County Jail were those of the Jail Diversion/Intensive Case Management program. EB 27–39; Pls' App. A041–53. Eyerly-Ball did not provide mental health services in the Madison County Jail.** *See* **Deposition of Monica Van Horn; p. 45; ln. 4– 9. ("We didn't provide mental health services in the jail, but we did have the jail diversion program.").**

24.   Eyerly-Ball was also contracted to provide the services enumerated in the Regional Management Plan developed pursuant to Iowa Code section 331.393 [Renumbered to Iowa Code § 225C.60 by 2023 Acts, ch 140, §15(1)(f), effective July 1, 2023], as approved by the Director of the Department of Human Services. (*Id.*, EB28; App. A042).

**RESPONSE: Admitted to the extent consistent with the CICS contract, which**

8

speaks for itself.

25.  "Core Services" to be provided by Eyerly-Ball under the Regional Management Plan to the covered counties, including Madison County, included "[m]ental health services in jails" and "Basic Crisis Response." (*Id.* EB68, EB75; App. A061, A062).

**RESPONSE: Denied. Plaintiffs misrepresent the CICS Mental Health and Disability Services Management Plan Policies and Procedures and the CICS Provider and Program Participation Agreement contract executed between CICS and Eyerly-Ball. The *only* services provided to Madison County Jail were those of the Jail Diversion/Intensive Case Management program. EB 27–39; Pls' App. A041–53. Eyerly-Ball did not provide mental health services in the Madison County Jail. *See* Deposition of Monica Van Horn; p. 45; ln. 4–9. ("We didn't provide mental health services in the jail, but we did have the jail diversion program."). *See also* Eyerly-Ball's Answers to Plaintiffs' Second Interrogatories (Interrogatory No. 6), which explained:**

> **Eyerly-ball and its employees do not provide mental health services or treatment to inmates and the Madison County Jail. The services provided to the Madison County Jail are limited to the Jail Diversion Program, which involves the coordination of mental health services through other providers, particularly after an inmate's release from jail. Eyerly-Ball does not provide mental health treatment or evaluations to inmates, but assists in coordinating services with Madison County and CIC's other contracted providers, including Integrated Telehealth Partners.**

26.  "Mental health services in jails under the Regional Management Plan included "[e]valuation, medication management and therapy services." (*Id*).

**RESPONSE: Denied. *See* Response to Paragraph 25. Plaintiffs continue**

to misrepresent the **Regional Management Plan** and the specific **Agreement** between **CICS** and **Eyerly-Ball**, outlining the scope of its services to the Madison County Jail. Again, those services were limited to the Jail Diversion Program and did not include providing mental health treatment or evaluations to inmates. *See* **Deposition of Monica Van Horn; p. 45; ln. 4–9. ("We didn't provide mental health services in the jail, but we did have the jail diversion program.").** *See also* **Eyerly-Ball's Answers to Plaintiffs' Second Interrogatories (Interrogatory No. 6).**

27.   The Plan also covered "Crisis prevention training" which encompasses "Educational and Training services, Safety training for law enforcement, first responders, etc., regarding mental health awareness such as Crisis Intervention Training (CIT)." *Id.*

**RESPONSE: Denied.** *See* **Response to Paragraph 25. Plaintiffs continue to misrepresent the Regional Management Plan and the specific Agreement between CICS and Eyerly-Ball, outlining the scope of its services to the Madison County Jail. Again, those services were limited to the Jail Diversion Program and did not include providing mental health treatment or evaluations to inmates.** *See* **Deposition of Monica Van Horn; p. 45; ln. 4–9. ("We didn't provide mental health services in the jail, but we did have the jail diversion program.").** *See also* **Eyerly-Ball's Answers to Plaintiffs' Second Interrogatories (Interrogatory No. 6).**

28.   Pursuant to Eyerly-Ball CICS Agreement, "[t]he relationship between CICS and Provider is solely that of independent contractors." (CICS Contract, EB31; App. A045).

**RESPONSE: Admit.**

29.    The term of the contract between CICS and Eyerly-Ball was for a term of one

(1) year, and the Agreement provides several provisions relating to the termination rights of

CICS and Eyerly-Ball.  (CICS Contract, EB32-33; App. A046-A047).

**RESPONSE: Admit.**

30.    Additionally, pursuant to said Agreement, Eyerly-Ball was required to carry

professional liability and comprehensive general liability insurance, at its own expense. (CICS

Contract, EB31; App. A045).

**RESPONSE: Admit.**

31.    Pursuant to their Agreement with CICS, Eyerly-Ball was compensated a flat

fee of $6,147.00 monthly for "Jail Diversion/Intensive Case Management Services in

Madison County Jail." (CICS Contract, EB37; Client Account Summary Record, EB 92-94;

App. A051, A184).

**RESPONSE: Admit.**

32.    Eyerly-Ball was compensated $78,059.68 for services provided

between January 1, 2020, and December 31, 2020. (*Id.*)

**RESPONSE: Admit.**

33.    Eyerly-Ball was the designated and contracted CICS mental health provider at

the Madison County Jail on June 12, 2020. (Penn Sup., p. 2, ¶1(a)-(b); App. A224).

**RESPONSE: Denied. Professionals from ITP provided mental health services such as psychiatric evaluations to inmates at the Madison County Jail pursuant to contract. (Defs' SOF, ¶¶ 39-41).**

34.   As the contracted CICS mental health provider at the Madison County Jail, Eyerly-Ball had a duty and obligation to provide timely crisis services and crisis psychiatric evaluations to inmates.  (Penn Sup., p. 3, ¶ (1)(c); App. A225).

**RESPONSE: Denied. Professionals from ITP provided mental health services such as psychiatric evaluations to inmates at the Madison County Jail pursuant to contract. (Defs' SOF, ¶¶ 39-41).**

**D.    Thomas' Role with Eyerly Ball**

35. Thomas was employed by Eyerly-Ball on June 12, 2020, as a "Jail Diversion Case Manager." (Thomas Depo, pp. 27-28, lines 21 – 01; App. A076- A077).

**RESPONSE: Admit.**

36. The written job description for "Jail Diversion Case Manager" identified the following relevant essential Functions/Responsibilities:

- Meets with incarcerated individuals at county jails at request of law enforcement personnel; assists inmates in obtaining referrals to mental health services; *assists mental health professionals in* <u>*determining physical and mental health and substance abuse care needs of inmates*</u>. (emphasis added) (Dep. Exhibit 6, p. 1; Thomas depo, p. 38, lines 1 – 15; EB App. 047)

- Either through post-incarceration services or through referrals from County Mental Health Services, determines appropriate provider of services, assists client in applying for services, ***provides direct client*** <u>***services until client is***</u> <u>***able to begin services with the referral source***</u>, *assists with the development of a*

*client crisis plan…* (emphasis added) (Depo Exhibit 6, p. 1, EB App. 047)

- Responds to calls from law enforcement personnel related to mental health issues, ***assists in the development of client crisis plans;*** refers individuals to appropriate mental health services; provides follow-up with client as needed. (emphasis added)

(Depo Exhibit 6, p. 1; EB App. 047) (Emphasis added).

**RESPONSE: Admitted as to the content of the written job description, which speaks for itself, but denied insofar as it is inconsistent with sworn testimony provided in this case and the actual job requirements, as explained by Scott Thomas's supervisor, Monica Van Horn:**

> **Q: Is there anything on [the Jail Diversion Case Manager Job Description] that you can identify as being inaccurate, outdated, or antiquated in any way?**
> **A: I don't believe Scott coordinates referrals for precommitment screenings. And he doesn't develop client crisis plans.**
> **Q: Would he have a role in assisting in the development of client crisis plans?**
> **A: Not that I know of.**

**Deposition of Monica Van Horn, p. 42; ln. 20–p. 43; ln. 8.**

> **Furthermore, Scott Thomas testified:**
>
> **• Coordinating precommitment screenings was not part of the job.**
> **• Responding to calls from law enforcement personnel related to mental health issues, assists in the development of client crisis plans referred to a different aspect of the position that was no longer part of the job in 2020.**

**Deposition of Scott Thomas, p. 32–33.**

37.   Pursuant to the Job Description, Thomas was also required to complete "all annual education and competency requirements as required." (Depo Exhibit 6, p. 2; EB App. 048).

**RESPONSE: Admitted as to the content of the written job description, which speaks for itself.**

38.   According to Thomas' immediate supervisor, Monica Van Horn ("Van Horn"), Thomas' job description required him to meet with inmates in the jail and "screen for any current presentations of mental health symptoms to see if they needed mental health care while in jail." (Van Horn Depo., p. 25, lines 3-10; App. A140).

**RESPONSE: Denied. Van Horn's testimony was not regarding the requirements of Thomas's job description. Rather, Van Horn's testimony was in response to a question regarding "the purpose of meeting with those inmates at the jail . . ." (Van Horn Depo., p. 25, lines 3-10; Pls' App. A140).**

39.    Thomas' role was to ask questions to find out "what's going on presently" which Van Horn explained included "seeing kind of what is going with folks in terms of current distress levels and different presentation of maybe depressive symptoms, anxiety symptoms, things like that." (Van Horn Depo., p. 27, lines 13-24; App. A141).

**RESPONSE: Admit that paragraph 39 generally paraphrases the cited testimony.**

40.    Thomas describes his job responsibilities to include: "*to screen individuals for possible mental health concerns* and discuss options for services and then refer to services." (emphasis added) (Thomas depo, p. 28, lines 4-6; App. A077).

**RESPONSE: Admit.**

41.    He has explained: "It's, it's a routine part of my job to come to this jail on a regular basis to meet with all inmates that stay here more than a day or two to do a mental health scree, and to assess them for needs for services." (Thomas June 12, 2020, Interview, p. 2 lines 15-18; App. A105.)

**RESPONSE: Admit that paragraph 41 accurately quotes the cited testimony.**

42.    When asked by an investigator what he did for the screening, Thomas responded in part: "I do a, what I typically use is a brief jail mental health screen on an individual which consists of eight basic questions … So, I do the basic screen with them to, to assess whether there is any type of a need or a concern there." (Thomas June 12, 2020, Interview, p. 3 lines 6-8 and 13-15; App. A106 )

15

**RESPONSE: Admit that paragraph 42 accurately quotes the cited statement.**

43.  For inmates at the Madison County Jail to obtain any mental health services, they had to go through Thomas first.  (Thomas depo, p. 52, lines 18-21; App. A087)

**RESPONSE: Admitted to the extent that Thomas coordinated services with Madison County Jail's contracted mental health services provider—which is not Eyerly-Ball—for services to be rendered to inmates within the Madison County Jail, but disputed to the extent that other mental health services were available, including by transporting inmates to the Madison County Hospital.**

**Deposition of Sheriff Jason Barnes, p. 95; ln. 2–14:**

**Q: Were there other resources available?**

**A: Yes.**

**Q: What were they?**

**A: Madison County hospital. We'd take them down there and have them talk to a psychiatrist via internet down there too.**

44.  Thomas has a bachelor's degree in sociology.  (Thomas depo, p. 8, lines 1-2; App. A069).

**RESPONSE: Admitted.**

45.  Thomas does not hold any professional certifications or licenses of any kind. (Thomas depo. p. 9, lines 19-24; App. A070).

16

**RESPONSE: Disputed. Thomas testified that he does not hold any professional licenses or certifications "specific to the field of mental health or human services." Thomas does hold various certifications in the area of suicide risk prevention and intervention. (Defs' SOF, ¶ 21-25).**

46.   According to Van Horn, Thomas could perform a Columbia Suicide Screening which is a screening tool for suicide risk.  (Van Horn depo., p. 31, lines 14-17; App. A144).

**RESPONSE: Admit that Van Horn testified Thomas could perform a Columbia Suicide Screening. However, Van Horn further testified that: "We haven't used them in Scott's position traditionally, because he's not – that's not some of the information he's trying to gather. He's not doing those suicide risk assessments. He's really just, like I said, kind of trying to, first off, get a person's interest in mental health treatment and kind of identify that initial ongoing need for mental health services to then get them set up." (Van Horn Dep. 32:1-8; Pls' App. at A146).**

E.   **Madison County Reliance on Eyerly Ball and Thomas**

47.   Pursuant to their Agreement with CICS, Eyerly-Ball was obligated to ensure that "[a]t all times, Provider and the providers it employes or contracts with to provide services to CICS individuals shall have all necessary licenses and certifications to perform the Covered Services." (CICS Contract, EB30; App. A044).

**RESPONSE: Admitted. The document speaks for itself.**

48.   Although Thomas was not licensed as a mental health professional of any kind, Thomas was the sole provider for mental health care and sole Eyerly- Ball employee

to see inmates at Madison County Jail. (Barnes depo, pp. 103-104, lines 19 – 04; App. A125-A126)

**RESPONSE: Disputed. Barnes testified that Thomas was "really the only one I know. I'm sure they have more employees, but he's really the only one I've ever dealt with or seen in our jail." (Barnes depo, pp. 103-104, lines 19 – 04; Pls' App. A125-A126). Further, Professionals from ITP provided mental health services such as psychiatric evaluations to inmates at the Madison County Jail pursuant to contract. (Defs' SOF, ¶¶ 39-41).**

49.   If Madison County had an inmate in their jail that was having a mental crisis or an issue or needed assistance of some type mentally, Madison County could contact Eyerly-Ball.  (Barns Depo, p. 94, lines 14-18; App. A120).

**RESPONSE: Admit that paragraph 49 generally paraphrases the cited testimony. Further, Professionals from ITP provided mental health services such as psychiatric evaluations to inmates at the Madison County Jail pursuant to contract. (Defs' SOF, ¶¶ 39-41).**

50.   When mental health assistance was requested by Madison County, Eyerly-Ball would send Scott Thomas. (Barns Depo, p. 94, line 17; App. A120).

**RESPONSE: Disputed. Barnes testified that Eyerly-Ball would send Scott Thomas "or whoever they had working." (Barns Depo, p. 94, line 17; Pls' App. A120).**

51.   Barnes understood that Eyerly-Ball was there to help inmates who were having mental health crises.  (Barnes Depo, p. 98, lines 9-11; App. A121).

**RESPONSE: Admit that paragraph 51 generally paraphrases the cited testimony.**

52.   Barnes and Madison County Jail relied on Eyerly-Ball as it related to mental health of inmates.  (Barnes Depo., p. 100, lines 20-25; App. A122).

**RESPONSE: Admit that paragraph 52 generally paraphrases the cited testimony.**

53.   When Madison County would call Eyerly-Ball it was Jail Administrator Niblo's understanding that Thomas and Eyerly-Ball would "provide mental health services."  (Niblo depo, p. 43, lines 22-25; App. A161).

**RESPONSE: Admit that paragraph 53 generally paraphrases the cited testimony.**

54.   Madison County would comply with any professional recommendations related to the mental health of an inmate provided by Eyerly-Ball. (Barnes Depo., p. 101, lines 3-7 &14; App. A123).

**RESPONSE: Admit that paragraph 54 generally paraphrases the cited testimony. However, Thomas does not make recommendations to the jail staff, nor does he have any authority to direct the jailers. (*See* Defs' SOF, ¶¶ 15-17).**

55.   When Madison County contacted Eyerly-Ball with a mental health need, they would send Scott Thomas to assist.  (Barns Depo., p. 103, lines 19-22; App. A126)

**RESPONSE: Admit that paragraph 55 generally paraphrases the cited**

testimony.

56.   It was Barnes' understanding that when a mental health need arose and Eyerly-Ball was contacted, Thomas would "come in and meet with the inmate, and then they would make a determination what the best move is from this point on." (Barnes Depo., p. 104, lines 7-10; App. A127).

**RESPONSE: Admit that paragraph 56 generally paraphrases the cited testimony.**

57.   Barnes was led to believe that Thomas was in a position to evaluate or at least make a preliminary assessment of the inmates' mental health conditions and suicide risk. (Barnes Depo., p. 104, lines 11-15; App. A127).

**RESPONSE: Denied. Barnes simply agreed that he "believe[d] that Thomas was in a position to evaluate or at least make a preliminary assessment of the inmates' mental health conditions." He never testified that he was "led" to believe anything. Further, he did not testify as to "suicide risk." (Barnes Depo., p. 104, lines 11-15; Pls' App. A127).**

58.   Thomas would screen inmates, including Jordan Payne's "mental state." (Niblo depo, p. 39, lines 15-16; App. A160).

**RESPONSE: Admit that paragraph 58 generally paraphrases the cited testimony. However, the testimony is incomplete. Niblo testified that Thomas would screen and evaluate Payne for "his mental state, if he needed an ITP appointment." (Niblo Dep. 39:15-21; Pls' App. at A160).**

20

59.   According to Weakland, Eyerly-Ball was "our contact for any mental health problems." (Weakland depo, p. 25-26, lines 025-02; App. A150-A151).

**RESPONSE: Admit that paragraph 59 correctly quotes the cited testimony. However, Professionals from ITP provided mental health services such as psychiatric evaluations to inmates at the Madison County Jail pursuant to contract. (Defs' SOF, ¶¶ 39-41).**

60.   Weakland understood Thomas' role to be evaluating Jordan Payne's "mental health." (Weakland depo, p. 27, lines 12-18; App. A152).

**RESPONSE: Admit that paragraph 60 generally paraphrases the cited testimony.**

61.   If Thomas identified concerning behaviors or statements, especially those considered to be elevated risk factors for suicide, Barnes expected those concerns to be communicated to him and jail staff. (Barnes Depo., p. 105, lines 10-14; App. A128).

**RESPONSE: Admit that paragraph 61 generally paraphrases the cited testimony.**

62.   Barnes expected Thomas to communicate to him and his jail staff if he identified any concerning behaviors or statements that could be considered elevated risk factors for Jordan. (Barnes depo, p. 105, lines 15-23, p. 106, lines 14- 20; App. A128-A129).

**RESPONSE: Admit that paragraph 62 generally paraphrases the cited testimony.**

63.    Having Eyerly-Ball as a contracted mental health provider, Barnes expected effective communication back from Eyerly-Ball. (Barnes Depo., p. 106, lines 10-13; App. A129).

**RESPONSE: Admit that paragraph 63 generally paraphrases the cited testimony.**

64.    Such communication was part of Madison County's agreement with Eyerly-Ball. (Barnes Depo., pp. 105-106; App. A128-A129).

**RESPONSE: Denied. Barnes' testimony was in response to a question regarding whether such communication was "kind of" part of the agreement. (Barnes Dep. 105:24 – 106:4; Pls' App. at A128-129).**

65.    If an Eyerly-Ball employee identified an inmate as an elevated suicide risk, Barnes expected them to share that information with him so that he could do his best to keep that inmate safe.  (Barnes Depo., p. 106, lines 14-24; App. A129)

**RESPONSE: Denied. Barnes testified that he expected such information to be shared with him "so we could do out best at providing and making sure." Barnes did not testify that it was to keep inmates safe. (Barnes Depo., p. 106, lines 14-24; Pls' App. A129).**

66.    Barnes recognized that it is hard to take action to protect an inmate if that information is withheld.  (Barnes Depo, p. 106-107, lines 25-03; App.A129- A130)

**RESPONSE: Admit that paragraph 66 generally paraphrases the cited testimony.**

67.   If alerted to an inmates elevated suicide risk, Madison County would place the inmate under direct observation and take away anything that they could hurt themselves with. (Barnes Depo, p. 108, lines 2-9, and 19-22; App. A131)

**RESPONSE: Denied. Barnes' testimony was qualified by stating, "depending on how they're going to do this, do they have a plan?" (Barnes Dep. 108:2-9; Pls' App. at A131).**

**F.      Professional Standard of Care.**

68.   Plaintiffs have designated Dr. Joseph V. Penn, MD CCHP FAPA, a physician who is Board Certified in General Psychiatry, Forensic Psychiatry, Child and Adolescent Psychiatry and who is a Diplomate with the American Board of Psychiatry and Neurology as an expert who will opine on the standard of care for the medical and mental health care providers, Scott Thomas and Eyerly-Ball's failure to comply with the basic minimum standards of care as it relates to Jordan and the causal connection between Thomas and Eyerly-Balls' failure to comply with the applicable standards and the resulting preventable death of Jordan. (Plaintiffs Designation of Experts, p. 2, App. A189)

**RESPONSE: Admit. The Designation of Experts speaks for itself. However, Dr. Penn has not expressed an opinion on causation in this matter. (Defs' SOF, ¶ 53; Dr. Penn Report; App. at 091-122).**

69.   Dr. Penn is the Director of Mental Health Services for University of Texas

Medical Branch, Correctional Managed Care and is also a Clinical Professor of Psychiatry in the Department of Psychiatry and Behavioral Sciences, at the UTMB Medical School in Galveston Texas.  (Penn CV, p. 3; App. A197).

**RESPONSE: Admit.**

70.    Within his position as the Director of Mental Health Services for UTMB Correctional Managed Care, Dr. Penn oversees the provision of psychiatric, psychological and mental health services of approximately 80% of the entire Texas state jail and state adult prison populations house within the Texas Department of Criminal Justice facilities. (Penn Initial Report, p. 2; EB App., 092)

**RESPONSE: Admit.**

71.    According to Dr. Penn, "[t]he standard of care for the evaluation and treatment of a patient such as Jordan Payne in a jail setting is timely access to quality mental health treatment and services and suicide prevention practices for custody and health care staff."  (Penn Initial Report, p. 29, ¶ 1; EB App., 119).

**RESPONSE: Admit that paragraph 71 accurately quotes the report.**

72.    Dr. Penn further explained the standard of care that "whether a county jail directly provides medical or mental health services, or as in Madison County Jail, where the jail contracted with an outside community mental provider for mental health services (e.g., Eyerly Ball) – it is the standard of care that timely mental health evaluation and screening be available and provided."  (Plaintiffs' Second Supplemental Initial Disclosures, Attachment E, Penn Sup. p. 4, ¶ 3; App. A224).

**RESPONSE: Admit that paragraph 72 accurately quotes the statement.**

73.  According to the National Commission on Correctional Health Care (NCCHC) Jail Standards all custody and health care staff should receive ongoing education on suicide prevention practices.  (Penn Sup. P. 6, ¶ 9; App. A228).

**RESPONSE: Admit that paragraph 73 generally paraphrases the statement.**

74.  "[W]hether Eyerly Ball did nor did not render "mental health treatment or evaluations," as mental health system and professionals they had a professional and ethical duty to take additional precautions prior to any clinical involvement with any Madison County jail inmate.  In particular they had a duty to instruct, train and explain to their case manager/jail diversion staff that they had an ethical and clinical duty to communicate in a timely manner at all times with jail staff, the appropriate course of action to safely deal with any inmates who they learned of or during the course of any meeting had suicide risk, suicidal ideation, intent or plan, or posed any acute or non-acute risk of self-harm." (Penn Supp, p. 7; App. A230).

**RESPONSE: Admit that paragraph 74 accurately quotes the statement.**

75.  As the contracted mental health provider, Eyerly Ball was obligated to make it clear to Madison County Jail staff that Thomas was not qualified and did not and will not perform mental health evaluations or assessments or evaluate inmates for potential suicide concerns.  They were obligated to make it explicitly clear that his role was solely for case management and jail diversion purposes. (Penn Sup. p. 7, ¶12; App. A230)

**RESPONSE: Admit that paragraph 75 generally paraphrases the statement.**

25

76.   "[A]t a minimum, given Scott Thomas' role as being the only individual from Eyerly Ball to set foot in the Madison County Jail, and his admission to at least assessing individuals for determination of potentially appropriate services, and due to the well-known risk of suicide attempts and completed suicide within correctional settings, and in particular in jail settings, Mr. Thomas should have received mandatory and ongoing training on basic suicide prevention practices and procedures." (Penn Sup. p. 8; App. 231).

**RESPONSE: Admit that paragraph 76 accurately quotes the statement. Additionally Thomas did receive mandatory and ongoing training on basic suicide prevention practices and procedures. (Defs' SOF, ¶¶ 20-25).**

77.   "[A]ny individual who carries out any ongoing or substantive work in a jail that interacts with inmates should receive/be trained in basic suicide prevention practices/procedures. This important public health and safety initiative is also clearly stated and emphasized in the State of Iowa Administrative Code…" (Penn Sup. p. 8; App. 231).

**RESPONSE: Admit that paragraph 77 correctly quotes the statement. Additionally, Thomas did receive mandatory and ongoing training on basic suicide prevention practices and procedures. (Defs' SOF, ¶¶ 20-25).**

78.   "Eyerly Ball should have had the ability to facilitate having a qualified and licensed mental health professional respond to the Madison County Jail in a more timely manner and to evaluate Mr. Payne. In summary, Scott Thomas was the only person ever to come to the Jail – Mr. Payne clearly required the skill set, qualifications and expertise of a qualified mental professional. In my professional opinion, Eyerly Ball should have

maintained more timely crisis/emergency clinical services to facilitate an emergency mental health evaluation by a qualified mental health professional without requiring an initial meeting with Mr. Thomas." (Penn Sup., p. 5; App. 228)

**RESPONSE: Admit that paragraph 78 correctly quotes the statement.**

79.   "Eyerly Ball as Mr. Thomas' employer should have set expectations by policies, procedures and practices that Mr. Thomas and other similarly situated case managers/jail diversion staff be appropriately trained, receive additional new employee and annual or similar established frequency training and therefore be better trained and qualified to identify recognized suicide risk factors (that elevate a jail inmates risk of suicide) and be trained on how to assess, evaluate, manage and how to communicate and work more effectively with jail/custody staff to reduce suicide risks." (Penn Sup., p. 6 ¶ 8; App. 229)

**RESPONSE: Admit that paragraph 79 correctly quotes the statement.**

80.   Thomas should have been trained and received supervision by Eyerly Ball staff and leadership to NOT make statements that an inmate "will be ok" or that he was otherwise NOT a suicide risk when he was not qualified to make such determinations. (Penn Sup., p. 8 ¶¶ 14 & 15; App. 231).

**RESPONSE: Admit that paragraph 80 generally paraphrases the statement. However, Thomas did not make any statements that Payne "will be ok" or that he was otherwise NOT a suicide risk. Thomas testified that "I let [Weakland] know that Jordan had specifically told me on more than one occasion that he was not going to hurt himself in custody, but he was not sure what would happen when he**

27

**left." (Thomas Dep. 73:2-5; Defs' App. at 020).**

81.    Even if Thomas was, as Eyerly Ball contends, only providing Jail Diversion and /or Intensive Case Management services, "Eyerly Ball was still under an existing contract and understanding with Madison County Jail and Sheriff's Department and had a duty and obligation to provide timely crisis services and a crisis psychiatric evaluation. The Madison County Sheriff's Department relied on the recommendations from Mr. Scott Thomas regarding his mental health needs and custody supervision to protect him from self—harm and suicide." (Penn Sup Rpt., p. 3 ¶ 1(c); App. A226)

**RESPONSE: Admit that paragraph 81 correctly quotes the statement.**

**G.    Eyerly-Ball Failure to Train Thomas**

82.    Eyerly-Ball's certification with CARF International requires employees to receive annual specific training related to suicide prevention or intervention.  (Van Horn depo, p. 17, lines 20-25 & p.18, lines 1-14; App. A138 – A139).

**RESPONSE: Admit.**

83.    While Eyerly-Ball was contracted to provide mental health services to incarcerated inmates, Monica Van Horn, director of Eyerly-Balls crisis service department under which the jail diversion programs fall, did not have any knowledge regarding statistics related to inmate suicides.  (Van Horn depo, pp. 9, lines 5-9 & p.28, lines 9-13; App. A134, A143).

**RESPONSE: Admit that paragraph 83 generally paraphrases the cited testimony.**

28

84.     Eyerly-Ball as a community mental health provider appreciates the risk of suicide and further understands that it is important for everyone to be aware of risk factors for suicide. (Van Horn Depo, pp. 13-14, lines 21-04; App. A135- A136).

**RESPONSE: Admitted to the extent that Monica Van Horn testified "I think it's important for everyone to be aware of risk factors for suicide," but otherwise denied, including insofar as Plaintiffs attempt to misstate the detail and scope of Ms. Van Horn's testimony.** *See* **Deposition of Van Horn, p. 14; ln. 3–4; Pls' App. at A135-136.**

85.     Van Horn was aware that suicide is the ninth leading cause of death in Iowa but was unaware that it is the leading cause of death in correctional institutions.  (Van Horn depo, p.28, lines 19-24; App. A143).

**RESPONSE: Admitted.**

86.     Despite the statistics, Van Horn, as the supervisor of the Eyerly-Ball jail diversion programs did not believe it was important for Thomas to have an understanding of the peculiar risk factors of suicide that are applicable to incarcerated individuals. (Van Horn depo, pp. 30-31, lines 10-03; App. 144-145).

**RESPONSE: Denied. Plaintiffs misrepresent and mischaracterize Ms. Van Horn's testimony. She testified, "I think it's important for everyone to have a basic working knowledge of risk factors of suicide, but it's really not Scott [Thomas]'s role in there to be doing suicide risk assessments. We're really trying to get him to be**

29

**kind of that connection for folks to those other services." and repeatedly explained to Plaintiffs' counsel that "Scott [Thomas] isn't really providing those mental health services, per se. I think information is always good, but I don't think that changes his process at all." Deposition of Van Horn, p. 29; ln. 9–12; p. 30; ln.23–p. 31; ln. 3; Pls' App. at A144-145.**

87.    Van Horn denied that knowledge of those risk factors by Thomas would change what he does.  (Van Horn depo, p. 30 & 31, lines 23-03; App. A144 - A145).

**RESPONSE: See response to paragraph 86.**

88.    Van Horn considers the National Alliance for Mental Illness a governmental agency or authority that would be a reliable source in identifying and describing recognized factors that increase a person's risk of suicide.  (Van Horn Depo, p. 16, lines 5-15; App. A137).

**RESPONSE: Admit.**

89.    For suicide prevention, the quicker concerns are addressed the better. (Van Horn Depo, p. 17, lines 13-15; App. A138).

**RESPONSE: Admitted to the extent consistent with Van Horn's testimony, but disputed to the extent Plaintiffs make this assertion, generally, as it is unsupported by the record.**

90.    Early identification or diagnosis is a focal point of suicide prevention. (Van Horn depo, p. 17, lines 16-19; App. A138).

**RESPONSE: Admitted to the extent consistent with Van Horn's testimony, but disputed to the extent Plaintiffs make this assertion, generally, as it is unsupported by the record.**

91.    Despite Eyerly-Ball's services verbalized concern with suicide prevention and intervention, Thomas has not received any training related to identifying individuals who may be at greater risk of suicide. (Thomas depo, p. 26, lines 8 – 10; App. A075).

**RESPONSE: Denied. Thomas testified that he does not recall any specific training related to identifying individuals who may be at a greater risk of suicide. However, the record reflects that he received extensive training and certification in suicide prevention and crisis intervention. (Defs' SOF, ¶¶ 20-25).**

92.    Thomas' precise sworn testimony was as follows:

Q.            (By Mr. Rehkemper)  Has Eyerly Ball ever provided you with any specific training related to identification of individuals who may be at greater risk of suicide?
A.            I don't recall having that kind of training.
Q.            Have you ever received any of that type of training from any other entity or agency?
A.            Can you say the parameters again, please?
Q.            Any training related to identifying individuals who may be at greater risk of suicide?
A.            I don't recall anything specific.

(Thomas depo, pp. 25-26, lines 24 – 04; App. A074-A075).

**RESPONSE: Admit.**

93.    Thomas had not received any training, certifications, or instruction, prior to June 12, 2020, related to individual, relationship, community, or societal factors that are recognized as increasing an individual's risk of self-harm and/or suicide.  (Scott Thomas Answer to Interrogatory 6; App. A179).

31

**RESPONSE: Admit to the extent consistent with the Interrogatory response. The response further provides that "I have obtained training from the Crisis Prevention Institute (CPI) and from LivingWorks on issues related to self-harm and suicide." (Scott Thomas Answer to Interrogatory 6; Pls' App. A179). Further, the record reflects that he received extensive training and certification in suicide prevention and crisis intervention. (Defs' SOF, ¶¶ 20-25).**

94.  Neither Eyerly-Ball nor Thomas have produced in discovery, any documentation or materials for any training Thomas received while employed at Eyerly-Ball.  (Thomas & Eyerly-Ball's Response to Plaintiffs' First Request for Production of Documents, No. 5; App. A167).

**RESPONSE: Admit.**

95.  Thomas was never asked or required to familiarize himself with Madison County Jail standard operating procedures.  (Thomas depo, p. 51, lines 10 – 13; App. A086).

**RESPONSE: Admit.**

96.  Thomas was not required to familiarize himself with Madison County's written suicide prevention plan.  (Thomas depo, p. 51, lines 14-17; App. A086).

**RESPONSE: Admit.**

97.  Thomas does not hold any professional certifications or licenses specific to the field of mental health or human services.  (Thomas depo, pp. 9-10, lines 25 – 03; App. A070-A071).

**RESPONSE: Admit.**

98.   Thomas is not a licensed mental health provider. (Thomas depo, p. 42, lines 3-5; App. A081).

**RESPONSE: Admit.**

99.   Thomas is not qualified to provide or administer a suicide risk assessment.  (Thomas depo, p. 53, lines 16 – 18; App. A088).

**RESPONSE: Admit.**

100.   Thomas does not even know what a suicide assessment looks like. (Thomas depo, p. 53, lines 19 – 21; App. A088).

**RESPONSE: Admit.**

101.   Prior to June 12, 2020, Eyerly-Ball did not have any standard operating procedures or protocols related to mental health services provided to inmates in county jails. (Thomas & Eyerly-Ball's Response to Plaintiffs' First Request for Production of Documents, No. 2; App. A166).

**RESPONSE: Admit. The full Response provides as follows: "Eyerly-Ball did not provide mental health services to inmates in county jails. Eyerly-Ball's jail diversion program served to connect inmates with mental health evaluations and care via licensed healthcare providers affiliated with Integrated Telehealth Partners ("ITP"). (Thomas & Eyerly-Ball's Response to Plaintiffs' First Request for Production of Documents, No. 2; Pls' App. A166).**

102.   Prior to June 12, 2020, Eyerly-Ball did not have any policies or procedures

related to crisis response, suicide assessments or mental health evaluations and interventions

of inmates of county jails.  (Thomas & Eyerly-Ball's Response to Plaintiffs' First Request for

Production of Documents, no. 6; App. A167-A168).

**RESPONSE: Admit. The full Response provides as follows: "Everly-Ball does not provide crisis response, suicide assessments, or mental health interventions for Madison County and its jail. Eyerly-Ball's services to the Madison County jail are limited to the Jail Diversion program, which include assisting in coordination of mental health services during and after an inmate's incarceration, as was the case with Mr. Payne, who was scheduled for a mental health evaluation and treatment with ITP within 90 minutes of his meeting with Mr. Thomas." (Thomas & Eyerly-Ball's Response to Plaintiffs' First Request for Production of Documents, no. 6; Pls' App. A167-A168).**

103. Monica Van Horn had not trained Scott Thomas at the time of his

interaction with Jordan.  (Van Horn depo, p. 39, lines 4-5; App. A148).

**RESPONSE: Admitted as to Monica Van Horn, personally, and her specific testimony regarding the same.**

104. Thomas is admittedly not qualified to conduct suicide risk assessments or

provide mental health services to inmates. (Thomas depo, p. 53, lines 13-18; App.

A087).

**RESPONSE: Admitted. Again, Eyerly-Ball was *not* contracted to provide mental health services to inmates incarcerated in the Madison County Jail. *See***

34

Deposition of Monica Van Horn; p. 45; ln. 4–9. ("We didn't provide mental health services in the jail, but we did have the jail diversion program."). *See also* Eyerly-Ball's Answers to Plaintiffs' Second Interrogatories (Interrogatory No. 6) , which explained:

> Eyerly-ball and its employees do not provide mental health services or treatment to inmates and the Madison County Jail. The services provided to the Madison County Jail are limited to the Jail Diversion Program, which involves the coordination of mental health services through other providers, particularly after an inmate's release from jail. Eyerly-Ball does not provide mental health treatment or evaluations to inmates, but assists in coordinating services with Madison County and CICS's other contracted providers, including Integrated Telehealth Partners.

### H.    Thomas' Interaction With Jordan

105.   At some point on June 11, 2020, Jordan made a request to speak to mental health services which was communicated to Thomas and Eyerly-Ball at approximately 2:10 p.m. on June 11, 2020. (Scott Thomas e-mails with Madison County, EB26; App. A183)

**RESPONSE: Admit.**

106.   At 11:37 on June 12, 2020, Leslie Payne, Jordan's mother, placed a telephone call to the Madison County Sheriff's Department and spoke to Linda Barker, reporting that Jordan Payne was "going nuts" and was threating to "chew the veins out of his arm." (Leslie Phone Call Audio; App. A066)

**RESPONSE: Admit.**

107.   At 12:21:45, Weakland brought Jordan his medication and asked if he was "ok." Jordan made the following statements:

- "I need to talk to a doctor and it would be better." (12:21:49)

- "I'm just losing it in here." (12:22:04)

- "I'm doing alright, my head is just not right." (12:22:16) (Jail

Check Video; App. A007).

**RESPONSE: Admit. The video speaks for itself.**

108. As a result of concerns for Jordan's mental health, Weaklend set up an appointment for Jordan to see Thomas with Eyerly-Ball. (Weakland Depo, p. 25, lines 25-02; p. 26, lines 12-21; App. A150, A151)

**RESPONSE: Admit that paragraph 108 generally paraphrases the cited testimony.**

109. At 1:30:56, Jordan is removed from his cell and escorted to the Multi- Purpose room by Weakland to meet with Thomas. (Jail Check Video @ 1:30:56; App. A007; Weakland depo, pp. 26, lines 22-25; App. A151).

**RESPONSE: Admit.**

110. When Thomas arrived at the Madison County Jail, Jordan was in an acute mental health crisis and care attendant to the seriousness of that crisis was required. (Penn Report, p. 31; EB App. 121).

**RESPONSE: Admit that paragraph 110 generally paraphrases from the cited report. Denied to the extent that the record lacks evidence that Payne was ever diagnosed with having an "acute mental health crisis."**

36

111. When Thomas arrived at the Madison County Jail, Weakland informed Thomas of the medications Jordan was taking and nothing more.  (Thomas depo, p. 57, lines 2 – 13; App. A090).

**RESPONSE: Denied. During Thomas's interview with Payne, Thomas said Weakland had talked to him about Payne's medications, 1:32:11, but then later said Weakland told him Payne hadn't been eating his meals during Weakland's shift, 1:42:53. [Multi-purpose room video; Pls' App. at A008]. Thomas's testimony was that he only *recalled* discussing Payne's medications with Weakland, but the video shows more than that was discussed. [Thomas Depo. Tr. 57:2–11, Pls' App. at A090; Multi-purpose room video; Pls' App. at A008]. The record is unclear on the extent of what else Weakland may have reported to Thomas.**

112. According to Thomas: "I knew before I went in to meet with him that he was on psychiatric medications… I already know, when I walked in there, that he had mental health concerns, and he was on psychiatric medications."  (Thomas June 12, 2020, Interview, p. 4, lines 2-10; App. A107)

**RESPONSE: Admit that paragraph 112 correctly quotes the cited testimony.**

113. Thomas was aware prior to meeting him that Jordan had specifically requested his services the previous day but chose to wait until the following day when he was already planning to be at the Madison County Jail.  (Thomas depo, p. 59, lines 11-25; App. A091).

**RESPONSE: Denied. Thomas testified: "I believe – my recollection is that I was**

37

**sent an email on the 11ᵗʰ that Jordan wanted to meet with me the next time I was at the jail. That's my recollection." (Thomas depo, p. 59, lines 22-25; Pls' App. A091).**

114. Thomas did not request nor receive any additional information from the Jail such as the information Jordan provided to the jail upon his booking. (Thomas depo, p. 56, lines 11-20; App. A089).

**RESPONSE: Admit that paragraph 114 generally paraphrases the cited testimony. Thomas testified that he doesn't believe he's ever asked for such information about an inmate. (Thomas depo, p. 56, lines 11-20; Pls' App. A089).**

115. Thomas met with Jordan in the Multi-Purpose room of the Madison County Jail.  (Thomas depo, p. 60, lines 12 -13; App. A092).

**RESPONSE: Admit.**

116. Jordan entered the multi-Purpose room at 1:31:22. (Multi-Purpose Room Video, App. A008).

**RESPONSE: Admit. The video speaks for itself.**

117. Thomas made the following introduction:

"I'm Scott from Eyerly-Ball, have you ever heard of Eyerly-Ball before?
… We are a mental health agency… What we do is meet with folks who are in jail here, see if there are any mental health concerns that they have
…. We see if they have any mental health concerns…"

(Multi-Purpose Room Video @ 1:31:38 – 1:32:12; Transcript – Multi Purpose Room, pp. 3-4; App. A008, A011-A012).

**RESPONSE: Admit. The video speaks for itself.**

118.  During the initial portion of their meeting, Jordan made the following

statements:

- I've lost everything.  I've lost my girlfriend, I've lost my house I was going to get, my jeep, I'm going to be homeless when I'm out of here so I'm not doing so well at all. (1:32:40, p. 5, lines 1-4)

- I'm losing everything out there. (1:33:19, p. 5, line 19)

- I gave myself a black eye because I'm hearing these fucking things in my head telling me all sorts of stupid shit, and I'm not trying to listen to it. (1:33:23, p. 5, lines 20-23)

- I'm not in good shape right now. (1:33:34, p. 6, line 3)

- I got my girlfriend just now that thinks I'm cheating on her.  (1:33:36, p. 6 lines 5-6)

- I went to prison and built myself back up and now I'm not doing so well. I'm not doing great.  (1:33:47, p. 6, lines 8-10)

- I got no TV and I'm stuck in a room for weeks, nothing.  I mean I got no no roommate, I got no tv. I got a phone doesn't work. (1:34:09, p. 6, lines 13-16)

- Well, hey, I've got a broken [inaudible] ankle, I've got a broken tailbone too. (1:34:58, p. 7, lines 11-13)

- I'm not normally this way, I don't know what the hell is wrong with me, Scott. I'm not this way at all. (1:35:22, p. 7, lines 23-25)

- I've got one of those Chirp things that you can text back and forth with outside and stuff.  Yeah, right now my girlfriend thinks I cheated on her four weeks ago so I know that's gone. (1:36:19, p. 9, lines 2-9)

- Like, I'm getting these thoughts in my head and shit like that, and the only person I got to talk to was her and all that shit, and I'm afraid that she might just call up here and say, you know, put him on suicide watch and all that shit. I don't [inaudible]. But I got these thoughts in my head that are like: Chew my veins out.  I mean, shit like that.  Like I don't want these thoughts in my head.

(1:36:30, p. 9, lines 6-17)

- Well, I wouldn't say completely sober.  I smoke weed.  I smoke that -- religiously. (1:37:18, p. 10, lines 4-8)

- I went to prison for slitting my wrists (inaudible) called the cops on me. (1:37:56, p. 10, lines 22-23)

**RESPONSE: Admit. The video speaks for itself.**

119.   Less than ten minutes into their conversation, Jordan asked Thomas if what he told him was confidential.  Thomas assured Jordan that anything Jordan told was confidential and could not be shared with anybody absent a lawfully issued subpoena.  (Multi-Purpose Room Video @ 11:40:12, pp. 12-13, lines 23-13; App. A008, A021-A022).

**RESPONSE: Admit. The video speaks for itself.**

120.   Thomas' promise of confidentiality was sealed with a fist-bump and upon securing a promise of confidentiality, Jordan preceded to share the following:

- I've had like seven suicide attempts in the last year, I lost my kids, I lost everything.  I'm not going to kill myself here, but I can't guarantee I won't kill myself when I leave here. (1:40:27, p. 13, lines 15-19)

- I got nothing left anymore, and I don't know – I mean, I can't sleep.  I can't – There's nothing I can do.  I'm sitting here, and just I'm thinking, and I'm hearing shit, and this wont go away, hence the black eye. (1:40:38, p. 13, lines 20-24)

- I'm [inaudible] to kill myself here.  I don't want to.  I'm not going to [inaudible] that … I don't want to kill myself in general [slamming the table], I'm sorry. (1:41:05, p. 14, lines 2-7)

- I'm going insane in there. (1:41:20)

- After I slit my wrist, they brought me here instead of taking me to the hospital … and they chained me to the bed with my bloody wrists. (1:42:20, p. 15, lines 4-8)

- I'm pretty much in solitary confinement, and I did nothing wrong.  I just got

40

here on m-, m-, -- Tuesday. (1:42:40, p. 15, lines 9-12)

- I haven't ate anything. I won't eat anything.  I'm afraid [inaudible] the food.  I haven't ate one meal since I've been here.  (1:42:44, p. 15, lines 9-14)

**Thomas responded** – "That's what John was saying, he was worried you hadn't been eating. He thought maybe you were eating when he wasn't around." (1:42:55)

- I can calm myself down, I just can't keep it calm, does that make sense? (1:44:00, p. 16, lines 9-10)

- Then [inaudible] started fucking slapping myself or start hitting myself. I didn't do this before. What the fudge is happening to me? I'm going insane? (1:44:14; p. 16 Lines 13-16)

- Is it bad? [referring to black eye] Thomas responds, "it's a little purple." (1:48:52, p. 20, line 19)

- I've never done it before, but I just want it to stop. Have you ever had a thought to, like, chew your own veins out of your frickin hand -- or arm? (1:48:54, p. 20, lines 20-23)

- And neither have I. Neither have I. Until now. What the shit? It's just insane [inaudible] crazy in there.  (1:49:08, p. 21, lines 1-3)

(Multi-Purpose Room Video @ 1:40:12 – 1:49:14, App. A008).

**RESPONSE: Admit. The video speaks for itself.**

121. Jordan's speech was fast, rambling and he was visually and auditorily agitated and animated throughout his conversation with Thomas. (Multi-Purpose Room Video, App. A008).

**RESPONSE: Denied. The video speaks for itself and Defendants dispute Plaintiffs' counsel's description of the video.**

122. Thomas identified that Jordan appeared agitated and animated during their meeting. (Thomas depo, p. 64, lines 6 – 11; App. A093).

**RESPONSE: Admit.**

123. Thomas recalled Jordan reporting that he was feeling anxious and

42

depressed as well as relaying psychosis.  (Thomas depo, p. 65, lines 1 – 10; App. A094).

**RESPONSE: Admitted as to Thomas's testimony at p. 65; ln. 1–5, but denied to the extent not contained or supported by the testimony cited by Plaintiffs.**

124. Thomas considered the information communicated to Jordan in that interview to be protected health information "unless I felt that he was a danger to himself or others."  (Thomas depo, p. 68, lines 9 – 18; App. A095).

**RESPONSE: Admit.**

125. During the interview Thomas requested and received information regarding Jordan's medication, medical and mental health history.  (Transcript, Multi-Purpose Room Video, pp. 19, 21-25; App. 028, A030-A034)

**RESPONSE: Admit.**

126. During the interview with Thomas, Jordan signed authorizations for releases of information to allow Eyerly-Ball to communicate information "to law enforcement agencies, providers or agencies who have arranged with the counties or regions to perform related duties on behalf of the counties and regions…" (Exhibit 30, Payne Release, App. A181; Thomas depo, pp. 69-70; App. A096- A097).

**RESPONSE: Admit. The documents speak for themselves.**

**I.** **Thomas' Knowledge of Risk of Harm**

127. Thomas acknowledges that there are recognized factors that increase a

person's risk of suicide in his profession. (Thomas depo, p. 23, lines 10-12; App. A072).

**RESPONSE: Admit.**

128. Thomas recognizes that the following are factors that are recognized in his profession as being risk factors for elevated risk of suicide:

- A history of self-harm is a recognized factor that increases a person's risk of suicide. (Thomas depo, p. 23 & 24, lines 25-02). A family history of suicide is a recognized factor that increases the risk of suicide. (*Id.,* pp. 24, lines 3-8).

- Criminal or legal problems is considered a recognized risk factor for elevated risk of suicide. (*Id.*, pp. 26-27, lines 20 – 03).

- Job loss or financial problems (*Id.*, p. 27, lines 4-5)

- History of depression (*Id.,* line 6-7).

- Substance abuse. (*Id.* line 8-9).

- Sense of hopelessness. (*Id.* line 10-11).

- Loss of relationship or the potential for loss of relationship. (*Id.* at lines 12-14).

- Social isolation. (*Id.* at lines 15-16).

- High-conflict relationships. (*Id* at lines 17-18).

- Conflicts related to sexual orientation. (*Id.* at lines19-20).

(Thomas depo, pp. 23-24, 26-27: App. A072-A073, A075-A076).

**RESPONSE: Admit.**

129. Thomas agrees that the Center for Disease Control would be a government agency that would have reliable information in determining factors that

elevate a person's risk of suicide. (Thomas depo., p. 25, lines 5-14; App. A074).

**RESPONSE: Admit.**

130.  Thomas recognizes that a "serious mental illness" includes "psychosis, severe depression, bipolar disorder, a chronic condition." (Thomas depo, p. 28, lines 17-20; App. A077).

**RESPONSE: Admit.**

**J.    Thomas's Recognized Duty to Communicate**

131.  Thomas recognized that if someone is in custody, there needs to be some disclosure of information, some sharing of information with the custodial agency. (Thomas depo, p. 70, lines 21 – 25; App. A097).

**RESPONSE: Admit that paragraph 131 generally paraphrases the cited testimony.**

132.  If Madison County informed Thomas that they were dealing with a potentially suicidal inmate, Thomas would not decline to assist, but would go to the jail to meet with an inmate to "explore the issues" and "what was going on with them." (Thomas depo, p. 47, lines 9 – 22; App. A082).

**RESPONSE: Admitted to the extent Thomas specifically testified, "if they asked me to come and meet with that inmate at the jail, I would go there. . . . I would meet with them, if they were willing to meet with me, and I would begin to explore the issues regarding the - - you know, what was going on with them. . .**

**. I would notify the jailer on duty immediate after my interview was over, after I left**

**. . . I would not make suggestions, that's not my - -it's not my place to tell the jail**

**what to do in their jail. They have complete autonomy. I don't give them - - I don't**

**give them directives or tell them what to do." Thomas Depo. p. 47; ln. 3–p. 48; ln.**

**11; Pls' App. at A082-083.**

133.   If Thomas identified a concern that the individual may be a danger to

himself, he would notify the jailer on duty immediately after his interview was over.

(Thomas depo, pp. 47 – 48, lines 23 – 04; App. A082-A083).

**RESPONSE: Admitted as to the specific testimony of Scott Thomas,**

**as more fully set out in Response to Paragraph 132, above, and which speaks for**

**itself.**

134.   When asked by an investigator what he was required to do for "people that

would throw the red flag as harming themselves or somebody else" Thomas responded:

"What, what I do in working with the jail is, whoever the jailer is that I'm working with

that day, I, I make sure that they're aware of the conversation that I had of anything that

raises a red flag and of concerns."  (Thomas June 12, 2020, Interview, pp. 10-11, lines

17-02; App. A108-A109)

**RESPONSE: Admit that paragraph 134 correctly quotes the cited**

**testimony.**

135.   If an individual was "checking all the boxes" for suicidal risk factors,

Thomas understood it to be important to relay the information being provided to him

46

by the inmate, to Madison County, to fulfill his job obligations with Eyerly- Ball. (Thomas depo, p. 49, lines 1-18; App. A084).

**RESPONSE: Admit that paragraph 135 generally paraphrases the cited testimony.**

136.   Thomas understood it was important for him to provide jail staff with the information necessary to guide their decision-making.  (Thomas depo., p. 49 & 50, lines 24-23; A084-A085)

**RESPONSE: Admit that paragraph 136 generally paraphrases the cited testimony. However, Thomas does not make recommendations to the jail staff, nor does he have any authority to direct the jailers. (*See* Defs' SOF, ¶¶ 15-17).**

137.   While not qualified to perform assessments or evaluations, Thomas agrees that it is still important to fulfill his job obligations with Eyerly-Ball to communicate information to Madison County if an inmate provided him with information indicating that he was at an elevated risk of suicide.  (Thomas depo, p. 49, lines 14-18; App. A084).

**RESPONSE: Admit that paragraph 137 generally paraphrases the cited testimony.**

138.   Specifically, Thomas testified under oath:

Q.  It would be imperative, in fact consistent with what you are hired and paid to do to forward that information on to the jail, who's ultimately in control of that person's supervision?

A.  Yes.

(Thomas depo, p. 49, lines 19-23)

**RESPONSE: Admit.**

139. Thomas' supervisor, Van Horn also concurred that if an inmate identifies thoughts of self-harm during an interview, it would be important for Thomas to relay that information to the jail.  (Van Horn depo, p. 32, lines 9-16; App. A146).

**RESPONSE: Admit that paragraph 139 generally paraphrases the cited testimony.**

140. According to Van Horn, when presented with a patient who communicates known suicidal risk factors such as psychosis, thoughts of self- harm, prior suicide attempts, nothing to look forward to, Thomas' role would be to set up an ITP appointment but also to then relay and communicate the information, including the identified suicidal risk factors, to the jail.  (Van Horn depo, p. 36, lines 7-18; App. A147)

**RESPONSE: Admit that paragraph 140 generally paraphrases the cited testimony.**

141. Van Horn concedes that Thomas should have relayed any statements of concern to the jail.  (Van Horn depo, p. 39, lines 6-9; App. A147).

**RESPONSE: Denied. Plaintiffs misstate the content and context of Van Horn's testimony, which speaks for itself. First, Van Horn's testimony was in response to a hypothetical and did not refer to Thomas specifically. Further, Van Horn specifically testified:**

48

"Scott [Thomas]'s not doing suicide assessments there in the jail. So he would relay any information of concern on. To the jail. In this case, since he did have that pretty solid safety contract without even being prompted, he would relay any information of concerns, share that during – you know, that it was future-oriented, had agreed to attend that appointment, and then get that appointment set up as quickly as possible." (Van Horn Depo. p. 38; ln. 4–23; Defs' App. at 062).

142. Thomas recognizes that if communication is not adequately made about concerns, it is hard to take action to prevent a tragedy. (Thomas depo, p. 50, lines 10 – 18; App. A085).

**RESPONSE: Admit that paragraph 142 generally paraphrases the cited testimony. However, in this case, the jail already had knowledge about Payne's suicide concerns. (*See* Defs' SOF, ¶¶ 43-49).**

**K.     Thomas' Failure to Exercise Reasonable Care**

143.   Jordan left the multi-Purpose room at 1:53:47. (Multi-Purpose Room Video, App. A008).

**RESPONSE: Admit. The video speaks for itself.**

144.   Upon Jordan's exit from the multi-purpose room nobody asked for assistance in keeping an extra eye on Jordan.  (Henry depo, pp. 48-49, lines 24-02; App. A163-A164)

**RESPONSE: Denied. Henry testified that nobody asked for *her* assistance in keeping an extra eye on Jordan. (Henry depo, pp. 48-49, lines 24-02; Pls' App. A163-A164).**

49

145.   Jordan re-entered the Max Cell, still in an agitated state. (Jail Check Video; App. A007)

**RESPONSE: Admit that Jordan reentered the max cell but dispute Plaintiffs' characterization of Payne's state. The video speaks for itself.**

146.   Following his conversation with Jordan, Thomas informed Weakland that "he was not going to hurt himself in custody, but he was not sure what would happen when he left." (Thomas depo, p. 73, lines 2-5; App. A098).

**RESPONSE: Denied. The full testimony is as follows: "I let him know that Jordan had specifically told me on more than one occasion that he was not going to hurt himself in custody, but he was not sure what would happen when he left." Thomas depo, p. 73, lines 2-5; Pls' App. A098).**

147. Both Thomas and Weakland agree that Thomas did not share any of the concerning statements made by Jordan during Thomas' evaluation of Jordan. (Weakland depo, pp. 32-33, lines 12-06; App. A156-A157).

**RESPONSE: Denied. Weakland specifically testified that he doesn't remember whether Thomas shared any such concerns with him. (Weakland depo, pp. 32-33, lines 12-06; App. Pls' App. A156-A157).**

148. Thomas concedes he did not relay any of the following to jail staff:

- Jordan reported attempting suicide seven times in the prior year.
- Jordan had a history of depression.
- Jordan had a history of severe mental illness.
- Jordan had a current injury that was causing him pain.

- Jordan communicated hearing voices.
- Jordan specifically told him that he thought about eating his veins.
- Jordan reported difficulty sleeping.
- Jordan had a history of substance abuse.
- Jordan communicated a sense of hopelessness or concern that he had nothing left.
- Jordan reported having relationship problems.

(Thomas depo, pp. 77-78; App. A099-A098).

**RESPONSE: Admit. However, the jail was already aware of essentially all of the same information about Payne's suicide concerns. (*See* Defs' SOF, ¶¶ 43-49).**

149. Thomas believed the information about Jordan not hurting himself while in the jail was "important for them to know for caring for him, supervising him." (Thomas depo, p. 73, lines 9-13; App. A098).

**RESPONSE: Admit that paragraph 149 generally paraphrases the cited testimony.**

150. Thomas did not suggest to Weakland or anyone else with Madison County that Jordan's level of supervision should be increased.  (Weakland depo, p. 28 lines 4-6; App. A143; Barnes depo, p. 107, lines 17-19; App. A130).

**RESPONSE: Admit.**

151. Weakland recalls Thomas informing him that there was no concern that Jordan was going to hurt himself.  (Weakland depo, pp. 27-28, lines 23-04; App. A152-A153).

**RESPONSE: Denied. Weakland testified: "I do not recall the specifics of the conversation. I just know that at the time there was no concern that Jordan was going to hurt himself." (Weakland depo, pp. 27-28, lines 23-04; Pls' App. A152-A153).**

152. Based upon his conversation with Thomas, Weakland remembers that he was led to believe that there was not any concern for Jordan's wellbeing or safety. (Weakland depo, p. 34, lines 16-23; App.A157 )

**RESPONSE: Denied. The actual testimony is as follows:**

**Q. You don't recall at all Scott Thomas ever suggesting that a closer eye be kept on Jordan Payne?**

**A. No, I do not remember. No. I'm sorry. I take that back. I do not remember the specifics of the conversation, but I do remember after we spoke that there was not any concern. I did not feel any extra concern for Jordan Payne." (Weakland depo, p. 34, lines 16-23; Pls' App.A157).**

153. As a result of his conversation with Thomas, Weakland returned Jordan to his cell and continued as business as usual with no suicide watch or mitigation efforts being made by Madison County.  (Weakland depo, p. 35, lines 4-7; App. A158 )

**RESPONSE: Denied that any such action on the part of Weakland was "as a result of his conversation with Thomas." No such testimony was provided. (Weakland depo, p. 35, lines 4-7; Pls' App. A158).**

154. Thomas left the jail after the previously mentioned brief conversation with Weakland and scheduled Jordan's ITP appointment for 3:30 that afternoon. (Thomas

depo, pp.80, line 25, p.84, lines 5-7; App. A101, A103).

**RESPONSE: Admit.**

155. Within the ITP appointment request, Thomas did not make any specific request for a suicide assessment even though he could do so. (Thomas depo, p. 82, lines 2 – 5; App. A102).

**RESPONSE: Admit that paragraph 155 generally paraphrases the cited testimony.**

156. "Because Mr. Thomas was not a licensed or qualified mental health professional and therefore not qualified to perform a mental health evaluation nor a suicide risk assessment, it was inappropriate for him to communicate in anyway to John Weakland that Mr. Payne was safe, or had been cleared, or that he did not require any additional custody supervision or a suicide watch and precautions." (Penn Sup., p. 4, ¶ 4; App. ).

**RESPONSE: Admit that paragraph 156 accurately quotes the cited statement. Deny that Thomas communicated to Weakland that Payne was "cleared" or that he did not require any additional custody supervision or a suicide watch and precautions. Specifically, Thomas testified that "I let [Weakland] know that Jordan had specifically told me on more than one occasion that he was not going to hurt himself in custody, but he was not sure what would happen when he left." (Thomas Dep. 73:2-5; Defs' App. at 020).**

157. "In my professional opinion Mr. Thomsas was not trained, supervised,

licensed or otherwise appropriately qualified to provide the requisite/necessary emergency mental health evaluation or suicide risk assessment that Mr. Payne required. He certainly was not qualified to 'clear' Mr. Payne or to provide any other type of verbal or written mental health 'clearance' to jail staff."   (Penn Sup. p. 5, ¶ 6; App. 228 )

**RESPONSE: Admit that paragraph 157 accurately quotes the cited testimony. Deny that Thomas "cleared" Payne. See response to paragraph 156.**

**L.    The Tragic Consequence of Thomas' Silence**

158. Jordan returned to his cell at 1:54:16. (Payne – Post Thomas Meeting Video @ 1:54:16; App. A067).

**RESPONSE: Admit. The video speaks for itself.**

159. Jordan was still agitated and emotional. *Id.*

**RESPONSE: Deny Plaintiffs' characterization of the video. The video speaks for itself.**

160. No increased observation periods were undertaken by Weakland or any member of the Madison County Jail after Jordan was returned to his cell. (Payne – Post Thomas Meeting Video; App. 067)

**RESPONSE: Admit.**

161. Jordan informed Weakland that the phones did not work and "now my girlfriend thinks I'm cheating on her." (*Id.* at 1:54:16 – 1:54:30).

**RESPONSE: Admit.**

162. Weakland told Jordan: "Let me get things finished and I'll come figure out that phone." (*Id.* at 1:54:32).

**RESPONSE: Admit.**

163. That was the last contact that Weakland had with Jordan alive. (*Id.* at 1:54:32 – 3:17:45).

**RESPONSE: Admit.**

164. At 2:01:42, Jordan can be clearly seeing manipulating a towel or sheet with his hands into a noose. (Payne – Post Thomas Meeting Video; App. 067).

**RESPONSE: Denied. The video speaks for itself. It cannot be clearly seen that Payne is making a noose because the door blocks the video of this; the first visual of the noose is at 2:02:06, and it can be seen very briefly as Payne walks over to close it in the jail door and make his first attempt at hanging himself.**

165. At 2:02:05, in full view of the surveillance video cameras, Jordan walks to the interior jail cell door, secures the towel to the interior door, and attempts to lift his head and neck up to where the towel is located. (*Id.*)

**RESPONSE: Admit.**

166. Unable to get his body elevated high enough to get his neck into the noose, Jordan takes the towel down and returns to his bed in a visibly agitated state. (*Id.*)

55

**RESPONSE: Admit.**

167. At 2:03:23, Jordan takes the towel and walks into the shower door and closes the door, all in clear view of the surveillance video cameras. (*Id.*)

**RESPONSE: Admit.**

168. At 2:04:40, an audible "thump" can be heard coming from within the shower, and a reflection or movement can bee seen toward the bottom of the door. Audible gasping is also heard. (*Id.*)

**RESPONSE: Admit.**

169. At 2:05:25 movement is observable again followed by another "thump" sound and "gasping." (*Id.*)

**RESPONSE: Admit.**

170. Weakland is not observable in the area until at 3:17:23 when he enters Jordan's cell, calls his name, opens the shower door, and finds Jordan hanging. (Jail Check Video @ 3:17:23; App. 007).

**RESPONSE: Admit.**

171. Emergency Medical responders were unable to revive Jordan and he was pronounced dead. Cause of death was Suicide, manner of death, hanging. (Report of Autopsy, p. 2; App. A001).

**RESPONSE: Denied. The Report of Autopsy specifically states:**

**"Cause of Death: Hanging. Manner of Death: Suicide. (Report of Autopsy, p. 1;**

**Pls' App. A001).**

    **M.**    **Breach of the Professional Standard of Care.**

    172.  The standard of care was breached by Scott Thomas, Eyerly Ball

Community Mental Health services … because they:

    1) Failed to identify the potential lethality of Mr. Payne's past suicide

       attempts,

    2) Failed to identify and evaluate his changes in mental status, emotional

       lability and clinical instability.

    3) Failed to conduct and document a thorough and clinically indicated

       suicide risk assessment,

    4) Failed to share and communicate vital information regarding Mr. Payne with

       each other in a timely manner and

    5) Failed to conduct a detailed and thorough intake mental health

       assessment/evaluation and implement a suicide prevention plan/treatment

       plan.

(Penn Initial Report, p. 29 ¶ 2; EB App. 119).

    **RESPONSE: Admit that paragraph 172 accurately reflects the cited**

**report. Deny all legal conclusions contained therein.**

    173. Thomas should have provided more timely communication to jail staff.

Thomas "failed to identify and instead minimized the level of severity of Mr. Payne's

suicide risk and accepted his verbal statements at face value without additional clinical inquiry into possible inconsistencies and risk factors." (Penn Initial Report, p. 30; EB App. 120).

**RESPONSE: Admit that paragraph 173 accurately reflects the cited report. Deny all legal conclusions contained therein.**

174. "Because Mr. Thomas was not a licensed or qualified mental health professional and therefore not qualified to perform a mental health evaluation or a suicide risk assessment, it was inappropriate for him to communicate in anyway to John Weakland that Mr. Payne was safe, or had been cleared, or that he did not require any additional supervision or a suicide watch and precautions … Mr. Thomas failed to communicate the need for Mr. Payne to be placed on a suicide watch or increased level of supervision by custody until he could undergo the crisis/emergency psychiatric evaluation. Mr. Thomas did not engage in appropriate and timely communication with jail staff regarding Mr. Payne's emotional lability and risk of self harm even if his role was solely as a jail diversion/case manager and not a qualified mental health professional." (Penn Sup. p. 4 ¶ 4; App. A227).

**RESPONSE: Admit that paragraph 174 accurately reflects the cited report. Deny all legal conclusions contained therein.**

175. "In other words, Scott Thomas should have explained to jail staff that until Mr. Payne could be properly evaluated by a qualified mental health professional that it would be better to err on the side of caution and maintain a higher level of custody

supervision due to his emotional lability and acute clinical status." (Penn Sup., p. 4; App. A227)

**RESPONSE: Admit that paragraph 175 accurately reflects the cited report. Deny all legal conclusions contained therein.**

176. "Thomas was not trained, supervised, licensed or otherwise appropriately qualified to provide the requisite/necessary emergency mental health evaluation or suicide risk assessment that Mr. Payne required.  He certainly was not qualified to "clear" Mr. Payne or to provide any other type of verbal or written mental health "clearance" to jail staff." (Penn Sup., p. 5; App. A228).

**RESPONSE: Admit that paragraph 176 accurately reflects the cited report. Deny all legal conclusions contained therein.**

177. "Thomas' selective communication of Jordan Payne's statement that he wouldn't hurt himself while in jail, while leaving out the fact that Mr. Thomas checked all the elevated risk factor boxes provided the Madison Conty jail staff with a sense of false security that a mental health professional had "cleared" Mr. Payne and found him to be safe and not require a suicide watch and suicide precautions.  Mr. Thomas himself should have known or recognized his background training and qualifications and his role and function and that he should not make statements to this effect if he was not trained or otherwise unqualified." (Penn Sup., p. 8, ¶ 15; App. A231).

**RESPONSE: Admit that paragraph 177 accurately reflects the cited report. Deny all legal conclusions contained therein.**

178. Eyerly Ball failed to adequately train and supervise Thomas and failed to provide Thomas with appropriate clinical supervision or back up. (Penn Initial Report pp. 29-30, ¶ 4; EB App. 119-120).

**RESPONSE: Admit that paragraph 178 accurately reflects the cited report. Deny all legal conclusions contained therein.**

179. Eyerly-Ball failed to identify Jordan's imminent risk for suicide/lethal attempts, failed to conduct suicide risk assessment(s) and implement suicide prevention practices, failed to monitor Jordan's activities and keep him safe, and delayed in providing him timely and appropriate mental health and psychiatric diagnostic evaluation, and psychotropic medications, and did not conduct additional mental health re-evaluation and treatment planning and follow up services respectively.  (Penn Sup. p. 9, ¶ 17; App. A232)

**RESPONSE: Admit that paragraph 179 accurately reflects the cited report. Deny all legal conclusions contained therein.**

**Expert Designations**

180.   Plaintiffs timely designated Dr. Penn. (See ¶ 68).

**RESPONSE: Admit.**

181.   Plaintiffs also designated Dennis Klien, M.D., of the State Medical Examiner's Office who certified Jordan's cause of death to be "Suicide." (Plaintiffs Designation of Experts, p. 3; App. A190)

**RESPONSE: Denied. Dr. Klein states, "His manner of death was suicide. Cause of death, hanging." (Plaintiffs Designation of Experts, p. 4; Pls' App. A191).**

_/s/ Joseph F. Moser_

Jack Hilmes                    (AT0003523)
Joseph F. Moser              (AT0011413)
FINLEY LAW FIRM, P.C.
699 Walnut Street, Suite 1700
Des Moines, IA  50309
Telephone:  (515) 288-0145
Fax:  (515) 288-2724
E-mail:  jhilmes@finleylaw.com
               jmoser@finleylaw.com
ATTORNEYS FOR DEFENDANTS
EYERLY-BALL COMMUNITY MENTAL
HEALTH SERVICES and SCOTT THOMAS

Original filed.

Copy to:

Robert G. Rehkemper
Cory F. Gourley
440 Fairway Drive, Suite 210
West Des Moines, IA 50266
Telephone: (515) 226-0500
Email: rgrehkemper@grllaw.com
cfgourley@grllaw.com

Paul J. Statler
301 East Walnut Street, Suite 7
Des Moines, Iowa 50309
Telephone: 515.288.
Email: paul@statlerlaw.net
ATTORNEYS FOR PLAINTIFFS

Michael C. Richards
Katie E. Anderegg

DENTONS DAVIS BROWN PC
215 10th Street, Suite 1300
Des Moines, Iowa 50309
Telephone: (515) 288-2500
Fax: (515) 243-0654
Email: mike.richards@dentons.com
Email: katie.anderegg@dentons.com
ATTORNEYS FOR DEFENDANTS
JOHN WEAKLAND, JASON BARNES,
AND MADISON COUNTY, IOWA

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing instrument was served upon one of the attorneys of record for all parties to the above-entitled cause by serving the same on such attorney at his/her respective address/fax number as disclosed by the pleadings of record herein, on July 29, 2024 by:

☐ U.S. Mail              ☐ FAX
☐ Hand Delivered         ☐ UPS
☐ Federal Express        ☒ Electronic Filing
☐ Other _____

*/s/ Fonda M. Davis* _____